UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS, INTERNATIONAL UNION,
AFL-CIO-CLC, and UNITED STEEL, PAPER
AND FORESTRY, RUBBER, MANUFACTURING,
ENERGY, ALLIED INDUSTRIAL AND SERVICE
WORKERS LOCAL 4-786,

                Plaintiffs,

     v.                                 Case No.

E.I. DuPONT De NEMOURS AND
COMPANY,

                Defendant.

_____/

**COMPLAINT FOR BREACH OF LABOR CONTRACT
AND TO COMPEL LABOR ARBITRATION**

Come now Plaintiffs United Steel, Paper and Forestry, Rubber,

Manufacturing, Energy, Allied Industrial and Service Workers ("the International

Union") and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

Allied Industrial and Service Workers, Local 4-786, ("Local 4-786"), and complain

against Defendant E.I. DuPont De Nemours and Company ("DuPont").

**Introduction**

1.      This is a suit by labor organizations for breach of a collective bargaining agreement and to compel an employer to process a grievance and participate in the arbitration of that grievance pursuant to the procedure in the parties' collective bargaining agreement which provides for grievances to be discussed in the grievance procedure and resolved by a labor arbitrator in final and binding arbitration.

**Jurisdiction and Venue**

2.      This Court has jurisdiction over this action under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, and under 28 U.S.C. §§ 1331 and 1337.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2).

**The Parties and the CBA**

4.      Plaintiffs are labor organizations representing employees in industries affecting commerce within the meaning of the LMRA, 29 U.S.C. §§142, 152, and 185, and represent employees within this judicial district, including DuPont employees in the collective bargaining unit at DuPont's plant in Edgemoor, Delaware, within this judicial district.  Local 4-786 maintains its principal office in Edgemoor, Delaware.

5.      Defendant DuPont is an employer engaged in an industry affecting commerce within the meaning of the LMRA, 29 U.S.C. §§ 142, 152, and 185, doing business within this judicial district and operating a plant in Edgemoor, Delaware, whose employees include the represented collective bargaining unit.

6.      The International Union and Local 4-786 and DuPont are parties to a collective bargaining agreement applicable to that collective bargaining unit of employees at DuPont's Edgemoor plant consisting of "all employees . . . with the exception of the Administrative Secretary to the Plant Manager, Human Resources Assistant, Technologists (Training, Planning, DCS), Work Leader, Nurses, salary roll employees exempt under the Fair Labor Standards Act, and supervisory employees with the authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees or effectively recommend such action."  Attached hereto as Exhibit A is a true copy of the collective bargaining agreement between the International Union and Local 4-786 and DuPont applicable to this bargaining unit, which collective bargaining agreement has an effective date of May 20, 2006, and is scheduled to expire on May 19, 2009.

7.      Article VI, Section 1 of the collective bargaining agreement states:

"Definition of Grievance.  During the term of this Agreement, a grievance is:  (1) an allegation by an employee or the Union that the Plant has violated an express provision of this Agreement as defined in Section 3 of Article III; (2) any other dispute between the Plant and the Union or employees concerning terms or conditions of employment."

Article VI, Section 2 of the collective bargaining agreement provides for a three-step grievance procedure prior to the submission of a grievance to arbitration.

8.      Article VII, Section 1 of the collective bargaining agreement states:

"Any question as to the interpretation, or any alleged violation, of any provision of this Agreement, as defined in Section 3 of Article III, which is not otherwise settled to the mutual satisfaction of the parties hereto, at the request of either party, shall be submitted to arbitration in the manner provided in Section 2 of this Article."

3

9.    On August 28, 2006, DuPont announced in an e-mail sent to all United States employees various changes in terms and conditions of employment of members of the bargaining unit.  Such changes were to become effective on January 1, 2007, for bargaining-unit members hired on or after that date and on January 1, 2008, for bargaining-unit members hired before January 1, 2007.  A true copy of this announcement is attached as Exhibit B.

10.    On September 14, 2006, Local 4-786 President Mark Schilling and Vice-President Thomas M. Campbell filed Grievance No. 1867.  A copy of Grievance No. 1867 is attached hereto as Exhibit C.  Subsequently, Grievance No. 1867 was amended, and a true copy of the amended grievance is attached as Exhibit D.  The amended grievance, which incorporated the August 28, 2006, announcement, stated in full:

"On August 28, 2006, the Company announced changes in the terms and conditions of employment for actives and new hires in the attached e-mail incorporated herein, sent on that date to U.S. employees from Jim Borel, Senior Vice President – Human Resources.  With respect to actives, the application to such persons of the changes in the Pension and Retirement Plan and Savings and Investment Plan, effective January 1, 2008, violates Article IX, Section 1 of the Collective Bargaining Agreement because such changes are not permitted 'modifications' within the meaning of that article and section.  With respect to new hires hired on or after January 1, 2007, the withdrawal, effective January 1, 2007, of the Pension and Retirement Plan, and the current terms of the Vacation Plan, violate Article IX, Section 1 on two independent and sufficient grounds.  First, these announced changes violate Article IX, Section 1, because such changes are not permitted 'modifications' within the meaning of that Article and Section.  Second, these announced changes involved 'Company Plans and Practices' within the meaning of Article IX, Section 1 and their withdrawal from employees covered by this agreement, on and after January 1, 2007, violates Article IX, Section 1 because such Plans and Practices remain 'in effect within the Company.'  In addition, with respect to new hires hired on or after January 1,

4

2007, the withdrawal of the subsidies for retiree health care (medical and dental) violates Article IX, Section 3 of the Collective Bargaining Agreement.

Remedy:  Cease and desist from making the announced changes.

It is requested that the processing of this grievance, which has been filed as a precautionary measure, be held in abeyance pending the Company's response to the Union's pending information request."

11.    On September 26, 2006, DuPont, in its First Step Response to the grievance, inter alia, "agree[d] to suspend the grievance submission time limits (Article VI, Section 1 of the Collective Bargaining Agreement)" until a pending Union information request had been sufficiently answered.  A true copy of DuPont's First Step Response is attached as Exhibit E.

12.    On January 25, 2007, DuPont Human Resources Consultant Frank Ingraham provided a memorandum, bearing that date, to Local Union President Schilling.  In that memorandum, DuPont refused to process Grievance No. 1867 through the grievance and arbitration procedure and stated that "DuPont is not contractually obligated to submit the above-referenced grievance to arbitration, and DuPont hereby refuses to submit the disputes to arbitration."  A true copy of this memorandum is attached as Exhibit F.  In that same memorandum, Mr. Ingraham asserted that any claim by the Union or an individual must be submitted to the internal plan review procedures established pursuant to ERISA, which procedures designated DuPont as the final decision maker.

13.    On February 8, 2007, United Steelworkers Senior Associate General Counsel Richard J. Brean sent a certified letter to Mr. Ingraham.  A true copy of this letter is attached as Exhibit G.  In the letter, Mr. Brean stated that

"The grievance is clearly arbitrable under the broadly worded arbitration clause of the CBA pursuant to §301 of the Labor Management Relations Act and is not subject to any exhaustion requirement applicable to individual eligibility claims under ERISA" and further stated that unless DuPont provided written notice within 10 days of the date of the letter that it had agreed to resume processing the grievance that suit would be brought in Federal District Court to compel it to do so.

14.    On February 28, 2007, DuPont Corporate Counsel Laura H. Huggett faxed a letter to Mr. Brean, dated February 27, 2007, a true copy of which is attached as Exhibit H.  In that letter, Ms. Huggett reiterated DuPont's refusal to process the grievance to arbitration, stating that "DuPont does not believe the Union's grievances are arbitrable because they inevitably involve benefit eligibility determinations that must be resolved under the claims procedures set forth in the specific ERISA benefit plans under which eligibility for benefits is being asserted or in a civil action under ERISA."  She did so notwithstanding that DuPont in her letter disputed the arbitrability under the terms of the collective bargaining agreement of only that limited portion of the grievance involving a dispute under either the Medical Care Assistance Plan or the Dental Assistance Plan.

**DuPont's Breach and This Suit to Compel Arbitration**

15.    By refusing to process Grievance No. 1867 through the grievance procedure and to further process the grievance to arbitration, DuPont has breached and continues to breach the collective bargaining agreement since Grievance No. 1867 is both grievable and arbitrable under the provisions of Article VI, Section 1 and Article VII, Section 1 of the collective bargaining agreement.

16.    By refusing to cooperate or participate in the processing and arbitration of the grievance and breaching the collective bargaining agreement, DuPont is undermining the collective bargaining relationship and causing harm and damage to the International Union and Local 4-786 and represented employees in the collective bargaining unit.

17.    The claims set forth the in Grievance No. 1867 are not subject to any internal plan review procedures established pursuant to ERISA.

18.    The Union and Local 4-786 ask that this Court find DuPont to be in breach of the collective bargaining agreement and compel DuPont to process Grievance No. 1867 through the grievance procedure and arbitrate said grievance.

WHEREFORE,  Plaintiffs International Union and Local 4-786 pray that this Court:

1.    Enter judgment in their favor and against Defendant DuPont, finding that DuPont breached and continues to breach the collective bargaining agreement;

2.    Compel DuPont to process Grievance No. 1867 through the grievance procedure and arbitrate said grievance in compliance with the collective bargaining agreement;

3.    Direct DuPont to pay the attorney fees and costs incurred by the International Union and Local 4-786 in prosecuting this lawsuit; and

4.    Award such other relief as law, equity, and circumstances may warrant.

Susan E. Kaufman (DSB #3387)
Heiman, Gouge & Kaufman, LLP
800 King Street, Suite 303
P.O. Box 1674
Wilmington, DE  19801
Phone:  (302) 658-1800
Fax:  (302) 658-1473
E-mail:  skaufman@hgkde.com

Attorney for Plaintiffs
United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International Union,
AFL-CIO-CLC, and United Steel, Paper and
Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
Local 4-786

Dated:  March 1, 2007

# EXHIBIT A

# AGREEMENT

between

## E. I. du Pont de Nemours and Company

and

## UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION (USW) AND ITS LOCAL 4-786

at

## Edge Moor, Delaware

May 20, 2006

to

May 19, 2009

DMEAST #3147359 v5

## *Table of Contents*

| *Article* | *Description* | *Page* |
|---|---|---|
| | Agreement | 2 |
| ARTICLE I | Purpose of Agreement | 1 |
| ARTICLE II | Definitions | 1 |
| ARTICLE III | Recognition and Scope | 3 |
| ARTICLE IV | Management Responsibilities | 4 |
| ARTICLE V | Deduction of Unions Dues | 6 |
| ARTICLE VI | Grievance Procedure | 6 |
| ARTICLE VII | Arbitration | 9 |
| ARTICLE VIII | Discharge | 10 |
| ARTICLE IX | Industrial Relations Plans and Practices | 11 |
| ARTICLE X | Seniority | 12 |
| ARTICLE XI | Hours of Work and Overtime Premiums | 14 |
| ARTICLE XII | Holiday Pay | 27 |
| ARTICLE XIII | Wages | 32 |
| ARTICLE XIV | Miscellaneous Provisions | 34 |
| ARTICLE XV | Bulletin Boards | 42 |
| ARTICLE XVI | No Strike And No Lockout | 42 |
| ARTICLE XVII | Bump & Bid Procedure | 43 |
| ARTICLE XVIII | Performance Based Compensation For DuPont Edge Moor Non-Exempt Employees | 49 |
| ARTICLE XIX | Union Business | 51 |
| ARTICLE XX | Progressive Discipline | 54 |

ARTICLE XXI     Substance Use/Abuse Procedure                                    63

ARTICLE XXII    Scope of The Agreement                                           92

                Supplemental Agreement No. 1                                     95

                Appendix A – Additional Supplemental Agreements                  98

                Appendix B – Grievance Forms                                     107

                Index                                                            —

## AGREEMENT

Effective the 20th day of May, 2006 by and between E. I. DU PONT DE NEMOURS AND COMPANY, INC., on behalf of its Edge Moor Plant, Edgemoor, Delaware, hereinafter referred to as the Plant or Management, and the UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION (USW) AND ITS LOCAL 4-786 , Edgemoor, Delaware, hereinafter referred to as the Union, acting for and on behalf of itself and of all employees of the said Edge Moor Plant with the exception of the Administrative Secretary to the Plant Manager, Human Resources Assistant, Technologists (Training, Planning, DCS), Work Leader, Nurses, salary roll employees exempt under the Fair Labor Standards Act, and supervisory employees with the authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees or effectively recommend such action,

WITNESSETH:

### ARTICLE I

#### Purpose of Agreement

Whereas, it is the intent and purpose of the Union and the Plant to promote and improve industrial and economic relationships between the employees and the Plant, and to set forth the basic agreement covering conditions and terms of employment, the parties hereto agree with each other as follows:

### ARTICLE II

#### Definitions

Section 1.    The term "Plant," as used herein, shall mean the Edge Moor Plant and the Management of the Edge Moor Plant of E. I. du Pont de Nemours and Company, Titanium Technologies, located at Edge Moor, Delaware.

Section 2.    The term "Company" shall mean the corporate entity of E.I. du Pont de Nemours and Company, located in Wilmington, Delaware.

Section 3.    The term "Union," as used herein, shall mean the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union (USW) and its Local 4-786.

Section 4.    Unless specifically qualified, the term "employee" or "employees", as used herein, shall mean those employees of the Plant included within the bargaining unit set forth in the preamble to this Agreement.

Section 5.    The term "base rate" as used herein with respect to a non-exempt salaried employee shall mean the established hourly rate for the employee on his regular job, excluding shift differential and all other payments, and shall be calculated in accordance with the following formula:

$$\frac{\text{Established Monthly Salary} \times 12 \text{ Months}}{52 \text{ Weeks} \times 40 \text{ Hours Per Week}} = \text{Base Rate Per Hour}$$

Section 6.    An employee's "regular rate" as used herein shall mean the base rate, plus any applicable shift differential.

Section 7.    The term "regularly scheduled working hours", as used herein, shall mean the hours which the employee has been assigned to work regularly.

Section 8.    The term "holiday" as used herein shall mean any one of the holidays listed in Article XII, Section 1 of this Agreement, or the day observed in lieu thereof.

Section 9.    When the term "employee(s)" or a personal noun or pronoun appears in the agreement, it shall be understood to refer to either the masculine or feminine gender or both as applicable in the context in which it appears.

Section 10.     For purposes of this agreement, the term "day(s)" shall mean calendar day(s) unless otherwise stated.

ARTICLE III

Recognition and Scope

Section 1.     The Union has been and is recognized by the Plant as the exclusive bargaining agent for the employees of the Edge Moor Plant for the purpose of collective bargaining with respect to rates of pay, wages, hours of work, and other conditions of employment.  Nothing contained in this Agreement, however, shall limit the rights of individuals as set forth in Section 9(a) of the Labor–Management Relations Act.

Section 2.     There shall be no discrimination, coercion, interference, or restraint by the Plant or by any of its agents against any employee because of membership or non-membership in the Union; and the Union agrees that there shall be no meetings or solicitation or promotional Union activity on Plant time.  Plant time shall not include break periods, meal times, and other specified periods during the workday when employees are properly not engaged in performing their work tasks.

Section 3.     This Agreement constitutes the entire Agreement between the parties hereto as of the execution date hereof.  However, any existing supplements listed in Appendix A to this Agreement, and any supplements which may hereafter be mutually agreed upon by the Plant and the Union, when executed in the same manner as this Agreement, shall become and be a part of this Agreement.

Section 4.     In consideration of the Union's execution of this Agreement, in the event that the operations covered by this Agreement are conveyed, or otherwise transferred or assigned to any successor, the Plant shall notify the successor of the existence of this Agreement, provide

the successor with a copy of this Agreement, and ask that the successor consider hiring the existing workforce.

## ARTICLE IV

### Management Responsibilities

Section 1.    The Union recognizes that the Plant has the exclusive responsibility, whether or not the same was exercised heretofore, for the management, operation and maintenance of its facilities, and in furtherance thereof, has the right to select for hire, direct the work force, schedule work, establish schedules of work hours and shifts, determine what work is to be done, what products are to be produced and by what methods and means, to determine the size of the work force, to locate or remove any portion of the facilities, to expand, reduce, combine, transfer or abandon any area or operation, to establish and change job qualifications and classifications and to issue and revise job descriptions, and such shall not be subject to grievance and arbitration.

Except the Plant shall not, in exercising its rights to direct the work force, to establish work hours and shift schedules, and to assign and reassign work, violate the other express provisions of this Agreement.  Any such violations shall be subject to the grievance and arbitration procedures of this Agreement.

In exercising its other management responsibilities, the Plant shall comply with the express provisions of this Agreement, subject to the grievance and arbitration procedures.

Section 2.    The Plant may establish and revise reasonable work and safety rules as it deems necessary or desirable, provided they do not conflict with any term or provision of this Agreement.  A copy of such rules shall be sent to the Union at least twenty (20) days prior to the

rules going into effect, and the Union will be given the opportunity to meet and discuss proposed rules during this period prior to implementation.

Section 3.    The Plant has the right to arrange for work to be done by other companies, third parties, or other locations of the Company, and such shall not be subject to grievance and arbitration. Whenever practical, the Plant will discuss with the Union any types of work deemed necessary to require other companies or third parties or other locations of the Company. A log will be maintained by the Plant to record all non-capital work performed on-site or sent off-site by/to other companies or third parties. The Union will periodically review this log on a weekly basis and discuss with Plant Management as needed. These latter administrative tasks may be subject to the grievance and arbitration procedures.

Section 4.    No agreement, alteration, understanding, variation, waiver or modification of any of the terms or conditions expressly contained in this Agreement shall be made by any employee or group of employees with the Plant, and in no case shall it be binding upon the parties hereto unless made and executed in writing between the parties to this Agreement. However, this Section shall not affect the continued use of the Plant's standard form restrictive covenant/confidentiality agreement.

Section 5.    The Plant's failure to exercise any retained right of management shall not be considered a waiver of such right.

Section 6.    Management shall not perform any work normally done by bargaining unit employees, except in the case of emergency, for short periods associated with instructing or training, for work related to the installation or implementation of new processes or procedures, or when such work is incidentally related to the inspection of equipment or correcting production

difficulties.  However, Management may be permitted to relieve an employee at his/her request for short periods not to exceed thirty (30) minutes.

## ARTICLE V

### Deduction of Unions Dues

Section 1.      The Plant will deduct the regular dues prescribed by the Union from the salary of an employee who authorizes the Plant to make such deductions on a form provided by the Union.  Such dues authorizations shall be canceled and deductions stopped in accordance with the provisions of the dues authorization forms or at the option of the Plant at the termination of this Agreement.

All sums deducted in this manner and a list of employees from whose earnings such deductions have been made shall be turned over by the Plant to the Treasurer of the Union.

Section 2.      The Union shall indemnify and hold the Plant harmless from any claims, actions or proceedings arising from this Article.  After the funds have been remitted to the Union, the sole and exclusive obligation and responsibility for their disposition shall fall upon the Union.

## ARTICLE VI

### Grievance Procedure

Section 1.      Definition of Grievance.  During the term of this Agreement, a grievance is: (1) an allegation by an employee or the Union that the Plant has violated an express provision of this Agreement as defined in Section 3 of Article III; (2) any other dispute between the Plant and the Union or employees concerning terms or conditions of employment.  In the event that a dispute or grievance shall arise between the Plant and the Union or employees, an earnest effort

shall be made to settle such dispute or grievance, provided it is reduced to writing to the Plant within thirty (30) days of the incident causing the grievance.

Section 2.    Procedure.

(a)    Step 1 - Verbal Discussion with Team Manager.  The employee involved shall first attempt to resolve the grievance with his/her Team Manager.  The employee may, at his/her option, be accompanied by a Union Representative in the discussion of the grievance with the Team Manager.  Any resolution of the grievance at Step 1 shall be on a non-precedential basis and shall not be binding upon the parties in connection with any other grievance or be construed to modify this Agreement in any way.  Note:  For historical purposes only, the Union's Grievance Chairman and Plant Human Resources shall be provided a copy of any informal agreement that is reduced to writing.  No resolution of a grievance will be made without a Union representative having been given the opportunity to be present.

(b)    Step 2 - Written Grievance to Area Manager.  If the grievance is not resolved at Step 1, the employee or the Union must submit a written grievance to the Area Manager or designee.  Within fourteen (14) days of receipt of the written grievance, the Area Manager or designee shall meet with the employee and a Union Representative to discuss the matter and give a written response to the grievance.

(c)    Step 3 - Written Appeal to Unit Manager.  If the grievance is not resolved at Step 2, the employee or the Union must submit a written appeal to the Unit Manager or designee within seven (7) days of receipt of the Area Manager's response, or the Area Manager's failure to respond.  Within fourteen (14) days of receipt of such appeal, the Unit Manager or designee shall meet with the employee, and up to three (3) members of the Union's Grievance

Committee and a representative of the International Union. The Unit Manager or designee shall give a written response to the appeal within fourteen (14) days after such meeting.

      (d)    <u>Arbitration</u>. Within forty-five (45) days of receipt of the Unit Manager's written response in Step 3, or the Unit Manager's failure to respond, the Union may initiate arbitration in accordance with the procedures set forth in Article VII of this Agreement.

      (e)    Any grievance involving a suspension or discharge shall be submitted directly to Step 3 within fourteen (14) days of the imposition of the discipline in order to be subject to the terms of this Agreement.

      Section 3.    <u>Time Limitations</u>. The time limitations contained herein shall be considered as a maximum and may be extended only by mutual consent of the parties in writing or electronically. The Plant's failure at any Step in this procedure to communicate a decision on the grievance within the specified time limits shall permit the aggrieved employee or the Union to proceed to the next Step. Any grievance not appealed to the next Step within the time limits specified in this Article shall be deemed to be settled. Note: When a grievance is filed by a shift worker, the parties will make every effort to comply with the time frames to hear and answer the grievance.

      Section 4.    <u>Written Presentation</u>. All grievances at Step 2 and Step 3 shall be signed and dated by the aggrieved employee(s) and/or a Union Representative. Written answers submitted by the Plant shall be signed and dated by the appropriate Plant representative.

      Section 5.    <u>No Loss of Pay</u>. Any employee or representative of the Union who participates during his/her working time in any grievance meeting shall do so with no loss of pay, so long as the employee is first released by his/her supervisor or area manager before leaving his/her place of work. Such permission shall not be unreasonably withheld. Where a

grievance involves more than one aggrieved employee, no more than two (2) will be allowed time off during work hours without loss of pay to participate in the above procedure.

Section 6.     Additional Management Representative.  At the Plant's option, a second management representative may attend the Step 2 or Step 3 meetings.

ARTICLE VII

Arbitration

Section 1.     Any question as to the interpretation, or any alleged violation, of any provision of this Agreement, as defined in Section 3 of Article III, which is not otherwise settled to the mutual satisfaction of the parties hereto, at the request of either party, shall be submitted to arbitration in the manner provided in Section 2 of this Article.  Unrelated multiple alleged violations or grievances cannot be submitted to arbitration in the manner provided in Section 2 of this Article unless the parties specifically agree thereto.

Section 2.     The party seeking arbitration shall forward a written request for arbitration, referencing the grievance number involved, to the American Arbitration Association ("AAA"), 230 S. Broad Street, 6th Floor, Philadelphia, PA  19102.  A copy of such request shall be sent simultaneously to the other party.  The parties shall thereafter choose an Impartial Arbitrator in accordance with the AAA's standard selection procedures.

The decision of the Impartial Arbitrator shall be final and binding upon the parties.  The Impartial Arbitrator shall render his/her written opinion and award within thirty (30) days following the closing of the record of the arbitration hearing, unless otherwise agreed by the parties in writing.

The jurisdiction and authority of the Impartial Arbitrator to make an award shall be confined to the interpretation or application of the provisions of this Agreement.  The Impartial

Arbitrator shall not have jurisdiction or authority to make an award which has the effect of amending, altering, enlarging or ignoring any section of the Agreement or establishing or revising rates of pay; nor shall he/she have jurisdiction or authority to determine that the parties by prior practice or implication have amended or added to this Agreement.

Section 3.    The fees and expenses of the Impartial Arbitrator, the fees of the American Arbitration Association, and the cost of the hearing room shall be borne equally between the Union and the Plant.

## ARTICLE VIII

### Discharge

Section 1.    The Plant agrees that no employee will be discharged except for just cause. Such cases of discharge or suspension will be discussed with a representative of the Union before final action is taken. The employee involved may attend such discussions if he wishes.

Section 2.    When an employee has been discharged or suspended from work, and believes that he has been unjustly discharged or suspended, such employee shall be allowed fourteen (14) days within which to register a complaint and such complaint shall be considered and dealt with in accordance with the provisions of Article VI, "Grievance Procedure," beginning at the Step 3. For the arbitration of a discharge case, the arbitration hearing will be scheduled to be held within two (2) months of the appointment of the Impartial Arbitrator.

Section 3.    Both parties shall make every effort to complete a discharge arbitration as quickly as possible. If an Impartial Arbitrator concludes that an employee has been unjustly discharged or suspended, the Arbitrator may order the employee reinstated with no loss of seniority or benefits, and reimbursement for up to twelve (12) months of pay lost at his regular

rate, including scheduled overtime allowance and any applicable interim rate increases.

Recognizing an employee's duty to mitigate his losses, the Plant shall receive a credit against

lost wages for all earnings by an employee through other employment (including self-

employment), after discharge and before reinstatement.

ARTICLE IX

Industrial Relations Plans and Practices

Section 1.    All existing privileges heretofore enjoyed by the employees in accordance

with the following Industrial Relations Plans and Practices of the Company shall continue,

subject to the provisions of such Plans and to such rules, regulations and interpretations as

existed prior to the signing of this Agreement, and to such modifications thereof as may be

hereafter adopted generally by the Company to govern such privileges; provided, however, that

as long as any one of these Company Plans and Practices is in effect within the Company, it shall

not be withdrawn from the employees covered by this Agreement; and provided, further, that any

change in the Industrial Relations Plans and Practices which has the effect of reducing or

terminating benefits will not be made effective until one (1) year after notice to the Union by the

Plant of such change:

> Career Transition Financial Assistance Plan
> Short Term Disability Plan
> Pension and Retirement Plan
> Special Benefits Plan
> Vacation Plan
> Service Emblem Plan
> Continuity of Service Rules
> Treatment of Employees Called or Enlisting for Military Service
> Payment to Employees on Jury Duty
> Savings & Investment Plan
> Total & Permanent Disability Income Plan

Section 2.     An employee's length of service for consideration of benefits under the Company's *Industrial Relations Plans and Practices* shall be the employee's continuous service with the Company, as calculated in accordance with the Company's Continuity of Service Rules.

Section 3.     In addition to receiving benefits pursuant to the Plans set forth in Section 1 above, employees shall also receive benefits as provided by the Company's Beneflex Benefits Plan, subject to all terms and conditions of said Plan.

## ARTICLE X

### Seniority

Section 1.     Seniority of an employee placed on the Edge Moor Plant roll shall be calculated and adjusted beginning with the first day he worked in the last period of his unbroken employment on the Edge Moor Plant, in accordance with provisions (a), (b), and (c) of this Section.

(a)     When a former employee is re-employed following his termination because of lack of work, he shall immediately regain the seniority he had accrued prior to his termination. It is understood that no seniority credit will be given for the period of time between termination and re-employment, and it is further understood that the seniority a former employee had at the time of termination because of lack of work shall be used only for the purpose of giving consideration to re-employment during a period limited to two (2) years following such termination.

(b)     An employee whose break in length of service is cured by action of the Plant, shall regain or be credited with the amount of seniority equivalent to the length of service credit of the cure, provided that such cured service must have been for time worked on the Edge Moor Plant in order to be credited as seniority.

(c)     The seniority of an employee shall be adjusted by deducting the time lost due to leave of absence without pay, except that time lost or leave of absence granted because of illness or injury or military service will not be deducted.

Section 2.     The seniority of an employee shall be automatically broken and terminated in case of:

(1)     Discharge for just cause;

(2)     Discontinuance;

(3)     Voluntary quit;

(4)     Termination because of lack of work;

(5)     Absence in excess of sixteen (16) consecutive days not covered by leave of absence; or

(6)     Failure to return to work following expiration of leave of absence.

Section 3.     In matters affecting terminations because of lack of work, bumping during a reduction of force, transfers, demotions and promotions of employees and re-employment of former employees, including temporary assignment of expected duration longer than three (3) months, the following factors shall apply:

(1)     Seniority;

(2)     Ability, skill, efficiency, knowledge and training; and

(3)     Physical fitness to perform the essential functions of the job, with or without reasonable accommodation (only in cases of re-employment, transfers, demotions and promotions).

In cases where the candidates have approximately the same qualifications as determined by factors (2) and (3), seniority shall govern.

Section 4.     An employee who is or has been transferred out of the bargaining unit into a non-bargaining unit position, and who is later forced out of his position and seeks to return to the bargaining unit, shall be credited with seniority for all time spent both inside and outside the bargaining unit and that seniority will be used for purposes of bidding into a vacant bargaining unit position that has been posted.  However, during the first year after returning to the bargaining unit pursuant to this Section, only Plant seniority within the bargaining unit will be used for purposes of reductions of force and related job bumping.

Section 5.     Should any difference arise with respect to the promotion, demotion, termination because of lack of work, or transfer of an employee, or re-employment of a former employee, such difference may be treated as a grievance under Article VI of this Agreement.  Promotions to supervisory positions or to jobs outside the scope of this bargaining unit shall be solely a function of the Plant, and, therefore, such action shall not be subject to the terms of this Agreement.

Section 6.     A new employee shall not benefit from seniority provisions during the first six (6) calendar months of service, but after completion of the first six (6) calendar months of service, his seniority shall be established as of hiring date.

During this probationary period of six (6) calendar months, a new employee may be terminated in the sole discretion of the Plant, and such action shall not be subject to the terms of this Agreement.

## ARTICLE XI

### Hours of Work and Overtime Premiums

Section 1.     <u>Provisions Applicable to all Employees Covered by this Agreement:</u>

(a)    The regular workday for 12 hour shift employees shall begin at 6:00 A.M. and shall end the following day at 6:00 A.M., and for day employees shall begin at 7:00 A.M. and shall end the following day at 7:00 A.M., except in cases where the Plant may designate otherwise with respect to any individual employee or group of employees.

(b)    The regular workweek for 12 hour shift employees shall begin Monday at 6:00 A.M., and for day employees shall begin Monday at 7:00 A.M., and shall end the following Monday at the same hour, except in cases where the Plant may designate otherwise with respect to any individual employee or group of employees.

(c)    The working hours of day employees shall be from 7:00 A.M. to 3:30 P.M., with one-half hour unpaid lunch period.  The working hours of 12 hour shift employees shall either be from 6:00 A.M. to 6:00 P.M., or from 6:00 P.M. to 6:00 A.M., with one-half hour paid lunch period.  Schedules other than these may be established by the Plant and will be discussed with the Union.  Twelve hour shift employees will have an hour of flexibility for relief times (flex hour) from either 5:00 a.m. to 6:00 a.m. or 5:00 p.m. to 6:00 p.m.  Twelve hour shift employees can make relief anytime within this hour of flexibility as long as the following conditions are met:

(1)    Jobs will not be left uncovered/unmanned;

(2)    Relief will be made in the operating/work areas;

(3)    All shift employees will work twelve hours;

(4)    No overtime will be paid until after 6:00; and

(5)    No twelve hour shift employee can leave the Plant prior to 5:00.

(d)    For the purpose of determining the sixth or seventh day worked in a workweek, an employee shall be considered to have performed a day's work when:

(1)  The employee works his regularly scheduled working hours in a workday;

(2)  On any workday, the employee works any time or reports for assigned work and is sent home because of lack of work or other reason beyond his control, provided that if the employee in either of these cases absents himself for any part of his full schedule of work without justifiable cause as determined by the Plant, that day shall not be counted as a day worked;

(3)  On any holiday which falls on a day in the employee's regular schedule of work in that work week and occurs prior to the sixth day worked, and the employee is required to take the day off solely because it is a holiday; provided, however, that a holiday occurring on an employee's day of rest shall not be counted in determining the sixth or seventh day worked in a work week. If the employee scheduled to work on such a holiday is absent, he shall not receive credit for it as a day worked;

(4)  An employee works beyond his normal shift into his regularly scheduled day of rest to the extent of four (4) or more hours. In no case shall an employee receive credit for more than one (1) day worked in any workday;

(5)  Vacation occurring prior to hours over 40, or 6th or 7th day;

(6)  Emergency military duty occurring prior to hours over 40, or 6th or 7th day;

(7)    Jury duty.

Section 2.    <u>Overtime Provisions for non-exempt salaried employees</u>:

(a)    Overtime shall be paid at one and one-half (1-1/2) times the employee's regular rate.  When more than one rate is applicable to the same hours of work, the rates shall not be pyramided, but only the highest single rate applicable shall be paid.  When one and one-half (1-1/2), two (2), or two and one-half (2-1/2) time rates are paid for hours worked, such hours will be considered overtime hours.

(b)    For day workers, overtime shall be paid for:

(1)    All hours worked in excess of eight (8) hours in any workday, or in excess of forty (40) hours in any work week, whichever provision produces the greater amount of pay;

(2)    All hours worked on the sixth day worked in a work week, subject to provisions of Section 1(d)(3) of this Article;

(3)    All consecutive hours worked by a vacation relief employee in excess of eight (8) straight time hours in any consecutive twenty-four (24) hour period;

(4)    Work outside of regularly scheduled working hours, except when the hours worked outside the schedule are at the employee's request.

(c)    For day workers, overtime pay at two (2) times the employee's regular rate shall be paid for all hours worked on the seventh day worked in the work week.

(d)    For twelve (12) hour shift employees

(1)     Employees working 12 hour shifts shall be paid pursuant to the

following table:

| WEEK IN WHICH THE FOLLOWING SCHEDULE IS WORKED | | | | | | | TOTAL HOURS WORKED | TOTAL HOURS PAID |
|------|------|------|-------|-----|-----|-----|------|------|
| MON | TUES | WEDS | THURS | FRI | SAT | SUN | | |
| 1 | 1 | 1 | 1 | | | | 48 | 52 |
| | | | | 2 | 2 | 2 | 36 | 42 |
| 2 | | | | 1 | 1 | 1 | 48 | 54 |
| | 2 | 2 | 2 | | | | 36 | 36 |

(2)     Employees working 12 hour shifts shall be eligible for overtime

pay for additional hours worked under the following

circumstances:

A.     All hours worked in excess of twelve (12) in any workday.

B.     Work outside of regularly scheduled working hours, except

when the hours worked outside the schedule are at the

employee's request.

C.     Employees working the three (3) day or thirty six (36) hour

workweek:

(i)     Day Four – Employee receives time-and-a-half his

regular rate;

(ii)     Day Five – Employee receives double his regular

rate for hours worked;

(iii)     Day Six – Employee receives time-and-a-half his

regular rate;

(iv)    Day Seven – Employee receives time-and-a-half his regular rate.

D.    Employees working the four-(4) day or forty eight (48)hour workweek:

(i)    Day Five – Employee receives time-and-a-half his regular rate;

(ii)    Day Six – Employee receives double his regular rate for hours worked;

(iii)    Day Seven – Employee receives time-and-a-half his regular rate.

Section 3.    <u>Assignment of Overtime</u>:

(a)    The Plant reserves the right to schedule and require overtime work to the extent it deems necessary or desirable.

(b)    Overtime opportunities for shift employees will be offered to eligible qualified employees in the same job title on the first shift due back to work, and, if the opportunity is not accepted by the employee(s) on the first shift due back, the opportunity will be offered on the next shift due back to work using the same procedure. Relief Operators, if applicable, will be asked after the Operator with the same job title as the opportunity, on the same shift, before proceeding to the next shift.

(c)    Overtime opportunities for day shift employees will rotate by seniority in the job title.

(d)    Detailed overtime guidelines will be established and maintained with mutual agreement between the Plant and the Union. These guidelines will be set out in the Policy Manual.

(e)    If the overtime opportunity is not accepted following the above procedure, the least senior qualified employee(s) shall be required to perform overtime work. The assignment of such mandatory overtime will rotate in reverse seniority, following the same shift and job title rotations as above.

(f)    Employees required to work mandatory overtime will be provided a minimum of four (4) hours of work, if so desired by the employee. Employees will not be required to work more than sixteen (16) hours of overtime per week. Employees will not be required to work overtime in the event of a personal emergency off-Plant, provided that this is not abused.

(g)    The Plant shall provide an employee with transportation to and from his local residence when required to work mandatory overtime, provided the employee has no other means of transportation.

(h)    In the event that the Plant, as a result of a good faith error, fails to offer overtime to the appropriate employee in accordance with the above outlined procedure, that employee shall be offered the next opportunity. If it was not a good faith error, the employee shall be offered "make up" overtime work, scheduled at a mutually convenient day and time; the employee will perform any work assigned.

(i)    It continues to be the Plant's objective to minimize overtime, including the use of Call-In Allowances. After exhausting all efforts to fill a full shift opportunity for overtime (day or shift), using the above procedure and Overtime Guidelines, the Plant will offer split

shifts. However, where splitting a shift will require that more than one Call-In Allowance be paid, the Plant shall pay only a reduced Call-In-Allowance of one and one half (1 1/2) hour's pay to each employee accepting split shift overtime. If an overtime opportunity cannot be filled voluntarily by full or split shifts in accordance with the above procedure and the Overtime Guidelines, the Plant may require overtime in a full shift.

Section 4.     The Plant retains the right to assign overtime outside of the above-outlined procedure in the event of an emergency.

Section 5.     (a)     Any employee receiving an overtime opportunity by telephone who fails to answer the call shall be considered to be unavailable for the opportunity. The Plant will leave a message, if applicable. The Plant is not required to wait for a response. Nothing in this section shall be construed to require that the Plant do more than call an employee's home telephone number to offer the overtime opportunity.

(b)     The procedures of the Overtime Guidelines will be exhausted before subcontractors are assigned to do the work.

Section 6.     <u>Working Through Lunch Period</u>. If an employee is asked by the Plant to work through an unpaid lunch period and completes his full scheduled day, the employee has one of the following options with concurrence of supervision:

(a)     Leave early the same day (30 minutes).

(b)     Take regular pay, *i.e.*, eight hours straight time plus 1/2 hour overtime.

(c)     Take the time (30 minutes x 1.5) off on another day during the same work week.

(d)     Employees working through lunch will be given a lunch break following their completed assignment.

Section 7.     All qualified employees within a job title will be called before a temporary supervisor is called in for the purpose of performing overtime work within his/her skill. A nonexempt Plant employee is considered a temporary supervisor from the time he/she receives detailed rate until he/she is returned to his/her normal duties, *i.e.*, when the supervisor returns.

Section 8.     If employees work outside their job title on either holdover, call-in or scheduled overtime, they remain eligible for overtime in accordance with Section 3.

Section 9.     Holdover/Job Continuity.  Employee(s) working on the job, if needed, will be asked to work overtime first.  If additional help is required, the opportunity to work will be offered consistent with the procedures described in Section 3 above.

Section 10.     No overtime shall be paid unless such overtime work has been specifically authorized by Plant management.

Section 11.     Wash-Up Time.  A five (5) minute wash up period will be provided to all employees prior to break time, lunch time and quitting time.

Day employees working in the field will be permitted back in their shops at 11:55 a.m. and will normally leave their job sites at 11:50 a.m.  However, appropriate travel time will be afforded for those working in remote areas.

Employees leaving the site for lunch or at quitting time may do so 5 minutes before Lunch and Quitting Time, in lieu of wash-up time.

Section 12.     Consecutive Hours of Work – Sixteen (16) Hour Rule:

(a)     Plant Management's objective continues to be to minimize all overtime, but, when it cannot be avoided, overtime must be distributed consistent with the Collective Bargaining Agreement.  The parties' primary concern is for the employee's safety.  It is expected that a supervisor will exercise judgment in each individual case, taking into account physical

strength, how heavy the work is, working conditions, the temperature, and other factors affecting physical condition. ··

(b)  ·  Plant Management will continue to maintain the maximum limit of sixteen consecutive hours of work, which is not to be exceeded except in cases of major emergencies and/or with the prior approval of the Plant Manager or his alternate. It is the mutual responsibility of the supervisor and employee to insure that the maximum limit of sixteen consecutive hours worked is not inadvertently exceeded. Each supervisor should be aware of his employees' time on the Plant. If a supervisor does not release an employee whose time at work is approaching sixteen consecutive hours, the employee has the responsibility to advise the supervisor of the situation. Both the supervisor and the employee must work together to see that this limitation is not inadvertently exceeded.

(c)   It is desirable to restrict continuous periods of work to less than sixteen hours. When sixteen hours have been worked, a minimum rest break of six hours must be provided. Should this regulation prohibit an employee from working a part of his or her regularly scheduled hours, the employee should be given the opportunity in the immediate future to make up the straight time pay for that portion of the shift which he was obligated to rest.

Section 13.   <u>Call-In Allowance</u>:

(a)   A "Call-In Allowance" is to be paid whenever an employee works overtime assigned on the employee's regularly scheduled day off, or for overtime worked when the employee is called back into the Plant to report for work at times outside his/her regularly scheduled work hours.

(b)   A Call-In Allowance is not to be paid when an employee's regularly scheduled shift is extended. So long as an employee is already present at work at the Plant, any

additional overtime hours added to his/her scheduled hours are to be treated consistent with the "holdover" provisions of this Agreement, even if the additional hours are scheduled prior to the day they are worked.

      (c)    A full Call-In Allowance shall be three (3) hours of pay at the employee's base rate, and shall be paid in addition to payment for all hours worked.

      (d)    A reduced Call-In Allowance will be paid where arrangements are made with an employee on-site for work outside his/her regularly scheduled shift. This reduced Call-In Allowance shall be equal to one and one-half (1 1/2) hours pay at the employee's base rate and shall be paid in addition to payment for all hours worked.

Section 14.    Make-Up Time For Overtime or Missed Call-In:

      (a)    Make-up time for overtime or call-in under Section 3(h) above does not necessarily have to be made up in the same week in which the incident occurred, as overtime will be paid for this.

      (b)    If overtime missed involves work on a sixth or seventh day, the person must work the sixth or seventh day as make-up.

      (c)    Make-up will be scheduled in advance with reasonable notice to supervision. This will ensure proper time keeping as well as time card coding.

Section 15.    Holdover Allowance:

      (a)    An employee requested to work beyond the end of his regularly scheduled working hours, shall be given a minimum of thirty minutes' notice of such holdover prior to the end of the scheduled working hours. If the employee does not receive this notice, an allowance equal to one (1) hour's pay at regular rate shall be paid, in addition to overtime pay earned. Late

relief and similar situations beyond Management's control are excluded and will not warrant payment of this allowance.

(b)    An employee held over at least 15 minutes beyond his regular shift shall be provided the opportunity to continue to work at least two (2) hours. This does not apply if the holdover is caused by late relief.

Section 16.    Change of Schedule:

(a)    Whenever a change of schedule needs to occur, all employees in the affected job title (including Relief Operator for jobs on which they are qualified) will be asked by seniority if they want to volunteer to change their schedule. If no one accepts the offer, then the junior employee within the job title (including Relief Operator) will have his/her schedule changed. This process will work in reverse seniority starting with the most junior employee in the job title, and restarting with the junior employee once the senior employee has worked a change of schedule. Management will maintain a list for forced change of schedule for the purpose of monitoring the rotation. Change of schedule forms shall be used for all change of schedules.

(b)    Forced Change of Schedule (8 Hour Shift): When a forced change to an eight (8) hour day employee's schedule occurs, it will be for a minimum of two (2) days and initially no longer than thirty (30) days. When the thirty (30) day period has expired, then Management will reevaluate the change of schedule and discuss with the Union whether or not the change of schedule needs to continue. For periods shorter than two (2) days, overtime or voluntary change of schedule will be utilized. When an eight (8) hour day employee is forced to work a twelve (12) hour shift, the schedule change shall be for no less than a full work week.

(c)    Forced Change of Schedule (12 Hour Shift):  When a forced change to a twelve (12) hour shift employee's schedule occurs, it will be for a minimum of one (1) full work week and initially no longer than sixty (60) days.  When the sixty (60) day period expires, then Management will reevaluate the change of schedule and discuss with the Union whether or not the change of schedule needs to continue.  For periods shorter than one (1) week, overtime or voluntary change of schedule will be utilized.

(d)    When a day employee's schedule is changed (forced or volunteer) to the 11:00 p.m. – 7:00 a.m. shift, the employee will be made whole in pay for the week in which the change of schedule occurred (ex:  the employee shall not be required to work more than eight (8) hours on any given day to obtain forty (40) hours for the week).

(e)    Whenever a forced or voluntary change of an employee's regularly scheduled working hours occurs without three (3) days (72 hours) prior notice, a change of schedule allowance of one and one-half (1-1/2) times his regular rate of pay is to be paid for those hours worked on the first day of the new schedule.  However, a change of schedule allowance will not be paid in the event of:  (1) a promotion or demotion (excluding temporary assignments); (2) personal request; (3) return to work after a shutdown; (4) return to original schedule; (5) successful applicants for advertised jobs; or (6) reassignment during vacation shutdown.

Section 17.    Overtime Maintenance – Trainees:

(a)    Holdovers:  If a trainee has been working on the job requiring overtime, he or she is considered for the overtime.  If a trainee has not been working on the job requiring overtime, then he or she would be considered only after all Senior Maintenance in that craft on the Plant have been asked.

(b)  Scheduled:  Trainees are considered only after all Senior Maintenance in that craft have been asked.

(c)  Call-Ins:  Trainees are considered only after all Senior Maintenance in that craft have been asked.  If a trainee is ultimately called in to handle a job, it should be understood that a greater degree of supervision would obviously be necessary.

NOTE:  For clarification purposes, "A" class personnel are asked for overtime before "B" class, if overtime is offered to "B" class, the Team Manager will determine whether the "B" class person is qualified to perform job/task; if "B" class personnel are not qualified for job/task, then "A" class personnel are forced per above guidelines; "B" class personnel will not be in forced rotation; continue current practice of paying "B" class rate when performing "A" class work during training, when "B" is qualified and works full "A" assignment, "B" will receive "A" rate as it is not the intent to have "A" work accomplished at "B" class rate.

## ARTICLE XII

## Holiday Pay

Section 1.  (a)  A non-exempt salaried employee (whether regularly working an 8 or 12 hour shift) who works on any of the holidays designated below shall be paid overtime pay at one and one-half (1-1/2) times his regular rate for all hours worked in addition to a holiday allowance equivalent to pay for regularly scheduled working hours not to exceed eight (8) hours at his regular rate; pay shall be at 2 1/2 times the employee's regular rate for all hours worked in excess of all hours regularly scheduled.  An employee who is required by Management to take the day off from work solely because of a Plant holiday will receive a holiday allowance equivalent to regularly scheduled hours not to exceed 12 hours at the employee's regular rate:

New Year's Day

Good Friday

Memorial Day

July Fourth

DMEAST #3147359 v5

- 27 -

Labor Day

Thanksgiving Day

Day After Thanksgiving Day

December 24th

Christmas Day

Two (2) Personal Holidays

When any of the foregoing holidays, except December 24th, falls on Sunday, the following Monday shall be observed as the holiday. When December 24th falls on Sunday, the following Tuesday shall be observed as the holiday.

When any of the foregoing holidays falls on a Sunday, the holiday shall be observed on a Saturday for non-exempt salaried employees working the holiday. The exception to this is if Christmas day falls on a Sunday. In that case, the holiday shall be observed on the preceding Friday for non-exempt salaried employees who work on the holiday.

When any of the foregoing holidays fall on Saturday, the preceding Friday shall be observed as the holiday by all employees regularly scheduled to work on a Monday through Friday basis. All other employees will observe such holiday on Saturday. When Christmas Day falls on Saturday and is observed on Friday, the December 24th holiday will be observed on the preceding Thursday.

Holiday hours shall coincide with the regular workday, as defined in Section 1 of Article XI.

Section 2.    Pay for hours equivalent to regularly scheduled hours not to exceed eight (8), at the employee's regular rate, shall be paid to an hourly wage roll employee for a holiday on which he does not work, provided such employee:

(a)    Does not work the holiday for the reason that

(1)    He is required by Management to take the day off from work solely because it is a holiday, or

(2)    The holiday is observed on one (1) of his scheduled days of rest (an employee on vacation, leave of absence without full pay, or absent from work for one (1) week or more due to a shutdown of equipment or facilities or conditions beyond Plant's control, shall not be considered as having "scheduled days of rest" during such periods of absence), and

(b)    Works on his last scheduled working day prior to the holiday and on his next scheduled working day following the holiday unless excused by Management from work on these days.

Section 3.    The hours for holidays not worked under Section 2, Item (a)(2) above, shall not be used in computing overtime payable for hours worked in excess of forty (40) in a work week.

Section 4.    Postponed Holiday Guidelines.

(a)    A holiday (other than personal) may be postponed if:

(1)    A holiday falls on the employee's scheduled day of rest and the employee does not choose to be paid; he may choose to take a day (8 hours) off at another time;

(2)    A day the employee is scheduled to work eight hours or more and does not choose to be paid the holiday allowance of eight hours; the employee may choose to receive one and one-half his regular

rate for the first eight hours work plus a postponed holiday in lieu of the eight hours holiday allowance.

(b)     The following criteria for postponing the holiday must be met:

    (1)     The holiday must be either a day on which the employee works eight hours or a scheduled day of rest, and

    (2)     An employee wishing to postpone the holiday must notify supervision during the week in which the holiday falls.

(c)     For day-workers and those on the eight-hour shift, no more than six (6) postponed holidays may be banked at any one time. For shift-workers on the twelve-hour shift schedule, no more than six (6) postponed holidays may be banked at any one time (a total of 48 hours for four (4) 12-hour postponed holidays).

(d)     Guidelines for taking the postponed holiday are as follows:

    (1)     Requests for scheduled postponed holidays will be considered only if there is no overtime incurred. Normal relief operating priorities, and guidelines for postponed holidays apply on all other shifts. The postponed holiday will not be granted if it interferes with production or work efficiency.

    (2)     A postponed holiday must be scheduled after the observed holiday and before December 3 of the year in which the holiday falls. Requests will be considered on a "first come, first served" basis; however, they will not take precedence over scheduled full weeks or split vacations where proper notification has been given.

(3)    If an employee is terminated for any reason or the time limit expires and the employee has not taken the postponed holiday, an allowance of eight hours pay at the regular rate will be made. This allowance will not be used to compute 6th or 7th day pay.

(4)    Postponed holidays may be taken on any day except Sunday, days of vacation or other holidays; however, shift workers should note the following item (5).

(5)    Pay for Holiday allowance: The postponed holiday is an 8-hour allowance. Shift workers taking a postponed holiday or a personal holiday on a Thursday when they would normally receive 1-1/2 times pay, will not have the 1/2 times pay overtime payment deducted from their next pay check, *i.e.*, they will not lose 4 hours of pay. (8 hours at 1/2 time = 4 hours).

(6)    Employees who have scheduled a postponed holiday and then move to another work group, thereby causing scheduling conflicts, must choose other days.

(7)    Postponed holidays cannot be rescheduled once they have started (notification of disability, death in family, jury duty, etc., must be received prior to the start of the day in the normal manner).

(8)    Employees off on postponed holiday will not be considered for overtime on that day (7 a.m. to 7 a.m. for those on the 8-hour schedule; 6 a.m. to 6 a.m. for those on the 12-hour schedule) until all other qualified employees are considered.

ARTICLE XIII

Wages

Section 1.     Rates of pay for new job classifications will be subject to bargaining between the Union and the Plant at any mutually convenient time. Either party to this Agreement may open negotiations in connection with rates of pay for new job classifications on sixty (60) days' written notice to the other party.

Section 2.     (a)     All bargaining unit base rates of pay shall be increased by 4.5% effective in the pay period this Agreement is ratified. Effective January 1, 2007, all base rates of pay will be further increased by 3% and, effective January 1, 2008, all base rates of pay will be further increased by 3%.

(b)     Thereafter, either party to this Agreement may open negotiations in connection with general rates of pay on sixty (60) days' written notice to the other party. General rates of pay will be subject to bargaining between the Union and the Plant at any mutually convenient time, and no general changes will be made in general rates of pay without prior consultation between the Plant and the Union. Any increases to general rates of pay will be implemented on an across-the-board basis.

(c)     During the term of the Agreement, base rates of pay in effect on the date of the execution of this Agreement will not be decreased.

Section 3.     (a)     Employees regularly scheduled to work on shifts shall be paid, in addition to their base rate, the shift differential applicable to the hours worked, as follows:

(1)     For all hours worked on the afternoon eight (8) hour shift (3:00 P.M. to 11:00 P.M.), a shift differential of sixty-nine cents ($.69) per hour shall be paid.

(2)    For all hours worked on the midnight eight (8) hour shift (11:00 P.M. to 7:00 A.M.), a shift differential of one dollar and seven cents ($1.07) per hour shall be paid.

(3)    For all hours worked on the eight (8) hour day shift (7:00 A.M. to 3:00 P.M.), no shift differential shall be paid.

(4)    For all hours worked on the evening twelve (12) hour shift (6:00 PM to 6:00 AM). a shift differential of one dollar and seventeen cents ($1.17) per hour shall be paid.

(5)    For all hours worked on the day twelve (12) hour shift (6:00 AM to 6:00 PM), no shift differential shall be paid.

(6)    When an employee's regularly scheduled shift includes work in more than one of the periods specified in (1), (2) or (3) of this Section, his shift differential shall be determined by either method (i) or (ii) below, whichever yields the greater amount of pay:

A.    he shall receive the shift differential applicable to the hours worked, or

B.    he shall receive for all hours worked, the higher shift differential, if any, applicable to the period in which he works four (4) or more hours.

(b)    When a day worker works hours outside of his regular schedule, he shall be paid the shift differential applicable to such hours worked.

Section 4.    After a two (2) weeks' training period, a non-exempt salaried employee who has been selected for a job will receive the rate of that job, provided that in the opinion of

the Plant, he is qualified to perform the job, except for permanent transfers to Relief Operator jobs. On those jobs, the employee will receive the full rate of the job when he is qualified to cover all the job(s) or after two (2) months' time on the job, whichever happens first.

Section 5.    An employee who reports on time for regularly scheduled work and has not been previously notified to remain away from work shall be worked as scheduled, or in lieu thereof, shall be sent home immediately and receive an allowance of four (4) hours' pay at his base rate plus applicable shift differential, if any.

## ARTICLE XIV

### Miscellaneous Provisions

Section 1.    <u>Making Up Time For Personal Reasons</u>. Make up work for time taken off for personal reasons will be granted based on the needs of the business. Personal reasons might include such things as teacher-parent conferences, certain school activities that the parent may want to attend and certain appointments. Time lost for such reasons **must** be made up in the same pay week in which the lost hours occurred; to make up time in any other week would require that overtime (time and one-half) be paid in accordance with the Fair Labor Standards Act and this would cause a penalty to the Company. Therefore, time worked under this policy will be paid as straight-time rates; it is agreed that the provisions of Article XI, Section 2 will not apply to such work.

For example, two hours taken off on Monday can be made up during the balance of the week. Time taken off on Friday afternoon, if known ahead of time, can be made up Monday through Thursday of that same week. Time taken **off** on Friday **cannot** be made upon the following Monday through Thursday, as this constitutes another work week, and time and one-half would need to be paid for hours over 40.

Section 2.    No detrimental notation shall be made on the employee interview record of an employee or other record that serves the same purpose unless the employee, and his Union representative if the employee so desires, are notified that such notation is to be made and an opportunity is given the employee to present any reason why such notation should not be made.

Section 3.    <u>Clothing Allowance</u>.  The Plant will provide a three hundred fifty dollar ($350.00) annual cash allotment for clothing (the "clothing allowance") to employees who are regularly engaged in work that may cause abnormal wear to their clothing, permanently assigned to operations, maintenance, R&D, I.S., or respiratory protection technician classifications (the "eligible classifications") on the payday immediately following April 30th of each year of this Agreement.  In the event an employee begins permanent employment in an eligible classification after April 30th, the clothing allowance will be prorated, *i.e.*, one twelfth (1/12) of the clothing allotment will be paid for each month worked in the eligible classification after April 30th.

The Plant will provide a safety shoe allowance of up to $100.00 per employee, to obtain safety shoes twice per year.  Alternatively, basic stock shoes will be provided at no cost to employees.  Employees ordering approved styles, exceeding the shoe allowance, will pay the difference in price between the shoe ordered and the basic shoe allowance.

Section 4.    <u>Meal Allowance</u>.  Day employees who work four (4) hours or more beyond their regularly scheduled working hours, and shift employees who work two (2) or more hours beyond their regularly scheduled working hours, shall receive a twelve dollar ($12.00) meal allowance.

Section 5.    <u>Adverse Weather</u>.  In the event of an adverse weather condition, as determined by the Plant, the following shall apply:

(a)    Employees who have difficulty reporting for work at their scheduled start time are required to contact their supervisor and make every reasonable effort to report for work as close to their scheduled start time as possible. Employees will be paid only for hours worked, subject to Article XIII, Section 5. The Plant may grant an appropriate grace period for lateness due to adverse weather conditions.

(b)    Non-essential employees who are unable to report for work due to an adverse weather condition are required to contact their supervisor and may request to use a personal holiday, split vacation, postponed holiday, if applicable, or a day off without pay. Requests will be granted at the Plant's discretion.

For purposes of this Adverse Weather Section, a non-essential employee shall be defined as an employee whose duties are not directly related to the Plant's operating requirements on the day that an adverse weather condition exists, as determined by the Plant. The Plant will notify non-essential employees of their status via the Plant's 373 message system.

(c)    If an employee requests, and is given, permission to take the day off without pay due to an adverse weather condition, the partial day or full day off can be worked on an alternative day during that work week at the Plant's discretion.

(d)    The Plant may offer employees the option to leave prior to the end of their scheduled shift, if business needs permit. Employees will be paid only for hours worked unless an allowance is given at the discretion of the Plant Manager or his/her designee, subject to Article XIII, Section 5.

Section 6.    PSM Committee. The Union shall designate a representative to serve as a member on the Plant PSM Committee. The Plant shall make every effort to release such representatives for PSM Committee meetings, consistent with established practice. Additionally,

a Union Representative will be released in order to participate on all Plant teams assembled to investigate safety incidents.

Section 7.    Each bargaining unit employee will be provided with a copy of this Agreement by the Plant.

Section 8.    The Plant will replace (in kind) an employee's personal tools that are broken, lost, stolen or need replacing for safety reasons. In certain circumstances, when deemed necessary by Management, an upgrade in the quality of a tool will be authorized.

Section 9.    Special Assignment. Employees performing work considered "special assignment," defined as temporary work outside of the bargaining unit, including temporary upgrade to a supervisory position, will receive a ten percent (10%) increase above the top base pay for the period of time while in this special assignment, provided the special assignment is at least for one-half of the employee's shift.

Section 10.    Union Notification of Temporary Job:

(a)    When there is a need for temporary jobs, regardless of whether for a term of less than or more than three (3) months, the Union President or his designee should be notified in writing of the temporary position and the actual starting date. Temporary jobs will be reviewed with the Union every three (3) months.

(b)    The Union President or his designee should also be notified in advance of any temporary upgrades.

Section 11.    Funeral Allowance. In the case of death of a member of the immediate family of an employee, the Plant will grant as an excused absence such time as may be needed in connection therewith. A maximum of three (3) working days taken during the period extending from the day of death to and including three (3) calendar days after the funeral, which are

regularly scheduled days of work for the employee, shall be paid for at the employee's regular rate for the number of hours that would normally have been scheduled for those days, but such hours paid for shall not be considered as hours worked in computing overtime payable for hours worked in excess of forty (40) in any work week, nor shall such days be counted as days worked in determining whether an employee has worked a sixth or seventh day in the regularly scheduled work week [thirty-six (36) or forty-eight (48) hours for shift workers.].

For the purpose of this Section, a member of the employee's immediate family shall be limited to father, mother, husband, wife, brother, sister, son, daughter, or current mother-in-law or father-in-law. No more than three (3) days' pay shall be given should more than one (1) death occur in the family within any three (3) day period.

An employee who is excused from work to attend the funeral service in connection with the death of his grandparent, grandchild, son-in-law, daughter-in-law, or current brother-in-law or sister-in-law shall be paid his regular rate of pay for regularly scheduled hours of work up to a maximum of one (1) working day. Current brother-in-law and sister-in-law are defined as the spouse of the employee's brother or sister and the brother or sister of the employee's current spouse.

No leave or allowance shall be granted in the case where, because of distance or other cause, the employee does not attend the funeral of deceased. Notice of such deaths must be given to the employee's supervision as soon as is reasonably possible.

Section 12.    Medical Examinations. The Plant shall continue its current practice of providing periodic medical examinations for the Plant's TERP Team, forklift drivers, and employees who must wear respirators. The Plant will also continue its current practice of medical surveillance for those who have had known exposure to asbestos, and will continue its

Hearing Conservation Program. The Plant shall not provide regular or periodic physical examinations to Plant employees outside of these specified programs.

Section 13.    Life Saving Rules:

(a)    The following seven (7) Plant safety rules are considered "Life Saving Rules":

(1)    Vessel Entry (Tipster 1-28)

(2)    Lock, Tag, Try (Tipster 1-27 [1-10])

(3)    Exposure to Hazardous Materials (Line Break) (Tipster 1-27 [11-12])

(4)    Unauthorized Overriding of "A" Interlocks (P&P 7.7)

(5)    High Energy (Tipster 1-23 Electrical Section)

(6)    Fall Protection (Tipster 1-35)

(7)    Direct or Willfully Condone Violations of "Life Saving Rules" (refer to Section 13(b) below)

(b)    If an employee willfully violates a Life Saving Rule thereby subjecting themselves and/or others to possible serious injuries and/or subjects the site and/or surrounding community to undue risks, then the first consideration is termination. Any discipline imposed pursuant to a Life Saving Rule will be subject to the grievance and arbitration procedures of this Collective Bargaining Agreement. The term "willful" is intended to encompass concepts such as: an intent to violate safety rules; conduct at odds with an employee's training and experience; and taking extenuating circumstances into account in the decision-making process. "Life Saving Rules" are intended to prevent serious injury or death to people working at Edge Moor. They are not meant to threaten employees in any way.

(c)     Safety Rules, including the seven Life Saving Rules, will be printed in the "Tipster". The electronic "Tipster" will be the Plant's official safety manual. Eight printed versions of the electronic "Tipster" will be distributed and located as follows: Production (Control Room L1); Production (Control Room L11); Maintenance (Reaction Shop); Safety Office; North End (Maintenance Shop); Stores; R&D; USW Local 4-786.

(d)     The Seven Life Saving Rules may be changed only upon mutual agreement. All other changes to the "Tipster" are subject to Article IV Section 2.

Section 14.     <u>Short Vacations</u>. Since departure from normal vacation schedules (*i.e.*, in full weeks) may interfere with the operation of the Plant, supervision will have full discretion for the administration of whether a short vacation may be granted or not.

(a)     All vacations for the year will be recorded in hours.

(b)     All vacation can be taken in 2-hour increments.

(c)     Forty-eight hours' notice should be given, but supervision will grant requests if mutually convenient with less notice. Requests will be considered on a "first come, first served" basis.

(d)     Requests for short vacations with less than 48 hours notice can be made to supervision at any time prior to the start of such vacation in emergency situations or at the discretion of supervision.

(e)     Short vacations may not be granted with less than 48 hours notice if it interferes with production scheduling and shutdown staffing.

(f)     Requests for short vacations will be considered only if there is no overtime or other cost penalty involved. Exception to this is where overtime is required to cover disabilities or relief operator absences. In these cases, supervision will minimize overtime costs.

(g)     Short vacations may be taken only on days the employee is scheduled to work.  They may not be taken on days of rest.

(h)     Short vacations may not be rescheduled or cancelled once they have started.

(i)     Individual days taken off from scheduled work for vacation time, which preceded the sixth and seventh day, shall be counted as days worked for the purpose of determining the sixth and seventh day worked.  No premium will be paid for sixth and seventh day not actually worked.

(j)     Selection of vacation by seniority should be made prior to April 1st.  Any request made after April 1st will be considered on a first-come first-served basis.  Full weeks and full days take precedence over half days or two-hour increments.

(k)     Employees receiving short vacation the first part of the workday must report directly to their supervisor at the time they begin the last part of the workday.  This is required to determine starting time for pay purposes.

(l)     Two, four and six hour vacations will count as hours worked toward overtime hours.  Example:  A shift worker takes the first half day off as vacation, works the second half; then all hours worked in that day after the worker's regular shift are overtime hours.

(m)     Vacation hours will count as hours worked toward a meal allowance as referenced in Section 4 of this Article.

(n)     If the relief operator of the shift is available, any combination of hours up to 12 hours may be taken if granted by supervision for that day requested.

## ARTICLE XV

### Bulletin Boards

Bulletin boards will be made available to the Union at mutually agreed upon locations. Notices shall be restricted to the following types:

(a)    Notices of Union recreational and social affairs;

(b)    Notices of Union elections, appointments, and results of elections;

(c)    Notices of Union meetings; and

(d)    Minutes of meetings of Union membership, and minutes of meetings with the Plant.

(e)    Any/all literature of a derogatory and/or inflammatory nature is prohibited.

## ARTICLE XVI

### No Strike And No Lockout

Section 1.    (a) During the term of this Agreement, there shall be no strikes of any kind, including sympathy strikes, work stoppages, slowdowns, or interruptions of work of any kind, on the part of the Union and/or its members, for any reason, nor lockout on the part of the Plant for any reason.  In exchange for the Union's agreement not to strike during the term of this Agreement, the Plant agrees that all disputes that arise under this Agreement, including interpretation thereof, shall be settled as specified in Article VI, entitled "Grievance Procedure."

(b)    However, the parties agree that the no-strike/no lockout provisions of this Section shall not apply in the event of wage/rate negotiations as provided in Article XIII, Sections 1 and 2, above.

Section 2.    The Union further agrees that in the event an employee or a group of employees instigates and/or takes part in any strike, as defined in Section 1, above, that the

Union officers, stewards and representatives will not, in any way, participate in any such activity. The Union shall promptly disavow in writing any such action on the part of the employee or employees and the Union further agrees that it shall, through its officers, stewards and representatives make all reasonable efforts in order to terminate any such work interruption or interference. So long as the Union in good faith fulfills its responsibilities under this section, there shall be no liability on the part of the Union under this Agreement.

Section 3.     Any individual, or group of individuals participating in such activity as has been described in the preceding sections, shall be subject to disciplinary action, up to and including discharge.

## ARTICLE XVII

### Bump & Bid Procedure

Section 1.     <u>Job Bid Procedure</u>:

(a)     Employees available for recall to a particular function will be contacted prior to filling the vacancy through the Job Posting Procedure.

(b)     All shift movement within a job title/classification will be made prior to a job opening being posted.

(c)     Permanent job openings in the bargaining unit will be posted on the main gate job posting board from Tuesday to Tuesday (12:00 Noon to 12:00 Noon). Job descriptions for any job posted on the board will be available for review at the main gate house where the posting sheets are available for bidding.

(d)     Management will issue a Plant-wide electronic communication when a permanent job is posted. The Plant will make an effort to issue this communication the Thursday

before the job is posted.  Management will also notify the Union in writing prior to lateral job openings being filled.

      (e)    Any employee who wishes to be considered for a job posted during his/her vacation, or other absence from the Plant, shall inform Human Resources by completing an Extended Leave/Vacation Bid Form and putting it in the Job Bid Box.

      (f)    When filling permanent job openings in the bargaining unit, the following factors shall apply:

      (1)    Seniority;

      (2)    Ability, skill, efficiency, knowledge and training; and

      (3)    Physical fitness to perform the essential functions of the job, with or without reasonable accommodation (only in cases of reemployment, transfers, demotions and promotions).

      (4)    In cases where the candidates have approximately the same qualifications as determined by factors (2) and (3), seniority shall govern.

      (g)    An employee who bids on a posted job and is the most senior qualified applicant must go to this job when so requested by management.

      (h)    If an employee has not moved within 180 calendar days and there has been no movement in jobs which precede his movement in the daisy chain, an employee may withdraw his application.

      (i)    A job's lock-in period begins when the employee physically moves to the new job and extends for one year after the employee assumes the job's full responsibilities.

(j). If an employee has been bumped into a job there is no lock-in period for bidding.

(k) The successful bidder will receive the rate of the new job upon qualifying in that job. If the applicant is moving to a job with a higher rate of pay and the employee has not been moved within 180 days, the applicant will receive the starting rate of the new job.

(l) A successful applicant who does not perform satisfactorily in the judgment of the Plant in his/her new job during a trial period of ninety (90) calendar days or less, will go back to his/her former job, and all other moves that were made as a result of the opening will revert to their former status.

(m) Temporary job openings which are expected to exist longer than three (3) months will be posted according to the same procedure as permanent jobs.

(n) Temporary jobs which are expected to exist for less than three (3) months, and temporary jobs pending the transfer of the successful applicant for a posted job, will be filled by an employee deemed qualified and selected by the Plant.

Section 2. New Jobs:

(a) If a new job is established or a job is changed 50%, the incumbent will be given the opportunity to remain on the job or accept a bump letter.

(b) The process for filling the new job will be handled by the current bid system, of posting Tuesday to Tuesday, at the Main Gate, (12 noon to 12 noon).

(c) Any employee who is going to be on vacation is required to inform Human Resources that he wants to be considered for any new job by completing an Extended Leave/Vacation Bid Form and putting it in the Job Bid Box.

(d)     Management will contact any employee on extended disability to determine interest in any new job.

(e)     Employees can turn down new jobs.

(f)     Any job that is an addition to head count is NOT considered a new job (*i.e.* adding another pipe fitter position to the site, even though the job is an addition, the site currently has pipe fitters).  Lock-in periods will be waived to allow employees to bid on new jobs.

Section 3.     <u>Interdepartmental Bidding</u>:

(a)     If a job bid from one department within the site to another department will cause a bargaining unit employee to be displaced and cause a reduction of force, the bid will stop and the daisy chain of moves will be discontinued.  This does not pertain to employees exercising bump rights if they are going out the gate due to a reduction of force.

Section 4.     <u>2A Rate</u>:

(a)     Due to the different learning curves of employees, there will be no set time frame to give employees the 2A Rate.  2A Rate will be given based on the assessment of the Training Department and the Team Manager (immediate supervisor).  The assessment will be based on the proficiency on the job and the use of tools.

(b)     An operator will be evaluated at the following intervals: 30 days, 60 days, and 80 days.  The criteria for awarding the 2A Rate will be based on the employee's ability to do his/her assignment with minimal supervision, and the ability to demonstrate the skills required for the job (including the use of tools) to the satisfaction of the Team Manager (immediate supervisor) and a representative of the Training Department.

(c)     If, after the first 80 days, the employee has not satisfied the required criteria, the operator may receive additional training and the evaluation process would continue or the employee may be disqualified and sent back to his/her previous function.

Section 5.     New Employee: Management retains the right to disqualify new employees for any reason for the first six (6) months.

Section 6.     Bidding on Probationary Status. Any employee who is on probationary status for unsatisfactory job performance will be permitted to bid on lateral jobs. Employees may bid on jobs with an ultimate base rate higher than their present rate of pay. However management will consider awarding these jobs on a case by case basis. The severity of and length of probation would be reasons considered in permitting an employee to bid on a job.

Section 7.     Bump Procedure. An employee is entitled to a bump letter whenever they are displaced or when their job is changed 50% or greater.

When the above occurs, Management will provide the employee(s) with a list of jobs the employee(s) are qualified for. Seniority and qualifications shall be the governing factors for bumping.

The employee(s) will be afforded 96 hours to review the list and make 3 selections in order of preference. Additional time may be granted if tests and or other pre-qualifying factors exist.

Lock-in periods will not apply to displaced employees; therefore, they can bid on jobs.

If a bump from one department within the site into another department results in a bargaining unit employee being displaced and causes a reduction of force, the bump chain will stop and be reviewed by Union and Management. If it is determined that any of the displaced

employees in the bump chain have an option to bump into another position of equal pay and not cause a reduction of force, this option will be used.

Section 8.    Recall Rights.  Recall rights will be for a period of two years.  They will start once an employee moves to a position he/she has either bumped into or bid on as a result of being displaced.

When a recall situation arises, all employees in the recall chain will be contacted by Management and asked if they wish to exercise their recall rights.

If all employees in the recall chain elect to stay in their current positions and not exercise their rights, they will not move and the open job will be filled under the Job Bid Procedure.

If any of the employees elect to exercise their rights, all employees involved in the recall chain must move back to their former positions.  The exception to this is an employee who bid out of the chain; in this case the employee that bid out of the chain will be given the option of recall or staying in the current position.  This would not break the chain or prevent any employee in the chain from exercising his/her rights.  In the event the chain is broken, the open job will be filled under the Job Bid Procedure.

A displaced employee that later receives recall rights to a former job will receive the rate of pay for that job on the first day of return.

Displaced employees will be afforded the opportunity to bid on and accept jobs and still maintain their recall rights.

Section 9.    Job Changes:

(a)    Prior to changing any job qualifications, management will notify the Union and discuss the changes at the Union's request.

(b) Management will establish a reasonable time period for affected employees to become qualified.

## ARTICLE XVIII

### Performance Based Compensation For DuPont Edge Moor Non-Exempt Employees

Section 1.    Purpose.  The purpose of this Performance-based Compensation Program (the "Program") is to provide the opportunity for eligible employees to share in business results that exceed expectations.

Section 2.    Form of Awards.  Awards under this Program shall be paid in cash through the regular payroll system.  Awards shall be considered "pay" for purposes of the Company's Pension and Retirement Plan, but not for any other benefit plan.

Section 3.    Program Details/Award Criteria.  Awards under this Program shall be determined in accordance with the written criteria determined by the Company as described in Section 4(b) below.

Section 4.    Administration:

(a) Except as otherwise specifically provided herein, this Program shall be administered by the Company.  Decisions of management with respect to any questions arising out of the interpretation, operation, or administration of this Program shall be final and not subject to any grievance or arbitration procedures.

(b) The financial and other performance objectives shall be established exclusively by Management of the Company.

Section 5.    Eligibility:

(a)   To be eligible for an award, an employee shall be a Full Service Employee (including U.S. Transferees or on-loan employees), and shall be employed on the nonexempt salary roll.

(b)   Eligible employees who are active employees for the entire Program year will be eligible for a full-year award.  Employees who transfer into the (business/site) from another business or site during the Program year will have their full-year Program award administered by the business or site by which they are employed on December 31 of the Program year.

(c)   Eligible employees who are newly hired employees, employees not on the Full-Service Roll for the entire Program year, employees working a reduced schedule, employees on approved leave of absence, or employees who terminated employment voluntarily due to retirement, or employees who terminated because of death or disability or lack of work will be eligible to receive a partial full-year award.

(d)   Independent contractors and consultants, employees of third parties and employees of the Company terminated involuntarily or for cause are not eligible to participate.

Section 6.   Term.  While it is the present intention of Management to continue this Program, Management reserves the right to modify the Program from time to time or to repeal the Program entirely, or to direct the discontinuance of awards.

Section 7.   Access to Financial and Other Data.  Participants in this Program and their representatives shall waive any right they may have to information pertaining to the application, operation or administration of the Program.  Management, in its sole discretion, may make such information available.

Section 8.   Miscellaneous:

(a)     For purposes of this Program, the term "Company" means E. I. du Pont de Nemours and Company.

(b)     All expenses and costs in connection with the operation for this Program shall be borne by the Company.

(c)     For purposes of this Program, the term "Program Year" shall mean the calendar year January 1, through December 31, to which the criteria set forth in Appendix C ("Schedule A") applies.

(d)     For proposes of this Program, "Annual Pay" shall mean pension-base earnings minus any award(s) under this Program from the previous Program Year.

(e)     Pension-base Earnings means pay as defined in the Pension and Retirement Plan.

(f)     For purposes of this Program, the term "Part Year Award" shall mean a full year award multiplied by the number of full and part months worked, divided by 12.

## ARTICLE XIX

### Union Business

Section 1.     <u>Off-Plant Union Business</u>

Union officers and representatives may request and be granted time off without pay to conduct Union business. This is business to be conducted off the Plant. Management will release Union officials provided their absence will not interfere with Plant operation or result in increased cost to the business. In no instance will more than sixteen consecutive calendar days be granted to any one (1) individual, and the Plant shall not grant time off under this Section to more than five (5) employees at any one time (or as otherwise mutually agreed).

Below is a listing of those eligible to request and receive time off under this Section:

(1)    Officers:  President; Vice President; Secretary; and, Treasurer.

(2)    Representatives:  E & I Representative; Plant Maintenance Representative; R & D Control Lab and Shipping Representative; Administrative Assistant Representative; "A" Shift Representative; "B" Shift Representative; "C" Shift Representative and "D" Shift Representative.

(3)    Trustees.

(4)    Committee Chairs of the Contract, Grievance, Safety & Health, Elections & Polls, and Bylaws Committees.

Section 2.    <u>On-Plant Union Business</u>

Management will schedule, by mutual agreement, all Union-Management meetings held on the Plant either by request of the Union or Management.  The party requesting the meeting shall provide the other party with a suggested agenda, to the extent practical, at least forty-eight (48) hours prior to the meeting.  The agenda shall be mutually agreed upon and both parties shall have the right to add items to the agenda.  Management will agree to release a predetermined number of employees to attend these meetings as listed below.

This procedure does **not** limit the number of Union officers, representatives and committee members attending meetings on their own time when their personal schedules permit. Union officers, representatives and committee members attending meetings with Management on their off time will receive no pay.

The Union will provide Management the names of officers, representatives, and committee members for use in scheduling meetings. The Union will make any changes in writing to Management, as soon as practical.

Management will release with pay those employees designated by the Union as follows:

(1) For area negotiations – Three (3) employees will be released with pay, four (4) if mutually agreeable. This bargaining involves subjects concerning an area, work group or several areas or work groups, but less than a Department.

(2) For departmental negotiations – Four (4) employees will be released with pay. This bargaining involving subjects concerning a whole department such as Mechanical, Operations, R&D, or Administrative Assistants.

(3) For Plant-Wide negotiations – Five (5) employees will be released with pay. Plant-wide bargaining involves all nonexempt bargaining-unit employees.

(4) For Union-Management Contract Negotiations – Five (5) employees will be released with pay. This bargaining is bargaining over a Collective Bargaining Agreement and Successor Agreements, and any modifications to such Agreements that affect the entire bargaining unit.

(5) For Union Contract Chairperson – This chairperson will be released with pay for up to two (2) hours a week, considering the needs of the business.

(6)    For Union Grievance Chairperson – The Union Grievance Chairperson will be released with pay for up to three (3) hours a week, considering the needs of the business.

(7)    For Union Communication Chairperson – This Chairperson will be released with pay for up to two (2) hours/week, considering the needs of the business, to update Union Bulletin Boards.

(8)    For Local Union President – The Union President (or the Vice President in his absence) will be released with pay for up to sixteen (16) hours per week, considering the needs of the business, to conduct on-Plant Union business.

Section 3.    Union Business on Company Premises

The Plant will continue to provide the Union President with storage and office space on the Plant site and will continue allow the Union President and Vice President to return to the site outside of their working hours for Union/Management business in accordance with the current practice, with advance notice to Management.

ARTICLE XX

Progressive Discipline

Section 1.    Objective. The objectives of this procedure are to establish a uniform approach to the maintenance of discipline, high moral conduct and efficient Plant operations. It is a corrective procedure designed to correct and to improve performance. Progressive discipline involves proper training, follow-up, consistency, firmness and understanding on the part of all parties. Action is required when an employee has unsatisfactory performance in one or more phases of his/her job or fails to comply with Plant rules. While it is progressive in design, any

step or steps may be omitted when the severity of the situation dictates use of a higher level step of discipline.

There are three progressive developmental steps in the disciplinary procedure prior to discharge:

    (1)    Verbal Contact

    (2)    Formal Reprimand

    (3)    Formal Reprimand with Probation

The objective of all of these steps is to develop the employee's efforts, skill and desire and to obtain compliance with Plant rules and standards of proper workplace behavior.

Section 2.    <u>Employee Rights and Management Actions Under the Weingarten Doctrine</u>.  If Management requests an investigatory interview which could reasonably lead to discipline or termination, an employee can request that a Union Representative, officer, or steward be present at this meeting.  Absent extenuating circumstances, Management will honor that request and will arrange for the attendance of a reasonably available Union Representative. Without Union representation after a proper request, the employee can choose not to participate in the discussion or interview.  This provision is not intended to expand or limit employee, union or management rights under the Weingarten Doctrine as interpreted by the NLRB and the courts.

Section 3.    <u>Disciplinary Steps</u>.

    (a)    <u>Verbal Contact</u>.

        (1)    Such discussions are used to correct relatively minor performance errors or less severe violations of rules/practices or to assist the employee to correct unsatisfactory performances.

- 55 -

(2)    The verbal contact should ordinarily take place in private. The supervisor should make sure that the employee understands: the reason for the rule or practice; what was done wrong; and what must be done to correct the infraction.

(3)    A memo to file, rather than a Conference Report, may be made of the discussion for future reference by the Supervisor. It will be retained by the Supervisor in his/her files for up to six months. However, the memo to file can be removed from the employee's personnel file before the six month period if Management feels that the employee's performance has improved sufficiently in the targeted deficiency.

(b)    Formal Reprimand.  A Formal Reprimand can be used when:

(1)    An employee accumulates more than one Verbal Contact.

(2)    Performance continues to be unsatisfactory after receiving a verbal contact.

(3)    There is a more serious violation of a rule/practice, or a significant performance error, and a verbal contact is not regarded as an appropriate response under all of the circumstances of the incident. Examples of significant performance errors include, but are not limited to the following:  overfilling a tank, tank truck, rail car; not following SJP's (Standard Job Procedures); causing an environmental incident.

(c)    Probation.  Probation can be used when:

(1)  An employee repeats the same infraction or violation after a formal reprimand.

(2)  An employee commits a different infraction or violation after a formal reprimand or another formal reprimand is not regarded as an appropriate response under all of the circumstances of the incident.

(3)  An employee's performance continues to be unsatisfactory after receiving a formal reprimand, including a failure to meet any specific requirements outlined in the Conference Report.

(4)  An employee commits an act of serious misconduct or a similarly severe act and discharge is not regarded as an appropriate response under all the circumstances of the incident.

(5)  Probation will be imposed for a term of up to one year, unless it is extended (for an additional six months due to continued unsatisfactory performance) or if additional progressive actions are taken during its term.  However, probation may be reduced or ended before the one-year period, if Management feels that the employee's performance has improved sufficiently in the targeted deficiency.

Any employee who is on probationary status for unsatisfactory job performance will be permitted to bid on lateral jobs. Employees may bid on jobs with an ultimate base rate higher than their present rate of pay.  However, Management will consider awarding these jobs on a

case by case basis. The severity and length of probation would be reasons considered in permitting an employee to bid on a job.

(d)    Discharge.  An employee will be discharged when probation does not improve the targeted deficiency or deficiencies, when performance declines significantly in another area, or when a serious act of misconduct occurs, regardless of its relation to the targeted deficiency or deficiencies.

Section 4.    Conference Reports.  A Conference Report will be written to document the meeting with the employee and the expectations conveyed in that meeting whenever a Formal Reprimand or higher step of progressive discipline is used.  The Conference Report procedure must be explained to the employee and should take place as soon after the incident as is reasonable.

(1)    The employee will be given a reasonable opportunity to gather and present, in writing, his/her facts and any extenuating circumstances that pertain to the nature of the incident.

(2)    The Conference Report will be filed in the employee's personnel folder for up to one year or for the duration of probation.

(3)    The Conference Report will be removed from the employee's personnel file after one year unless it is extended or if additional progressive actions are taken during its term.  However, the Conference Report can be removed from the employee's personnel file before the one-year period if Management feels that the employee's performance has improved sufficiently in the targeted deficiency.

(4)   If additional progressive action is taken during the term, the existing Conference Report will be attached to the new Conference Report.

(5)   Periodic reviews at 30, 60 or 90 days will be held with employees as specified in the Conference Report.

(6)   An employee may request the presence of a Union Representative, officer or steward, consistent with the section on the Weingarten Doctrine, above.

(7)   Whether present at the meeting where the progressive action is conveyed to the employee or not, the Union Representative will be given the Conference Report reflecting that meeting, even if it is one of commendation. The Union Representative must be given the opportunity to initial it.

Section 5.    Serious Acts of Misconduct.

(1)   These rules address serious acts of misconduct obviously contrary to the ability to maintain a safe, respectful, orderly, and productive workplace. The actions and behaviors listed below will not be tolerated and are dischargeable offenses. The list of items below is not intended to represent a complete list of unacceptable conduct. There may be other acts of misconduct that result in the same consequences.

A.  Neglect, incompetence, or carelessness in performing duties including safety violations, and acts leading to environmental incidents.

B.  Engaging in hostile, abusive, threatening, or disrespectful behavior while engaging in activities on behalf of the Company, including physical intimidation, threats, sexual or other forms of harassment.

C.  Horseplay and malicious mischief.

D.  Use, sale, distribution, dispensing, and possession of drugs taken for non-medical reasons or alcohol while on site property.

E.  While engaged in activities on behalf of the Company, "presence in the body" of alcohol or drugs taken for non-medical reasons.

F.  Unauthorized use or disclosure of Company information such as process know-how, trade secrets, business data and personnel data.

G.  Use or possession of firearms, ammunition, explosives, or other dangerous weapons on site property or in the workplace.

H.  Insubordination in connection with work or work assignments, including deliberate refusal to comply with

reasonable requests or instructions, subject to the "Protocol for Addressing S.H.E. Concerns".

I.   Intentional falsification of records, data, documents, or other information including giving false or incomplete information during employment, when applying for employment, or in connection with investigations.

J.   Intentional damage to Plant, employee, contractor, or vendor property.

K.   Fighting or acts leading to fighting.

L.   Theft, unauthorized possession or removal of company property or personal items belonging to employees, contractors, vendors, or visitors.

M.   Smoking in areas where prohibited.

N.   Sleeping on the job.

O.   Use of Company electronic communications resources, including electronic mail and internet access, in a way that does not conform to Plant rules and restrictions or access to INTERNET WEB SITES that are inconsistent with Company policies, ethics, values and business practices. REF: http://www2.lvs.dupont.com/diso/nonbususe.html.

P.   Any illegal gambling or any gambling which takes place on Plant time, as that term is defined in Article III, Section 2.

-61-

The "workplace" is used in a broad sense to include acts that occur and conditions that exist at all locations where employees are engaged in activities on behalf of DuPont. "Site Property" is defined as the fence-enclosed Plant property, the Stores facility and all parking lots.

The employee involved in an act of serious misconduct must be given an opportunity to present information about the incident, consistent with the section of this policy on the Weingarten Doctrine. During the discussion, area supervision will assure the employee that a thorough effort to obtain all the facts will be made before a decision is reached on the disposition of the incident.

Section 6.    Protocol for Addressing SHE Concerns. The following procedure provides a means for Management and employees to resolve questions on the job regarding SHE issues.

If employees reasonably believe in good faith that an assigned task could reasonably lead to a SHE incident, they should first express their concerns and attempt to clarify their concerns about the work assignment with their work group supervisor. Requesting such a review in good faith will not be considered insubordination. If a job plan cannot be agreed upon at that point, discussion will next take place by phone between employee, work group supervisor and the SHE Consultant. If a job plan cannot be agreed upon after that step, then discussion in person will take place among employee involved, the work group supervisor and SHE Consultant to identify an acceptable plan. If the SHE Consultant concludes that the job plan is safe, an employee's continued refusal at this point to perform a work assignment may be considered insubordination, unless the employee reasonably believes that the work conditions pose an imminent risk of death

or serious bodily injury and the employee has reason to believe that there is not sufficient time or opportunity to seek an effective resolution with Management.

### ARTICLE XXI

#### Substance Use/Abuse Procedure

Section 1.    <u>Plant Philosophy</u>. The Edge Moor Plant subscribes to the medical opinion that chemical dependency is an illness that can be treated and controlled through abstinence. Substance use/abuse is recognized as a most serious problem in our society, from the use of illegal drugs, the misuse of prescription drugs and the misuse of over-the-counter drugs and alcohol. While individual cases require individual treatment, there are certain eligibility requirements that participants must make. This procedure outlines those elements.

Rehabilitation can take many forms. The abuse of alcohol and/or drugs can sometimes be managed by regular consultation with appropriate Integrated Health Care (IHC) resources. Chemical dependency in its early stages can sometimes be helped by attending Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) support groups. In its more advanced stages, chemical dependency can be managed by treatment in outpatient or inpatient facilities, both of which result in healthcare insurance claims, possible job reassignment or lost time from work.

Employees whose substance abuse problems are sufficiently severe as to require a level of treatment that is Company-assisted must agree to terms in Rehabilitation Agreements, described later in this procedure, in order to receive that assistance. "Company-assisted" means that the Company has, in whole or in part, compensated either directly or indirectly the provider or an insurance carrier.

Awareness Programs that encourage employees to seek assistance early in their dependencies and aggressive detection programs that enable early identification of substance abusers are clearly advantageous to both employees and the site.

The following is intended to explain Edge Moor's substance use/abuse procedure for rehabilitation and corrective action.

"On the job" use, sale or possession of illegal drugs or alcohol will be handled according to standard disciplinary procedures, (Reference - "Acts of Serious Misconduct").

Management's most important responsibility is to protect the safety of Edge Moor's employees, Plant facilities, the environment, and the community. Any activity which adversely affects an employee's judgment or job performance is a most serious matter including substance use/abuse.

Section 2.    Rehabilitation and Discipline.  In order to encourage early treatment and to meet the site's duty to protect the best interests of all, all employees must be made aware that substance abuse and dependency will not be regarded as providing an "excuse" for poor safety performance, poor job performance, poor attendance, or any violation of standards of conduct and performance applicable to all employees.  Employees who choose to participate in rehabilitation programs, must understand that, consistent with our commitment to maintaining a safe and productive workplace for all, violations of such standards of conduct and poor performance will result in appropriate discipline, including discharge.  Likewise, employees whose performance has been adversely affected by substance use or abuse but have declined evaluation or treatment will be advanced in the disciplinary system, as appropriate, if performance continues to be unsatisfactory or they violate rules of conduct, (Acts of Serious

Misconduct included). Employees will be discharged for repeated or serious misconduct and last minute requests for help will not override the decision to discharge.

It must be recognized that discipline and rehabilitation are separate concepts that will operate simultaneously in cases where performance is adversely affected. Discipline, including discharge, will be used to deal with misconduct, including all instances of reporting for work with alcohol or drugs in the system, occurring before or during the rehabilitation process. Thus, when an employee who is subject to follow-up testing as a term of his/her rehabilitation program tests positive in a sample taken during the workday, the employee has not only failed to comply with a term of his/her rehabilitation program but has also plainly violated an established standard of conduct regarding drugs/alcohol "in the system" while at work. This noncompliance and/or violation requires a disciplinary response. In other words, this employee should be considered for "advancement" under both the disciplinary system and the rehabilitation program.

Employees have the responsibility of contacting and reporting to site medical and consulting with the doctor or nurse when taking any prescription drugs to determine fitness for duty. Many prescription medications indicate that a side effect, *e.g.* drowsiness, may occur and site medical needs to determine if the employee can safely perform his/her function. Employees who are taking drugs prescribed by their physician should carry medication in appropriately labeled containers in order to document their acquisition.

(a)     "Voluntary" Request for Help

If an employee requests help for a chemical dependency problem, before job performance is adversely affected, and supervision and/or IHC determine that there is a problem which justifies coverage under this procedure, assistance should be offered. The employee should not be placed on probation unless performance deteriorates during or following desired treatment.

However, an employee's request to participate in the program shall not affect supervision's right to administer appropriate disciplinary action for incidents occurring before and after the request.

    (b)    Deterioration of Performance

        (1)    Indirect Observation - supervision has not seen the use/abuse of chemicals. Consultation should take place with another member of management to confirm observations. The employee should be informed that something is adversely affecting job performance and needs to be rectified. Supervision should request a meeting with an IHC representative for discussions concerning deterioration of performance. Supervision may refer the employee to an IHC representative for evaluation.

            A.    Remaining on the Job Criteria

                (i)    If the employee indicates to supervision or IHC representative that there is a chemical dependency problem, appropriate steps will be taken to assist the employee.

                (ii)    If it is determined that substance use has affected performance at work, whether treatment is requested or not by the employee, the employee must be informed that follow-up testing will take place for at least the next year including numerous substance abuse tests weekly to confirm the absence

of drugs and alcohol in the system, while in the workplace.

(iii)   Employee must maintain satisfactory job performance including compliance with all standards of conduct.

(iv)   Employee may be reassigned or have job content altered if appropriate because of the nature of employee's work (safety or security sensitive).

(v)   IHC and site supervision will evaluate the employee's job to determine if restrictions are needed, (especially in safety sensitive and safety critical jobs).

(vi)   If disciplinary action is warranted due to diminished performance, disciplinary action must still be taken separate from the substance use/abuse situation.

(2)   Direct Observation - If management observes direct substance use or paraphernalia typically associated with drug use, the employee will be advised that substance abuse is suspected, will be removed from the job and required to consult with IHC resources.

A.   Supervision will take appropriate disciplinary action for violating site rules prohibiting drugs ( for non-medical reasons) and/or alcohol in the system while in the workplace.

B.     Whether treatment is requested or not by the employee, the employee must be informed that stringent follow-up testing will take place for at least the next year, including numerous substance abuse tests weekly, to confirm the absence of drugs and alcohol in the system, while in the workplace.

C.     Employee must maintain satisfactory job performance including compliance with all standards of conduct.

D.     IHC and site supervision will evaluate the employee's job to determine whether restrictions are needed (especially in safety sensitive and safety critical jobs).

E.     Employee may be reassigned or have job content altered, if appropriate because of the nature of employee's work (safety or security sensitive).

(3)     The rehabilitation assistance can take one of four courses (can be a combination of any of the following):

A.     Consultation with IHC resources.

B.     Attendance at Self-Help Meetings such as AA, NA.

C.     IOP

D.     Inpatient treatment at an approved treatment center. If the employee enters a Company-approved treatment center:

(i)     Employee will be covered by the Short Term Disability Pay Plan. The employee must comply

with the terms and conditions of the plan language

in order to be paid and continue employment.

(ii)    The employee's medical insurance, (*i.e.* MEDCAP), will pay for 90% of the charges in a Company-approved treatment provider.

(iii)    It is not the intent of this procedure to provide payment for transportation charges and other incidental expenses. Edge Moor's supervision may, in unusual circumstances, provide transportation to and from the treatment center; for example, if this is essentially the only practical way the employee can get to the facility.

Employees are expected to utilize the Employee Assistance Program (EAP), prior to initiating substance use/abuse treatment. A substantial savings can be realized by the employee when arrangements are made for treatment through the EAP instead of being handled by the employee.

Section 3.    If the employee refuses rehabilitation treatment after a positive result for substance use or the employee was removed from the job due to presence of drugs/alcohol in the workplace, the follow guidelines must be followed:

(a)    The employee is to be informed that he/she must submit to a urine test immediately and is being sent home without pay pending a negative result in order to return to work. There are possible outcomes to the sample:

(1)    If the sample taken immediately prior to being sent home indicates a negative result the employee will be returned to work.

    A.    The employee must be told that he/she will be randomly tested on a very frequent basis to confirm the absence of drugs and alcohol in the system while in the workplace as a condition of continued employment. The frequency of the testing is to be determined by supervision and IHC and will last for at least one year.

    B.    Employee may be reassigned by supervision or have job content altered if appropriate because of the nature of the employee's work. (Safety-sensitive, safety critical jobs.)

    C.    Any subsequent sample that tests positive for at least the next year will subject the employee to an unpaid 90 day rehabilitative leave or termination of his/her employment at Edge Moor. The course of action will be determined by IHC representatives and site supervision.

(2)    If the sample taken immediately prior to being sent home indicates a positive result, the following criteria will be followed:

    A.    Management has the right to terminate the employee:

        (i)    An employee whose performance has deteriorated to the point that termination is appropriate.

(ii)    An employee who has repeatedly violated a standard of conduct for which termination is appropriate.

B.    Management has the ability to offer the employee a 90 day rehabilitation leave.

    (i)    90 Day Rehabilitation Leave (use)

        1.    Last chance action short of termination.

        2.    Employee must cooperate with appropriate IHC resources and other treatment resources. (Visit IHC resources at least twice monthly - to be determined by IHC).

        3.    Employee must cooperate with site supervision.

        4.    No pay or service credit during 90 day leave.

        5.    Aggressive testing will continue and the employee must submit to testing to confirm abstinence.

        6.    If the employee test positive during the 90 day rehabilitation leave their employment WILL be terminated immediately.

    (ii)    90 Day Leave will NOT be used when:

1.    Serious misconduct occurs that warrants termination considering both the employee's misconduct, disciplinary status and history.

Section 4.    If the employee accepts Management's offer of rehabilitation treatment after a positive result or it has been determined that the employee was removed from the job for presence of drugs/alcohol while in the workplace, the following guidelines must be used:

(a)    The employee requires evaluation by appropriate IHC resources.

(b)    Management will take appropriate disciplinary action for violating site rules (Acts of Serious Misconduct), prohibiting drugs (for non-medical reasons) and/or alcohol in the system while in the workplace.

(c)    If local or outplacement treatment is determined appropriate, IHC resources and site supervision will determine whether reassignment or restrictions are needed, (especially in safety sensitive, safety critical jobs).

(d)    Very aggressive follow-up testing will take place for at least one year, to determine the absence of drugs and alcohol while in the workplace.

(1)    Should the employee test positive during or after rehabilitation, management has the right to terminate the employee or offer a 90 day rehabilitation leave.

90 Day Rehabilitation Leave:

A.    Last chance action short of termination.

B.    Employee has not been out of treatment at least one year.

C.    Employee has demonstrated a period of sustained overall job performance.

D.   Employee has cooperated with IHC resources and
     supervision.

E.   No pay or service credit during 90 day leave.

F.   Aggressive testing will continue and the employee must
     submit to testing to confirm abstinence.

G.   Supervision believes, after consultation with appropriate
     IHC resources and the employee, that the employee has
     demonstrated and will continue to demonstrate a
     commitment to recovery.

H.   If the employee tests positive during the 90 day
     rehabilitation leave their employment WILL be terminated
     immediately.

Section 5.    Edge Moor's management reserves the right, after appropriate discussions

with bargaining representatives, to amend any parts of this Substance Use/Abuse Procedure or

terminate it in its entirety should either action be deemed necessary by management.

Section 6.    Drug and Alcohol Searches.  Drug and alcohol searches can be of either

Company or personal property, and can be conducted on a random, or for cause, basis.  The

intent of these searches will be to act as a possible deterrent to substance use/abuse and to

minimize Plant use, manufacture, or sale of drugs and alcohol.

It must be clear to all employees that searches are a condition of employment.

Employees who refuse to cooperate during a search should be aware that failure to comply can

result in disciplinary action up to and including discharge.

Searches that will be conducted may include but are not limited to:

(a)    Gate Searches.

(b)    Unannounced random searches of employees lockers, work areas, offices may be conducted by either supervision, security, trained detection animals and/or electronic surveillance.

(c)    Parking lot - on Plant property and alcohol and drugs are forbidden. Cars are not subject to search until they pass the Gate House.

Random searches will be designed in a manner not to discriminate against any class of employees, visitors or vendors and will include all employees.

Other methods needed to stop or detect the presence of drugs on the Edge Moor Plant will be used. These may include, but are not limited to, undercover operatives, visual and electronic detection.

Management will cooperate fully with law enforcement agencies.

Section 7.    Search Procedure:

(a)    If a substance(s) is detected by supervision or trained detection animals, whether it is located in the locker, office, work area or person, the employee(s) suspected will be required to submit to testing.

(b)    If it is determined that the substance detected belongs to an employee, that employee will be immediately sent home and his/her status of employment will be evaluated by supervision. The substance may be turned over to appropriate law enforcement personnel and/or routed for analysis by a laboratory.

(c)    An employee will not be searched physically, *i.e.* stripped, searched, but could be asked to empty pockets, etc. Failure to do so will be considered failure by the employee to cooperate with supervision and disciplinary action will be taken.

(d)     Human Resources will be responsible for scheduling all searches.

(e)     After testing, an employee may return to work provided it is concluded that he/she can work safely.

(f)     If the test results are positive when received, 3-5 days later, the employee will be interviewed by the Medical Review Officer (MRO) for an explanation and will then be sent home pending the outcome of the situation.

Section 8.     Drug Detection Testing Procedures:

(a)     Overview

The entire rehabilitation process, regardless of the   options used, must take a no nonsense approach.  Employees entering the process need to understand that the procedure will support their efforts to help themselves but they will be held accountable for failures. Experience shows this approach to be most effective in breaking down the barriers of denial and discouraging relapse, both common symptoms of substance dependency.

All cases will be managed in a way that protects the privacy interests of those involved employees.  ONLY those people that have a need to know should be involved in managing individual cases.

(b)     Identification of Employees with a Chemical Dependency

Employees with a chemical dependency can be identified in many ways.  They can identify themselves, management can identify them by their deteriorating job performance and/or positive alcohol/drug tests, family members and coworkers can identify them to management, news media can report on their off-site activities, etc.

Testing programs can both aid in detection of substance use and act as a deterrent to substance users that may threaten the safety or productivity of the work-place.  A test, however,

should not replace supervisory judgment in disciplinary decisions. Testing may take one or all of the following forms:

    (1)    Pre-employment/Rehire/Moving to Edge Moor Testing

        A.    All applicants for employment after January 1, 1987 will be tested for drug presence.

        B.    Failure to submit to the testing will disqualify a candidate for employment since the employment process cannot be completed.

        C.    The Plant's intention to test for substance use will be communicated to applicants by a statement on the Qualification Record stating "Employees of the DuPont Company or applicants for employment are subject to testing for substance use".

        D.    All employee's, regardless of status within the Company, will be required to pass a substance test when moving to the Edge Moor Site from another DuPont site.

            (i)    Both the receiving and sending points will receive the drug test results.

            (ii)    failure to pass the test will result in the sending point evaluating the employee for entrance into the rehabilitation process or other appropriate action.

            (iii)    Edge Moor will not offer employment should the transferring employee fail the test.

(2)    Self-Identification

An employee whose performance is satisfactory yet voluntarily asks for assistance should receive an explanation of the eligibility requirements. If the requirements are acceptable, assistance will be arranged, following one or more of the Rehabilitation Options outlined below.

The agreement will be documented and placed in the employees Medical file.

(3)    Management Identification

Management identification normally occurs because of deteriorating job performance, a positive drug or alcohol test or management observations such as smell of alcohol or other unusual behavior. Before confronting an employee, management will consult with another member of management, the guards, or someone outside the bargaining unit and appropriate IHC resources to confirm their observations. In some situations, a drug test might also be appropriate.

A.    For Cause Testing

(i)    Testing for cause will be used when supervision or an investigating committee suspects that a performance deviation, an incident, or unusual behavior of an employee may be related to substance use when there is reason to suspect that the employee has drugs in the system while at work, or when there is reason to suspect that the employee has used or possessed unauthorized drugs or alcohol while in the workplace.

(ii)   Supervisory judgment of an employee's ability to perform a job should remain as the determining

factor with the test result to be used only to assist the supervisor.

    (iii)    Supervisory Action:

        1.    Any person reporting for work whose actions indicate the influence of substance abuse should be removed from the job by the supervisor, after following the outlined guidelines, and a judgment made on the fitness of the employee for work.

        2.    In all cases, Human Resources, IHC and the Unit Manager must be informed as soon as practical of the situation.

B.    Administering the For-Cause Testing Procedure

Following the judgment that the employee is unable to perform work assignments in a safe manner because of substance use, the supervisor should inform the employee that:

    (i)    He/she will not be permitted to work because, in the supervisor's judgment, the employee is unable to work in a safe manner;

    (ii)    He/she will be tested for substance use based on a urinalysis per the procedure;

    (iii)    He/she will be subject to disciplinary action, up to and including discharge, if he/she refuses to submit to testing. (Two areas may be used to justify

termination of an employee who refuses substance

testing for cause: insubordination or observed on

site evidence of substance use);

(iv)    His/her locker, work area or office may be

inspected, and;

(v)    He/she is to report to the Plant in a satisfactory

condition on the employee's next scheduled work

days.  Immediately after the results of the test are

known, the matter will be discussed further,

including possible further disciplinary action.

If an employee consents to be tested, supervision will escort him/her to Plant Medical.  If

on the back shifts or weekends/holidays, the Plant Physician or nurse will be contacted.  All tests

will be supervised by Plant Medical.

Depending on the circumstances, the supervisor may advise the employee not to report

back to the Plant until notified to do so by supervision.

C.    If the supervisor's judgment indicates that the employee's

ability to work in a safe manner is impaired and he/she is to

be sent home, the supervisor will:

(i)    Have a member of the employee's family or a friend

provide transportation, or

(ii)    Arrange for public transportation (taxi cab).

(iii)    In no case shall the employee be physically

restrained or detained if the offer of assistance is

declined. If, while the employee is in a state of reduced capability, the employee insists on driving his/her vehicle off of Plant property, supervision should advise against it and tell the employee that, in the interest of public safety and the employee's safety, the situation will be reported to the police and he/she should reconsider the decision to drive.

(iv)     If persuasion fails, the situation should be called to the attention of the Delaware State Police by the guard as information only. Then it is up to the police to investigate and determine whether to take action.

(v)     The supervisor should promptly escort the employee to the gate. If the employee refuses to leave, the supervisor should call "911" and ask for a patrol car response.

(vi)     The supervisor should document the incident promptly, paying particular attention to describing the actions by the employee that prompted the supervisor to believe he/she was unfit for work.

D.     Follow-Up Testing

(i)     Follow-up testing is a method by which management can assess whether employees who

have experienced substance-related problems at work, including having substances in their systems, are remaining substance-free while at work. It is also a rehabilitative deterrent used to assist employees in their recovery process. It is management's responsibility to request follow-up testing and failure can severely undermine the success of an employee's recovery. It is intended to discourage employee(s) in recovery from taking a drink or drug because of the likelihood of being follow-up tested. Follow-up testing will also be used for employees who have not entered Company-assisted treatment but have experienced substance-related performance problems at work.

(ii)    Employees who test positive after for-cause or random testing or who return from rehabilitation programs will be required to participate in a follow-up testing process, per their return to work conference which sets forth expectations of the employees' reintegration into the workplace.

(iii)    Testing will continue for at least a one-year period.

(iv)    The testing will be on an unannounced frequency as determined by IHC.

DMEAST #3147359 v5

-81-

       (v)    Follow-up testing should occur 2-3 times per week for the first six months and 1-2 times per week for the second six months or as recommended by appropriate IHC resources

       (vi)    For employees that choose the rehabilitation process, participation in an after care program, (*i.e.* AA/NA Meetings, support groups, counseling etc.), will be strongly encouraged.

       (vii)    Employees with positive tests will be disciplined up to and including discharge.

E.    Random Testing

       (i)    Edge Moor's drug testing program is careful to balance management's concern for safety, product integrity and rehabilitation with the privacy interests of employees.

       (ii)    Random testing is mandatory for those involved in performing "critical" tasks and their supervision.

       (iii)    Critical jobs are defined as those that, if improperly performed, would contribute to a catastrophic event that would substantially impact large numbers of employees, off-Plant persons or the environment. In general, this catastrophe would include exposure or releases to the atmosphere which could cause

adverse community impact and reaction. Section E(iv) below delineates critical tasks.

(iv)    Listed below are the specific tasks which we deem to be "critical" and rationale we used for classifying them in this way. Anyone involved in performance of or supervision of these tasks or analogous high risk tasks will be subject to random testing. With regard to critical tasks listed below, the most commonly used hazardous materials are chlorine, titanium tetrachloride and hydrochloric acid.

Critical tasks include:

1.    Putting together flanged pipelines that carry hazardous materials. (If bolts are not tightened properly or if the wrong gasket material is used, release of hazardous chemicals into the atmosphere is possible.)

2.    Welding of vessels and pipes that hold or transmit hazardous material. (If the integrity of the weld is not absolute, or if a rod of the wrong material is used, a catastrophic release could occur.)

3.    Installation, operation, and maintenance of pumps and valves used in hazardous-

DMEAST #3147359 v5

- 83 -

chemical service. (Failure to install or maintain correctly, results in a hazardous leak; incorrect operation leads to over pressuring of process systems and results in release to the atmosphere.)

4. Installation or repair of electrical equipment used to control the process or handling of process materials containing hazardous chemicals. (Electrical failures of equipment such as caustic scrubbers, could cause a release of toxic material into the atmosphere or contamination of the water discharge system.)

5. Maintenance or switching of electrical distribution systems. (If improperly done, a total power outage in our Plant and fume release from our site could occur. In addition, a surge on the supplier could result in shutdown of other industries, causing numerous fume releases throughout the entire area.)

6. Operation of lifting and/or rigging equipment such as cranes, etc. (Example:

Improper operation of rigging could result in a catastrophic release, [such as the one that occurred near Baytown, Texas.] Improper rigging caused the equipment being lifted by crane to fall on an HF line resulting in a release of a large amount of HF.)

7.    Loading and/or unloading of hazardous chemicals.  (Resultant spills pose a significant environmental threat in addition to being an immediate safety hazard.)

8.    Control of manufacturing processes.  (Any misoperation in the control room could have an extremely serious impact.  Runaway reactions, over pressuring of systems, misdirected materials are all potentially destructive.  Pollution of the river is also a very real possibility.)

9.    Required response to emergency situations, either actively controlling the emergency or associated with the transportation and/or treatment of victims.  (Obvious consequences.)

10. Maintenance of safety life support systems. (Obvious consequences.)

11. Repair and adjustment of safety relief devices. (Any deviation from near-perfect work allows possible fire, explosion, or release of toxic gas into the atmosphere.)

12. Design, operation, or maintenance of computerized process control equipment used in the control of hazardous chemicals. (Errors in judgment while making software changes, etc. could result in process control upsets that could cause a catastrophic release of hazardous chemicals.)

13. Movement or switching of tank cars containing hazardous materials. (Careless or improper methods result in damage to mechanical devices on rail equipment and permit release of hazardous materials.)

14. Research and development activities involving process and test equipment design, sampling, or modifications; changes in operating parameters, conditions, or ingredients; or any other factors effecting

Plant operation that pose the potential for a

safety or environmental incident.

(v)     System for Random Testing

Random testing will be based on the premise that all employees in critical jobs, either the

performance of, or supervision of, will be subject to being tested at any time and will be tested

for substance use at a frequency of at least once per year.  We will utilize a computer based

random selection process. Two lists will be utilized using all names on both lists.  After a person

has been randomly selected from List A, they will be returned to List A.  After a person is

selected from List B, they will be removed from the List B.  This will insure every person on the

list is tested once per year.  Some will be tested more than once per year.  Each year List A will

be renewed.

(vi)     Summary

Based on our experience with "for cause testing", and our assessment of the severity of

the substance problem in our community, we believe that our efforts to date have been very

positive; but we feel we need to become even more proactive.  Considering the risk and

hazardous potential of our operation and the proximity of a highly populated community, the

addition of the random testing program is in the best interest of employees, the business, the

community and the environment.

Section 9.     <u>Medical Sampling Procedure</u>:

(a)     Urinalysis is the only test procedure that will be used.

(b)     Chain of Custody for Drug Analysis

(1)     An employee or applicant who has been requested to submit to

testing will be escorted to Medical by supervision.

DMEAST #3147359 v5                              - 87 -

(2)     If requested, the employee/applicant may retain a copy of the form.

(3)     The form will be kept in the employee's medical file.

(4)     Donor Release Statement

    A.     Prior to giving a urine test, the employee must sign the Donor Release Statement Section prior to the collection of the urine.

    B.     Refusal to sign the Donor Release Statement will lead to disciplinary action up to and including discharge.

(5)     Donor Certification Statement:  Privacy in obtaining the sample is extremely important.  Sampling will be closely monitored as noted below.

    A.     During the "Day" shift - 6:00 a.m. to 3:00 p.m., Monday - Friday.

        (i)     The Plant Physician or Nurse will provide the container, obtain the sample and tamper proof it for transport by off-Plant personnel.

        (ii)    The sample will not be identified by the name of the individual, but will be coded and recorded in the log book.

        (iii)   The individual will be required to sign the Donor Certification Statement stating that the specimen the employee provided was placed in a container, sealed and labeled under his/her presence, and that

the sample provided is the employee's own urine and has not been adulterated. The employee is also required to check the Specimen Number appearing on the specimen and the form to be sure they are identical.

B.    On back shifts - weekdays, weekends, and holidays

   (i)    Medical personnel will do testing.

   (ii)   The same procedure as "Day" shift will be followed.

(6)    Recording and Notification of Results

A.    Any time there is a positive result on the first analysis, the Laboratory will check the sample again by a more sophisticated method to insure against the possibility of a false positive.

B.    Laboratory test results will be reported to Medical.

C.    The Site Physician is the designated Medical Review Officer (MRO). When Medical receives a positive result from the testing laboratory, the MRO will review that result with the employee who gave the sample before he/she advises Site Management or Employee Assistance Personnel of the result. The same practice will be used for applicants.

D.  Pending resolution of positive results, the MRO or other IHC personnel may place work restrictions on employees. Positive test results that come about for legitimate reasons will be reported to Management as negative.

E.  Contacts with employees and applicants who test positive will be made directly by the MRO with the individuals. If the employee refuses to be interviewed, the positive result can be released to management without an interview. The MRO can use designated management representative(s) to locate donors who cannot be contacted at the telephone or address in medical record.

F.  When results are positive, the immediate supervisor, after review of the situation with Human Resources and IHC, will hold a discussion with the employee to obtain an explanation.

G.  Appropriate action will be taken to either get the employee assistance or remove the employee from the site pending the outcome of a negative result. This action will not take away the need for discipline for Acts of Serious Misconduct violation should the positive result be from for cause or random testing.

H.  If the results are negative the employee will receive the information from IHC if he/she desires.

I.    A log book will be maintained by IHC with the following

information: name, reason for test, laboratory identification

number, date sample taken, date sample picked up by

carrier, and date test results received. Test results will not

be recorded in the log book but will be kept confidentially

by the Plant Physician. Access to the log book is restricted

to the Plant Physician and the Nurse.

J.    All documents will be considered personal medical records.

Section 10.    Training: The most important part of our program is ensuring everyone on

our Plant is aware of available treatment, assistance, and possible consequences for substance

use/abuse. Management is concerned about the problem and is taking steps to ensure that

substance use/abuse does not adversely affect the safety of our Plant. The following Training

Program is designed to ensure all personnel are aware of the drastic problems created by

possession or use of substance.

(a)    Drug Awareness Training. All employees (minimum 2 hours - maximum

4 hours).

Emphasis:

Awareness

Usage

Addiction Psychology

Life Affect

Availability for Help

Job Performance

Types of Substance

Safety

Symptom Recognition

(b)     Family orientation and awareness (2 hours).

### ARTICLE XXII

#### Scope of The Agreement

Section 1.     <u>Duration</u>. This Agreement shall become effective at 12:01 a.m. May 20, 2006, and shall continue in full force and effect through 11:59 p.m. May 19, 2009. Thereafter, it shall renew itself automatically and continue in full force and effect from year to year, unless written notice of an election to terminate or modify this Agreement is given by one party to the other at least ninety (90) days prior to the expiration date.

Section 2.     <u>Separability</u>. If any provision of this Agreement, is, at any time during the life of this Agreement, in conflict with any law, such provision shall become invalid and unenforceable, but such invalidity or unenforceability shall not impair or affect any other provision of this Agreement.

IN WITNESS WHEREOF the PLANT and the UNION have caused these presents to be executed by their duly authorized representatives on the 8th day of June, 2006.

E.I. DUPONT DE NEMOURS AND
COMPANY, INC.

By _C. Bland Dickey_
   C. Bland Dickey, Plant Manager

By _Frank B. Ingraham_
   Frank B. Ingraham, Site Bargainer

Witness:

_Robin P. Spangler_

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED-INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION (USW)
and ITS LOCAL 4-786

By _Mark Schilling_
   Mark Schilling, President

By _Thomas M. Campbell_
   Thomas M. Campbell, Vice President

By _Joseph Witkowski_
   Joseph Witkowski, Chairman Contract Committee

By _Marlin C. Frisby_
   Marlin Frisby, Contract Committee Member

By _____
   Tera Taylor, Contract Committee Member


UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED-INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION (USW)

By _John Barcellona_
   John Barcellona, International Representative

By _Kenneth O. Test_
   Kenneth O. Test, USW DuPont Council Chairman

**E.I. du Pont de Nemours and Company**
**(on behalf of its Edgemoor Plant, Edge Moor, Delaware)**
**And**
**United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial**
**and Service Workers International Union (USW) and Its Local 4-786**

This **SIDE LETTER** between the above referenced parties shall be incorporated into and made a part of the Collective Bargaining Agreement ("Agreement") between said parties effective May 20, 2006 through May 19, 2009. The terms of this Side Letter shall be in full force and effect for the life of the Agreement.

Notwithstanding anything in the Agreement or in Supplemental Agreement No. 1 thereto, and regardless of the number of bargaining unit positions, the Plant, at its discretion, may subcontract the Coke & Ore hauling and handling functions. In that event:

(a)    The Plant shall issue four (4) "bump letters", on the basis of seniority, to the Process Operators.

(b)    The Processor Operators shall no longer perform Coke & Ore hauling and handling work but shall perform, among other things, the following duties: PET and Lift Station; Chlorine Storage; Chlorine Hook-up and Disconnect; TiCL$_4$ Hook-up and Disconnect; TiCL$_4$ Scrubber; Wash House/Equipment Cleaning.

IN WITNESS WHEREOF the PLANT and the UNION have caused these presents to be executed by their duly authorized representatives on the 8th day of June, 2006.

E.I. DUPONT DE NEMOURS AND
COMPANY, INC.

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL
AND SERVICE WORKERS INTERNATIONAL UNION
(USW) and ITS LOCAL 4-786

By _Frank B. Ingraham_
Frank B. Ingraham, Site Bargainer

By _Mark Schilling_
Mark Schilling, President

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL
AND SERVICE WORKERS INTERNATIONAL UNION
(USW)

By _John Barcellona_
John Barcellona, International Representative

By _Kenneth O. Test_
Kenneth O. Test, USW DuPont Council Chairman

DMEAST #3147359 v6

## SUPPLEMENTAL AGREEMENT NO. 1

### Minimum Staffing Levels

1.   During the term of the Agreement, the Plant will not further utilize contractors which displace bargaining unit positions if the number of bargaining unit positions is reduced below the number of one-hundred thirty five (135) (this number is intended to be a minimum and not a maximum); provided however, that the Plant is not obligated to limit the use of contractors or hire new employees to backfill these positions, if any reduction below the number of 135: (i) is due to natural attrition; (ii) or results from a lack of business caused by: storms, floods, fires or other natural disasters; unavailability of power or utilities; Plant shutdown caused by order of the government; work stoppage, labor dispute; significant reduction of volume; or loss of a product line.

NOTE:  The loss of a product line or the significant reduction in volume shall only displace the employees whose work is significantly diminished by the loss of that product line or reduction in volume, and the provisions of Article XVII (Bump & Bid) shall apply.

2.   In the event that the Plant adds new processes and/or new product lines requiring additional personnel, Plant management will notify the Union at least sixty (60) days in advance and bargain over the issue of whether this new work will be assigned to new bargaining unit positions and/or to contractors, as well as, if applicable, bargain rates of pay for any new job classifications consistent with Article XIII of the Agreement.

3.  Notwithstanding the above, and regardless of the number of bargaining unit positions at the time, once the PPM Technician position becomes vacant, it will not be backfilled by a bargaining unit employee.

4.  Business Opportunities:  Over the course of this Agreement, the Plant may be presented with opportunities to reduce costs or improve efficiency by eliminating positions within the unit after the number of bargaining unit positions has dropped below 135.  The Plant may eliminate particular bargaining unit positions so long as no employee suffers a reduced regular rate of pay (including SSP and SOA) or a loss of employment, because of such elimination; the Plant and Union shall bargain to mutual agreement or impasse over such elimination before implementation.

5.  Nothing in this Supplemental Agreement is intended to limit the Plant's current levels and practices regarding subcontracting or to otherwise limit the Plant's right to subcontract as described in the Agreement.

6.  Notwithstanding the above and regardless of the number of bargaining unit positions, the Plant, at its discretion, may subcontract the Coke & Ore hauling and handling functions.  In that event:

(a)  the Plant shall issue four (4) "bump letters", on the basis of seniority, to the Process Operators.

(b)  The Processor Operators shall not longer perform Coke & Ore hauling and handling work but shall perform, among other things, the following duties:

PET and Lift Station

Chlorine Storage

Chlorine hook-up and disconnect

$TiCL_4$ Hook-up and disconnect

$TiCL_4$ scrubber

Wash House/equipment cleaning

# APPENDIX A

## ADDITIONAL SUPPLEMENTAL AGREEMENTS

### Excused Time Off With Pay (Casual Time)

Casual time is for unusual circumstances on a very infrequent basis.

The following examples will hopefully show the types of circumstances that fall under casual time with pay:

- An employee is called by a next door neighbor who states that water from a broken pipe is seen running by the window inside the employee's house,

- Someone calls the employee in his/her immediate family stating they locked their keys in the car at a local parking lot.

In these two examples, the employee would be permitted to go home, shut off the water from the broken water pipe, or drive across town to unlock the car door for a family member.

Casual time does not mean that an employee can leave early to beat the seashore traffic, watch a child play a ball game, or just because someone else got casual time off. The vacation policy was liberalized to two-hour increments to handle any planned situations.

Casual time is granted at management discretion and will not be unreasonably withheld, provided it is not abused. Casual time with pay was established to liberalize giving employees time off in very unusual situations. The procedure should not be abused.

Disability Guidelines

The following disability guidelines must be followed by employees in order to be paid disability wages.

- The employee's supervisor (or his/her designee) must be contacted prior to the start of the shift concerning the disability.

- Employee must cooperate fully with Plant medical.

- Site medical must concur with the employee's doctor on prognosis for the return of employee. Site medical will determine when employee can return if different than family doctor.

- Disability plan will be uniformly administered throughout the site:
  - Disability will be based on a 12 month rolling calendar year.
  - Three (3) instances of disability in any rolling calendar year will cause verbal disciplinary contact and automatic loss of single day disability privilege.
    - Failure on the part of an employee to obtain a doctor's slip on the third day of illness or for those within the disciplinary procedure on the first day of illness will result in disability wages not being paid. The time off will be counted as an unexcused absence.

  - Single day disability will be restored one year from date causing removal if NO disability instances occur. If further instances occur loss of single day privilege will continue.
    - Four (4) instances of disability in any rolling calendar year will cause written disciplinary action, and possible probation.
    - Five (5) or more instances of disability in any rolling calendar year will be handled on a case by case basis within the disciplinary system, up to and including termination.

*Additional Agreement 06/23/2000*

Excessive absences due to a disability may be cause for discipline up to and including discharge, consistent with governing statutory provisions. Excessive absences are considered to be more than (3) separate incidents in any rolling (12) month period. However, multiple absences caused by a single medical condition will be treated as one incident for purposes of this policy.

Discipline based upon excessive absences due to disability will follow the normal progressive discipline procedure, if no improvement is noted.

Clarification of Progressive Discipline for Disability

**Short Term Disability:** The Short Term Disability Plan is an important employee benefit which protects eligible employees against the loss of income during a period of absence due to illness. Employees, when reporting off due to illness, must contact their Supervisor before the start of the shift. Goal is to eliminate/reduce employee disability to meet corporate standards for managing disability.

**Calling in Sick:** The determination of whether the employee really needs to be absent or whether s/he can come in on a limited assignment should be made during this discussion because certain disabilities do not normally require an employee to be absent from work for a full day. Examples of these are routine tooth extraction, common cold, headaches, minor stomach upset, and most diagnostic tests. (In some cases when a proper contact is not made, a Supervisory visit to the employee's home may be necessary.)

**Going Home Sick:** Employees should go through Medical for permission to go home sick. If Site Medical deems the employee is sufficiently ill to go home, Medical will advise the employee's Supervisor who will make the final determination as to whether the employee goes home or not. When an employee is sent home ill, that day is not considered a disability day for pay purposes or as a full day for one of the three days requiring a Physician's Statement.

**Attending Physician's Statement:** An employee who is on disability for three or more days must have a doctor's note to receive disability wages. To insure that adequate information is reported by the employee's physician, the standardized "Attending Physician's Statement" form is required. This form is to be filled out completely by the employee's doctor on the initial visit, signed by the employee, and returned to Site Medical. In the absence of the standard form, pay will be held up until the form is submitted and it is determined that the employee qualifies for pay for disability.

If the absence is an extended one, succeeding copies of the "Attending Physician's Statement" may be required to provide Plant Medical with information on the employee's progress. The Supervisor should follow up on the employee's progress at least weekly in extended illnesses. To receive pay for disability, employees must cooperate with Plant Medical. This includes following Site Medical's recommendations and permitting inquiries and examinations as requested. These recommendations may include the request to return to work on limited assignment after Plant Medical has consulted with the employee's personal physician. If an employee is on disability for more than 16 days without an "Attending Physician's Statement", the employee is considered AWOL, and is subject to termination.

All employees (including those on exempt and nonexempt salary) must report to Plant Medical upon return to work or as soon as the shift schedule allows, regardless of the length of absence.

FMLA (Family and Medical Leave Act): When an absence is to be monitored according to the FMLA, the appropriate paperwork will be generated. This includes requesting medical certification of the absence, notifying the employee when the absence is to be counted towards their FMLA leave, and maintaining a log of FMLA absences. All documents containing medical information will be maintained is Site Medical files. Site Medical will determine if/when absence is FMLA related and Management will determine if/when notification occurs.

Self-Inflicted Injuries or Illnesses: Wages will not be paid under this Plan during periods of disability resulting from illness or injuries intentionally self-inflicted or from the use of drugs or intoxicants, or from illness or injury due to willful acts contrary to law and order.

# Report of Disability
## Edge Moor Plant

Payroll No.:_____     Name:_____

Department:_____     Job Title:_____


Employee began losing time on: _____ at

Please choose one:   O Day Worker     O Shift Worker

**\*Is this disability work related?          Yes    No**

**\*If Yes response, then Supervisor to ask why employee believes disability is work related, include any details in the 'Remarks' field and must contact Area Manager and SHE Manager immediately.**

**\*Is this disability an off Plant related injury? Yes    No**

**\*If 'Yes' response, then Supervisor to ask what was the event that caused the injury, include any details in the 'Remarks' field and must contact Area Manager and SHE Manager immediately.**

**\*Communicate to Employee s/he must contact Site Medical between 8AM and 4PM to have disability time approved (disability 3 or more days, requires doctor note) and is required to come back to work through Site Medical for a return to work form.**

**\*Site Medical will contact Supervisor and communicate the length of disability for their determination of whether coverage is needed for the disabled employee.**

|     | M | T | W | T | F | S | S |
|-----|---|---|---|---|---|---|---|

Shift schedule for week ending:_____  ____  ____  ____  ____  ____  ____  ____

(Week endings are on Sundays)

Remarks:_____

_____

Manager Name _____  Plant Telephone No._____  Date_____

DMEAST #3147359 v5                    - 101 -

**Medical Recommendation**

**Employee:**_____        **Date:**_____

**Supervisor:**_____

    ARTICLE XXI For the employee's safety and health, we recommend the following:

_____ Return to full duty. _____First day out.  _____ PCP note received
<span>(date)</span>                        (date)

_____ Return to duty with the following medical restrictions until: _____
<span>(date)</span>                                     (date)

____ No / Limited,  prolonged walking /standing
____ No / Limited, climbing  ____ladders  ____ stairs
____ No / Limited, stooping / bending / kneeling
____ No pushing / pulling / lifting over____ lbs.
____ Allow rest periods of:_____
____ Limit keyboarding / typing to: _____
____ No / Limited, operating power equipment / tools
____ Confined to shop / desk work
____ Confined to inside work
____ Confined to ground level work
____ No ladder or scaffold work
____ No working above ground at height of more than _____ feet
____ Avoid fume or dust exposure
____ Avoid handling or contact with _____
____ May do light housekeeping
____ Other _____

____ Unable to perform any duties.  Recommend sending home.
____ Consult private physician:  ____ at once ____ as work schedule allows

____ Return to Site Medical: _____
<span>(date)</span>

Supervisors are responsible to determine if the above restrictions can be accommodated within their organizational area of responsibility.  If they cannot be accommodated, employees should be placed in the proper leave status.  Employees are required to return to Medical as indicated.

Signature: _____    ____ Call me for further information
        ( Site Medical )                 Extension: # 12371

DMEAST #3147359 v5           - 102 -

DuPont Titanium Technologies
104 Hay Road
Edge Moor Site Medical Office
Edge Moor, DE 19809
Phone (302) 761-2371
Fax    (302) 761-2391

Date: _____

Patient Name: _____

SSN: _____

Dear Doctor: _____

In order to evaluate your patient's disability or medical leave of absence and/or continue his/her benefits, the following information is needed. Attach copies of test results, or additional reports as appropriate. Thank you for your assistance.

**Diagnosis (If diagnosis is confidential, please note and Site Medical will contact you):**
_____
_____

**History of Illness or Injury:** (If you believe the condition is occupationally related, indicate why.)
_____

€ _Occupational_      € _Non-Occupational_      € _Unknown_
**Positive Physical Findings / Pertinent Diagnostic Studies:**
_____

**Surgery:** (Procedure and date)
_____

**Present Therapy:** a) Medicines and dosing
_____

b) Physical therapy (how often, how long and type)
_____

c) Other (specify)
_____

Prognosis for recovery:
_____

Date of Next visit:_____
**Estimated Return to Work Date:**_____ €**Full duty**_____ €**Restricted duty**_____
**Work Restrictions:** Describe recommended work restrictions, specify activities that need to be avoided, and duration if applicable. State whether they are temporary or permanent. ( **Note:** Supervisors are generally able to provide restricted work, including different job duties, part-time, or work from home).
_____

Thank you for your cooperation,
    Section 1.  Kathryn A. Sarnecky, RN, MSM, COHN-S/CM

**Patient Consent: I authorize the release of all information or records connected with the above illness or injury to the above DuPont Integrated Health Services clinic.**

Patient Signature_____    Date_____

Physician Signature_____    Date_____

        Section 2.  Physician Phone _____    Fax_____

Physician Address (Street, City, State, Zip)

**This report will be treated as Medical-Confidential Information.**
**Fax to 302-761-2391 or Mail directly to the above address or Employee may hand deliver.**

### Non-Occupational Disabilities and Treatment

Plant Medical cannot assume the responsibility for treating injuries or illnesses, which are personal in nature. Only first aid will be given by the Site Medical in such cases where immediate attention is indicated, and the employee will then be advised to see his/her personal physician for further consultation and treatment. This applies to all Plant personnel.

The use of the dispensary, its facilities and personnel is not intended to replace the private physician, community hospitals or laboratories.

The Disability Wage Plan provides for compensation during bona fide illness supported by a physician's statement. However, routine medical attention such as teeth filling, or exam for new glasses should be scheduled outside working hours.

To minimize time lost from work, employees should arrange appointments the first thing in the morning or late in the afternoon, if no evening appointments are available. There is no intent to deprive employees of needed medical treatment, but employees are expected to schedule routine doctor and dentist appointments, blood tests, x-rays and Blood Bank appointments on their own time.

### Pregnancy

Disability due to pregnancy, child birth, or related medical conditions must be treated the same as any other non-occupational disability.

Any employee granted a personal leave prior to actual disability should be advised that disability pay will begin when she can produce the same type of medical evidence of her inability to work as would be required by the Company if she remained in active employment. The most concrete evidence of such disability is the onset of labor but other circumstances in the final days of pregnancy may also be disabling.

Full Service Employees (FSE's) will be covered by the Short Term Disability Plan from the first full day of disabled absence, as determined by Management and Site Medical. Disability pay will continue during the entire period of disability up to a maximum of six months.



**Disability Pay**

<u>8-Hour & 12-Hour Shifts</u>
Eligible employees shall be granted regular pay during disability resulting from non-occupational illness or injury for a maximum period of six months in each separate and distinct case of disability subject to provisions outlined in the Disability Pay Plan.

Disability hours do not count towards hours worked over 40 hours in a work week.

## APPENDIX B

The forms set out below, "Grievance Report" and "Grievance Timeline," shall be used for all grievances brought under Article VI "Grievance Procedure."

**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION (USW)**

**AND ITS LOCAL 4-786**

**GRIEVANCE REPORT**

Grievance No.          Subject:                          Date:

When did grievance occur? Date – On or about _____ Time: _____ Shift: _____

Who was involved?      Grievant: _____

                       Others: _____

Area Manager: _____ Unit Manager: _____

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

        Section 3.  NATURE OF GRIEVANCE

1. Fundamental Unfairness: _____
2. Violation of Contract: _____
3. Violation of Policy: _____
4. Violation of Past Practice: _____
5. Violation of Safety Policy: _____

State what happened:

_____
_____
_____
_____
_____

Remedy requested: _____ In addition,
the Union demands that the Company cease and desist from violating the Labor Agreement, that
incidents(s) be rectified, that proper compensation, including benefits and overtime, at applicable rate of
pay, be paid for all losses; and further that those affected be made whole in every respect.

Signatures: _____  _____

This form must be signed by all parties and given to the Grievance Chairperson

**GRIEVANCE TIMELINE**

**Step II**

**Filed By:**                    **Union:**                    **Management:**


Presented to Area Manager: _____ Date: _____

Date Answer Due (within 14 days): _____

Date Extend To: _____ Union: _____ Management: _____

Area Manager's Answer:  See attached Step II Answer Form

**Step III**

**Filed By:**                    **Union:**                    **Management:**


Presented to Unit Manager: _____ Date: _____

Meeting Due (within 14 days) Date: _____ Date Meeting Held: _____

Date Answer Due (within 14 days of meeting): _____

Date Extend To: _____ Union: _____ Management: _____

Unit Manager's Answer:  See attached Step III Answer Form


Step II                                Step III

Original to Grievance Chairman         Copies to Union Officers*
Copy to Union Representative           Copies to Other Meeting Attendees
Copy to Grievant                       Copy to Plant Manger
Copy to Human Resources                Copies to Unit Managers
Copy to Unit Manager                   Original to Human Resources

*Union President, Union Vice President, Union Secretary, Grievance Chairperson, Contract
Chairperson

# EXHIBIT B

To:        U.S. Employees
From:      Jim Borel, Senior Vice President, Human Resources

As you know, the company is taking actions to help DuPont succeed in 2006 and beyond. This includes important changes to our U.S. employee benefits offering.

Today we are announcing a number of changes that are designed to modernize the current benefits offering for our U.S. employees. These planned changes are being made with consideration of market trends and current and future employee expectations. They will enhance the portability of our retirement benefit and provide more opportunity for employees to self-manage the benefit value delivered through company plans. These changes will not impact current retirees.

While evaluating alternatives, we were guided by
- Adherence to our core values.
- Alignment of our benefits package with market trends to further support the competitiveness of our businesses.
- An objective of increasing employee control over and responsibility for individual financial well being.
- A need to provide an ongoing benefit package for current employees that supports the transition from a defined benefit to a defined contribution approach.
- A desire to design a benefits package that will attract the next generation of employees, many of whom prefer portable benefits.

Changes are highlighted below.

**U.S. Savings and Investment Plan (SIP) (Effective January 1, 2008)**
- Company contribution up to 9% of pay
- Enhancement of the SIP will include a company contribution equal to three percent of an employee's pay directly into each employee's account.
- Employees who contribute to the SIP also will receive a 100 percent match on up to the first six percent of their pay. This doubles the current company match, which is 50 percent up to six percent. The definition of compensation also will be expanded to include base pay plus variable compensation, Local Performance Based Compensation, The DuPont Sales Incentive Compensation Program and all overtime.
- By mid-2007, we will implement enhanced investment options with SIP, along with an investment advice offering that will provide support to employees in the selection of their investment options and in the ongoing management of their SIP accounts.
- The number of outstanding loans allowed by the savings plan will be reduced from five to two. This is consistent with our desire to reposition SIP as the company's primary retirement vehicle.
- Additionally, matching company contributions after 12/31/07 will be restricted from withdrawal until age 59 ½ except in the case of approved hardships.

**U.S. Pension and Retirement Plan (Effective January 1, 2008)**
- The pension benefit for existing employees will continue, with future accruals at a reduced level. For service accrued through 2007, the pension calculation will not change. For service accrued after 2007, the pension calculation will be reduced to one-third of its current level. Pay for both calculations will continue to grow until retirement.
- The company-paid survivor benefit will not continue to grow with service or pay after December 31, 2007. The benefit employees will have earned up to that date will be fully preserved.

**U.S. New Hires**
- For employees hired beginning January 1, 2007, the redesigned SIP plan will be the sole vehicle for their retirement security. They will not be eligible to participate in the Pension and Retirement Plan and they will not receive a company subsidy for retiree healthcare (medical and dental) and retiree life insurance. Their maximum annual vacation benefit will be five weeks and they will be eligible to bank no more than three weeks of vacation. They will be eligible to purchase vacation only during the first ten years of employment with DuPont.

DuPont was a leader when we introduced a pension program more than 100 years ago. Today's market environment is very different and constantly changing. With a goal of helping our businesses and the company be more competitive, our comprehensive benefits package is designed to address both employee and business needs. The redesigned package provides more portable benefits that many new employees expect. At the same time, it will ease the transition for current employees through continued accruals at a reduced rate under the Pension and Retirement Plan, coupled with a significantly enhanced Savings and Investment Plan benefit.

Next Steps

Over the next two weeks, your work unit will cover these changes. In the meantime, you can get more information from the following website http://www1.lvs.dupont.com/hr/hr_new/index.html or by calling 866-494-2523.

EXHIBIT C

# UNITED STEEL WORKERS INTL. UNION
# AND ITS LOCAL 4-786

### GRIEVANCE REPORT

Grievance No. _1867_    Subject:    Violation of Contract    Date:    9/14/06

When did grievance occur? Date – On or about    _8/28/06_    Time: _____    Shift:  Days

Who was involved?    Grievant:  USW Local 4-786 _____

Others: _____

Area Manager:  Frank Ingraham _____    Unit Manager:  Robin Spangler _____

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

### NATURE OF GRIEVANCE

1. Fundamental Unfairness: _____
2. Violation of Contract:    Article IX, Section1 _____
3. Violation of Policy: _____
4. Violation of Past Practice: _____
5. Violation of Safety Policy: _____

State what happened:    Changes to the Pension & Retirement Plan and the Savings &
Investment Plan, effective January 1, 2008, for current employees and
January 1, 2007 for new hires, violates Article IX, Section 1, because
such "modifiactions" are not permitted within the meaning of that article.

_____
_____
_____
_____
_____

Remedy requested:    _Cease and Decist from making the announced changes_    In addition,
the Union demands that the Company cease and desist from violating the Labor Agreement, that
incidents(s) be rectified, that proper compensation, including benefits and overtime, at applicable
rate of pay, be paid for all losses; and further that those affected be made whole in every respect.

Signatures:    Mark Schilling - President _____    Thomas M. Campbell - Vice President

# GRIEVANCE TIMELINE

Step II - 1867

**Filed By:**    **Union:** M. Schilling    **Management:** D. Bolin

Presented to Area Manager: Frank Ingraham    Date: 9/14/06

Date Answer Due (within 14 days): 9/28/06

Date Extend To: _____ Union: _____ Management: _____

Area Manager's Answer: See attached Step II Answer Form.


**Step III**

**Filed By:**    **Union:** _____    **Management:** _____

Presented to Unit Manager: _____ Date: _____

Meeting Due (within 14 days) Date: _____ Date Meeting Held: _____

Date Answer Due (within 14 days of meeting): _____

Date Extended To: _____ Union: _____ Management: _____

Unit Manager's Answer: See attached Step III Answer Form.


**Step II**

Original to Grievance Chairman
Copy to Union Representative
Copy to Grievant
Copy to Human Resources
Copy to Unit Manager

**Step III**

Copies to Union Officers*
Copies to Other Meeting Attendees
Copy to Plant Manager
Copies to Unit Managers
Original to Human Resources


*Union President, Union Vice President, Union Secretary, Grievance Chairperson, Contract Chairperson

# EXHIBIT D

## AMENDED GRIEVANCE NO. 1867

**State What Happened;**

On August 28, 2006, the Company announced changes in the terms and conditions of employment for actives and new hires in the attached e-mail incorporated herein, sent on that date to U.S. employees from Jim Borel, Senior Vice President – Human Resources. With respect to actives, the application to such persons of the changes in the Pension and Retirement Plan and Savings and Investment Plan, effective January 1, 2008, violates Article IX, Section 1 of the Collective Bargaining Agreement because such changes are not permitted "modifications" within the meaning of that article and section. With respect to new hires hired on or after January 1, 2007, the withdrawal, effective January 1, 2007, of both the Pension and Retirement Plan and the current terms of the Vacation Plan violate Article IX, Section I on two independent and sufficient grounds. First, these announced changes violate Article IX, Section 1, because such changes are not permitted "modifications" within the meaning of that Article and Section. Second, these announced changes involved "Company Plans and Practices" within the meaning of Article IX, Section 1 and their withdrawal from employees covered by this agreement, on and after January 1, 2007, violates Article IX, Section 1 because such Plans and Practices remain "in effect within the Company." In addition, with respect to new hires hired on or after January 1, 2007, the withdrawal of the subsidies for retiree health care (medical and dental) and life insurance violates Article IX, Section 3 of the Collective Bargaining Agreement.

Remedy: Cease and desist from making the announced changes.

It is requested that the further processing of this grievance, which has been filed as a precautionary measure, be held in abeyance pending the Company's response to the Union's pending information request.

# EXHIBIT E

Frank B
Ingraham_Jr/AE/DuPont
10/03/2006 01:11 PM

To  Mark A Schilling/AE/DuPont@DuPont

cc  Robin P Spangler/AE/DuPont@DuPont, Lauren McKeown/AE/DuPont@DuPont

Subject  Grievance #1867 'abeyance' question - response.

Per discussions with Mark Schilling, Union President of the USW Local 4-786 concerning the benefit plan changes announced by the Company on 28AUG2006, Management agrees to suspend the grievance submission time limits (ArticleVI, Section1, of the Collective Bargaining Agreement) until the Union information request, dated 14SEP2006, has been "sufficiently answered".  If there is disagreement on what is meant by "sufficiently", either party may give notice and the Union will have 14 days to resume the grievance process.

Management reminds the Union that the announcement on 28AUG2006 provides notice, to the extent necessary, that the Company intends to change the benefit plans as set forth in that announcement.

EXHIBIT F

To:    Mark Schilling, Union President
From:  Frank Ingraham, HR Consultant
Subject:  Grievance #1867 – Claims/Denial Response.
Date:  25JAN2007
CC:    Robin Spangler

We have completed our preliminary review of the grievance. This is to advise you that
we consider the grievance to invoke a dispute, on behalf of members of your bargaining
unit and/or other individuals who are or have been employed at the facility, as to whether
those individuals are eligible for certain benefits under the terms of various employee
benefit plans sponsored by DuPont. As you are aware, DuPont has communicated the
new eligibility rules to all current employees and continues to communicate these rules to
all newly hired employees. We note that any disputes over eligibility for benefits under
DuPont's benefit plans must be handled according to the procedures set forth in the
relevant plan documents and summary plan descriptions, and/or through a civil
enforcement action brought by any adversely affected individual pursuant to Section 502
of the Employee Retirement Income Security Act of 1974 ("ERISA").

Please note further that the Plan Administrators of the various ERISA plans sponsored
and maintained by DuPont have the ultimate discretionary decision-making authority to
determine whether or not individuals, including members of your bargaining unit, are
eligible for benefits under the plans. The Plan Administrators are required by ERISA to
make such eligibility determinations in accordance with the terms of those plans. Claims
alleging benefit entitlements inconsistent with the eligibility standards set forth in those
Plans will therefore be denied. Please also understand that if you wish to challenge any
such denial, you must pursue an appeal under the terms of the respective plans. Absent
such an appeal, participants and beneficiaries in the various plans will be deemed to have
failed to exhaust their administrative remedies, and any claimed entitlement to benefits
under the terms of the DuPont plans will be barred. Under ERISA, completion of this
appeal process is a prerequisite to pursuing any further legal remedies that may be
available.

If you wish to pursue such a claim, you should advise any participant or beneficiary that
he/she should follow the claim procedures as detailed in the Summary Plan Description
for each of the respective plans.

Disputes over claims for benefits under the DuPont plans are not subject to resolution
through the grievance and arbitration provisions of the CBA between your union and
DuPont. DuPont is not contractually obligated to submit the above–referenced grievance
to arbitration, and DuPont hereby refuses to submit the disputes to arbitration.

If you have any questions or, need additional information or documentation, or require
assistance in filing an appeal on behalf of a member of your bargaining unit, please
contact me.

# EXHIBIT G



**UNITED STEELWORKERS**

UNITY AND STRENGTH FOR WORKERS

*Writer's Direct Dial 412-562-2542*
*Writer's Fax 412-562-2429*

February 8, 2007

**VIA CERTIFIED MAIL NO.: 7005 0390 000 7181 1776**

Mr. Frank Ingraham
Human Resources Consultant
DuPont Edgemoor Plant
104 Hay Road
Edgemoor, DE  19809

Dear Mr. Ingraham:

Your January 25, 2007, e-mail to Local 4-786 President Mark Schilling has been referred to the USW Legal Department for reply. Please be advised that there is no duty to process the grievance through the ERISA review procedure. The grievance is clearly arbitrable under the broadly worded arbitration clause of the CBA pursuant to §301 of the Labor Management Relations Act and is not subject to any exhaustion requirement applicable to individual eligibility claims under ERISA.

Please be advised that unless the undersigned receives written notice within 10 days of the receipt of this letter that DuPont has agreed to resume processing of the grievance within the contractual grievance and arbitration procedure, USW and Local 4-786 will file suit in Federal District Court to compel DuPont to do so and will seek to recover their attorneys fees. The Unions will also seek to recover their attorneys fees if DuPont files a declaratory judgment in an unlawful effort to thwart the exercise of our federally protected right to process and arbitrate grievances.

Sincerely yours,

Richard J. Brean
Senior Associate General Counsel

RJB/cp

cc:    DuPont Council Coordinator Kenneth Test
       District Director William Pienta
       Staff Representative John Barcellona
       Local Union President Mark Schilling

United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union

# EXHIBIT H



DuPont Legal
Wilmington Office Buildings
1007 Market Street
Wilmington, DE 19898

Laura H. Huggett
Corporate Counsel
DuPont Legal
D7032
302-773-3421
fax: 302-774-8625

February 27, 2007

Richard J. Brean, Esquire
Senior Associate General Counsel USW
Five Gateway Center
Pittsburgh, Pa. 15222

Dear Mr. Brean:

I write in response to your letters to our Edge Moor and Chambers Works sites which were forwarded to me for response. In your letter, you threatened to file an action to compel arbitration of the grievances filed at DuPont's Edge Moor and Chambers Works facilities challenging DuPont's right to amend and apply the eligibility provisions contained in certain of its nationwide ERISA benefit plans.

DuPont does not believe the Union's grievances are arbitrable because they inevitably involve benefit eligibility determinations that must be resolved under the claims procedures set forth in the specific ERISA benefit plans under which eligibility for benefits is being asserted or in a civil action under ERISA.

In addition, the grievances appear to involve matters that are beyond the scope of the arbitration provisions set forth in the collective bargaining agreements. By its terms, the Edge Moor collective bargaining agreement only requires arbitration of disputes "as to the interpretation, or any alleged violation, of any provision of this Agreement." See Edge Moor Agreement, Article VII. Neither DuPont's Medical Care Assistance Plan ("Medcap") nor its Dental Assistance Plan is referenced in the collective bargaining agreement. Therefore, the Edge Moor grievance is not arbitrable to the extent that it involves retiree benefits provided under either Medcap or the Dental Assistance Plan. In addition, the Chambers Works collective bargaining agreement limits arbitration to "a grievance relating to the interpretation or any alleged violation of" the collective bargaining agreement itself. See Chambers Works, Agreement, Article XI. Neither DuPont's BeneFlex Employee Life Insurance Plan nor its BeneFlex Vacation Buying Plan is referenced in the collective bargaining agreement. Consequently, the grievance is not arbitrable to the extent that it involves a dispute concerning benefits provided under either the BeneFlex Life Insurance Plan or the BeneFlex Vacation Buying Plan.

Also, I write in further response to the grievance that the Union filed on September 9, 2006 at our Niagara facility, challenging DuPont's right to amend and apply the eligibility provisions contained in certain of its nationwide ERISA benefit plans. As we have stated above, DuPont does not believe this grievance is arbitrable because it inevitably involves benefit eligibility determinations that must be resolved under the claims procedures set forth in the specific ERISA benefit plans under which eligibility for benefits is being asserted or in a civil action under ERISA.

In addition, the grievance appears to involve matters that are beyond the scope of the arbitration provisions set forth in the collective bargaining agreement. By its terms, the Niagara Falls agreement only requires arbitration of disputes relating "to the interpretation, or any alleged violation, of any provision of this Agreement." See Niagara Falls Agreement X. Neither DuPont's Medical Care Assistance Plan ("Medcap") nor its Dental Assistance Plan is referenced in the collective bargaining agreement. Therefore, the grievance is clearly not arbitrable to the extent it involves retiree benefits provided under either Medcap or the Dental Assistance Plan.

DuPont is willing to arbitrate the grievance to the extent that it involves eligibility for benefits under DuPont's "Vacation Plan," however, because the Vacation Plan is specifically identified in the collective bargaining agreement, and that benefits plan does not contain a final and binding dispute resolution procedure

As you may know, DuPont has filed an action in U.S. District Court for the Eastern District of Virginia seeking a declaration that a grievance filed by the union at our Spruance Fibers Plant, Ampthill Rayon Workers Inc. ("ARWI"), concerning its members' eligibility for benefits under certain DuPont ERISA benefit plans, is not arbitrable and must be resolved under the claims procedures set forth in the specific benefit plans at issue and/or in a civil action under ERISA. DuPont also seeks a declaration that its actions in amending the ERISA benefit plans are consistent with its rights under the ARWI collective bargaining agreement. DuPont intends to file a similar action against the United Steel Workers in the same court in order to clarify the parties' rights and obligations under the relevant ERISA benefit plans and under the parties' collective bargaining agreements at DuPont's Edge Moor, Chambers Works and Niagara Falls facilities.

With kind personal regards,

Laura H. Huggett
Corporate Counsel

cc:
Howard Brian Collings, Chambers Works
Dennis P. Malloy, Chambers Works
Robin Spangler, Edge Moor
Frank B. Ingraham, Edge Moor
Marit Ogin, Niagara
Carole Sarazin, Niagara
Kris D. Meade, Esq.
Thomas P. Gies, Esq.

℀JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** United Steel Workers International Union and United Steel Workers Local 4-786

**DEFENDANTS** E.I. DuPont De Nemours and Company

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant __New Castle County__
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Susan E. Kaufman, (DSB# 3381) (302) 658-1800
Heiman Gouge & Kaufman, LLP
800 King St., Suite 303, Wilmington DE 19801

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☒ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
LMRA, 29 USC Sections 142, 152 & 185
Brief description of cause:
Breach of Labor Contract & to Compel Labor Arbitration

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE  March 1, 2007

SIGNATURE OF ATTORNEY OF RECORD  *Susan E. Kaufman*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

$0\,7^-1\,2\,6$

Civil Action No. _____

# ACKNOWLEDGMENT
## OF RECEIPT FOR AO FORM 85

### *NOTICE OF AVAILABILITY OF A*
### *UNITED STATES MAGISTRATE JUDGE*
### *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____3_____ COPIES OF AO FORM 85.

_____3/1/07_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____January Reif_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action