# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS, INTERNATIONAL UNION, AFL-CIO-CLC, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS LOCAL 4-786, <br><br> Plaintiffs, <br><br> v. <br><br> E. I. DU PONT DE NEMOURS AND COMPANY, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      C.A. No. 07-126 (JJF) |

## DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION TO STAY ALL PROCEEDINGS

OF COUNSEL:
CROWELL & MORING LLP
Thomas P. Gies
Kris D. Meade
Jennifer G. Knight
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Telefax: (202) 628-5116

POTTER ANDERSON & CORROON LLP
Kathleen Furey McDonough (#2395)
Sarah E. DiLuzio (#4085)
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Telefax: (302) 658-1192
kmcdonough@potteranderson.com
sdiluzio@potteranderson.com

*Attorneys for Defendant E. I. du Pont de
Nemours and Company*

Dated: May 7, 2007
793763

## **TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS ........................................................................1

SUMMARY OF ARGUMENT ..........................................................................................2

I.     Proceedings in this case should be stayed under the first-filed rule.  This case is
duplicative of previously-filed litigation that is proceeding in federal court in the
United States District Court for the Eastern District of Virginia, and no
extraordinary circumstances warrant allowing this case to proceed
contemporaneously with the Virginia litigation. ..........................................................2

STATEMENT OF FACTS ................................................................................................3

ARGUMENT ....................................................................................................................7

I.     Introduction .............................................................................................................7

II.    This Matter Should Be Stayed Under The First-Filed Rule. ............................................7

CONCLUSION ..............................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Arrow Communication Labs., Inc. v. John Mezzalingua Assocs.,*
No. Civ. 05-357-SLR, 2005 WL 2786691 (D. Del. Oct. 26, 2005) .......................................... 8

*AT&T Techs., Inc. v. Communications Workers of Am.,*
475 U.S. 643 (1986)............................................................................................................ 12

*Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein,*
107 F.3d 139 (2d Cir. 1997) ............................................................................................... 10

*Black-Clawson Co., Paper Mach. Div. v. Int'l Ass'n of*
*Machinists Lodge 355, Dist. 137,* 313 F.2d 179 (2d Cir. 1962) ............................................. 13

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.,*
265 F. Supp. 2d 445 (D. Del. 2003)...................................................................................... 8

*Col. River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976).......................................................................................................... 7

*Compagnie Des Bauxites De Guinea v. Ins. Co. of N. Am.,*
651 F.2d 877 (3d Cir. 1981) ................................................................................................ 8

*Cont'l Grain Co. v. Barge FBL-585,* 364 U.S. 19 (1960) .................................................. 11

*Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925 (3rd Cir. 1941) ........................................ 8, 11

*Devlin Graphic Indus. Inc. Pension Plan v. Lewis,*
No. 00 Civ. 6665LTSMHD, 2001 WL 310626
(S.D.N.Y. March 30, 2001) ................................................................................................. 10

*Dippold-Harmon Enters., Inc. v. Lowe's Cos.,*
No. 01-532-GMS, 2001 WL 1414868 (D. Del. Nov. 13, 2001)............................................. 13

*E.E.O.C. v. Univ. of Pa.,*
850 F.2d 969 (3rd Cir. 1988) ............................................................................................. 8, 11

*Hunter Douglas Inc. v. Sheet Metal Workers Int'l,*
714 F.2d 342 (4th Cir. 1983) ............................................................................................. 13

*Int'l Assoc. of Machinists & Aerospace Workers,*
*Progressive Lodge No. 1000 v. Gen. Elec. Co.,*
865 F.2d 902 (7th Cir. 1989) ............................................................................................. 12, 13

*Johnson v. Celotex Corp.,*
899 F.2d 1281 (2d Cir. 1990) ............................................................................................. 12

*Landis v. N. American Co.*, 299 U.S. 248 (1936) ........................................................................ 7

*Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco,*
    28 F.3d 347 (3d Cir. 1994) ..................................................................................... 13

*PDG Chem., Inc, v. Oil, Chem. & Atomic Workers Int'l Union,*
    164 F. Supp. 2d 856 (E.D. Tex. 2001) .............................................................. 12, 13

*Radio Corp. of Am. v. Ass'n of Prof'l Eng'g,*
    291 F.2d 105 (3d Cir. 1961) ..................................................................................... 13

*Regions Bank v. Wieder & Mastroianni, P.C.,*
    170 F. Supp. 2d 440, 441 (S.D.N.Y. 2001) .......................................................... 13

*Rexam v. United Steelworkers of Am.,*
    No. Civ. 03-2998, 2003 WL 22477858 (D. Minn. Oct. 30, 2003) ......................... 11

*Schnabel v. Ramsey Quantitative Sys., Inc.,*
    322 F. Supp. 2d 505 (S.D.N.Y. 2004) ...................................................................... 9

*Servian v. Health Data Sciences Corp.,*
    Civ. A. No. 92-2693, 1992 WL 174705 (E.D.Pa. July 21, 1992)............................. 9

*Winstead v. J.C. Penney Co., Inc.,*
    933 F.2d 576 (7th Cir. 1991) ............................................................................. 10, 11

**Statutes**

29 U.S.C. § 1001 *et seq.*........................................................................................................ 3

29 U.S.C. § 1132(a)(3)(B)(ii) ............................................................................................. 10

**Federal Rules of Civil Procedures**

Fed. R. Civ. P. 42(a) .......................................................................................................... 12

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Local 4-786 ("Local 4-786") (collectively, "Plaintiffs") filed the complaint in this matter on March 1, 2007. Plaintiffs are seeking to compel Defendant E.I. du Pont de Nemours & Company ("DuPont" or "the Company") to arbitrate, under a collective bargaining agreement between Plaintiffs and DuPont, a grievance that Local 4-786 filed arising out of DuPont's announcement of prospective changes to certain employee benefit plans. Five weeks earlier, DuPont initiated litigation in the United States District Court for the Eastern District of Virginia encompassing the exact issues that are raised in this action, including the underlying question of whether DuPont acted within its rights under the relevant collective bargaining agreements in making the prospective employee benefit plan changes that are the subject of the complaint in this matter.

Because of the overlap between the previously-filed Virginia proceedings and this case, and because resolution of the Virginia litigation may obviate any need for this litigation, DuPont has filed a motion to stay the present proceedings until the United States District Court in Virginia has the opportunity to decide the matter that is before it. This is DuPont's Opening Brief in support of its motion to stay.

## **SUMMARY OF ARGUMENT**

**I.**     Proceedings in this case should be stayed under the first-filed rule.  This case is duplicative of previously-filed litigation that is proceeding in federal court in the United States District Court for the Eastern District of Virginia, and no extraordinary circumstances warrant allowing this case to proceed contemporaneously with the Virginia litigation.

## STATEMENT OF FACTS

DuPont employs more than 30,000 employees nationwide, of which more than 4,500 are unionized. *See* Complaint, *E.I. du Pont de Nemours & Company v. United Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union*, Case No. 03:7CV103 (E.D Va.) at ¶ 5 ("Virginia USW Complaint") attached hereto as Exhibit 1. The USW (and/or its local union affiliates) is the exclusive collective bargaining representative for hourly production, maintenance, service and plant technical employees employed at several sites operated by DuPont, including DuPont's Edgemoor plant located in Edge Moor, Delaware, its ChambersWorks plant located in Deepwater, New Jersey, and a chemical manufacturing plant located in Niagara Falls, New York. *Id.* at ¶ 6. Another union, the Ampthill Rayon Workers, Inc. ("ARWI"), represents employees at DuPont's Spruance Fiber Plant located near Richmond, Virginia. *See* First Amended Complaint, *E.I. DuPont de Nemours v. Ampthill Rayon Workers, Inc.*, Case No. 3:07CV52 (E.D.Va) at ¶ 6 ("ARWI Amended Complaint") attached hereto as Exhibit 2.

DuPont maintains and makes available to eligible employees, both unionized and non-represented, a number of employee benefit plans. Most of these benefit plans are regulated by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). These include a Savings and Investment Plan, pension and retirement plans, life insurance, medical care assistance, dental care assistance, and a vacation buying plan. *See* Virginia USW Complaint at ¶¶ 15-42. DuPont, either directly or through DuPont employees or committees of such employees, is a fiduciary of each of the ERISA benefit plans. *Id.* at ¶ 5.

On August 28, 2006, DuPont announced, to all of its U.S. employees, a number of prospective changes regarding eligibility for benefits under these benefit plans. Some of these changes apply to current employees; others apply only to employees hired after December 31,

3

2006. *See* Complaint, Exh. B (D. I. 1). These changes were accomplished through amendments made to the various benefit plans, and, consistent with the terms of the plan documents and the requirements of ERISA. Since the changes were made, DuPont has administered all of these plans in a uniform manner consistent with the terms of the plans as amended.

Labor unions representing some of DuPont's employees challenged the Company's announcement. On November 7, 2006, ARWI filed a grievance alleging that the amendments violate the collective bargaining agreement between DuPont and ARWI. *See* ARWI Amended Complaint at ¶ 40. This grievance was processed according to procedures set forth in the relevant collective bargaining agreement but was not resolved. ARWI demanded arbitration of the dispute. *Id.* at ¶ 41. DuPont maintained that portions of ARWI's grievance were not arbitrable because the gist of the grievance involved matters of benefit plan interpretation excluded from the arbitration provision of the parties' collective bargaining agreement.

The USW followed ARWI's lead in challenging the changes announced by DuPont. The USW and/or its local affiliates filed grievances under the collective bargaining agreements in force at the DuPont's Niagara Falls, ChambersWorks, and Edgemoor facilities. These grievances, like the ARWI grievance, raise similar ERISA benefits eligibility issues arising from the August 2006 amendments. *See* Virginia USW Complaint at ¶¶ 40, 42.

On January 24, 2007, DuPont filed an action in the United States District Court for the Eastern District of Virginia, seeking a declaratory judgment regarding arbitrability of the issues underlying the grievance ("the ARWI action"). The complaint also sought injunctive relief. *See* ARWI First Amended Complaint at ¶¶ 50-53; Virginia USW Complaint at ¶ 4. The ARWI action has been assigned to United States District Judge Henry Hudson. On April 5, 2007, Judge Hudson held a pretrial conference, during which he set a series of deadlines in the case, including

4

a September 12, 2007 hearing date on cross-motions for summary judgment that will be filed by DuPont and ARWI. Counsel for DuPont and ARWI are in the process of developing a set of stipulations that will constitute the factual record on which these cross-motions will be based.

The USW, like ARWI, eventually demanded arbitration of their grievances. *See generally* Complaint and Exh. F (D.I. 1). On February 8, 2007, the USW threatened to file suit to compel arbitration of its grievances. *See id.*, Exh. F. Thereafter, on February 28, 2007, DuPont filed a complaint against the USW in the Eastern District of Virginia, seeking a declaration that the USW's grievances related to the ERISA plan amendments, including the grievance Local 4-786 filed are not arbitrable ("the Virginia USW action"). *See* Virginia USW Complaint at ¶¶ 63-65. Like the ARWI action, the Virginia USW action also seeks a declaration that DuPont's actions in amending the ERISA plans do not violate the applicable collective bargaining agreements, including the collective bargaining agreement between DuPont and Plaintiffs herein. *See id.* at ¶¶ 67-69. Because the Virginia USW action raised precisely the same issues as presented in the ARWI action, DuPont designated the Virginia USW action as related to the ARWI matter. *See* Virginia USW Complaint Civil Cover Sheet at VII, attached hereto as Exhibit 3. The Virginia USW action was thus also assigned to United States District Judge Hudson. That same day, DuPont amended its complaint in the ARWI action to seek a declaration that the benefit plan amendments announced by DuPont do not violate the ARWI-DuPont collective bargaining agreement. *See* ARWI Amended Complaint, Count II.

The USW has moved to dismiss the Virginia USW action. DuPont opposed that motion in a memorandum filed with the court on April 16, 2007. On that same day, DuPont also filed a motion to consolidate the two cases pending in Virginia. Judge Hudson has set a pretrial

conference in the Virginia USW action and a hearing on the USW's motion to dismiss and DuPont's motion to consolidate for June 7, 2007.

The ARWI action and the Virginia USW action involve the same underlying facts as are presented here. DuPont's request for declaratory relief in the two Virginia cases seeks exactly the same resolution sought by the USW and Local 4-786 here, *i.e.*, a determination of whether DuPont violated the applicable collective bargaining agreements in making and implementing the benefit plan changes announced on August 28, 2006.

The complaint in this case was filed on March 1, 2007. The USW and/or local union affiliates filed similar actions in federal court in New York and New Jersey, on March 2, 2007 and February 28, 2007, respectively. On April 23, 2007, DuPont moved to stay the New York action under the first-filed doctrine and intends to file a similar motion in the New Jersey action.

## ARGUMENT

### I.    Introduction

Proceedings in this action should be stayed.  This case is duplicative of litigation pending

in the United States District Court for the Eastern District of Virginia, initiated by DuPont on

January 24, 2007.  More than 5 weeks before this action was filed, DuPont filed suit to resolve a

nation-wide dispute between DuPont and labor unions representing DuPont employees at

DuPont facilities in five states.  The dispute concerns DuPont's right to make prospective

changes to certain employee benefit plans covering eligible DuPont employees and retirees

around the country.  These changes affected, among many others, employees represented by the

USW.[1]

The relief requested by USW and  Local 4-786 in this case is specifically addressed in the

claims made by DuPont in the Virginia litigation.  Further proceedings in this case may be

rendered unnecessary, depending on the outcome of the Virginia USW action.  Accordingly, in

order to foster efficiency and conserve the resources of the parties and this Court, this action

should be stayed until the district court issues a final judgment in the Virginia USW action.

### II.    This Matter Should Be Stayed Under The First-Filed Rule.

The inherent power of federal district courts to control their dockets includes the power to

stay proceedings before them.  *Landis v. N. American Co.*, 299 U.S. 248, 254 (1936).  The

Supreme Court has also recognized that, in circumstances where two parallel cases are

proceeding at the same time in sister federal district courts, "the general principle is to avoid

duplicative litigation."  *Col. River Water Conservation Dist.  v. United States*, 424 U.S. 800, 817

(1976).  To accommodate the interest in avoiding duplicative parallel litigation, the United States

---

[1] Local 4-786 is a local affiliate of USW.

Court of Appeals for the Third Circuit follows a "first-filed" rule, under which a district court is empowered to dismiss or stay a later-filed litigation in favor of allowing the earlier-filed litigation to proceed through the judicial process. *See, e.g., E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 971-72 (3rd Cir. 1988); *see also Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 930 (3rd Cir. 1941) ("The party who first brings a controversy into a court of competent jurisdiction for adjudication should, so far as our dual system permits, be free from the vexation of subsequent litigation over the same subject matter."). The decision on whether to grant a stay based upon the first-filed doctrine is within the trial court's discretion. *E.E.O.C.*, 850 F.2d at 972. This rule applies where there are "'similar cases. . . in different federal district courts'" in the absence of "rare or extraordinary circumstances, inequitable conduct, bad faith, or forum shopping." *Id.* at 971-72 (quoting *Compagnie Des Bauxites De Guinea v. Ins. Co. of N. Am.,* 651 F.2d 877, 877 n. 10 (3d Cir. 1981)); *Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 265 F. Supp. 2d 445, 448 (D. Del. 2003); *see also Arrow Communication Labs., Inc. v. John Mezzalingua Assocs.*, No. Civ. 05-357-SLR, 2005 WL 2786691, at * 3 (D. Del. Oct. 26, 2005) ("Invocation of the rule will usually be the norm, not the exception. Courts presented with exceptional circumstances may exercise their discretion to depart from the first-filed rule.") attached hereto as Exhibit 4. The party opposing the application of the first-filed rule bears the burden of establishing the circumstances that should bar its application. *Arrow Communications*, 2005 WL 2786691, at *3.

These principles warrant a stay of proceedings in this case to permit resolution of the Virginia USW action. The Virginia USW action and this case undeniably involve more than substantially the same issues – they both seek the exact same declaratory relief regarding the arbitrability of Local 4-786's grievance, though from opposite sides of the dispute. *Compare*

8

Complaint at ¶¶ 15-18 with Virginia USW Complaint at ¶¶ 64-66. Indeed, the USW is a party to both this action and the Virginia USW action in Virginia. That the Virginia USW Complaint is broader in scope is immaterial, as the issue presented in this case is subsumed by the Virginia USW action.

No exceptional circumstances exist that justify allowing this case to proceed. *E.E.O.C.*, 850 F.2d at 977-978 (district court did not abuse discretion in refusing to dismiss second-filed action where university preemptively sued E.E.O.C. in an attempt to avoid disfavorable law of one forum).

Virginia is the logical forum in which this dispute should be resolved. There is no basis for any suggestion that DuPont engaged in forum shopping by initiating litigation in Virginia.

> Forum shopping occurs when a litigant selects a forum with only a slight connection to the factual circumstances of his action, or where forum shopping alone motivated the choice. A party who appropriately files a declaratory judgment action in the forum most convenient to him to resolve a ripe legal dispute is not engaged in forum shopping.

*Schnabel v. Ramsey Quantitative Sys., Inc.*, 322 F. Supp. 2d 505, 513-14 (S.D.N.Y. 2004) (internal citations and quotations omitted). There is no evidence that DuPont sought to avoid unfavorable law in this forum. *Servian v. Health Data Sciences Corp.*, Civ. A. No. 92-2693, 1992 WL 174705, at *2 (E.D.Pa. July 21, 1992) ("Courts which have held that a party's forum shopping permits exception to the 'first filed' rule have done so primarily based on the determination that such actions were filed in order to avoid the law of an unfavorable forum.") attached hereto as Exhibit 5 Rather, the facts here show that DuPont, when faced with a ripe dispute arising in Virginia, properly initiated litigation in that forum.

Specifically, the grievance filed by the ARWI had proceeded to the final step in the grievance procedure, before any of the USW grievances reached that stage. The ARWI

grievance thus became the "lead grievance." The United States District Court for the Eastern District of Virginia is the only venue in which personal jurisdiction could be obtained over the ARWI. DuPont thus chose the only appropriate forum to resolve the specific dispute presented by the ARWI grievance.

Thereafter, as the USW grievances were being processed through the grievance procedures under the relevant collective bargaining agreements, DuPont recognized that those grievances raised precisely the same issues presented in the ARWI matter. DuPont further recognized that it would be a waste of both the parties' and the courts' resources for DuPont and numerous local unions affiliated with the USW to be contemporaneously litigating one aspect of the dispute in courts around the country. DuPont determined it was sensible to have the underlying dispute resolved in one forum. Accordingly, DuPont properly brought suit against the USW in the same forum as the ARWI action and is seeking consolidation of the two actions.

If any forum shopping did occur, it occurred with the filing of the complaint in this case, as well as the companion actions brought by the USW and/or its local affiliates in New Jersey and New York.

Further, DuPont has two separate and legitimate interests, applicable to both the ARWI and the USW, in bringing suit to resolve this dispute resolved in one forum, which negates any suggestion of improper anticipatory litigation by DuPont.

First, as a fiduciary of the various benefit plans regulated by ERISA, DuPont is explicitly entitled to bring an action to enforce the terms of the plans. *See* 29 U.S.C. § 1132(a)(3)(B)(ii). This right encompasses the right to seek a declaratory judgment as to the meaning of the terms of the plan, as well as the fiduciary's rights and obligations under plan terms. *See Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139 (2d Cir. 1997); *Winstead v. J.C.*

10

*Penney Co., Inc.*, 933 F.2d 576 (7th Cir. 1991); *Devlin Graphic Indus. Inc. Pension Plan v. Lewis*, No. 00 Civ. 6665LTSMHD, 2001 WL 310626 at *8 (S.D.N.Y. March 30, 2001) attached hereto as Exhibit 6; *see also Rexam v. United Steelworkers of Am.*, No. Civ. 03-2998, 2003 WL 22477858, at *3 (D. Minn. Oct. 30, 2003) (fiduciary properly brought declaratory judgment action where it "desire[d] clarification about its ability to amend healthcare plans since several retirees have filed individual grievances" and where "[t]hese proceedings have been repetitious and costly, and there is a likelihood of continued similar litigation.") attached hereto as Exhibit 7.

DuPont is in a similar position to the plan fiduciaries in those cases. The benefit plans at issue here cover 30,000 DuPont employees working across the United States. DuPont is obligated under ERISA to follow the terms of these plans on a uniform basis. As the fiduciary of these plans, DuPont seeks clarification, in the wake of the various legal challenges described herein, to insure that the Company continues to follow the terms of the plans as amended. DuPont is understandably concerned about the prospects of inconsistent outcomes resulting from the various legal proceedings described herein. If, for example, one of the unions succeeds in its claim that DuPont does not have the right to administer the plans as amended, DuPont will face potential liability for not having administered the plan according to its terms, an exposure that could extend to thousands of other plan participants. In these circumstances, "simple prudence dictated" DuPont's decision to seek declaratory and injunctive relief as to its rights and obligations under the plans. *Winstead,* 933 F.2d at 578. DuPont had every right to seek this relief initially in Virginia, in the ARWI action. Bringing suit subsequently against the USW in Virginia is a prudent step to have the entire dispute resolved in one forum. *E.E.O.C,* 850 F.2d at 974 ("It is of obvious importance to all the litigants to have a single determination of their controversy, rather than several decisions which if they conflict may require separate appeals to

11

different circuit courts of appeals." (quoting *Crosley Corp.*, 122 F.2d at 930)). *Cf. Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."); *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990) (consolidation before one judge under Fed. R. Civ. P. 42(a) is appropriate where "specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives").

Second, DuPont has a separate and legitimate interest in seeking a declaratory judgment regarding the arbitrability of the various grievances filed in response to the August 28 announcement. Arbitration is a matter of contract, and "the question of arbitrability -- whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance -- is undeniably an issue for judicial determination." *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648-49 (1986). Parties to a contract, including a collective bargaining agreement, can agree to exclude a particular subject from the scope of an arbitration clause. *See, e.g., Int'l Assoc. of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. Gen. Elec. Co.*, 865 F.2d 902, 904-06 (7th Cir. 1989). The grievances filed by the USW, like the ARWI grievance, present identical disputes concerning eligibility for benefits under DuPont's various ERISA plans. Disputes over eligibility for benefits under the ERISA plans are excluded from the grievance and arbitration provision of the various collective bargaining agreements. *See PDG Chem., Inc, v. Oil, Chem. & Atomic Workers Int'l Union*, 164 F. Supp. 2d

12

856, 864 (E.D. Tex. 2001) (where "the parties intended to have disputes concerning the plan and benefits received under the plan to be decided by the Benefits Administrative Committee," grievance pertaining to the plan was not arbitrable). Moreover, certain aspects of the grievances filed by the USW and/or its local union affiliates are excluded from arbitration as a result of specific language in those agreements. *Int'l Assoc. of Machinists & Aerospace Workers*, 865 F.2d at 904-06. It is perfectly appropriate for an employer to seek a declaratory judgment as to its rights and obligations under a collective bargaining agreement, including whether a particular dispute is excluded from the parties' grievance and arbitration procedure. *See, e.g., Radio Corp. of Am. v. Ass'n of Prof'l Eng'g*, 291 F.2d 105, 107 (3d Cir. 1961); *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco*, 28 F.3d 347 (3d Cir. 1994); *Hunter Douglas Inc. v. Sheet Metal Workers Int'l*, 714 F.2d 342, 345-46 (4th Cir. 1983); *Black-Clawson Co., Paper Mach. Div. v. Int'l Ass'n of Machinists Lodge 355, Dist. 137*, 313 F.2d 179, 181-182 (2d Cir. 1962); *PDG Chem.*, 164 F. Supp. 2d at 864..

These two actions squarely present the issue of whether DuPont violated any of the relevant collective bargaining agreements. The Virginia USW action does not deprive Local 4-786 of the opportunity to resolve the underlying question of whether DuPont violated the parties' collective bargaining agreement; that is precisely the same issue ultimately presented in this action. The interests of the USW and Local 4-786 are identical in this dispute. The USW has taken the lead in challenging DuPont's actions here. And the USW, represented by able counsel, will be able to advance the interests of its co-plaintiff in this action, Local 4-786, in the Virginia litigation.

That Local 4-786 is not a party to the Virginia USW action is irrelevant because "the first-filed rule may apply even if the two actions at issue involve different parties." *Regions*

13

*Bank v. Wieder & Mastroianni, P.C.*, 170 F. Supp. 2d 440, 441 (S.D.N.Y. 2001); *see also Dippold-Harmon Enters., Inc. v. Lowe's Cos.*, No. 01-532-GMS, 2001 WL 1414868 (D. Del. Nov. 13, 2001) (applying first-filed rule where two related parties were "effectively the same party") attached hereto Exhibit 8.   As noted above, the USW, which is a party to this action and the Virginia USW action, is fully capable of representing Local 4-786's interests in the Virginia USW action.

The outcome of pending motions in the Virginia litigation will likely have a material impact on this case.  As noted above, the USW has filed a motion to dismiss the Virginia USW action.  DuPont expects that matter to be resolved within 90 days.  If that motion is denied, as DuPont believes, the court will proceed to resolve both cases on cross-motions for summary judgment.  The schedule set by United States District Judge Hudson, consistent with standard practice in the United States District Court for the Eastern District of Virginia, suggests that a decision is likely by the end of the year.  And, of course, if Judge Hudson finds that DuPont breached its obligations under the USW collective bargaining agreements and finds that its grievances are arbitrable, there will be no need for this litigation, and DuPont and Local 4-786 will proceed to arbitrate the union's grievance.

In these circumstances, a stay is appropriate for the conservation of resources for both the parties and the Court.

## CONCLUSION

For all of these reasons, DuPont respectfully requests that this Court grant its motion and stay all proceedings in this action pending the resolution of the above-referenced litigation pending in the United States District Court for the Eastern District of Virginia.

POTTER ANDERSON & CORROON LLP

By */s/ Kathleen Furey McDonough*
   Kathleen Furey McDonough (#2395)
   Sarah E. DiLuzio (#4085)
   1313 North Market Street
   Hercules Plaza, 6th Floor
   Wilmington, DE  19801
   (302) 984-6000
   kmcdonough@potteranderson.com
   sdiluzio@potteranderson.com

   Thomas P. Gies
   Kris D. Meade
   Jennifer G. Knight
   Crowell & Moring LLP
   1001 Pennsylvania Avenue, N.W.
   Washington, D.C.  20004-2595
   (202) 624-2500

   *Attorneys for Defendant E. I. du Pont de Nemours and Company*

Dated:  May 7, 2007

## CERTIFICATE OF SERVICE

I hereby certify this 7th day of May, 2007, that the foregoing was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing to the following

counsel of record that the document is available for viewing and downloading from CM/ECF:

>Susan E. Kaufman
>HEIMAN, GOUGE & KAUFMAN, LLP
>800 King Street
>Suite 303
>Wilmington, DE 19801

>*/s/ Kathleen Furey McDonough*
>Kathleen Furey McDonough (#2395)
>Potter Anderson & Corroon LLP
>1313 North Market Street
>Hercules Plaza, 6th Floor
>Wilmington, DE 19801
>(302) 984-6000
>kmcdonough@potteranderson.com

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

FEB 2 8 2007

CLERK U S
RICHM...

| | |
|---|---|
| E.I. DUPONT DE NEMOURS AND COMPANY )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION )<br><br>Defendant. ) | CIVIL ACTION NO. 3:07CV103 |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff, E.I. du Pont de Nemours and Company ("Plaintiff" or "DuPont"), brings this action for declaratory judgment and a permanent injunction against Defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union ("Defendant" or "USW"). For its Complaint, Plaintiff alleges as follows:

### NATURE OF THE ACTION

1.    This is a complaint for declaratory relief and entry of a permanent injunction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the Labor Management Relations Act, 29 U.S.C. § 185.

2      Plaintiff maintains several nationwide ERISA benefit plans that provide benefits to eligible union and non-union employees, former employees, retirees, and their eligible dependents. Plaintiff and the USW are parties to collective bargaining agreements at several manufacturing sites covering employees who receive benefits through DuPont's ERISA benefit plans. The USW collective bargaining agreements specifically provide that employees are entitled to benefits under certain enumerated DuPont benefit plans subject to the terms of those benefit plans "and to such modifications thereof" that DuPont may adopt. The employees covered by the USW collective bargaining agreements comprise just a small fraction of the total number of individuals who receive benefits from DuPont's nationwide benefit plans. Each of the USW collective bargaining agreements contains grievance and arbitration provisions that provide for the resolution of designated disputes through procedures set forth in those provisions. Arbitration under the USW collective bargaining agreements is limited to disputes involving interpretations or violations of the collective bargaining agreements themselves. The USW has filed grievances under the collective bargaining agreements that threaten the uniform administration and enforcement of DuPont's ERISA benefit plans.

3.      Plaintiff seeks a declaration that certain grievances filed by Defendant, concerning its members' eligibility for benefits under certain ERISA benefit plans maintained by DuPont, must be resolved under the claims procedures set forth in the specific benefit plans under which eligibility for benefits is being asserted and/or in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), and are thus excluded from arbitration. Plaintiff also seeks a declaration that the actions taken by Plaintiff in amending the ERISA benefit plans at issue in this dispute are consistent with DuPont's rights under the collective bargaining agreements between DuPont and the USW, and that Plaintiff's actions do not violate those agreements. Finally, Plaintiff seeks a permanent injunction, ordering Defendant to refrain from seeking arbitration of these grievances.

4.      This action raises issues similar to those presented in the litigation styled <u>E.I.</u> <u>duPont de Nemours and Company v. Ampthill Rayon Workers, Inc.</u>, C.A. No. 3:07cv52, which was filed in this Court on January 24, 2007 ("the ARWI litigation"). In the ARWI litigation, DuPont alleges that a grievance filed by the defendant union in that case is excluded from arbitration for precisely the same reasons alleged in this case. The amended complaint in the ARWI litigation seeks precisely the same relief as is sought against the USW in this case.

### THE PARTIES

5.      Plaintiff, E.I. du Pont de Nemours and Company, is a Delaware corporation with its principal place of business in Wilmington, Delaware, and is licensed to do business in the Commonwealth of Virginia. DuPont employs more than 30,000 employees nationwide, of which more than 4,500 are unionized. DuPont, either directly or through DuPont employees or committees of such employees, is also a fiduciary of each of the ERISA benefit plans identified in Paragraphs 15 through 42 below.

6.      Defendant, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union ("USW"), is a "labor organization" as defined by 29 U.S.C. § 152(5), with its principal place of business in Pittsburgh, Pennsylvania. The USW is the exclusive collective bargaining representative for hourly production, maintenance, service and plant technical employees employed at several sites operated by DuPont, including DuPont's Edgemoor plant located in Edge Moor, Delaware, its Chambers Works plant located in Deepwater, New Jersey, and its chemical plant located in Niagara Falls, New York.

### JURISDICTION

7.      This action is brought under 28 U.S.C. § 2201 for declaratory judgment, and 28 U.S.C. § 1331 because the action involves questions of federal law under the Labor Management Relations Act, 29 U.S.C. § 185, and questions arising under ERISA, 29 U.S.C. Section 1001, *et seq.*

-3-

8.      Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b) because Defendant conducts business in this judicial district. Venue is also proper in this district under 29 U.S.C. § 185(c)(2) because, on information and belief, Defendant, through its duly authorized officers or agents, is engaged in representing or acting for employee members in this judicial district.

## STATEMENT OF FACTS
### The Parties' Relationship

9.      DuPont employs approximately 125 workers represented by the USW at its Edge Moor, Delaware Plant. USW-represented employees at the Edgemoor site are covered by a collective bargaining agreement ("the Edgemoor CBA") between DuPont and the USW which became effective on May 20, 2006 and runs through May 19, 2009.

10.     The Edgemoor CBA provides that USW-represented employees, if eligible, may receive benefits provided under a number of DuPont-sponsored benefit plans enumerated in the Edgemoor CBA. Among other benefits, USW-represented employees may be eligible for pension benefits, medical care, life insurance, dental benefits, vacation benefits and may be eligible to participate in DuPont's savings and investment plan. The Edgemoor CBA specifically provides that employees are entitled to receive such benefits under DuPont's Industrial Relations Plans and Privileges "subject to the provisions of such plans," and their "rules, regulations and interpretations, " and "to such modifications thereof" as may be adopted by DuPont generally.

11.     DuPont employs more than 500 workers represented by the USW at its Chambers Works site located in Deepwater, New Jersey. USW-represented employees at Chambers Works are covered by a collective bargaining agreement ("the Chambers Works CBA") between DuPont and the USW that first became effective on July 18, 1991. By its terms, the Chambers Works CBA remains in full force and effect until terminated by either party upon ninety (90) days notice.

12.     The Chambers Works CBA provides that USW-represented employees, if eligible, may receive benefits provided under a number of DuPont-sponsored benefit plans enumerated in the Chambers Works CBA. Among other benefits, USW-represented employees may be, or become, eligible for pension benefits, medical care, life insurance, dental benefits, vacation benefits and may be eligible to participate in DuPont's savings and investment plan. The Chambers Works CBA specifically provides that employees are entitled to receive benefits under DuPont's Industrial Relations Plans and Privileges "subject to such rules, regulations and interpretations as existed prior to the signing of [the Chambers Works CBA], and to such modifications thereof, as may be hereinafter adopted generally" by DuPont to govern such privileges.

13.     DuPont employs approximately 165 workers represented by the USW at its chemical plant in Niagara Falls, New York. USW-represented employees at the Niagara Falls site are covered by a collective bargaining agreement ("the Niagara Falls CBA") between DuPont and the USW. That agreement, executed by DuPont and the USW's predecessor union, first became effective on March 4, 1983. DuPont entered into a "Supplemental Agreement" on May 16, 1995 with the USW's predecessor union, which amended certain designated sections of the Niagara Falls CBA. The Niagara Falls CBA, as amended by the 1995 Supplemental Agreement, applies to USW-represented employees at Niagara Falls and continues in full force and effect until terminated by either party upon ninety (90) days notice.

14.     The Niagara Falls CBA, as amended by the 1995 Supplemental Agreement, provides that USW-represented employees, if eligible, may receive benefits provided under a number of DuPont-sponsored benefit plans enumerated in the Niagara Falls CBA. Among other benefits, USW-represented employees may be eligible for pension benefits, medical care, life insurance, dental benefits, vacation benefits and may be eligible to participate in DuPont's savings and investment plan. The Niagara Falls CBA, as amended, specifically provides that employees are entitled to receive such benefits under DuPont's Industrial

- 5 -

Relations Plans and Privileges "subject to the provisions of such plans," their "rules, regulations and interpretations, " and "to such modifications thereof" as may be adopted by DuPont generally.

## DuPont's Savings and Investment Plan

15.    DuPont maintains a nationwide benefit plan known as the DuPont Savings and Investment Plan ("SIP"), which is governed by ERISA. The SIP was originally adopted by DuPont on September 1, 1955, and applies to DuPont's U.S. employees nationwide, both union and non-union. Employees eligible to participate in the SIP are permitted to voluntarily contribute a percentage of their pay to the SIP, and DuPont makes a matching contribution up to a specified percentage of the employee's monthly pay.

16.    The SIP provides that DuPont shall serve as the Plan Administrator and states that, in that capacity, DuPont "retains the discretionary authority to determine eligibility for benefits" and "to construe the terms and conditions of" the SIP. The SIP further provides that the "decision of the Company shall be final with respect to any questions arising as to interpretation of [the] Plan." The SIP also states that DuPont's decisions concerning claims for benefits are final and binding.

17.    Consistent with ERISA requirements, the SIP also describes an employee's right to appeal any denial of a claim for benefits under the SIP, and specifies that employees whose claims are denied or ignored in whole or in part may file suit in a state or federal court to vindicate their rights. Included among claims that are subject to the claims procedure set forth in the SIP are individual eligibility determinations made by the Plan Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

18.    By its terms, the SIP reserves to DuPont the discretionary right to modify or discontinue the SIP. The SIP further provides that any change made by DuPont that has the effect of reducing or terminating benefits under the SIP will not be effective until one year

- 6 -

following the announcement of such change, unless earlier change is required to comply with governmental regulations.

19.     The SIP applies to all U.S. employees of DuPont who meet the eligibility requirements of the SIP, including employees represented by the USW. The SIP has been amended numerous times since its inception without bargaining with the USW and/or its predecessor union.

20.     During calendar year 2007, DuPont employees hired prior to January 1, 2007, including but not limited to USW-represented employees hired to work at the Edgemoor, Chambers Works and Niagara Falls facilities, are ineligible for certain enhancements to SIP benefits that will be provided to employees hired after January 1, 2007. For calendar year 2007, employees hired after January 1, 2007 are eligible to (a) receive a DuPont contribution to the SIP equal to three percent (3%) of earnings; and (b) contribute up to six percent (6%) of their earnings to the SIP, with a matching contribution by DuPont of one hundred percent (100%) of that amount. For calendar year 2007, employees hired prior to January 1, 2007 are eligible to contribute up to six percent (6%) of their earnings to the SIP and DuPont will match fifty percent (50%) of that contribution. For calendar year 2007, employees hired prior to January 1, 2007 are not eligible for the three percent (3%) DuPont contribution and are not eligible for the one hundred percent (100%) matching contribution. DuPont has informed both groups of employees as to their eligibility for the SIP benefits referenced above.

21.     Disputes as to eligibility for SIP benefits will inevitably be presented to the SIP Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the SIP to make final determinations and interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the SIP.

### DuPont's Pension and Retirement Plan

22.    Pension benefits are provided to USW-represented employees under a nationwide, defined benefit plan known as the DuPont Pension and Retirement Plan ("Pension Plan"), which is governed by ERISA. The Pension Plan was originally adopted over a hundred years ago, on September 1, 1904, and currently has more than 150,000 participants, including employees and former employees, union and non-union alike.

23.    The Pension Plan is administered by a "Board of Benefits and Pensions," the members of which are appointed by DuPont. Under the express terms of the Pension Plan, the "Board of Benefits and Pensions retains the discretionary authority to determine eligibility for benefits" and "to construe the terms and conditions of the Plan." The Pension Plan further provides that decisions of the Board of Benefits and Pensions in all matters involving the interpretation and application of the Plan are "final." The Summary Plan Description pertaining to the Pension Plan describes an employee's right to appeal any denial of a claim for benefits under the Pension Plan, and specifies that employees whose claims are denied or ignored in whole or in part may file suit in a state or federal court to vindicate their rights. Included among claims that are subject to the claims procedure set forth in the Summary Plan Description are individual eligibility determinations made by the Board of Benefits and Pensions. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

24.    The Pension Plan, by its terms, specifically reserves to DuPont the right to change or discontinue the Plan. The Pension Plan has been amended numerous times since its inception without bargaining with the USW and/or its predecessor union.

25.    DuPont has informed employees that DuPont employees hired after January 1, 2007, including, but not limited to, USW-represented employees hired to work at the Edgemoor, Chambers Works and Niagara Falls sites, are ineligible to receive benefits under the Pension Plan.

26.    Disputes as to eligibility for benefits under the Pension Plan will inevitably be presented to the Board of Benefits and Pensions, which will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Pension Plan to make final determinations and interpretations. The Board of Benefits and Pensions' eligibility determinations must be made consistent with the terms of the Pension Plan.

27.    DuPont has informed employees that (a) under the Pension Plan, service accrued after December 31, 2007 by DuPont employees who were employed as of December 31, 2006, including USW-represented employees working at the Edgemoor, Chambers Works and Niagara Falls sites, will be accrued at one-third the level of the current accrual rate, and (b) that the DuPont-paid survivor benefit under the Pension Plan will be frozen as of December 31, 2007. Disputes as to these issues will inevitably be presented to the Board of Benefits and Pensions, which will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Pension Plan to make final determinations and interpretations. The Board of Benefits and Pensions' eligibility determinations must be made consistent with the terms of the Pension Plan.

### DuPont's BeneFlex Employee Life Insurance Plan

28.    DuPont maintains a nationwide life insurance plan known as the BeneFlex Employee Life Insurance Plan ("Life Insurance Plan"), which is governed by ERISA. The Life Insurance Plan provides DuPont-funded life insurance for employees, both union and non-union, at one times their pay at no cost, and allows employees to purchase additional group insurance coverage at their own expense.

29.    Pursuant to its terms, the Life Insurance Plan vests DuPont, as Plan Administrator, with the "full discretion and authority to interpret Plan provisions, resolve any ambiguities and evaluate claims." Consistent with ERISA requirements, the Life Insurance Plan also has a claims procedure. Pursuant to that procedure, an employee whose claim for

benefits is denied may appeal first to the insurance company providing the specific insurance coverage involved. If that claim is denied, the employee may take a final appeal to DuPont. Under the terms of the Plan, decisions rendered by DuPont regarding the interpretation of the Plan and eligibility for benefits are final and binding. The Summary Plan Description pertaining to the Life Insurance Plan describes an employee's right to appeal any denial of a claim for benefits under the Life Insurance Plan, and specifies that employees whose claims are denied or ignored in whole or in part may file suit in a state or federal court to vindicate their rights. Included among claims that are subject to the claims procedure set forth in the Summary Plan Description are individual eligibility determinations made by the Plan Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

30.    The Life Insurance Plan reserves to DuPont the right to suspend, modify or terminate the Plan in its discretion at any time. DuPont has modified the Life Insurance Plan several times without bargaining with the USW and/or its predecessor unions.

31.    DuPont has informed employees that DuPont employees hired after January 1, 2007, including but not limited to USW-represented employees hired to work at the Edgemoor, Chambers Works and Niagara Falls facilities, are ineligible to receive a DuPont subsidy for retiree life insurance under the Life Insurance Plan. Disputes as to eligibility for these benefits will inevitably be presented to the Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Life Insurance Plan to make final determinations and interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the Life Insurance Plan.

### DuPont's Medical Care Assistance Plan

32.    DuPont provides health care benefits for certain employees, former employees, both union and non-union, and their eligible dependants through a nationwide

ERISA benefit plan known as the Medical Care Assistance Program ("Medcap Plan"). The Medcap Plan was initially adopted on January 1, 1983.

33.    DuPont serves as the Administrator of the Medcap Plan. Consistent with ERISA requirements, the Medcap Plan includes a claims procedure. Pursuant to that procedure, an employee whose claim for benefits is denied may appeal the denial to DuPont. By its terms, the Plan provides that DuPont, as the Plan Administrator, has "the discretionary right to determine eligibility for benefits" and "to construe the terms and conditions" of the Medcap Plan. The Plan further provides that DuPont's decisions are final as to any questions arising as to the interpretation of the Medcap Plan. The Summary Plan Description pertaining to the Medcap Plan specifically states that exhaustion of the claim and appeal procedure is mandatory for resolving claims under the Plan and that participants must pursue all claim and appeal rights on a timely basis before seeking any other legal recourse regarding claims for benefits. The Summary Plan Description further provides employees with the right to appeal any denial of a claim for benefits under the Medcap Plan, and specifies that employees whose claims are denied or ignored in whole or in part may file suit in a state or federal court to vindicate their rights. Included among claims that are subject to the claims procedure set forth in the Summary Plan Description are individual eligibility determinations made by the Plan Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

34.    By its terms, the Medcap Plan reserves to DuPont "the right to amend any provision" of the Medcap Plan or terminate the Plan in its entirety should either course of action be deemed necessary by the Company. DuPont has amended the Medcap Plan without bargaining with the USW and/or its predecessor unions.

35.    DuPont has informed employees that DuPont employees hired after January 1, 2007, including but not limited to USW-represented employees hired to work at the Edgemoor, Chambers Works and Niagara Falls sites, are ineligible to receive a DuPont

- 11 -

subsidy for retiree medical coverage under the Medcap Plan. Disputes as to eligibility for Medcap Plan benefits will inevitably be presented to the Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Medcap Plan to make final determinations and interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the Medcap Plan.

### DuPont's Dental Assistance Plan

36.    DuPont provides dental benefits to certain employees, former employees retired with a pension, eligible survivors, and their eligible dependents through a nationwide ERISA benefits plan known as the Dental Assistance Plan ("Dental Plan"). The Dental Plan was initially adopted by DuPont on September 1, 1976.

37.    DuPont serves as the Administrator of the Dental Plan. As Plan Administrator, DuPont retains "the discretionary right to determine eligibility for benefits" and "to construe the terms and conditions" of the Dental Plan. The Dental Plan further provides that DuPont's decisions are final with respect to any questions arising as to the interpretation of the Plan. The Plan further provides that a participant whose application for benefits is denied in whole or in part must submit an appeal of the benefits denial to a Contract Administrator, otherwise referred to as "the Insurance Company," which acts as the agent for DuPont. Under the terms of the Plan, the Insurance Company's review of a claim is conclusive and binding. Included among claims that are subject to the claims procedure set forth in the Plan are individual eligibility determinations made by the Insurance Company. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

38.    By its terms, the Dental Plan reserves to DuPont "the sole right to amend or discontinue" the Plan at its discretion. The Dental Plan further provides that any change made by DuPont that has the effect of reducing or terminating benefits under the Plan will

- 12 -

not be effective for one year following the announcement of the change. The Dental Plan has been amended several times without bargaining with the USW and/or its predecessor unions.

39.    DuPont has informed employees that DuPont employees hired after January 1, 2007, including but not limited to USW-represented employees hired to work at the Edgemoor, Chambers Works and Niagara Falls sites, will be ineligible to receive a DuPont subsidy for retiree dental coverage under the Dental Plan. Disputes as to eligibility for these benefits will inevitably be presented to the Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Dental Plan to make final determinations and interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the Dental Plan.

### DuPont's Vacation Plans and Programs

40.    DuPont provides employees, both union and non-union, with the opportunity to purchase up to one week of vacation time through an ERISA benefit plan known as the BeneFlex Vacation Buying Plan. DuPont originally adopted the BeneFlex Vacation Buying Plan on January 1, 1992.

41.    DuPont serves as the Plan Administrator for the BeneFlex Vacation Buying Plan. As Plan Administrator, DuPont retains the authority to determine eligibility for benefits under the BeneFlex Vacation Buying Plan and to construe the terms and conditions of the Plan. By its terms, the BeneFlex Vacation Buying Plan states that DuPont's decisions are final with respect to any questions arising as to the interpretation of the Plan. Included among claims that are subject to the claims procedure set forth in the BeneFlex Vacation Buying Plan are individual eligibility determinations made by the Plan Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

42.    Under the terms of the BeneFlex Vacation Buying Plan, DuPont retains the sole right to modify or terminate the Plan in its discretion, provided, however, that any

- 13 -

change in the price or level of coverage will be announced at the time of annual enrollment and will not be changed during a Plan Year unless coverage provided by an independent, third-party provider is significantly curtailed or decreased during the Plan Year. Termination of the BeneFlex Vacation Buying Plan by DuPont is not effective until one year following announcement of the termination by DuPont. The Vacation Buying Plan has been amended without bargaining with the USW and/or its predecessor unions.

43.    DuPont also provides employees with annual vacation benefits through its Vacation Plan. The Vacation Plan was initially adopted on January 1, 1934. Pursuant to the terms of the Vacation Plan, DuPont retains the right to change or discontinue the Plan, provided, however, that no change will be made which has the effect of reducing benefits for any calendar year unless the change has been announced in the preceding year.

44.    DuPont has informed employees that DuPont employees hired on or after January 1, 2007, including but not limited to USW-represented employees at the Edgemoor, Chambers Works and Niagara Falls sites will be eligible for a maximum vacation benefit of five weeks and are ineligible to bank more than three weeks of vacation under DuPont's Vacation Plan. DuPont has further informed employees that DuPont employees hired on or after January 1, 2007 will be ineligible to purchase vacation under DuPont's BeneFlex Vacation Buying Plan after their first ten years of employment. Disputes as to eligibility for these vacation benefits will inevitably be presented to the Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the BeneFlex Vacation Buying Plan to make final determinations and interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the BeneFlex Vacation Buying Plan.

### The Edgemoor Grievance

45.    On September 14, 2006, the USW filed a grievance against DuPont under the Edgemoor CBA ("the Edgemoor grievance"). The Edgemoor grievance alleged that DuPont

had made certain "modifications" to the SIP and the Pension Plan which violate the Edgemoor CBA. On information and belief, the USW claims, in the Edgemoor grievance that USW-represented employees hired after January 1, 2007, should be eligible to (a) participate in DuPont's Pension Plan; (b) receive a DuPont subsidy for retiree life insurance and medical and dental coverage under the BeneFlex Flexible Benefit Plan; (c) receive more than a maximum of five weeks of vacation benefits and bank more than three weeks of vacation in the future as previously provided under DuPont's Vacation Plan; and (d) purchase vacation after their first ten years of employment with the Company under the BeneFlex Vacation Buying Plan. On information and belief, the USW also claims, in the Edgemoor grievance, that employees hired prior to January 1, 2007, should be eligible to receive the same benefits as employees hired after that date under the terms of the SIP. In essence, the Edgemoor grievance challenges the application of certain eligibility provisions in the various DuPont ERISA plans referenced therein.

46.    DuPont has processed the Edgemoor grievance through the grievance procedure set forth in the Edgemoor CBA, and the parties have not been able to resolve their dispute. The USW demanded arbitration of the Edgemoor grievance. DuPont has refused to arbitrate the Edgemoor grievance as presented. DuPont has informed the USW that it considers the Edgemoor grievance to invoke a dispute as to whether certain individuals are eligible for benefits under various DuPont ERISA benefit plans, and that such disputes must be handled in accordance with the procedures set forth in the relevant ERISA plan documents and summary plan descriptions, and/or through a civil enforcement action brought by an adversely affected individual under ERISA.

47.    In response, on February 8, 2007, the USW threatened to bring legal action against DuPont to compel DuPont to arbitrate the Edgemoor grievance.

### The Chambers Works Grievance

48.    On September 22, 2006, the USW filed a grievance against DuPont under the Chambers Works CBA ("the Chambers Works grievance"). In language largely identical to

- 15 -

that used in the Edgemoor grievance, the Chambers Works grievance effectively contends that employees hired after January 1, 2007, should be eligible to (a) participate in DuPont's Pension Plan; (b) receive a DuPont subsidy for retiree life insurance and medical and dental coverage under the BeneFlex Flexible Benefit Plan; (c) receive more than a maximum of five weeks of vacation benefits and bank more than three weeks of vacation in the future as previously provided under DuPont's Vacation Plan; and (d) purchase vacation after their first ten years of employment with the Company under the BeneFlex Vacation Buying Plan. On information and belief, the USW alleges in the Chambers Works grievance that employees hired prior to January 1, 2007, should be eligible to receive the same benefits as employees hired after that date under the terms of the SIP. Like the Edgemoor grievance, the USW's Chambers Works grievance challenges the applicability of certain eligibility provisions in the various ERISA benefit plans at issue.

49.     DuPont has processed the Chambers Works grievance through the grievance procedure set forth in the Chambers Works CBA and the parties have not been able to resolve their dispute. The USW demanded arbitration of the grievance. DuPont has refused to arbitrate the Chambers Works grievance. DuPont has informed the USW that it considers the Chambers Works grievance to invoke a dispute as to whether certain individuals are eligible for benefits under various DuPont ERISA benefit plans, and that such disputes must be handled in accordance with the procedures set forth in the relevant ERISA plan documents and summary plan descriptions, and/or through a civil enforcement action brought by an adversely affected individual under ERISA.

50.     In response, on February 8, 2007, the USW has threatened to bring legal action against DuPont to compel DuPont to arbitrate the Chambers Works grievance.

### The Niagara Falls Grievance

51.     On August 28, 2006, the USW filed a grievance against DuPont under the parties' CBA ("the Niagara Falls grievance"). The Niagara Falls grievance is similar to those filed by the USW at Edgemoor and Chambers Works, and effectively contends that

- 16 -

employees hired after January 1, 2007, should be eligible to (a) participate in DuPont's Pension Plan; (b) receive a DuPont subsidy for retiree life insurance and medical and dental coverage under the BeneFlex Flexible Benefit Plan; (c) receive more than a maximum of five weeks of vacation benefits and bank more than three weeks of vacation in the future as previously provided under DuPont's Vacation Plan; and (d) purchase vacation after their first ten years of employment with the Company under the BeneFlex Vacation Buying Plan. On information and belief, the Niagara Falls grievance contends that employees hired prior to January 1, 2007, should be eligible to receive the same benefits as employees hired after that date under the terms of the SIP. The Niagara Falls grievance effectively challenges the applicability of certain eligibility provisions in the various ERISA benefit plans at issue.

52.    DuPont has processed the Niagara Falls grievance through the grievance procedure set forth in the Niagara Falls CBA, and the parties have not been able to resolve their dispute. The USW has demanded arbitration of the grievance. DuPont has refused to arbitrate benefits eligibility issues relating to the DuPont ERISA benefit plans. DuPont has informed the USW that it considers the Niagara Falls grievance to invoke a dispute as to whether certain individuals are eligible for benefits under various DuPont ERISA benefit plans, and that such disputes must be handled in accordance with the procedures set forth in the relevant ERISA plan documents and summary plan descriptions, and/or through a civil enforcement action brought by an adversely affected individual under ERISA.

### The Ampthill Rayon Workers Inc. Grievance

53.    Another labor union, the Ampthill Rayon Workers, Inc. ("ARWI"), represents employees at the DuPont Spruance manufacturing facility located in Ampthill, Virginia. DuPont and ARWI are parties to a collective bargaining agreement covering production and maintenance employees at the Spruance site. ARWI has recently filed grievances over the same conduct that gave rise to the USW grievances referenced above. More specifically, on November 7, 2006, ARWI filed a grievance involving similar benefit eligibility issues at the Spruance site ("the ARWI grievance"). The circumstances giving rise to the ARWI

grievance are the subject of litigation pending in this court, in the matter captioned <u>E.I.</u>
<u>DuPont de Nemours v. Ampthill Rayon Workers, Inc.</u>, Case No. 3:07cv52.

### USW Unfair Labor Practice Charges

54.    The USW has filed unfair labor practice charges with two regional offices of
the National Labor Relations Board ("NLRB"), asserting that DuPont has violated the Labor
Management Relations Act ("LMRA") with respect to changes to the various benefit plans
identified in Paragraphs 14 through 43 above.  DuPont is responding to those unfair labor
practice charges, and denies any violation of the LMRA or any breach of the collective
bargaining agreements.

### DuPont's Contractual Rights and Obligations

55.    The ERISA benefit plans identified in the various grievances filed by the
USW, as well as the grievance filed by the ARWI (collectively, "the union grievances"), and
referenced in Paragraphs 15 through 42 above, cover DuPont employees at locations
nationwide, including both union employees and non-union employees.  The eligibility rules
for these benefit plans must be, and are, interpreted and applied on a uniform basis consistent
with the terms set forth in the various plan documents.

56.    The union grievances, as well as the unfair labor practice charges filed by the
USW, inevitably involve questions of benefit eligibility and denials of claims for benefits
under the terms of DuPont's various ERISA benefit plans.

57.    Each of the ERISA benefit plans described in Paragraphs 15 through 42 above
specifies the fiduciary that has the exclusive authority to interpret the language of that plan
and to make determinations regarding eligibility for benefits.  Each of DuPont's ERISA
benefit plan documents and/or summary plan descriptions identified in Paragraphs 15
through 42 contains a specific procedure for resolving claims for benefits, including claims
related to benefit eligibility questions, and those procedures provide for a final and binding
decision by the Administrator.  None of these procedures call for dispute resolution by an
arbitrator pursuant to the grievance and arbitration provisions of the collective bargaining

agreements described in Paragraphs 9 through 14 above. In addition, disputes with respect to eligibility determinations under each of those plans may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). The union grievances with respect to the ERISA plans identified above are not subject to arbitration under the grievance and arbitration process set forth in the various collective bargaining agreements identified in Paragraphs 9 through 14, and 53 above, because they, along with any eligibility determinations made by Plan Administrators of the ERISA plans, must be addressed under the claims procedures set forth in the benefit plans or in a civil action filed pursuant to Section 502(a)(1)(B) of ERISA.

58.　　The grievance and arbitration provisions in the various collective bargaining agreements identified in Paragraphs 9 through 14, and 53 above are neither set forth in the ERISA plans nor incorporated by reference as the procedures by which disputes over benefit claims and eligibility determinations shall be resolved within the meaning of 29 C.F.R. § 2560.503-1(b)(6).

59.　　DuPont has the right under the parties' collective bargaining agreements to amend the eligibility provisions of the ERISA benefit plans described in Paragraphs 15 through 42 above, as reflected by the fact that the collective bargaining agreements specifically provide that employees covered by the collective bargaining agreements are entitled to benefits under certain enumerated DuPont benefit plans, but only subject to the terms of the plans themselves and any modifications thereof as DuPont may adopt generally.

60.　　DuPont did not violate the terms of its collective bargaining agreements with the USW by amending the ERISA benefit plans described in Paragraphs 15 through 42 above.

61.　　The arbitration provisions of the Chambers Works CBA, set forth in Article XI of that agreement, is expressly limited to grievances "relating to the interpretation or to any alleged violation of [the Chambers Works CBA]." Therefore, the Chambers Works grievance also is not arbitrable to the extent that it involves a dispute about vacation or life

insurance provided under DuPont's BeneFlex Flexible Benefits Plan because the BeneFlex Flexible Benefits Plan is neither set forth nor referenced in the Chambers Works CBA.

62.    The arbitration provisions of the Edgemoor CBA, set forth in Article VII of the agreement, expressly limit arbitration to disputes involving "the interpretation, or any alleged violation, of any provision of" the Chambers Works CBA itself.  Similarly, the arbitration provisions of the Niagara Falls CBA, set forth in Article of the agreement, expressly limit arbitration to questions "as to the interpretation of [the Niagara Falls CBA], or as to any alleged violation of the terms of" the Niagara Falls CBA.  Accordingly, the Edgemoor grievance and Niagara Falls grievance are not arbitrable to the extent that they involve a dispute concerning either retiree medical benefits provided under DuPont's Medcap Plan or retiree dental benefits provided under DuPont's Dental Assistance Plan because neither the Medcap Plan nor the Dental Assistance Plan are set forth in, or referenced in, either the Chambers Works CBA or the Niagara Falls CBA.

## COUNT I FOR DECLARATORY RELIEF - ERISA AND ARBITRABILITY OF THE USW'S GRIEVANCES

63.    Paragraphs 1-62 above are incorporated herein and made a part of this claim.

64.    An actual and substantial controversy presently exists within this Court's jurisdiction concerning the proper procedures for resolving disputes as to eligibility for certain benefits contained in the ERISA plans described in Paragraphs 15-42, which are administered and maintained by DuPont.  The controversy is justiciable and ripe for determination at this time.

65.    An actual and substantial controversy presently exists between DuPont and the USW within this Court's jurisdiction concerning both the parties' rights and obligations under the parties' various collective bargaining agreements and DuPont's obligation to arbitrate questions involving eligibility for certain benefits under DuPont's ERISA plans. The controversy is justiciable and ripe for determination at this time.

- 20 -

66.    If the present controversies are not resolved by a declaration of the proper procedures for resolving disputes as to eligibility for certain benefits contained in DuPont's ERISA plans, and the contractual rights and obligations of the parties, DuPont, the USW, and various other labor unions representing DuPont employees throughout the country will expend substantial time and expense arbitrating benefit eligibility determinations involving the same DuPont ERISA plans with the possibility of conflicting results. A prompt declaration: (1) that all disputes regarding eligibility for certain benefits contained in DuPont's ERISA plans are to be resolved exclusively through the procedures set forth in those plans, and/or in a civil enforcement action under Section 502 of ERISA; (2) that the USW's grievances are not arbitrable; and (3) that otherwise delineates the rights and obligations of the parties with respect to the matters alleged herein, is in the interest of justice.

## COUNT II FOR DECLARATORY RELIEF AS TO DUPONT'S RIGHTS AND OBLIGATIONS UNDER THE USW COLLECTIVE BARGAINING AGREEMENTS

67.    Paragraphs 1-66 above are incorporated herein and made a part of this claim.

68.    An actual and substantial controversy presently exists between DuPont and the USW within this Court's jurisdiction concerning the parties' rights and obligations under the parties' various collective bargaining agreements as to DuPont's right to modify its ERISA plans. The controversy is justiciable and ripe for determination at this time.

69.    If the present controversies are not resolved by a declaration of the proper procedures for resolving disputes as to eligibility for certain benefits contained in DuPont's ERISA plans, and the contractual rights and obligations of the parties, DuPont, the USW, and various other labor unions representing DuPont employees throughout the country will expend substantial time and expense arbitrating benefit eligibility determinations involving the same DuPont ERISA plans with the possibility of conflicting results. A prompt declaration: (1) that the actions taken by DuPont in amending the ERISA benefit plans at issue are consistent with DuPont's rights under the parties' collective bargaining agreements,

and that those actions do not violate the USW collective bargaining agreements; and (2) that otherwise delineates the rights and obligations of the parties with respect to the matters alleged herein, is in the interest of justice.

### COUNT III FOR PERMANENT INJUNCTION

70.    Paragraphs 1-69 are incorporated herein and made a part of this claim.

71.    The USW has demanded arbitration of the grievances it has filed pursuant to the arbitration provisions of the parties' various collective bargaining agreements. DuPont denies that it is contractually obligated to submit these disputes to arbitration. In response, the USW has threatened to bring legal action against DuPont to compel arbitration.

72.    DuPont is not required to arbitrate the USW's grievances. DuPont accordingly requests that the Court issue a permanent injunction ordering the USW to refrain from seeking to arbitrate any of the pending grievances filed by the USW. The issuance of a permanent injunction is necessary to protect Plaintiff's interests and is in the interest of justice.

### PRAYER FOR RELIEF

WHEREFORE, DuPont respectfully prays the Court to grant it judgment for the following relief:

1.    Enter judgment that the exclusive procedures for resolving any disputes as to eligibility for certain benefits under DuPont's ERISA plans are set forth in the language of the respective plans and/or in Section 502 of ERISA;

2.    Enter judgment that DuPont has not violated its collective bargaining agreements with the USW in amending the ERISA benefit plans at issue;

3.    Enter judgment against the USW, declaring that DuPont is not required to arbitrate any of the grievances filed by the USW described in this complaint, except to the extent that the grievances relate to benefits under DuPont's Vacation Plan;

4.    Enter a permanent injunction, ordering the USW to refrain from seeking arbitration of its pending grievances and from taking any additional steps to compel arbitration of those grievances;

5.    Enter judgment taxing costs of this action against the USW; and

6.    Such other relief as the Court deems just and proper.

Respectfully submitted,

James P. McElligott
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA  23219-4030
(804) 775-4329

Thomas P. Gies
Kris D. Meade
Glenn D. Grant
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595

Counsel for Plaintiff E.I. du Pont de Nemours and Company

February 28, 2007

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| E.I. DUPONT DE NEMOURS AND COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:07cv 52 |
| | ) | |
| AMPTHILL RAYON WORKERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff, E.I. du Pont de Nemours and Company ("Plaintiff" or "DuPont"), brings this action for declaratory judgment and a permanent injunction against Defendant Ampthill Rayon Workers, Inc. ("Defendant" or "ARWI"). For its Complaint, Plaintiff alleges as follows:

### NATURE OF THE ACTION

1.    This is a complaint for declaratory relief and entry of a permanent injunction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the Labor Management Relations Act, 29 U.S.C. § 185.

2    Plaintiff maintains several nationwide ERISA benefit plans that provide benefits to eligible union and non-union employees, former employees, retirees, and their eligible dependents. Plaintiff and the ARWI are parties to a collective bargaining agreement (the "ARWI CBA") at DuPont's Spruance Fibers Plant which covers employees who receive

benefits through DuPont's ERISA benefit plans. The employees covered by the ARWI CBA comprise just a small fraction of the total number of individuals who receive benefits from DuPont's nationwide benefit plans. The ARWI CBA specifically states that benefits are provided to employees covered by the ARWI CBA under DuPont's Industrial Relations Plans and Practices "subject to the provisions of such Plans and Practices," to the existing "rules, regulations and interpretations" of the Plans and Practices, and "to such modifications thereof" as may be adopted generally by DuPont. The ARWI CBA also contains grievance and arbitration provisions that provide for the resolution of designated disputes through procedures set forth therein. By its terms, arbitration under the ARWI CBA is expressly limited to questions concerning the interpretation of, or any alleged violation of, the ARWI CBA itself. Defendant has filed a grievance under the ARWI CBA that threatens the uniform administration and enforcement of DuPont's ERISA benefit plans.

3.      Plaintiff seeks a declaration that the grievance filed by ARWI, concerning its members' eligibility for benefits under certain ERISA benefit plans maintained by DuPont, must be resolved under the claims procedures set forth in the specific benefit plans under which eligibility for benefits is being asserted and/or in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), and is thus excluded from arbitration. Plaintiff also seeks a declaration that the actions taken by DuPont in amending the ERISA benefit plans at issue in this dispute are consistent with its rights under the ARWI CBA, and that Plaintiff's actions do not violate that agreement. Finally, Plaintiff seeks a permanent injunction, ordering Defendant to refrain from seeking arbitration of these grievances.

4.      This action raises issues similar to those presented in the litigation styled E.I. du Pont de Nemours and Company v. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, which was filed in this Court today (the "USW litigation"). In the USW litigation, DuPont alleges that grievances filed by the defendant union in that case are excluded from arbitration for

precisely the same reasons alleged in this case. The complaint in the USW litigation seeks precisely the same relief as is sought against the ARWI in this case.

## THE PARTIES

5.    Plaintiff, E.I. du Pont de Nemours and Company, is a Delaware corporation with its principal place of business in Wilmington, Delaware, and is licensed to do business in the Commonwealth of Virginia. DuPont employs more than 30,000 employees nationwide, of which more than 4,500 are unionized. DuPont, either directly or through DuPont employees or committees of such employees, is also a fiduciary of each of the ERISA benefit plans identified in Paragraphs 11 through 37 below.

6.    Defendant, Ampthill Rayon Workers, Inc. ("ARWI"), is a "labor organization" as defined by 29 U.S.C. § 152(5), with its principal place of business in Richmond, Virginia. ARWI is the exclusive collective bargaining representative for hourly production, maintenance, service and plant technical employees employed at DuPont's Spruance Fibers Plant located in Ampthill, Virginia.

## JURISDICTION

7.    This action is brought under 28 U.S.C. § 2201 for declaratory judgment, and 28 U.S.C. § 1331 because the action involves questions of federal law under the Labor Management Relations Act, 29 U.S.C. § 185, and questions arising under ERISA, 29 U.S.C. § 1001, *et seq.*

8.    Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b) because Defendant resides in this judicial district. Venue is also proper in this judicial district under 29 U.S.C. § 185(c) because Defendant ARWI maintains its principal office in this judicial district and because this action involves an actual controversy concerning the procedures for resolving disputes regarding eligibility for benefits under various ERISA benefit plans sponsored and administered by DuPont for ARWI-represented employees who work in this judicial district, whether DuPont is obligated to arbitrate such disputes, and whether DuPont's actions in modifying certain eligibility provisions in its ERISA benefit

- 3 -

plans have been consistent with the rights and obligations under the parties' collective bargaining agreement.

## STATEMENT OF FACTS

### The Parties' Relationship

9.    DuPont employs more than 1,000 workers represented by ARWI at its Spruance Fibers Plant. ARWI-represented employees are covered by a collective bargaining agreement ("the ARWI CBA") between DuPont and ARWI that became effective on September 1, 1999. The ARWI CBA renews, by its terms, each year on September 1, unless either party gives notice of an intent to terminate it. The ARWI CBA was renewed most recently on September 1, 2006.

10.    The ARWI CBA provides that ARWI-represented employees, if eligible, may receive benefits provided under a number of DuPont-sponsored benefit plans enumerated in the ARWI CBA. Among other benefits, ARWI-represented employees may be eligible for pension benefits, medical care, life insurance, dental benefits, vacation benefits and may be eligible to participate in DuPont's savings and investment plan.

### DuPont's Savings and Investment Plan

11.    DuPont maintains a nationwide benefit plan known as the DuPont Savings and Investment Plan ("SIP"), which is governed by ERISA. The SIP was originally adopted by DuPont on September 1, 1955. Employees eligible to participate in the SIP are permitted to voluntarily contribute a percentage of their pay to the Plan, and DuPont makes a matching contribution up to a specified percentage of the employee's monthly pay.

12.    The SIP provides that DuPont shall serve as the Plan Administrator and states that, in that capacity, DuPont "retains the discretionary authority to determine eligibility for benefits" and "to construe the terms and conditions of" the SIP. The SIP further provides that the "decision of the Company shall be final with respect to any questions arising as to interpretation of [the] Plan." The SIP also states that DuPont's decisions concerning claims for benefits are final and binding.

- 4 -

13.     Consistent with ERISA requirements, the SIP also describes an employee's right to appeal any denial of a claim for benefits under the SIP, and specifies that employees whose claims are denied or ignored in whole or in part may file suit in a state or federal court to vindicate their rights. Included among claims that are subject to the claims procedure set forth in the SIP are individual eligibility determinations made by the Plan Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

14.     By its terms, the SIP reserves to DuPont the discretionary right to modify or discontinue the SIP. The SIP further provides that any change made by DuPont that has the effect of reducing or terminating benefits under the SIP will not be effective until one year following the announcement of such change, unless earlier change is required to comply with governmental regulations.

15.     The SIP applies to all U.S. employees of DuPont who meet the eligibility requirements of the SIP, including employees represented by the ARWI. The SIP has been amended numerous times since its inception without bargaining with the ARWI.

16.     During calendar year 2007, DuPont employees hired prior to January 1, 2007, including but not limited to ARWI-represented employees hired to work at the Spruance Plant, are ineligible for certain enhancements to SIP benefits that will be provided to employees hired after January 1, 2007. For calendar year 2007, Employees hired after January 1, 2007 are eligible to (a) receive a Company contribution to the SIP equal to three percent (3%) of earnings; and (b) contribute up to six percent (6%) of their earnings to the SIP, with a Company matching contribution of one hundred percent (100%) of that amount. For calendar year 2007, employees hired prior to January 1, 2007 are eligible to contribute up to six percent (6%) of their earnings to the SIP and the Company will match fifty percent (50%) of that contribution. For calendar year 2007, employees hired prior to January 1, 2007 are not eligible for the three percent (3%) Company contribution and are not eligible for the

one hundred percent (100%) matching contribution. DuPont has informed employees regarding their eligibility for the SIP benefits referenced above.

17.    Disputes as to eligibility for SIP benefits will inevitably be presented to the SIP Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the SIP to make final determinations and interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the SIP.

### DuPont's Pension and Retirement Plan

18.    Pension benefits are provided to ARWI-represented employees under a nationwide, defined benefit plan known as the DuPont Pension and Retirement Plan ("Pension Plan"), which is governed by ERISA. The Pension Plan was originally adopted over a hundred years ago, on September 1, 1904, and currently has more than 150,000 participants, including employees and former employees, union and non-union alike.

19.    The Pension Plan is administered by a "Board of Benefits and Pensions," the members of which are appointed by DuPont. Under the express terms of the Pension Plan, the "Board of Benefits and Pensions retains the discretionary authority to determine eligibility for benefits" and "to construe the terms and conditions of the Plan." The Pension Plan further provides that decisions of the Board of Benefits and Pensions in all matters involving the interpretation and application of the Plan are "final." The summary plan description pertaining to the Pension Plan describes an employee's right to appeal any denial of a claim for benefits under the Pension Plan, and specifies that employees whose claims are denied or ignored in whole or in part may file suit in a state or federal court to vindicate their rights. Included among claims that are subject to the claims procedure set forth in the summary plan description are individual eligibility determinations made by the Board of Benefits and Pensions. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

- 6 -

20.    The Pension Plan, by its terms, specifically reserves to DuPont the right to change or discontinue the Plan. The Pension Plan has been amended numerous times since its inception without bargaining with the ARWI.

21.    DuPont has informed employees that DuPont employees hired after January 1, 2007, including, but not limited to, ARWI-represented employees hired to work at the Spruance Plant, are ineligible to receive benefits under the Pension Plan. Disputes as to eligibility for benefits under the Pension Plan will inevitably be presented to the Board of Benefits and Pensions, which will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Pension Plan to make final determinations and interpretations. The Board of Benefits and Pensions' eligibility determinations must be made consistent with the terms of the Pension Plan.

22.    DuPont has informed employees that (a) under the Pension Plan, service accrued after December 31, 2007 by DuPont employees who were employed as of December 31, 2006, including ARWI-represented employees working at the Spruance Plant, will be accrued at one-third the level of the current accrual rate, and (b) that the DuPont-paid survivor benefit under the Pension Plan will be frozen as of December 31, 2007. Disputes as to these issues will inevitably be presented to the Board of Benefits and Pensions, which will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Pension Plan to make final determinations and interpretations. The Board of Benefits and Pensions' eligibility determinations must be made consistent with the terms of the Pension Plan.

### DuPont's BeneFlex Employee Life Insurance Plan

23.    DuPont maintains a nationwide life insurance plan known as the BeneFlex Employee Life Insurance Plan ("Life Insurance Plan"), which is governed by ERISA. The Life Insurance Plan provides DuPont-funded life insurance for employees at one times their

pay at no cost, and allows employees to purchase additional group insurance coverage at their own expense.

24.    Pursuant to its terms, the Life Insurance Plan vests DuPont, as Plan Administrator, with the "full discretion and authority to interpret Plan provisions, resolve any ambiguities and evaluate claims." Consistent with ERISA requirements, the Life Insurance Plan also has a claims procedure. Pursuant to that procedure, an employee whose claim for benefits is denied may appeal first to the insurance company providing the specific insurance coverage involved. If that claim is denied, the employee may take a final appeal to DuPont. Under the terms of the Plan, decisions rendered by DuPont regarding the interpretation of the Plan and eligibility for benefits are final and binding. The summary plan description pertaining to the Life Insurance Plan describes an employee's right to appeal any denial of a claim for benefits under the Life Insurance Plan, and specifies that employees whose claims are denied or ignored in whole or in part may file suit in a state or federal court to vindicate their rights. Included among claims that are subject to the claims procedure set forth in the summary plan description are individual eligibility determinations made by the Plan Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

25.    The Life Insurance Plan reserves to DuPont the right to suspend, modify or terminate the Plan in its discretion at any time. DuPont has modified the Life Insurance Plan several times without bargaining with the ARWI.

26.    DuPont has informed employees that DuPont employees hired after January 1, 2007, including but not limited to ARWI-represented employees hired to work at the Spruance Plant, are ineligible to receive a DuPont subsidy for retiree life insurance under the Life Insurance Plan. Disputes as to eligibility for benefits under the Life Insurance Plan will inevitably be presented to the Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Life Insurance Plan to make final determinations and

interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the Life Insurance Plan.

## DuPont's Medical Care Assistance Plan

27.    DuPont provides health care benefits for certain employees, former employees and their eligible dependants through an ERISA benefit plan known as the Medical Care Assistance Program ("Medcap Plan"). The Medcap Plan was initially adopted on January 1, 1983.

28.    DuPont serves as the Administrator of the Medcap Plan. Consistent with ERISA requirements, the Medcap Plan includes a claims procedure. Pursuant to that procedure, an employee whose claim for benefits is denied may appeal the denial to DuPont. By its terms, the Plan provides that DuPont, as the Plan Administrator, has "the discretionary right to determine eligibility for benefits" and "to construe the terms and conditions" of the Medcap Plan. The Plan further provides that DuPont's decisions are final as to any questions arising as to the interpretation of the Medcap Plan. The summary plan description pertaining to the Medcap Plan specifically states that exhaustion of the claim and appeal procedure is mandatory for resolving claims under the Plan and that participants must pursue all claim and appeal rights on a timely basis before seeking any other legal recourse regarding claims for benefits. The summary plan description further provides employees with the right to appeal any denial of a claim for benefits under the Medcap Plan, and specifies that employees whose claims are denied or ignored in whole or in part may file suit in a state or federal court to vindicate their rights. Included among claims that are subject to the claims procedure set forth in the summary plan description are individual eligibility determinations made by the Plan Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

29.    By its terms, the Medcap Plan reserves to DuPont "the right to amend any provision" of the Medcap Plan or terminate it in its entirety should either course of action be

deemed necessary by the Company.  DuPont has amended the Medcap Plan without bargaining with the ARWL.

30.    DuPont has informed employees that DuPont employees hired after January 1, 2007, including but not limited to ARWI-represented employees hired to work at the Spruance Plant, are ineligible to receive a DuPont subsidy for retiree medical coverage under the Medcap Plan.  Disputes as to eligibility for Medcap Plan benefits will inevitably be presented to the Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Medcap Plan to make final determinations and interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the Medcap Plan.

### DuPont's Dental Assistance Plan

31.    DuPont provides certain dental benefits to employees, former employees retired with a pension, eligible survivors, and their eligible dependents through a nationwide ERISA benefits plan known as the Dental Assistance Plan ("Dental Plan").  The Dental Plan was initially adopted by DuPont on September 1, 1976.

32.    DuPont serves as the Administrator of the Dental Plan.  As Plan Administrator, DuPont retains "the discretionary right to determine eligibility for benefits" and "to construe the terms and conditions" of the Dental Plan.  The Dental Plan further provides that DuPont's decisions are final with respect to any questions arising as to the interpretation of the Plan.  The Plan further provides that a participant whose application for benefits is denied in whole or in part must submit an appeal of the benefits denial to a Contract Administrator, otherwise referred to as "the Insurance Company," which acts as the agent for DuPont.  Under the terms of the Plan, the Insurance Company's review of a claim is conclusive and binding.  Included among claims that are subject to the claims procedure set forth in the Plan are individual eligibility determinations made by the Contract

Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

33.    By its terms, the Dental Plan reserves to DuPont "the sole right to amend or discontinue" the Plan at its discretion. The Dental Plan further provides that any change made by DuPont that has the effect of reducing or terminating benefits under the plan will not be effective for one year following the announcement of the change. The Dental Plan has been amended several times without bargaining with the ARWI.

34.    DuPont has informed employees that DuPont employees hired after January 1, 2007, including but not limited to ARWI-represented employees hired to work at the Spruance Plant, will be ineligible to receive a DuPont subsidy for retiree dental coverage under the Dental Plan. Disputes as to eligibility for benefits under the Dental Plan will inevitably be presented to the Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the Dental Plan to make final determinations and interpretations. The Plan Administrator's eligibility determinations must be made consistent with the terms of the Dental Plan.

### DuPont's Vacation Plans and Programs

35.    DuPont provides employees, both union and non-union, with the opportunity to purchase up to one week of vacation time through an ERISA benefit plan known as the BeneFlex Vacation Buying Plan. DuPont originally adopted the BeneFlex Vacation Buying Plan on January 1, 1992.

36.    DuPont serves as the Plan Administrator for the BeneFlex Vacation Buying Plan. As Plan Administrator, DuPont retains the authority to determine eligibility for benefits under the BeneFlex Vacation Buying Plan and to construe the terms and conditions of the Plan. By its terms, the BeneFlex Vacation Buying Plan states that DuPont's decisions are final with respect to any questions arising as to the interpretation of the Plan. Included among claims that are subject to the claims procedure set forth in the BeneFlex Vacation

Buying Plan are individual eligibility determinations made by the Plan Administrator. In some cases, claims related to eligibility determinations may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

37.    Under the terms of the BeneFlex Vacation Buying Plan, DuPont retains the sole right to modify or terminate the Plan in its discretion, provided, however, that any change in the price or level of coverage will be announced at the time of annual enrollment and will not be changed during a Plan Year unless coverage provided by an independent, third-party provider is significantly curtailed or decreased during the Plan Year. Termination of the BeneFlex Vacation Buying Plan by DuPont is not effective until one year following announcement of the termination by the Company. The Vacation Buying Plan has been amended without bargaining with the ARWI.

38.    DuPont also provides employees with annual vacation benefits through its Vacation Plan. The Vacation Plan was initially adopted on January 1, 1934. Pursuant to the terms of the Vacation Plan, DuPont retains the right to change or discontinue the Plan, provided, however, that no change will be made which has the effect of reducing benefits for any calendar year unless the change has been announced in the preceding year.

39.    DuPont has informed employees that DuPont employees hired on or after January 1, 2007, including but not limited to ARWI-represented employees, will, in the future, only be eligible for a maximum vacation benefit of five weeks and are ineligible to bank more than three weeks of vacation under DuPont's Vacation Plan. DuPont has further informed employees that DuPont employees hired on or after January 1, 2007 will be ineligible to purchase vacation under DuPont's BeneFlex Vacation Buying Plan after their first ten years of employment. Disputes as to eligibility for benefits under the BeneFlex Vacation Buying Plan will inevitably be presented to the Plan Administrator, who will act in its capacity as an ERISA fiduciary with respect to such eligibility determinations, and in the exercise of its discretion as the only person designated under the BeneFlex Vacation Buying Plan to make final determinations and interpretations. The Plan Administrator's eligibility

- 12 -

determinations must be made consistent with the terms of the BeneFlex Vacation Buying Plan.

### The ARWI Grievance

40.    On November 7, 2006, the ARWI filed a grievance under the parties' CBA challenging the eligibility provisions in various of DuPont's benefit plans. Specifically, the ARWI's grievance contends that employees hired after January 1, 2007, should be eligible to (a) participate in DuPont's Pension Plan; (b) receive a DuPont subsidy for retiree medical and dental coverage and life insurance under the Medcap Plan, the Dental Plan and BeneFlex Employee Life Insurance Plan, respectively; (c) receive more than a maximum of five weeks of vacation benefits and bank more than three weeks of vacation in the future under DuPont's Vacation Plan; and (d) purchase vacation after their first ten years of employment with the Company under the BeneFlex Vacation Buying Plan. The grievance appears to contend that employees hired prior to January 1, 2007, should be eligible to receive the same benefits as employees hired after that date under the terms of the SIP. In essence, the ARWI's grievance challenges potential eligibility determinations based on dates of hire under DuPont's benefit plans, arguing, *inter alia*, that there is no provision "in the plans themselves" that "provides for one class of employees to be treated differently from another class of employees (new hires versus existing employees)."

41.    DuPont has processed the ARWI's grievance through the grievance procedure set forth in the CBA and the parties have not been able to resolve their dispute. The ARWI has now demanded arbitration of the grievance. DuPont has refused to arbitrate benefits eligibility issues relating to the DuPont ERISA benefit plans, including any such matters alleged in the ARWI grievance.

### USW Grievances and Unfair Labor Practice Charges

42.    Unions at other DuPont manufacturing facilities across the country have recently filed grievances that inevitably involve similar benefit eligibility issues. For instance, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-

Industrial and Service Workers International Union and various of its local unions (together, "the USW") has recently filed grievances involving similar benefit eligibility issues at DuPont's Edge Moor, Delaware plant, at DuPont's Niagara Falls, New York plant, and at DuPont's Chambers Works plant in Deepwater, New Jersey. The International Brotherhood of DuPont Workers ("IBDW") has asserted a similar grievance at DuPont's Marshall R&D facility in Philadelphia, Pennsylvania.

43.    The USW has also filed unfair labor practice charges with two regional offices of the National Labor Relations Board ("NLRB"), asserting that DuPont has violated the Labor Management Relations Act ("LMRA") with respect to changes to the various benefit plans identified in Paragraphs 11 through 38, above. DuPont is responding to those unfair labor practice charges, and denies any violation of the LMRA.

### DuPont's Contractual Rights and Obligations

44.    The ERISA benefit plans identified in the ARWI's grievance, and referenced in Paragraphs 11 through 37 above, cover DuPont employees at locations nationwide, including both union employees and non-union employees. The eligibility rules must be, and are, interpreted and applied on a uniform basis consistent with the terms set forth in the plan documents.

45.    The grievance filed by the ARWI at the Spruance Plant, as well as the grievances and unfair labor practice charges filed by unions elsewhere, inevitably involve questions of benefit eligibility and denials of claims for benefits under the terms of DuPont's various ERISA benefit plans.

46.    Each of the ERISA benefit plans described in Paragraphs 11 through 37 above specifies the fiduciary that has the exclusive authority to interpret the language of that plan and to make determinations regarding eligibility for benefits. Each of DuPont's ERISA benefit plans and/or summary plan descriptions identified in Paragraphs 11 through 37 contains a specific procedure for resolving claims for benefits, including claims related to benefit eligibility questions, and those procedures provide for a final and binding decision by

the Administrator, not by an arbitrator. In addition, disputes with respect to eligibility determinations under each of the ERISA benefit plans may be asserted in a civil action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). The ARWI's grievance with respect to the ERISA plans is not subject to arbitration under the grievance and arbitration process set forth in the ARWI CBA because the disputes raised in the grievance, including any eligibility determinations made by Plan Administrators of the ERISA plans, must be addressed under the claims procedures set forth in DuPont's ERISA benefit plans or in a civil action filed pursuant to Section 502(a)(1)(B) of ERISA.

47.    The grievance and arbitration provisions in the ARWI CBA are neither set forth in the ERISA plans nor incorporated by reference as the procedures by which disputes over benefit claims and eligibility determinations shall be resolved within the meaning of 29 C.F.R. § 2560.503-1(b)(6).

48.    By its terms, the arbitration provision set forth in Article XI of the ARWI CBA, states that arbitration is limited exclusively to questions "as to the interpretation of [the ARWI CBA], or as to any alleged violation of the terms of" the ARWI CBA. The ARWI's grievances are not arbitrable to the extent they raise disputes involving benefits provided under DuPont's Medcap Plan and Dental Assistance Plan because neither of those Plans are set forth in, or referenced in, the ARWI CBA.

49.    DuPont has the right under ARWI CBA to amend the eligibility provisions of the benefit plans described in Paragraphs 11 to 37 above, as reflected by the fact that the ARWI CBA specifically provides that employees covered by that agreement are entitled to benefits under certain enumerated DuPont benefit plans, but only subject to the terms of the plans themselves, and any modifications thereof as DuPont may adopt generally. DuPont did not violate the terms of the ARWI CBA by amending the ERISA benefit plans at issue.

### COUNT I FOR DECLARATORY RELIEF –
### ERISA AND ARBITRABILITY OF THE ARWI'S GRIEVANCE

50.    Paragraphs 1-49 above are incorporated herein and made a part of this claim.

51.    An actual and substantial controversy presently exists within this court's jurisdiction concerning the proper procedures for resolving disputes as to eligibility for certain benefits contained in the ERISA plans described in Paragraph 11-37 above, which are administered and maintained by DuPont. The controversy is justiciable and ripe for determination at this time.

52.    An actual and substantial controversy presently exists between DuPont and ARWI within this court's jurisdiction concerning DuPont's obligation to arbitrate questions involving eligibility for certain benefits under DuPont's ERISA plans. The controversy is justiciable and ripe for determination at this time.

53.    If the present controversies are not resolved by a declaration of the proper procedures for resolving disputes as to eligibility for certain benefits contained in DuPont's ERISA plans, and the contractual rights and obligations of the parties, DuPont, the ARWI, and various unions representing DuPont employees throughout the country will expend substantial time and expense arbitrating benefit eligibility determinations involving the same DuPont ERISA plans with the possibility of conflicting results. A prompt declaration: (1) that all disputes regarding eligibility for certain benefits contained in DuPont's ERISA plans are to be resolved exclusively through the procedures set forth in those plans, and/or in a civil enforcement action under Section 502 of ERISA; (2) that the ARWI's grievance is not arbitrable, and (3) that otherwise delineates the rights and obligations of the parties with respect to the matters alleged herein, is in the interest of justice.

## COUNT II FOR DECLARATORY RELIEF AS TO DUPONT'S RIGHTS AND OBLIGATIONS UNDER THE ARWI COLLECTIVE BARGAINING AGREEMENT

54.    Paragraphs 1-53 above are incorporated herein and made a part of this claim.

55.    An actual and substantial controversy presently exists between DuPont and ARWI within this Court's jurisdiction concerning the parties' rights and obligations under the parties' collective bargaining agreement and DuPont's right to modify its ERISA plans. The controversy is justiciable and ripe for determination at this time.

56.    If the present controversies are not resolved by a declaration of the proper procedures for resolving disputes as to eligibility for certain benefits contained in DuPont's ERISA plans, and the contractual rights and obligations of the parties, DuPont, the ARWI, and various other labor unions representing DuPont employees throughout the country will expend substantial time and expense arbitrating benefit eligibility determinations involving the same DuPont ERISA plans with the possibility of conflicting results. A prompt declaration: (1) that the actions taken by DuPont in amending the ERISA benefit plans at issue are consistent with DuPont's rights under the parties' collective bargaining agreement, and that those actions do not violate the ARWI collective bargaining agreement, and (2) that otherwise delineates the rights and obligations of the parties with respect to the matters alleged herein, is in the interest of justice.

## COUNT III FOR PERMANENT INJUNCTION

57.    Paragraphs 1-56 are incorporated herein and made a part of this claim.

58.    The ARWI has demanded arbitration of its grievance pursuant to the arbitration provisions of the ARWI CBA. DuPont denies that it is contractually obligated to submit this dispute to arbitration and requests that the Court issue a permanent injunction ordering the ARWI to refrain from seeking to arbitrate this dispute. The issuance of a permanent injunction is necessary to protect Plaintiff's interests and is in the interest of justice.

## PRAYER FOR RELIEF

WHEREFORE, DuPont respectfully prays the Court to grant it judgment for the following relief:

1.    Enter judgment that the exclusive procedures for resolving any disputes as to eligibility for certain benefits under DuPont's ERISA plans are set forth in the language of the respective plans and/or in Section 502 of ERISA.

2.    Enter judgment that DuPont has not violated its collective bargaining agreement with the ARWI in amending the ERISA benefit plans at issue.

3.    Enter judgment against the ARWI, declaring that DuPont is not required to arbitrate the disputes set forth in the grievance filed by the ARWI on November 7, 2006, except to the extent that the grievance relates to benefits under DuPont's Vacation Plan.

4.    Enter a permanent injunction, ordering the ARWI to refrain from seeking arbitration of its pending grievance and from taking any steps to compel arbitration of that grievance.

5.    Enter judgment taxing costs of this action against the ARWI; and

6.    Such other relief as the Court deems just and proper.


Respectfully submitted,


James P. McElligott
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA  23219-4030
(804) 775-4329

Thomas P. Gies
Kris D. Meade
Glenn D. Grant
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595

Counsel for Plaintiff E.I. du Pont de Nemours
and Company

February 28, 2007

# EXHIBIT 3

JS 44
(Rev.11/04)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)  PLAINTIFFS**
E.I. DUPONT DE NEMOURS AND COMPANY

**DEFENDANTS**
UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION

**(b)**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF:
New Castle County, Delaware

(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT:

(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)**    Attorneys (Firm Name, Address And Telephone Number)
James P. McElligott (VSB 14109)
McGuireWoods LLP
One James Center, 901 East Cary Street
Richmond, Virginia 23219-4030
Telephone: (804) 775-4329

Attorneys (If Known)

RECEIVED
FEB 2 8 2007
CLERK, U.S. DISTRICT COURT

**II. BASIS OF JURISDICTION** (Place An X In One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place An X In One Box For Plaintiff And One Box For Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. NATURE OF SUIT** (Place An X In One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | ☐ 625 Drug Related Seizure of | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | Property 21 USC 881 | | ☐ 450 Commerce/ICC |
| ☐ 150 Recovery of Overpayment & | ☐ 320 Assault, Libel | Product Liability | ☐ 630 Liquor Laws | | Rates/etc. |
| Enforcement of Judgment | & Slander | ☐ 368 Asbestos | ☐ 640 R.R. & Truck | PROPERTY RIGHTS | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Fed. Employers | Personal Injury | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | Product Liability | ☐ 660 Occupational | ☐ 830 Patent | Corrupt Organizations |
| Student Loans (Excl. Veterans) | ☐ 340 Marine | | Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of | ☐ 345 Marine Product | PERSONAL PROPERTY | ☐ 690 Other | | ☐ 810 Selective Service |
| Veterans Benefits | Liability | ☐ 370 Other Fraud | | | ☐ 850 Securities/ |
| ☐ 160 Stockholders Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth In Lending | LABOR | SOCIAL SECURITY | Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 195 Contract Product Liability | Product Liability | Property Damage | Act | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 196 Franchise | ☐ 360 Other Personal | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | Injury | Product Liability | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Vacate Sentence | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus | ☒ 791 Empl. Ret. Inc. Security | ☐ 870 Taxes (US Plaintiff | ☐ 895 Freedom of |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Act | or Defendant) | Information Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS-Third Party | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. | ☐ 540 Mandamus & | | 26 USC 7609 | Under Equal Access to Justice |
| | w/Disabilities— | Other | | | ☐ 950 Constitutionality of State |
| | Employment | ☐ 550 Civil Rights | | | Statutes |
| | ☐ 445 Amer. | ☐ 555 Prison Conditions | | | |
| | w/Disabilities – Other | | | | |
| | ☐ 440 Other Civil | | | | |
| | Rights | | | | |

**V. ORIGIN**    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
29 U.S.C. §1132(a) and §185   Declaratory judgment and injunction re: benefit claims.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND:**

Check YES only if demanded in Complaint
JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY:**
(See instructions):
JUDGE HUDSON

DOCKET NUMBER 3:07CV52

DATE
February 28, 2007

SIGNATURE OF ATTORNEY OF RECORD
James P. McElligott, Jr.

FOR OFFICE USE ONLY
RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# EXHIBIT 4

**Westlaw.**

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

**C**

Arrow Communication Laboratories, Inc. v. John Mezzalingua Associates, Inc.

D.Del.,2005.

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

ARROW COMMUNICATION LABORATORIES, INC., Plaintiff,

v.

JOHN MEZZALINGUA ASSOCIATES, INC., Defendant.

JOHN MEZZALINGUA ASSOCIATES, INC., Counterclaim Plaintiff,

v.

ARROW COMMUNICATION LABORATORIES, INC., and Tresness Irrevocable Patent Trust, Counterclaim Defendants.

**No. Civ. 05-357-SLR.**

Oct. 26, 2005.

Richard D. Kirk, of the Bayard Firm, Wilmington, Delaware. for Arrow Communication Laboratories, Inc., and Tresness Irrevocable Patent Trust. R. Terrance Rader, Charles W. Bradley, Glenn E. Forbis, Linda D. Kennedy, and Shelly L. Hokenstad, of Rader, Fishman & Grauer PLLC, Bloomfield Hills, Michigan, and Lawrence P. Trapani, of Manlius, New York, of Counsel.

Jeffrey B. Bove, and Kevin M. Baird, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware. for John Mezzalingua Associates, Inc. James R. Muldoon, and John A. Wasleff, of Wall, Marjama & Bilinski, LLP, Syracuse, New York. of Counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

## I. INTRODUCTION

*1 On June 3, 2005, plaintiff Arrow Communication Laboratories, Inc. ("plaintiff") filed a complaint in the United States District Court for the District of Delaware alleging patent infringement by defendant John Mezzalingua Associates, Inc. ("defendant"). (D.I.1) Plaintiff claims to be the lawful owner of all right, title and interest in U.S. Patent No. 5,745,838 ("the '838 patent"). (Id.) Plaintiff alleges that defendant is infringing the '838 patent by manufacturing, selling and offering for sale in the

United States, and by importing into the United States, electronic filters covered by one or more of the claims of the '838 patent. (Id.) Plaintiff further alleges that defendant is actively inducing others to infringe the '838 patent. (Id.)

On June 6, 2005, defendant filed an action for declaratory judgment of patent non-infringement and invalidity in the United States District Court for the Northern District of New York. (D.I.9, ex. A) On August 11, 2005, plaintiff's infringement suit was referred to the Magistrate Judge of the District of Delaware for the purpose of exploring alternative dispute resolution. (D.I.29) Trial is scheduled for November 2006. (Id.)

## II. BACKGROUND

Plaintiff is a corporation organized under the laws of the State of New York with its principal place of business in Syracuse, New York. Defendant is a corporation organized under the laws of the State of Delaware with its principal place of business in East Syracuse, New York.

## III. STANDARD OF REVIEW

Defendant moves the court to transfer this matter, pursuant to 28 U.S.C. § 1404(a), to the United States District Court for the Northern District of New York. (D.I.6) Section 1404(a) provides: "For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (2003). A plaintiff's choice of forum is to be accorded substantial weight and courts should only transfer venue if the defendant is truly regional in character. See Bergman v. Brainin, 512 F.Supp. 972, 973 (D.Del.1981) (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir.1970)). A defendant has the burden of establishing that "the balance of convenience of the parties and witnesses strongly favors" transfer. Id. Accordingly, "defendants brought into suit in Delaware must prove that litigating in Delaware would pose a 'unique or unusual burden' on their operations" for a Delaware court to transfer venue. See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 157 F.R.D. 215

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

(D.Del.1993). A motion to transfer venue may also be granted if there is a related case which has been first filed or otherwise is the more appropriate venue in which to litigate the issues between the parties. *See American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc., 1999 WL 615175, *5 (D.Del.1999).*

*2 In reviewing a motion to transfer venue, courts have not limited their consideration to the three factors enumerated in § 1404(a) (i.e., convenience of parties, convenience of witnesses, and interests of justice). The Third Circuit, in fact, has indicated that the analysis for transfer is very broad and has urged consideration of "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995)* (internal quotations and citation omitted). These factors entail six private and five public interests. Private interests include: (1) the plaintiff's forum preference as manifested by the plaintiff's original forum choice; (2) the defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of the books and records to the extent that the files could not be produced in the alternative forum. *Id.* Public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

In considering the private interest factors under *Jumara*, the court, consistent with Third Circuit precedent, adheres to the notion that transfer is not to be liberally granted and plaintiff's choice of forum is a paramount consideration. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp., 997 F.Supp. 556, 562 (D.Del.1998); Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 WL 1617186 (D.Del. Nov. 28, 2001); Cont'l Cas. Co. v. Am. Home Assurance Co., 61 F.Supp.2d 128, 131 (D.Del.1999).* Although transfer of an action is usually regarded as less inconvenient to a plaintiff if

the plaintiff has not chosen its "home turf" or a forum where the alleged wrongful activity or injury occurred, the "plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re ML-Lee Acquisition Fund II, L.P., 816 F.Supp. 973, 976 (D.Del.1993).*

## IV. DISCUSSION

As an initial matter, the court notes that venue is proper in Delaware as defendant is incorporated under the laws of the State of Delaware. Nevertheless, the District of Delaware is not plaintiff's "home turf," since it maintains its principal place of business in New York. In this sense, it appears to be more convenient to both the plaintiff and defendant to try the instant litigation in the Northern District of New York. Indeed, this court previously recognized that,
*3 [w]hen the plaintiff has chosen to bring suit in a district that is not plaintiff's "home turf" and that has no connection to any acts giving rise to the lawsuit, convenience to the plaintiff is not as great as it would be were plaintiff litigating at or near plaintiff's principal place of business or at the site of activities at issue in the lawsuit.

*Burstein v. Applied Extrusion Techs. Inc., 829 F.Supp. 106, 110 (D.Del.1992) (citing Sports Eye, Inc. v. Daily Racing Form, Inc., 565 F.Supp. 634, 637 (D.Del.1983)* (internal citations omitted)). Moreover, the locus of the alleged infringement occurred in Syracuse, New York. If defendant has infringed the '838 patent, such infringement was done primarily in Syracuse, where the accused products were developed, manufactured and sold. Based on the evidence offered, the majority of the witnesses with discoverable information also are located in and around Syracuse, New York. In addition, most of defendant's documents relating to the production, promotion, marketing and sales of the accused product are maintained in central New York. On this basis, the court concludes that the private factors under *Jumara* weigh in favor of transferring the case at bar to the United States District Court for the Northern District of New York.

One of the public interest factors under *Jumara* involves the administrative considerations of the courts. More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

"in all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. M'Iver,* 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second-filed action is usually stayed or transferred to the court where the first-filed action is pending. *Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D.Pa.1991); *Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.,* 2001 U.S. Dist. LEXIS 18547, Civil Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. *Id.* at 972, 977. Invocation of the rule will usually be the norm, not the exception. Courts presented with exceptional circumstances may exercise their discretion to depart from the first-filed rule. *Id.* at 979. In this case, it is undisputed that the present patent infringement suit in the District of Delaware was first filed and involves the same patent and the same issues as the declaratory judgment action filed thereafter by defendant in the Northern District of New York. Therefore, the burden is on defendant to present some exceptional circumstances why the court should depart from the first-filed rule.

**\*4** In support of its argument supporting transfer, defendant states that all of its relevant witnesses reside in New York, all the documents and records related to the accused product are in New York, and the subject matter of the lawsuit has significant local interest in New York. (D.I. 7 at 1-3) In contrast, evidence suggests that the District of Delaware has no connection to the subject matter of plaintiff's lawsuit, except that defendant is incorporated there. Defendant contends that pursuing the lawsuit in the District of Delaware will generate "significant expenses and other burdens" to the parties. (*Id.* at 3-4) Given this evidence and noting the regional character of the parties, with the primary business operations of each party located in the Northern District of New York, there are exceptional circumstances present which require the court to depart from the first-filed rule.

In considering the other public interest factors under *Jumara,* the court notes that the parties have taken significant steps to advance the instant litigation in the District of Delaware. The parties have exchanged initial disclosures, are set to explore settlement with the magistrate judge, and have arranged a schedule for litigation, with trial set to occur in about one year. These factors weigh in favor of maintaining the litigation in the District of Delaware. However, factors are also present which weigh in favor of transferring the case to the Northern District of New York. First, defendant's declaratory judgment action, which involves the same subject matter as this case, is currently pending in the United States District Court for the Northern District of New York.[FN1] In addition, both parties are regional in character and operate their businesses out of central New York, suggesting that the Northern District of New York is the most appropriate venue for the parties to litigate. Although a suit in this matter was first filed in Delaware, the public interest factors weighing in favor of keeping the litigation in the District of Delaware are not compelling. The court, therefore, concludes that the public interest factors under *Jumara* favor transferring venue to the Northern District of New York.

> FN1. By stipulation of the parties, that case has been stayed pending this court's decision on defendant's motion to transfer venue. (N.D. N.Y., Case No. 05-CV-703 (NAM/DEP), D.I. 6) The court has no reason to believe that, once the stay is lifted, the declaratory judgment action in the Northern District of New York will move forward with any less swiftness than that with which the instant case has progressed in the District of Delaware. The familiarity with the parties and subject matter possessed by the Northern District of New York will certainly promote expeditiousness in handling the case.

### V. CONCLUSION

On balance, the court finds that the public interest factors and private interest factors weigh strongly in favor of transferring venue in this case. The court, as a result, concludes that defendant has sufficiently proven that litigating in the District of Delaware would pose a unique burden which merits transfer of venue. For the reasons stated, defendant's motion to transfer is granted. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 26th day of October, 2005,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

consistent with the memorandum opinion issued this
same date;

IT IS ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. The above-captioned action shall be transferred to
the United States District Court for the Northern
District of New York.

D.Del.,2005.
Arrow Communication Laboratories, Inc. v. John
Mezzalingua Associates, Inc.
Not Reported in F.Supp.2d, 2005 WL 2786691
(D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 174705 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**C**

Servian v. Health Data Sciences Corp.
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Robert SERVIAN, Plaintiff,
v.
HEALTH DATA SCIENCES CORPORATION,
Defendant.
**Civ. A. No. 92-2693.**

July 21, 1992.

Mitchell A. Kramer, Mitchell A. Kramer & Assoc.,
Stacey P. Nakasian, Mitchell A. Kramer & Assoc.,
Jenkintown, Pa., for plaintiff.
David B. Snyder, Fox, Rothschild, O'Brien &
Frankel, Philadelphia, Pa., for defendant.

MEMORANDUM
ROBERT F. KELLY, District Judge.
**\*1** Defendant, Health Data Sciences Corporation
("HDS"), has filed a motion to dismiss this action
pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure.   HDS filed suit in Los Angeles
Superior Court on April 16, 1992 which was 22 days
prior to Plaintiff Robert Servian's filing of this action.
Plaintiff removed the California action to Federal
District Court for the Southern District of California.
Plaintiff has also filed a motion to transfer venue of
that action to the Eastern District of Pennsylvania.
HDS argues in its Motion to Dismiss that Plaintiff's
Complaint is based upon the same contracts, events
and contentions of import as in HDS' earlier filed
suit.   HDS further maintains that Plaintiff's action
requires resolution of the same questions at issue in
HDS' action, and therefore Plaintiff's Complaint is in
reality a compulsory counterclaim that is required to
be adjudicated in the California action.

Both actions seek a decision concerning whether
sales commissions are due in conformance with prior
agreements between the parties.   Rule 13(a) of the
Federal Rules of Civil Procedure provides that:
A pleading shall state as a counterclaim any claim
which at the time of serving the pleading the pleader
has against an opposing party, if it arises out of the
transaction or occurrence that is the subject matter of
the opposing party's claim and does not require for its
adjudication the presence of third parties of whom

the court cannot acquire jurisdiction.

A counterclaim is compulsory if it is "logically
related" to an opposing party's claim.   Great Lakes
Rubber Corp. v. Herbert Hoover Co., 286 F.2d 631
(3d Cir.1961) (citations omitted).A counterclaim is
"logically related" to the opposing party's claim
where separate trials on each of their respective
claims would involve a substantial duplication of
effort and time by the parties and the courts.   Where
multiple claims involve many of the same factual and
legal issues, or where they are offshoots of the same
basic controversy between the parties, fairness and
considerations of convenience and of economy
require that the counterclaimant be permitted to
maintain his cause of action.   Indeed the doctrine of
res judicata compels the counterclaimant to assert his
claim in the same suit for it would be barred if
asserted separately, subsequently.

*Id.* at 634.

The Third Circuit applies the "first-filed" rule to
determine whether a cause of action is required to be
adjudicated as a compulsory counterclaim.   This rule
provides that where Federal concurrent jurisdiction
exists, the court which first had possession of the
action must decide it.   Crosley Corp. v. Hazeltine
Corp., 122 F.2d 925, 929 (3d Cir.1941).   However,
there are exceptions to the application of this rule.
Rare or extraordinary circumstances, inequitable
conduct, bad faith, and forum shopping are all
situations where the court's discretion justifies
retention of an action and departure from the "first
filed" rule.   Equal Employment Opportunity Comm'n
v. University of Pa., 850 F.2d 969, 972 (3d Cir.1988).
Nevertheless, this discretion should be exercised only
in limited situations.

**\*2** After examining the pleadings and complaints in
both cases, it is evident that both actions require the
courts to resolve the same or similar issues.
Specifically, whether Plaintiff was entitled to sales
commissions as a result of a sale to New York City
Health and Hospital Corporation.

Plaintiff claims that HDS' suit was filed in
anticipation of impending litigation by Plaintiff and
was   therefore   impermissible   forum   shopping
justifying departure from the "first filed" rule.
Plaintiff cites a number of cases to support this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 174705 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 2

position.    However, those cases are factually distinguishable from the present matter.    Courts which have held that a party's forum shopping permits exception to the "first filed" rule have done so primarily based on the determination that such actions were filed in order to avoid the law of an unfavorable forum.  _Mission Ins. Co. v. Puritan Fashions Corp., 706 F.2d 599, 602 (5th Cir.1983)_ (citations omitted).    Further, courts have only found exception to the rule where the factual situations were convincingly persuasive and so extraordinary that they tended to prove the anticipatory nature of the suit.  _See id.; Ven Fuel Inc. v. Department of the Treasury, 673 F.2d 1194, 1195 (11th Cir.1982); Consolidated Rail Corp. v. Grand Trunk Western R. Co., 592 F.Supp. 562, 568 (E.D.Pa.1984)._

In the present case, Counsel for HDS sent a letter dated March 16, 1992 to Plaintiff's attorney indicating that HDS disputed Plaintiff's claims.    HDS stated in this letter that they were not interested in resolving this dispute through litigation.    One full month later HDS filed suit in California seeking declaratory judgment as to claims for commission owed.    HDS is also asking for the return of advances on commissions not earned.    The fact that HDS later changed its mind and filed suit subsequent to the March 16th letter does not make the nature of this action anticipatory entitling Plaintiff to maintain a separate suit.    Plaintiff did not file suit until three weeks after HDS' earlier filed complaint.    Moreover, California law governs HDS' as well as Plaintiff's claims.    California is also considered HDS' principal place of business.    As a result, there is no question that California is an appropriate forum to govern a suit between HDS and Plaintiff regarding the disputed sales commissions.

I find that the allegations and supporting facts are insufficient to warrant departure from the "first filed" rule based on the rationale that HDS' suit was merely filed for the purpose of forum shopping in anticipation of impending litigation.    This Court is aware of the fact that Plaintiff is a resident of Pennsylvania and the original suit was filed in California, but the nature of litigation sometimes results in undue hardship for one of the parties.    Aware of that fact, the Federal Rules of Civil Procedure, through the doctrine of forum non conveniens, were drafted to provide a remedy to litigants in those unfortunate situations.    However, considerations affecting a court's ruling on a motion to transfer are distinct from those relied upon when deciding whether to dismiss an action based on the "first filed" rule.    In the absence of an extraordinary

situation, where an opposing party's unfair tactical strategy justifies departure from the law regarding compulsory counterclaims, this Court is unable to grant any discretionary relief from the "first filed" rule.    In the present case, the timing and circumstances surrounding the filing of the first suit do not support an exception to this rule.    I shall therefore enter the following order:

ORDER

*3 AND NOW, this 21st day of July, 1992, upon consideration of Defendant Health Data Sciences Corporation's Motion to Dismiss Plaintiff Robert Servian's Complaint and all the responses thereto, it is hereby ORDERED that:

1. Defendant's Motion to Dismiss is GRANTED; and

2. Plaintiff's Complaint is DISMISSED without prejudice.

E.D.Pa.,1992.
Servian v. Health Data Sciences Corp.
Not Reported in F.Supp., 1992 WL 174705 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
(Cite as: Not Reported in F.Supp.2d)

**H**

Devlin Graphic Industries, Inc. v. Lewis
S.D.N.Y.,2001.

United States District Court, S.D. New York.
DEVLIN GRAPHIC INDUSTRIES, INC. Pension
Plan, et al., Plaintiffs,
v.
David LEWIS, Defendant.
**No. 00Civ.6665LTSMHD.**

March 30, 2001.

Scott M. Riemer, Attorney at Law, New York, NY,
for Plaintiffs.
Jerry Kugelmas, Attorney at Law, New York, NY,
for Defendant.

*OPINION AND PRELIMINARY INJUNCTION*
SWAIN, J.

*1 The issues in this case, which arises from a bitter
divorce and equitable distribution proceeding in New
York State court, focus on the interrelationship
between the federal Employee Retirement Income
Security Act of 1974, as amended ("ERISA") and
state domestic relations law. Plaintiffs are the Devlin
Graphic Industries, Inc. Pension Plan (the "Plan")
and Joan D. Lewis ("Mrs.Lewis") as a trustee of the
Plan. The defendant is David Lewis ("Mr.Lewis"),
the former spouse of plaintiff Lewis. Mrs. Lewis, in
her individual capacity, was the plaintiff in the
parties' state court proceeding. Plaintiffs' complaint,
filed in this Court on September 6, 2000, seeks a
declaration that an order entered by the New York
State Supreme Court, Westchester County, on June
30, 1998 in the parties' divorce and equitable
distribution action (the "State Court Order") fails to
constitute a "Qualified Domestic Relations Order" (a
"QDRO") within the meaning of relevant provisions
of the Employee Retirement Income Security Act of
1974, as amended ("ERISA"), and is therefore
preempted by that statute. Plaintiffs also seek an
injunction prohibiting enforcement of the State Court
Order.

The Court has jurisdiction of this action pursuant to
29 U.S.C.A. § 1132(e) (West 1999) and 28 U.S.C.A.
§ § 1331 (West 1993), 2201 and 2283 (West 1994).
Venue is proper in that the Plan is administered in
this District. *See* 28 U.S.C.A. § 1132(e)(2).

By Order to Show Cause entered by this Court on
November 24, 2000 (the "OSC"), plaintiffs initiated
an application for a preliminary injunction and
temporary restraining order preventing the
enforcement of the State Court Order. Plaintiffs'
application was prompted by a contempt proceeding
brought on in state court by Mr. Lewis. The Order to
Show Cause initiating the state court contempt
proceeding required Mrs. Lewis to show cause as to
why an order should not be entered directing her,
*inter alia,* "to comply with the [State Court Order]
and agreement with respect to the provisions therein
including (i) distribution from [Mrs. Lewis'] pension;
(ii) transfers of certain stocks and otherwise." Order
to Show Cause, October 25, 200 (annexed to OSC as
Exhibit C).

Following briefing and a hearing on November 30,
2000, this Court entered a Temporary Restraining
Order ("TRO"), setting forth the basis of its decision
at length on the record. The TRO was subsequently
continued through March 26, 2001. The Court having
had an opportunity to consider the parties' further
submissions and arguments, plaintiffs' application for
a preliminary injunction is hereby granted, to the
extent and for the reasons set forth below. This
opinion sets forth the Court's findings of fact and
conclusions of law in accordance with Rule 52 of the
Federal Rules of Civil Procedure.

*Background*

The Court makes the following findings of fact. The
material facts are largely undisputed. The Plan, first
adopted in 1990 and subsequently amended, is
sponsored by Devlin Graphic Industries, Inc.
("Devlin"), a closely-held corporation of which Mrs.
Lewis is a 51% shareholder and her daughter, Stacy
Semel, is the only other shareholder. Mrs. Lewis is a
trustee of the Plan. Devlin is the "Plan
Administrator" for ERISA purposes; Mrs. Lewis is
authorized to act on behalf of the company in that
connection. The Plan document in its current version
consists of the Datair Mass-Submitter Prototype
Defined Benefit Pension Plan and Trust ("Plan
Document" or "Plan Doc.") and an Adoption
Agreement in connection therewith. The Adoption
Agreement, dated December 10, 1993 ("Adoption
Agreement"), is signed by Mrs. Lewis as President of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

Devlin and as a trustee of the Plan, and by Mr. Lewis and Ms. Semel as Plan trustees. [FN1] The Plan Document was submitted to the Court as an exhibit to the March 15, 2001 Affirmation of Scott Riemer. The Adoption Agreement was submitted to the Court as Exhibit F to the OSC. There are currently three Plan participants-Mrs. Lewis, Ms. Semel and Dorothy Dabelstein.

> FN1. The Plan Document submitted to the Court by plaintiffs' counsel is dated March 1995, post-dating the Adoption Agreement. The Court notes that section 3.10.8 of the Plan Document authorizes the mass-submitter plan sponsor to amend the main plan document to comply with legal requirements. In that the material cross-references from the 1993 Adoption Agreement to the 1995 Plan Document appear consistent and the parties have not provided evidence of significant amendment of any of the relevant Plan provisions between 1993 and 1995, the Court has considered the version of the Plan Document provided to the Court as the operative one.

**\*2** The Plan is a tax qualified defined benefit plan covered by ERISA. It provides for retirement benefits in specified dollar amounts, calculated pursuant to accrual formulae set forth in the Adoption Agreement and underlying Plan Document. The Plan does not provide for the allocation of assets or benefits to the accounts of specific participants. Rather, it provides for payment of the formula benefit at or after "normal retirement age," in annuity or lump sum form. (Adoption Agreement at 11-21; Plan Doc. at 19-21.) Section 3.5.1 of the Plan Document provides in pertinent part that:

All assets held by the Trustee, whether in the Trust Fund or Segregated Funds, shall be owned exclusively by the Trustee and no Participant or Beneficiary shall have any individual ownership thereof.

(Plan Doc. at 76.) Although the Adoption Agreement includes language mandating the allocation of "residual assets" among "Participants in proportion to their Accrued Benefits" following "satisfaction of all liabilities to Participants," that language relates only to the operation of the Plan provision governing termination of the Plan. Under the termination provisions of the Plan,[FN2] any distribution of residual assets would occur only after formal termination of the Plan, liquidation of its assets, and distribution of

assets to participants entitled to benefits in accordance with priority categories set forth in the Plan Document. (Adoption Agreement at 25; Plan Doc. at 49-50.) The Plan has not been terminated.

> FN2. Plan Doc. § 2.5.15.

In or about September of 1996, Mrs. Lewis commenced an action against Mr. Lewis in New York State Supreme Court, Westchester County, for divorce and equitable distribution of marital property. At a hearing held in that action on April 23, 1998, Mr. Lewis' counsel recited into the record a stipulation of settlement. The transcript of the settlement stipulation reads in pertinent part as follows:

MR. KUGELMAS: Mr. Lewis, it is agreed that he is entitled to 50 percent of the wife's interest in her pension and those stocks in the said pension account will be divided by quadro [sic], by division, in kind and I will prepare-

MRS. LEWIS: The Judge said to leave the in kind off, right there in the office.

MR. KUGELMAS: Mr. Lewis' percentage of the interest in the pension will be distributed to Mr. Lewis and I will prepare a quadro to be signed by the Court which I will submit together with the judgment and findings.

MRS. LEWIS: We want written notice of settlement.

(Transcript of April 23, 1998 hearing at 12-13.) Mrs. Lewis held herself out as appearing *pro se* at the hearing but was accompanied by a lawyer, one Joel Mayer, who participated to some degree in the settlement colloquy and who appeared as Mrs. Lewis' counsel in connection with later state court proceedings arising from the settlement stipulation. There is no indication in the caption of the state court action or in the transcript of the April 23, 1998 proceeding that Mrs. Lewis was appearing in any capacity other than as an individual.

**\*3** Mr. Kugelmas' reference in the colloquy to "quadro" was to a qualified domestic relations order ("QDRO") within the meaning of section 414(p) of the Internal Revenue Code of 1986, as amended (the "Code") and section 206(d) of ERISA (29 U.S.C.A § 1056(d) (West 1999)). The relevant portions of section 206(d) of ERISA are set forth in the margin.[FN3]

> FN3. (1) Each pension plan shall provide that benefits provided under the plan may

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

not be assigned or alienated

....

(3)(A) Paragraph (1) shall apply to the creation, assignment or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that ... [such provision] shall not apply if the order is determined to be a qualified domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

(B) For purposes of this paragraph-

(i) the term "qualified domestic relations order" means a domestic relations order-

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term "domestic relations order." means any judgment, decree, or order (including approval of a property settlement agreement) which-

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies-

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order-

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

(E)(i) A domestic relations order shall not be treated as failing to meet the requirements of clause (i) of subparagraph (D) solely because such order requires that payment of benefits be made to an alternate payee-

(I) in the case of any payment before a participant has separated from service, on or after the date on which the participant attains (or would have attained) the earliest retirement age,

(II) as if the participant had retired on the date on which such payment is to begin under such order (but taking into account only the present value of benefits actually accrued and not taking into account the present value of any employer subsidy for early retirement), and

(III) in any form in which such benefits may be paid under the plan to the participant (other than in the form of a joint and survivor annuity with respect to the alternate payee and his or her subsequent spouse).

For purposes of subclause (II), the interest rate assumption used in determining the present value shall be the interest rate specified in the plan or, if no rate is specified, 5 percent.

(ii) For purposes of this subparagraph, the term "earliest retirement age" means the earlier of-

(I) the date on which the participant is entitled to a distribution under the plan, or

(II) the later of the date of the participant [FN1 notes "So in original. Probably should be 'date the participant'."] attains age 50 or the earliest date on which the participant could begin receiving benefits under the plan if the participant separated from service.

...

(G)(i) In the case of any domestic relations order received by a plan-

(I) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and

(II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

(ii) Each plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Such procedures-

(I) shall be in writing,

(II) shall provide for the notification of each person specified in a domestic relations order as entitled to payment of benefits under the plan (at the address included in the domestic relations order) of such procedures promptly upon receipt by the plan of the domestic relations order, and

(III) shall permit an alternate payee to designate a representative for receipt of copies of notices that are sent to the alternate payee with respect to a domestic relations order.

(H)(i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the "segregated amounts") which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

(ii) If within the 18-month period described in clause (v) the order (or modification thereof) is determined to be a qualified domestic relations order, the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.

(iii) If within the 18-month period described in clause (v)-

(I) it is determined that the order is not a qualified domestic relations order, or

(II) the issue as to whether such order is a qualified domestic relations order is not resolved, then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such

amounts if there had been no order.

(iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18-month period described in clause (v) shall be applied prospectively only.

(v) For purposes of this subparagraph, the 18-month period described in this clause is the 18-month period beginning with the date on which the first payment would be required to be made under the domestic relations order.

(I) If a plan fiduciary acts in accordance with part 4 of this subtitle in-

(i) treating a domestic relations order as being (or not being) a qualified domestic relations order, or (ii) taking action under subparagraph (H), then the plan's obligation to the participant and each alternate payee shall be discharged to the extent of any payment made pursuant to such Act.

(J) A person who is an alternate payee under a qualified domestic relations order shall be considered for purposes of any provision of this chapter a beneficiary under the plan....

(K) The term "alternate payee" means any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant.

<u>29 U.S.C.A. § 1056(d)</u> (West 1999).

Mr. Lewis' attorney thereafter settled on Mrs. Lewis a proposed order, labeled "Qualified Domestic Relations Order", which recited that it was intended to be a QDRO and directed the distribution to Mr. Lewis of 46.15% of the underlying assets of the Plan, including specific stockholdings or proceeds thereof and other specified Plan assets. The percentage was calculated based on an actuarial calculation of the then-lump sum value of Mrs. Lewis' accrued Plan benefit and a review of the assets of the Plan. Mr. Lewis, through his counsel, had determined that the lump-sum value calculated by the actuary constituted 92.3% of the assets of the Plan and determined further that Mr. Lewis' 50% of Mrs. Lewis' "interest" in the Plan benefit thus constituted 46.15% of the Plan's assets. Mrs. Lewis was 59 years old at the time the State Court Order was entered. She was not yet eligible to receive any distribution under the Plan, which provides for distributions only after attainment of age 60 and the satisfaction of certain length of service requirements. (Adoption Agreement at § §

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

II.B.1, II.B.2, II.G.1, II.I. 4; Plan Doc. at § 2.5.1.) Mrs. Lewis did not object to the proposed order and it was entered, along with a divorce judgment, on June 30, 1998. The State Court Order is annexed to the OSC as Exhibit D.

Shortly after the State Court Order was entered, Mrs. Lewis appeared by counsel in the state court proceedings, asserting that the "QDRO" was not in fact a QDRO because it failed to comply with certain ERISA and Code provisions and that it should therefore be modified. Specifically, Mrs. Lewis argued that the order was inconsistent with ERISA and Code, with the terms of the Plan, and with the in-court stipulation insofar as it measured benefits payable to Mr. Lewis by the value of plan assets rather than the plan's benefit formula, directed distribution of specific Plan assets in kind, and directed an immediate distribution to Mr. Lewis. Mrs. Lewis also argued that the State Court Order was inconsistent with the parties' stipulation of settlement and that there had been an error regarding the distribution of certain of the couple's collectibles. The state court denied Mrs. Lewis' application for modification of the order, issuing an order reading in its entirety as follows:

Upon the foregoing papers it is ORDERED that this motion and cross-motion are denied. The Defined Benefit Plan in which the defendant is to receive 50% of the assets can be amended, if necessary, to provide for the distribution to defendant. Additionally, there is no showing of a mistake with respect to the figurines. Nevertheless, the motion was made in good faith and is not frivolous. Therefore, attorney fees are denied.

*4 (Order, Sept. 23, 1998, annexed to OSC as Ex. E.)

Mrs. Lewis, still appearing in her individual capacity in the divorce action, thereafter appealed the order to the Appellate Division, First Department, arguing again that the State Court Order failed to comply with the terms of the Plan and the requirements of ERISA and the Code. The Appellate Division, affirming, held in February 2000 that there was no reason to grant relief from the order below. It did not address specifically Mrs. Lewis' ERISA and Code-based arguments. (Decision & Order, Feb. 14, 2000, annexed to OSC as Ex. E.) The Appellate Division thereafter denied Mrs. Lewis' motion for reargument. (Decision & Order on Motion, May 2, 2000, annexed to OSC as Ex. E.) None of the arguments in the parties' state court briefs addressed the question of the state courts' jurisdiction to determine whether the State Court Order is a QDRO within the meaning of

ERISA or the Code and, as explained *infra,* none of the state court decisions holds that the State Court Order is such a QDRO.

The State Court Order required service on the Plan Administrator of a certified copy of the order. Defendant takes the position that the original settlement of the order on Mrs. Lewis in connection with the divorce proceeding constituted such service. The State Court Order was apparently served formally on Devlin, as Plan Administrator, sometime after the final Appellate Division decision. It is undisputed that no steps have been taken to comply with the distribution requirements of the State Court Order. It is also undisputed that the Plan Administrator did not respond to the order by taking the steps outlined in section 206 of ERISA and related Code provisions, including informing Mr. Lewis of the Plan's procedures for determining the qualified status of domestic relations orders, making such determination and notifying Mr. Lewis within a reasonable time of such determination, and accounting separately for amounts that would have been payable to Mr. Lewis during the period of its deliberations if the order had been determined to be a QDRO. See 29 U.S.C.A. § 1056(d)(3)(G),(H) (West 1999). Instead, Mrs. Lewis (in her capacity as a trustee of the Plan) and the Plan commenced this litigation.

### *Erisa's Preemption and Civil Action Provisions*

ERISA's provisions generally "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" that is governed by ERISA. 29 U.S.C.A. § 1144(a) (West 1999). The Plan is such an employee benefit plan. Civil actions to enforce ERISA and/or the terms of employee benefit plans are authorized by section 502 of the statute, which also delineates the extent to which federal and state courts have jurisdiction of such actions. See 29 U.S.C.A. § 1132 (West 1999). Section 502 provides in pertinent part that a plan participant or beneficiary may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," 29 U.S.C.A. § 1132(a)(1)(B); and that a plan participant, beneficiary or fiduciary may bring such an action "(A) to enjoin any act or practice which violates any provision of [Title I of ERISA] [FN4] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 6
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

subchapter or the terms of the plan," 29 U.S.C. § 1132(a)(3). The statute grants federal and state courts concurrent jurisdiction of actions brought under subsection (a)(1)(B) and actions to enforce certain child support orders, but the federal district courts have exclusive jurisdiction of all other civil actions under ERISA. *See* 29 U.S.C.A. § 1132(e)(1).

> FN4. Title I of ERISA includes the anti-alienation, preemption, QDRO, and fiduciary responsibility provisions of ERISA. *See* 29 U .S.C. § § 1101-1191c (West 1999 & Supp.2000).

*Anti-alienation Provisions; Qdros*

**\*5** As noted above, ERISA and parallel provisions of the Code define a particular type of state court domestic relations order as a QDRO. QDROs, which are state judgments or orders relating, among other things, to marital property rights and meeting specific ERISA requirements, enjoy special status under these statutes. They are exempted from ERISA's general ban on the alienation of plan benefits, while state court domestic relations orders that are not QDROs do not enjoy such an exemption.[FN5] Employee benefit plans are required to provide for the payment of benefits in accordance with the applicable requirements of any QDRO. *See* 29 U.S.C.A. § 1056(d)(3)(A). ERISA also exempts QDROs (but not non-qualified state domestic relations orders) from its sweeping general preemption provision. *See* 29 U.S.C.A. § 1144(b)(7).

> FN5. ERISA section 206(d)(1) requires that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C.A. § 1056(d)(1) (West 1999). *See also* 26 U.S.C.A. § 401(a)(13) (West 1988 & Supp.2000). ERISA section 206(d)(3) provides that the bar on assignment and alienation of benefits "shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that [the bar] shall not apply if the order is determined to be a qualified domestic relations order." 29 U.S.C.A. § 1056(d)(3)(A).

Thus, if the State Court Order is indeed a QDRO, it can be enforced against the Plan. If it is not a QDRO,

it cannot be so enforced and the Plan has no authority to make payments pursuant to it. The central ERISA issues for purposes of resolution of the instant application for injunction relief are: whether there has been a determination that the State Court Order is a QDRO; if so, whether that determination was made by an authority with jurisdiction of the issue; and, if no such valid determination has yet been made, whether the State Court Order is a QDRO. These issues go to the likelihood of ultimate success on the merits of this action. As with any application for injunctive relief, the Court must also examine whether the other predicates for such relief-including irreparable harm-are present.

*Predicates for Injunctive Relief*

In this Circuit, a grant of preliminary injunctive relief is generally appropriate only upon the movant's showing: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See Brenntag Int'l Chemicals v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999); *Jackson Dairy v. H.P. Hood,* 596 F.2d 70, 72 (2d Cir.1979).

The Court will first examine the issue of irreparable harm for, if no such harm can be made out, injunctive relief will be inappropriate and there will be no need for the Court to engage at this stage of these proceedings in the delicate exercise of divining the impact of the State Court Order and determining whether that order is enforceable against the Plan.

The Court, having examined thoroughly the parties' factual proffers and considered carefully their arguments and the basic economic structure of defined benefit pension plans, finds that, if the State Court Order is not a QDRO, the Plan and its fiduciaries making distributions pursuant to the order would suffer irreparable harm in the absence of a preliminary injunction. If the order is not a QDRO, neither ERISA nor the Code provides authority for compliance with it. Compliance would thus violate the statutory prohibition on the alienation of pension plan benefits, and would violate the basic ERISA fiduciary rule that plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries.[FN6]

Not Reported in F.Supp.2d                                                                                           Page 7
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

FN6. *See* 29 U.S.C.A. § 1103 (West 1999 & Supp.2000).

*6 Defendant argues that "plaintiff is the monied spouse in [the] divorce," asserting that Mrs. Lewis' personal net worth exceeds $2 million while his own is less than $250,000, suggesting that defendant's inability thus far to receive the substantial Plan distribution called for by the State Court Order has had an adverse impact on defendant's financial well-being. Defendant has also pointed out that he is some ten years older than Mrs. Lewis. (Deft's Memo of Law in Opp. to Pls' Motion and On Submission of Jurisdictional Issues at 4.) Plaintiffs here are, however, the Plan and Mrs. Lewis in her capacity as a Plan fiduciary only. Mrs. Lewis' personal financial status is irrelevant to the irreparable harm analysis, while Mr. Lewis's is, because it suggests that Plan assets improperly distributed to defendant-an individual admittedly in need of cash who intends to apply the money to his personal expenses-would be difficult, if not impossible, for the Plan to recover.

The Plan, as an entity that relies on employer contributions and investment return for augmentation of its assets, has no independent means of generating replacement assets in respect of any that may wrongly be disbursed.[FN7] While Mrs. Lewis, in her individual capacity, appears to be the principal beneficiary of the Plan in terms of the value of her accrued benefits thereunder, she is not the only person with an accrued benefit under the Plan. An improper depletion of the Plan's assets would undermine the benefits of all participants, who look to the common fund for payment of their benefits.[FN8] Fiduciaries effecting improper distributions face potential personal liability for breach of duty.[FN9] Furthermore, a violation of the Code's requirement that a tax-qualified pension plan preclude the alienation of benefits[FN10] could jeopardize the Plan's tax-qualified status, resulting in adverse financial ramifications for the company and all of the Plan's participants. Thus, a sufficient prospect of irreparable harm exists to warrant consideration of plaintiffs' likelihood of success on the merits. To the extent such prospect might not clearly rise to the level of irreparable harm, it surely suffices, when compared to the resources admittedly available to defendant, to weight the balance of hardships in plaintiffs' favor. As shown below in the Court's analysis of the likelihood of success on the merits, plaintiffs have also clearly raised issues going to the merits that are sufficiently serious to make them a fair ground for litigation.

FN7. *Cf. Brenntag Int'l*, 175 F.3d at 249-50 (noting that while monetary injury generally does not constitute irreparable harm because it can be estimated and compensated, where circumstances are such that "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied," irreparable harm exists).

FN8. *See* Plan § 3.5.1 (Plan Doc. at 76).

FN9. *See* ERISA sections 403, 404, 409, codified at 29 U.S.C.A. §§ 1103, 1104 and 1109 (West 1999 & Supp.2000).

FN10. *See* 26 U.S.C.A. § 401(a)(13) (West 1988 & Supp.2000).

The first prong of the test for entitlement to injunctive relief having been met, the Court turns to the question of whether plaintiffs have shown a likelihood of success on the merits. The Court approaches with caution plaintiffs' efforts to thwart full enforcement of an order entered, after extensive litigation, in New York State court and affirmed on appeal after extensive motion practice and briefing. Section 1738 of title 28 of the United States Code requires federal courts to give "the same full faith and credit" to the judicial proceedings of states courts "as they have by law or usage in the courts of such State." The "Rooker-Feldman" doctrine, derived from *District of Columbia Court of Appeals v. Feldman*[FN11] and *Rooker v. Fidelity Trust Co.*[FN12] and their progeny, holds generally that the lower federal courts lack jurisdiction to entertain collateral attacks on state court judgments.

FN11. 460 U.S. 462 (1983).

FN12. 263 U.S. 413 (1923).

*7 Before examining the validity of the State Court Order or its consistency with QDRO requirements, it is thus prudent to determine whether the state courts have already reached the issue that is at the heart of the instant litigation-is the State Court Order a QDRO with which ERISA and the Code require the Plan to comply? If the state court litigation has not addressed that issue, the litigation of the question in this Court does not constitute a collateral attack on that decision.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 8
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
(Cite as: Not Reported in F.Supp.2d)

Careful review of the State Court Order and the state court litigation that followed its entry reveals that the issue of its QDRO status was never resolved by the state courts. The order, which was prepared by Mr. Lewis' counsel in the matrimonial action, is labeled a "Qualified Domestic Relations Order" and recites that "it is the intent of this Court that the provisions of this Domestic Relations Order operate as an effective assignment for the Alternate Payee's defendant's [sic] interest in the [Plan] for all purposes, and constitute a Qualified Domestic Relations Order in compliance with Section 414(p) of the [Code] and Section 206(d)(3) of [ERISA]." (State Court Order at 1-2.) Nowhere in the body of the order is there any analysis of the ERISA and Code criteria for QDRO status nor of whether the order meets those criteria. This Court cannot presume, on the basis of a caption and precatory language in an order prepared by counsel for an individual in an action to which the Plan was not a party, that the state court was purporting to adjudicate the Plan's obligations with respect to the distributions called for by the State Court Order.

Nor is the State Supreme Court's decision on Mrs. Lewis' subsequent motion to "resettle" the order any more suggestive of adjudication of the QDRO status issue. The state court's September 23, 1998 order reads in pertinent part: "it is ORDERED that this motion and cross-motion are denied. The Defined Benefit Plan in which defendant is to receive 50% of the assets can be amended, if necessary, to provide for the distribution to defendant." (OSC, Ex. E.) This language suggests that, far from having determined under federal law that the order meets QDRO requirements (which include a requirement that such an order "not require a plan to provide any type or form of benefit ... not otherwise provided under the plan"),[FN13] the state court was of the view that further steps might be necessary to make the order enforceable against the Plan in its current form. The February 14, 2000 decision of the Appellate Division, Second Judicial Department, dismissing Mrs. Lewis' appeal and affirming the decision below, similarly alludes to inconsistency between the requirements of the order and the terms of the Plan. The appellate court observed that Mrs. Lewis' motion for "resettlement" was "seeking to have the terms of the stipulation amended to comply with the provisions of the Plan." Holding that the underlying stipulation of settlement in the divorce action was "neither unfair nor unreasonable" and that the State Court Order had been entered upon Mrs. Lewis' consent, the appellate court affirmed the lower court's denial of Mrs. Lewis'

motion. (OSC, Ex. E.)

FN13. 29 U.S.C. § 1056(d)(3)(D) (West 1999).

*8 Plaintiffs' efforts to litigate the question of the State Court Order's QDRO status here thus are not inconsistent with the scope of the proceedings in the state court or with the order itself. Accordingly, it is unnecessary for this Court to determine whether, for instance, the state court would have had jurisdiction under section 502(a)(1)(B) of ERISA [FN14] (granting concurrent state and federal court jurisdiction of actions "to recover benefits due ... under the terms of [a] plan") to make an advance determination, in an action to which the Plan was not a party, that an order constituted a QDRO with which Plan fiduciaries could be compelled to comply.

FN14. 29 U.S.C. § 1132(a)(1)(B) (West 1999).

The Court now turns to the question of likelihood of success on the merits. Plaintiffs argue that the State Court Order is not a QDRO and that they are therefore entitled to preliminary injunctive relief precluding its enforcement pending this Court's ultimate determinations on their requests for declaratory and permanent injunctive relief. Defendant argues that this Court lacks jurisdiction to grant the declaratory relief sought by plaintiffs and that, to the extent this Court has jurisdiction of the issues raised it should defer to the state court because this is in essence a two-party domestic relations matter, relating to the Plan only incidentally, because Mrs. Lewis, as a shareholder of the sponsoring company, ultimately has the power to amend the Plan to comply with any agreements she may have made in her personal capacity. Defendant further asserts that the state court contempt proceedings should alternatively be considered as actions for benefits due under ERISA and therefore within the scope of concurrent state jurisdiction under ERISA section 502(a)(1)(B).

The Court clearly has jurisdiction to entertain this action. Section 502(a)(3) of ERISA grants the federal courts exclusive jurisdiction of civil actions brought on by fiduciaries for injunctions and equitable relief in respect of acts or practices that violate Title I of ERISA (the title that includes ERISA's anti-alienation provisions) or the terms of a covered plan. There is no dispute that Mrs. Lewis, in her trustee capacity, is

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

a Plan fiduciary. To the extent defendant's state court activities constitute an effort to compel the Plan to make distributions inconsistent with its terms and/or the provisions of ERISA, this Court has exclusive jurisdiction under ERISA to entertain an action for appropriate injunctive or other equitable relief, including the grant of an appropriate declaratory judgment.[FN15] The Declaratory Judgment Act, 28 U.S.C. § 2201(a), further empowers this Court, "[i]n a case of actual controversy within its jurisdiction, ... [to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201(a) (West 1994).

> FN15. *See, e.g, Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 141-42 (2d Cir.1997); Heimann v. Nat'l Elevator Industry Pension Fund, 187 F.3d 493, 504 (5 th Cir.1999).*

Having said that, the Court intends to focus squarely, and exclusively, on the question of whether this particular State Court Order is a QDRO and therefore enforceable in its current form against the Plan. Defendant is correct in contending that the statutory scheme contemplates that determinations of the individual parties' rights with respect to marital assets, including the allocation of accrued employee plan benefits, is a state court matter. The federal issue is whether the state court's determination has been embodied in a domestic relations order that survives ERISA preemption and the ban on alienation of benefits by meeting the specific federal statutory requirements for "QDRO" status.[FN16]

> FN16. Defendant argues that the Plan Administrator's admitted failure to comply with ERISA's procedural requirements for the processing and review of domestic relations orders somehow forecloses plaintiffs' instant effort to bring the question of the QDRO status of the State Court Order before this Court. There is nothing in section 206 or section 502 of ERISA that suggests that an administrator's compliance with the letter of the procedure is a jurisdictional prerequisite to a civil action addressing the issue. It is, of course, clearly preferable for plan fiduciaries to take seriously their statutory duties, and the Court expresses no opinion as other potential ramifications of

the Plan Administrator's apparent failure thus far to comply with the procedural requirements in this matter.

\*9 The question thus comes down to whether plaintiffs are likely to succeed on their claim that the State Court Order is not a QDRO. Arguing that the order is not a QDRO, plaintiffs have focused on its method of defining Mrs. Lewis' "interest" in the Plan, its mandate of an in-kind distribution of benefits, and its mandate that such distribution be immediate, at a time when Mrs. Lewis herself had not reached the minimum age requirement for Plan distributions. The elements of the requirements for QDRO status set forth in section 206(d)(3)(D) of ERISA are conjunctive.[FN17] Thus, plaintiffs will have met their burden if they have shown that the State Court Order fails to meet any of the three criteria set forth in that subsection.

> FN17. "A domestic relations order meets the requirements of [a QDRO] only if such order-(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan, (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), *and* (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a domestic relations order." 29 U .S.C.A. § 1056(d)(3)(D) (West 1999) (emphasis supplied).

ERISA section 206(d)(3)(D) provides, among other things, that a domestic relations order is a QDRO only if it "does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." 29 U.S.C. § 1056(d)(3)(D). The State Court Order defines Mrs. Lewis' "interest" in the Plan as "Ninety-Two 3/10 (92.3%) percent of the total assets of said Plan." (OSC, Ex. D at 5.) It requires payment "directly to the Alternate Payee/defendant, DAVID LEWIS, [of] Fifty (50%) percent of plaintiff's interest in the ... Plan (46.15% of the assets in the Plan) by transferring such assets to the Alternate Payee/Defendant's Charles Schwab retirement account in the name of David Lewis," and further specifies particular stockholdings to be transferred in the distribution. *Id.* The State Court Order requires the calculation of the amount to be transferred by

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

applying the specified percentage "as of the date of such distribution/transfer." *Id.*

The Plan, by contrast, defines a participant's Normal Retirement Benefit as "30% of the Participant's Average Monthly Compensation reduced by 1/28 for each year of Credited Service less than 28 years ." (Adoption Agreement at 11.) Benefit accrual under the Plan is based on years of service. *Id.* at 15. No early retirement benefits are provided for; benefits payable after the normal retirement date (age 60 if certain service requirements are met) are based on the normal retirement and accrued benefit formulae. *See id.* at 18. Formulae for the date as of which a benefit is determined and the application of the accrual principles in connection therewith are provided in the Adoption Agreement and the Plan Document. *See* Adoption Agreement at 11-21; Plan Document at 19-32, 36-52. None of the benefit calculation formulae set forth in the Adoption Agreement or the Plan document provides for the calculation of a benefit by reference to a percentage of the value of Plan assets. A provision relating to the allocation to participants of residual assets applies only following termination of the Plan. *See supra* n. 2 and accompanying text.

The State Court Order is thus clearly inconsistent with the terms of the Plan in relying on a benefit calculation formula not provided for under the Plan. It fails to satisfy the ERISA section 206(d)(3)(D)(i) requirement that a QDRO "not require a plan to provide any type or form of benefit ... not otherwise provided under the Plan." 29 U.S.C.A. § 1056(d)(3)(D)(i). It thus appears likely that plaintiffs will succeed in establishing their entitlement to relief on Count II of their Amended Complaint.[FN18]

> **FN18.** Plaintiffs' Amended Complaint consistently cites section 206(d)(3)(D)(ii) as the legal basis for their claims regarding the order's QDRO status. It seems that plaintiffs mean, however, to rely on section 206(d)(3)(D)(i). Paragraph 22 of the Amended Complaint, which purports to quote subsection (ii), in fact quotes the latter provision.

**\*10** In Count I of their Amended Complaint, plaintiffs take issue with the immediate and in-kind distribution requirements of the order. There appears to be no dispute that, at the time the State Court Order was entered, Mrs. Lewis had not reached the age at which she would have been eligible for an immediate distribution of benefits. Although ERISA

permits a QDRO to require payments to an alternate payee to commence before a participant has separated from service, such payments can only be required to commence on or after "the date on which the participant attains ... the earliest retirement age." 29 U.S.C. § 1056(d)(3)(E)(i)(I). In that Mrs. Lewis had not yet reached the Plan's earliest retirement age at the time the State Court Order was entered, plaintiffs are likely to succeed on their claim that the order is also inconsistent with the Plan and QDRO requirements in this respect.

In Count III of their Amended Complaint, plaintiffs further argue that the State Court Order's requirement of the distribution of the benefit in the form of specific items of property is impermissible under the terms of the Plan and ERISA. Their likelihood of success on this element of the claim is less clear. The Plan provides that "distribution of a Participant's benefit shall consist of cash, property, an annuity policy or any combination thereof." Plan Document at 46. Plaintiffs have pointed to no statutory or Plan provision precluding distributions of stocks or other property in respect of defined benefit plan benefits. Plaintiffs' failure to make out a likelihood of success on this particular issue is not fatal to their effort to obtain injunctive relief because, as explained above, both the benefit calculation and distribution timing requirements of the State Court order appear likely to preclude a finding of QDRO status.

The Court having found that plaintiffs will likely suffer irreparable harm in the absence of a grant of preliminary injunctive relief and that plaintiffs have demonstrated a likelihood of success on the merits of two of their claims, the Court hereby grants a preliminary injunction as follows.

*Preliminary Injunction*

Defendant, his agents, servants, employees, attorneys, and those persons in active concert or participation with him who receive actual notice of this Preliminary Injunction by personal service or otherwise, are hereby enjoined, pending resolution of this action, from taking any action to enforce the "Qualified Domestic Relations Order" dated June 30, 1998 and entered by the Supreme Court of the State of New York, County of Westchester, in the action captioned *Joan D. Lewis v. David Lewis,* Index No. 14120/96 (the "State Court Order"), or to sanction noncompliance therewith, to the extent the State Court Order requires benefit calculations under or distributions from the plaintiff Plan. Plaintiffs are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

hereby enjoined preliminary from making any benefit calculations or distributions of Plan assets pursuant to the State Court 1998 Order. No bond is required to be posted.

*11 The parties shall appear before the Court for a pre-trial conference on April 26, 2001 at 10:00 a.m.

IT IS SO ORDERED.

S.D.N.Y.,2001.
Devlin Graphic Industries, Inc. v. Lewis
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 22477858 (D.Minn.), 31 Employee Benefits Cas. 2562
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Rexam, Inc. v. United Steelworkers of America,
AFL-CIO-CLC
D.Minn.,2003.

United States District Court,D. Minnesota.
REXAM, INC., Plaintiff,
v.
UNITED STEELWORKERS OF AMERICA, AFL-
CIO-CLC; International Association of Machinists &
Aerospace Workers; United Steelworkers of
America, AFL-CIO-CLC, Local 0188s; Waldo W.
Slagerman, Marlene A. Rudolph, Steven J. Stolarski,
Frank Kieswether, Larry Alford, George A. Kneifel,
Gail J. Rearick, Dwayne L. Wilson, and Lloyd W.
Erickson, Individually and as Representatives of
Persons Similarly Situated, Defendants.
**No. Civ.03-2998 ADM/AJB.**

Oct. 30, 2003.

Timothy E. Branson, Dorsey & Whitney LLP,
Minneapolis, MN, and James P. McLoughlin, Jr., and
Nicole L. Gardner, Moore & Van Allen PLLC,
Charlotte, NC, for and on behalf of Plaintiff.
Mark W. Bay, Peterson, Engberg & Peterson,
Minneapolis, MN, and William T. Payne, Pittsburgh,
PA, for and on behalf of Defendants.

MEMORANDUM OPINION AND ORDER
MONTGOMERY, J.

I. INTRODUCTION

*1 Plaintiff's Motion to Enjoin a Parallel Proceeding
[Docket No. 17], and Defendants' Motion to Dismiss
or In the Alternative to Transfer Venue [Docket No.
16], were heard before the undersigned United States
District Judge on September 25, 2003. Plaintiff
Rexam, Inc. ("Rexam" or "Plaintiff") seek to enjoin a
parallel proceeding in the Northern District of Ohio
that certain Defendants filed subsequent to Plaintiff
filing this action in the District of Minnesota.
Defendants move to dismiss Plaintiff's claim for lack
of subject matter jurisdiction and failure to state a
claim upon which relief can be granted.
Alternatively, Defendants move to transfer venue to
the Northern District of Ohio. For the reasons
explained below, the Court grants Plaintiff's Motion
to enjoin a Parallel Proceeding and denies

Defendants' Motion to Dismiss or to Transfer Venue.

II. BACKGROUND

Plaintiff Rexam is an aluminum beverage can
manufacturer whose thousands of retirees reside in
forty-eight states and in Puerto Rico. Approximately
100 retirees live in Minnesota. Reilly Aff. ¶ 5.
Rexam has plants throughout the country, including a
facility in St. Paul, Minnesota with approximately
115 employees. Rexam and its predecessors have
provided medical and life insurance benefits to
qualifying retirees in plans based on labor agreements
created between Rexam and labor unions United
Steel Workers of America ("USWA") [FN1] and the
International Association of Machinists & Aerospace
Workers ("IAM"). Reilly Aff. ¶¶ 4-7.

> FN1. "USWA" refers collectively to both
> the United Steelworkers of America, AFL-
> CIO-CLC, and to Local 0188s.

In January 2002, Rexam changed the prescription
drug benefit provisions of retirees' medical plans,
raising out of pocket costs. USWA objected to the
change and filed a series of grievances on behalf of
retirees from December 2001 through April 2002. Id.
¶¶ 8-11, 14. Rexam and USWA representatives met
in February 2002 and again in June 2002 but failed to
resolve the issue. Id. ¶¶ 12, 13, 15. In August 2002,
USWA's counsel sent Rexam a letter reiterating the
discussions of the February meeting and suggesting
that the USWA was contemplating legal action. Id. ¶
17, Ex. 9. The parties continued to exchange
information regarding the retirees' medical benefits
plans until October 2002, but did not reach an
agreement. Payne Aff. ¶ 6. While Rexam asserts its
legal authority to amend benefits plans, USWA
argues that any reduction in vested benefits violates
both the individual plans and the underlying labor
agreements. USWA claims further that the change to
the plans is actionable under the Employee
Retirement Income Security Act of 1974, 29 U.S.C. §
§ 1001-1046 ("ERISA"). As a violation of the labor
agreements, USWA argues that the benefits change is
also actionable under the section 301 of the Labor
Management Relations Act ("LMRA"). See 29
U.S.C. § 185; Compl. ¶¶ 24, 27 of Kieswether v.
Rexam, Inc., Case No. 3:03-CV-7225 ("Kieswether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 22477858 (D.Minn.), 31 Employee Benefits Cas. 2562
**(Cite as: Not Reported in F.Supp.2d)**

Complaint") (Humphrey Aff. Ex. A).

On May 1, 2003, Rexam filed a Class Action Complaint for Declaratory Judgment [Docket No. 1] in the District of Minnesota. In an Amended Class Action Complaint filed on May 20, 2003 [Docket No. 3], Rexam asks the Court to determine whether Rexam may lawfully amend provisions in ERISA plans that provide retirees with medical benefits. 29 U.S.C. § § 1001-1046. Rexam also seeks a determination of whether amending such plans violates collective bargaining agreements under the LMRA § 301. 29 U.S.C. § 185.[FN2] On May 8, 2003, Defendants USWA, Frank Kieswether and Larry Alford filed a class action complaint in the Northern District of Ohio raising the same issues as those in the instant Minnesota action. Payne Aff. ¶ 7.

> FN2. While Rexam's Amended Complaint cites the National Labor Relations Act, 29 U.S.C. § § 151-169 ("NLRA") as a basis for jurisdiction, the parties' briefs and oral arguments instead cite LMRA § 301. See 29 U.S.C. § 185. Because LMRA § 301 is the proper statute for determining whether subject matter jurisdiction exists for some of Plaintiff's claims, the Court includes LMRA § 301 in its analysis when pertinent.

### III. DISCUSSION

*2 Defendants now move to dismiss Plaintiff's action for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. See Fed.R.Civ.P. 12(b)(1), 12(b)(6).

### A. Subject Matter Jurisdiction under the Declaratory Judgment Act

Defendants argues first that Plaintiff cannot establish subject matter jurisdiction for its ERISA claims. Plaintiff counters that the Court has subject matter jurisdiction to decide its ERISA claims under the Declaratory Judgment Act ("DJ Act"). See 28 U.S.C. § 2201; see also Prudential Ins. Co. v. Doe, 76 F.3d 206, 210 (8th Cir.1996).

The DJ Act is procedural only and does not, by itself, grant jurisdiction to the federal courts. See Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937). Rather, the DJ Act provides an additional remedy in cases where jurisdiction already exists based on diversity or federal issues, and where there is an

actual controversy between the parties. See id. at 239-241; see also Skelly Oil v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950). In determining whether subject matter jurisdiction is present, federal courts have "regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question." Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U .S. 1, 19 (1983). Following this principle, federal courts have held that the DJ Act provides federal question jurisdiction in cases where insurers seek declaratory relief regarding ERISA-governed policies, since insurance recipients could bring coercive actions under ERISA. Prudential, 76 F.3d at 210; Transamerica Occidental Life Ins. Co. v. Digregorio, 811 F.2d 1249, 1253 (9th Cir.1987).[FN3]

> FN3. Defendants' argument concerning the Supreme Court's decision in Textron Lycoming Reciprocating Engine Div. v. United Automobile, Aerospace, & Agricultural Implement Workers, 523 U.S. 653 (1998), does cast some doubt on this principle. See id. at 559-560 n .4. However, as the comments in Textron were merely dicta, Prudential is still controlling law in the Eighth Circuit. See Prudential, 76 F.3d 206, 210.

Subject matter jurisdiction over Plaintiff's ERISA claims is established by the DJ Act and Prudential. See 28 U.S.C. § 2201; Prudential, 76 F.3d at 210. Similar to the insurance recipient in Prudential, the retirees here could and in fact have asserted a coercive action under ERISA in federal court. See Kieswether Compl. (Humphrey Aff. Ex. A); Payne Aff. ¶ 2. This is the same underlying coercive action addressed in Prudential, one that "necessarily presents a federal question" as articulated in Franchise Tax Board. Franchise Tax Bd., 463 U.S. at 19; Prudential, 76 F.3d at 210. Therefore, Plaintiff has established subject matter jurisdiction for its ERISA claims. [FN4]

> FN4. Because subject matter jurisdiction for Plaintiff's ERISA claims exists based on the DJ Act, the Court need not determine whether jurisdiction is independently created by ERISA itself.

B. Courts' discretion to dismiss declaratory judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 22477858 (D.Minn.), 31 Employee Benefits Cas. 2562
(Cite as: Not Reported in F.Supp.2d)

claims

Defendants' second argument is that the Court, in its discretion, should dismiss Plaintiff's claims even after finding that subject matter jurisdiction exists. District courts possess discretion in deciding whether and when to hear claims under the DJ Act "even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 282 (1995). District courts are not obligated to assume jurisdiction of declaratory judgment actions and may stay or dismiss such claims in their discretion. *Id.* at 288. In exercising this discretion, district courts weigh several factors. These include whether the declaratory judgment action was brought as a wrongful preemptive strike or as an attempt at forum shopping. *See Verizon Communications, Inc. v. Inverizon Int'l, Inc.* 295 F.3d 870, 874-75 (8th Cir.2002); *BASF Corp. v. Symington,* 50 F.3d 555, 558 (8th Cir.1995). Where there are two actions pending, a court should consider whether they involve the same parties and issues, if they raise questions of federal law, whether one is a parallel state proceeding, and when the actions were filed. *See Wilton,* 515 U.S. at 282, 290; *Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 494-95 (1942); *Verizon Communications, Inc.* 295 F.3d 873-74.

*3 An analysis of these factors lead to a conclusion that dismissal is not warranted in this case. First, the record does not suggest that Rexam filed this action as an improper preemptive strike. The record shows Rexam initiated this proceeding in May 2003, several months after its final communication with Defendants regarding a possible lawsuit. A letter dated August 2002 was the last correspondence that directly referenced litigation. However, the letter does not state that litigation is imminent but invites Rexam to "amicably discuss" the health insurance rate changes. Reilly Aff. Ex. 9. Rexam sent Defendant USWA documents concerning retiree health benefits in October 2002, but it does not appear that the parties discussed litigation specifically at this time. Payne Aff. Ex. 1. Further, Rexam had previously given USWA these documents on several occasions. Reilly Aff. ¶ 18. Thus, this additional request would not have alerted Rexam of impending litigation. Even construing the October 2002 exchange as anticipating litigation, Rexam did not file a complaint until May 1, 2003-several months later. While Defendants USWA and certain retirees filed the Ohio lawsuit only days after the Minnesota filing, there is no evidence suggesting that Rexam knew of Defendants' litigation strategy and rushed to file in Minnesota.

The record also shows that Rexam possessed a strong interest in initiating litigation beyond simply thwarting Defendants' choice of forum. Rexam desires clarification about its ability to amend healthcare plans since several retirees have filed individual grievances contesting reduced benefits. These proceedings have been repetitious and costly, and there is a likelihood of continued similar litigation. Reilly Aff. ¶¶ 8-11, 14. Additionally, because Rexam's legal authority to amend benefits plans is challenged, it must either maintain the status quo or face possible litigation from any changes. Plaintiff must also include a seventy-nine million dollar liability on its balance sheet for retiree benefits. In Plaintiff's view, this liability lowers its stock value and impairs its ability to obtain financing. Am. Compl. ¶ 31. Thus, the record does not support the argument that the case at bar is a "calculated maneuver" aimed at denying USWA and retirees, as "natural plaintiffs," their "traditional right to choose the forum and time of suit." *See BASF,* 50 F.3d at 557-558.

Similarly, there is little evidence that Plaintiff engaged in forum shopping by filing in Minnesota. While Plaintiff has offices in both Chicago and Charlotte, former retirees dwell in forty-eight states and in Puerto Rico, including over 100 retirees who live in Minnesota. Payne Aff. ¶ 8; Reilly Aff. ¶ 5. Given Plaintiff's contacts to fora throughout the country, there is no suggestion that filing suit in Minnesota is any more arbitrary than bringing suit in one of the other forty-seven states where retirees reside. Plaintiff's St. Paul, Minnesota plant that employs 115 people provides a second link to Minnesota. Reilly Aff. ¶ 4. Because Plaintiff's choice of forum, at least in part, is based on legitimate connections to Minnesota, this factor also favors retaining Plaintiff's declaratory judgment action in Minnesota.

*4 Courts must consider additional factors when there are two actions pending. These include whether one suit is a parallel state proceeding, if the actions raise questions of federal law, if they involve the same parties and issues, and when the actions were filed. *See Wilton,* 515 U.S. at 282, 290; *Brillhart,* 316 U.S. at 494-95; *Verizon Communications, Inc.* 295 F.3d at 873-74. Starting with factors one and two, courts have greater discretion to stay or dismiss declaratory judgment claims when there is a parallel state proceeding, or when there are no federal questions raised. *See Wilton,* 515 U.S. at 290; *Verizon,* 295 F.3d at 873-75. Here, Defendants filed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22477858 (D.Minn.), 31 Employee Benefits Cas. 2562
**(Cite as: Not Reported in F.Supp.2d)**

claims premised on ERISA and the LMRA in federal district court in Ohio. Because both lawsuits are in federal courts and raise federal questions, the Court has less discretion to dismiss Plaintiff's Minnesota lawsuit. Therefore, these factors weigh against dismissal.

The Court must next consider whether the Ohio and Minnesota lawsuits involve the same parties and legal issues. If the parties litigate the same questions in two federal jurisdictions, dismissal of one action may be warranted for reasons of judicial economy and practicality. *See Wilton,* 515 U.S. at 288; *Verizon,* 295 F.3d at 873. In this case, the Ohio and Minnesota actions both address the same issues-namely whether reductions in benefits violate retirees' health care plans and labor agreements. The two actions do not involve the same parties however, because Defendant IAM and its retirees are not plaintiffs in the Ohio case. *See* Kieswether Compl. (Humphrey Aff. Ex. A). Thus, this factor is essentially neutral and neither supports nor disfavors dismissal.

The last factor is when the two actions were filed. Because the parties filed nearly identical cases in different federal courts, the Court must include the first-filed rule in its analysis. When parties file substantially similar lawsuits in two venues, the first-filed rule gives priority to the venue chosen by the party who first establishes jurisdiction in order to conserve judicial resources and avoid conflicting rulings. *Northwest Airlines, Inc. v. American Airlines, Inc.,* 989 F.2d 1002, 1006-07 (8th Cir.1993). The rule however, "yields to the interests of justice," and will not be applied where a court finds " 'compelling circumstances' supporting its abrogation." *Id.* at 1006 (citations omitted). The *Northwest* court noted two red flags that may signal compelling circumstances. They include whether the plaintiff in the first action had notice that the defendant was considering filing suit, and whether the first-filed action seeks declaratory relief. *Id.* at 1007.

In the present case, Plaintiff Rexam filed its action in Minnesota seven days before Defendants filed their action in Ohio. Payne Aff. ¶ 7. Based on the first-filed rule, this fact weighs against dismissing the Minnesota action unless compelling circumstances dictate otherwise.

*5 Both red flags highlighted in *Northwest* are present in this case. First, like the plaintiff in *Northwest,* Rexam had notice that Defendant USWA was considering litigation. Similar to the facts in *Northwest* however, USWA and Rexam's

correspondence did not suggest that litigation was imminent. *Northwest Airlines,* 989 F.2d at 1007; Reilly Aff. Ex. 9; *see* discussion *supra* p. 6. The record shows that Defendants mentioned litigation as a possibility, but preferred a non-litigious resolution. Reilly Aff. Ex. 9. Further, Rexam did not file suit until six months after the parties' last communication. While USWA filed its complaint in Ohio only seven days after the Minnesota suit was filed, unlike the six week gap between filings in *Northwest,* nothing in the record reveals that Rexam secretly learned of USWA's plans and consequently rushed to file first in Minnesota. *Northwest Airlines,* 989 F.2d at 1007; *see* discussion *supra* p. 6.

USWA and its retirees were undoubtedly preparing their complaint before Rexam filed, but this does not mean that Rexam knew of USWA's impending suit, as the parties had not communicated for six months. Payne Aff. ¶ 7. Rexam's actions here are markedly different from the plaintiff's in *Anheuser-Bush, Inc. v. Supreme Int'l Corp.,* 167 F.3d 417 (8th Cir.1999), where Anheuser, the plaintiff in the first-filed case, initiated a lawsuit eight days after receiving a cease and desist letter from the defendant that explicitly threatened litigation unless Anheuser responded in five days. *Id.* at 418-19. Therefore, that Rexam was on notice of possible litigation does not present a compelling circumstance in this case.

The second red flag raised in *Northwest* is also present here as Plaintiff's action is for declaratory judgment. *Northwest Airlines,* 989 F.2d at 1007. As expressed in *Northwest,* "such an action may be more indicative of a preemptive strike than a suit for damages or equitable relief." *Id.* Like the plaintiff in *Northwest* however, Rexam has outlined several reasons why declaratory judgment is necessary in this case. *See* discussion *supra* pp. 6-7. Rexam has faced a series of grievance proceedings since reducing retiree benefits and needs direction to assess if it risks liability for any current or future changes. Rexam also has financial concerns about providing benefits at their current level. *Id.* Thus, Rexam has not acted in bad faith or "raced to the courthouse" to preempt USWA's Ohio lawsuit. *See Northwest Airlines,* 989 F.2d at 1007.[FN5]

> FN5. The *Northwest* court considered other factors as well, such as whether the lawsuits raised the same issues, and whether one venue was a more convenient forum. The presence of the same issues in both cases favors applying the first-filed rule. *Id.* As

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22477858 (D.Minn.), 31 Employee Benefits Cas. 2562
**(Cite as: Not Reported in F.Supp.2d)**

noted on page 8 of this Order, the Minnesota and Ohio cases involve the same issues which favors adherence to the rule. *See* discussion *supra* p. 8. The Order addresses the convenience of venue issue *infra* pp. 13-14.

The factors outlined above disfavor dismissal of Plaintiff Rexam's declaratory judgment action. Plaintiff neither initiated litigation as an improper preemptive strike nor engaged in forum shopping. Additionally, there is no parallel state proceeding and the case raises federal questions. Finally, Plaintiff filed its action first, and there are no compelling circumstances present that warrant an exception to the first-filed rule. Therefore, the Court, in its discretion, will retain jurisdiction of Plaintiff's case.

### C. Ripeness of the IAM Claims

**\*6** Defendants' next argument is that Plaintiff's claims against the IAM class should be dismissed on ripeness grounds because IAM retirees have not lost any vested benefits. In order for a court to issue a declaratory judgment, the complaint must present an actual controversy within the meaning of the DJ Act. *Lake Carriers' Ass'n. et al. v. MacMullian et al.,* 406 U.S. 498, 506 (1972). This means "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273 (1941)). Determining whether the complaint contains an abstract question or an actual controversy requires careful analysis of a case's particular facts, as the difference between the two is "necessarily one of degree." *See Maryland Cas. Co.,* 312 U.S. at 273.

While there is not a precise test for deciding when a controversy exists, courts should examine "the fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Neb. Pub. Power Dist. v. Midamerican Energy Co.,* 234 F.3d 1032, 1038 (8th Cir.2000) (citations omitted). This analysis contains several factors including the following: (1) the hardship to the plaintiff by delaying review; (2) whether the plaintiff's claim is focused; (3) whether further factual development would benefit the court; and (4) whether the claim rests upon "contingent, future events that may or may not occur as anticipated." *Texas v. United States et al.,* 523 U.S. 296, 300 (1998) (holding that a claim is not ripe if based on

contingent future events); *Nat'l Right to Life Political Action Comm. et al. v. Connor et al.,* 323 F.3d 684, 692-694 (8th Cir.2003). Courts normally resist adjudicating disputes that are contingent in part on future events. There is an exception however, if the claim presents chiefly legal issues or where judicial resolution will largely settle the lawsuit. *Midamerican,* 234 F.3d at 1038.

The IAM claims are ripe based on the factors outlined above. Starting with the hardship prong, harm includes "the heightened uncertainty and resulting behavior modification that may result from delayed resolution." *Id.* Though IAM states that the current change to prescription drug benefits is permissible since it affects an optional feature in the IAM retirees' plan, IAM contests whether Plaintiff can freely alter vested benefits. McGarry Dec. ¶¶ 7, 10 (Payne Aff. Ex. 2); Humphrey Aff. of 8/21/03, Exs. 2-3. Further, several individual IAM retirees have complained that the change violates their rights. Evans Aff. Exs. 1-2; Werner Aff. ¶ 4. Even assuming that the current change complies with the IAM retirees' healthcare plan, Plaintiff is unsure whether it can legally amend other plan provisions. This in turn hinders Plaintiff's ability to effectively administer benefits programs. Plaintiff faces a second harm because it must maintain a seventy-nine million dollar liability on its balance sheet to cover retiree benefits. Plaintiff cannot lower this amount unless it reduces retirees' benefits, an action that IAM and its retirees would likely oppose. Am. Compl. ¶ 31; Humphrey Aff. of 8/21/03, Exs. 2-3.

**\*7** The IAM claims also present issues fit for judicial review. Conceding that the claims may rest in part upon the assumption that Plaintiff will change plans in the future, other factors favor adjudication now. First, Plaintiff's claim is focused. Plaintiff straightforwardly asks the Court to determine whether it can amend retirees' healthcare plans. Am. Compl. at 18. Second, further factual development will not benefit the Court because this claim involves interpreting the language in the retirees' benefits plans, a question of law. The court in *Midamerican* faced the same issue, contract interpretation, and held that the plaintiff's claim was ripe even though the disputed contractual provisions would not take effect, if at all, until nearly three years later. 234 F.3d at 1039. The court reached this holding because the case presented chiefly legal issues that did not require additional factual development. *Id.* In the case at bar, the facts in their current form will sufficiently guide the Court in resolving Plaintiff's purely legal claim. Finally, like the *Midamerican* case, judicial

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22477858 (D.Minn.), 31 Employee Benefits Cas. 2562
**(Cite as: Not Reported in F.Supp.2d)**

resolution of this matter will "largely settle the parties' suit" because after adjudication Rexam will know whether it can amend plans. *Id.* Because the issues presented are well posited for judicial decision, and because Plaintiff faces hardship from delayed review, the Court will adjudicate Plaintiff's IAM claims.

### D. Transferring Venue to the Northern District of Ohio

In the alternative, Defendants move to transfer venue to Toledo in the Northern District of Ohio. Courts should transfer venue based on the convenience of the parties and witnesses, and in the interests of justice. 28 U.S.C. § 1404(a). The analysis is not limited to these factors however, but requires a case-by-case evaluation of all relevant circumstances. *See Terra Int'l, Inc. v. Miss. Chem. Corp.,* 119 F.3d 688, 691 (8th Cir.1997). The party seeking transfer bears the burden of proving that a transfer is warranted, as courts normally defer to the plaintiff's choice of forum. *Id.* at 695.

In the present case, Defendants have not shown that Ohio is a superior forum. Beginning with the convenience to the parties, none of the parties is based in Toledo, Ohio. Plaintiff has offices in Chicago and Charlotte, but Minneapolis is easily accessible by air travel. Plaintiff states further that while Toldeo is actually closer to its offices based on mileage, traveling there is less convenient because there are fewer direct flights. Beirne Aff. ¶ 5. Defendant Unions are based in Washington, D.C. and Pittsburgh and can also readily fly to Minneapolis. *Id.* ¶ 6. As Defendants would still be forced to travel hundreds of miles to litigate in Toledo, transferring venue will not be appreciably more convenient. Payne Aff. ¶ 8.

Defendants have also not illustrated that Ohio is a more convenient forum for the witnesses. Defendants do not name specific witnesses with any certainty, but suggest that they may call retirees who reside in Pittsburgh and Toledo. *Id.* ¶ 9. Given that retirees reside in forty-eight states and Puerto Rico, however, including over 100 who live in Minnesota, Defendants have not proven that Toledo is the more convenient venue.

**\*8** The interests of justice likewise do not favor transferring venue to Toledo. As explained in detail above, Plaintiff did not file this action as an improper preemptive strike. Plaintiff instead has legitimate concerns about whether it can amend retiree benefit plans. Further, Plaintiff has multiple contacts with Minnesota which suggests that Plaintiff's choice to litigate here was premised on something more than flagrant forum shopping. Certain Defendants have filed a separate action in Ohio, but this was filed after Plaintiff brought its Minnesota claim. As explained above in the first-filed analysis, there are no compelling circumstances present that justify dismissing Plaintiff's claim. Transferring venue to the Northern District of Ohio, therefore, is not warranted based on the interests of justice. Because neither the convenience nor justice factors supports transfer, the Court denies Defendants' Motion.

### E. Plaintiff's Motion to Enjoin the Parallel Proceeding in Ohio

The final issue presented is Plaintiff's Motion to enjoin the parallel Ohio action. Plaintiff asks the court to grant an injunction that will stop Defendants from proceeding with their subsequently filed lawsuit in the Northern District of Ohio. Because the Minnesota and Ohio suits present the same factual and legal issues, the Court must apply the first-filed rule unless compelling circumstances dictate otherwise. *Northwest Airlines,* 989 F.2d at 1006-07. As discussed in detail above, no compelling circumstances justify an exception to the first-filed rule in this case. *See* discussion *supra* pp. 8-10. Therefore, the Court grants Plaintiff's Motion to enjoin the Ohio action.

### IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY ORDERED that:

1. Plaintiff's Motion to Enjoin a Parallel Proceeding [Docket No. 17] is GRANTED, and

2. Defendants' Motion to Dismiss or In the Alternative to Transfer Venue [Docket No. 16] is DENIED.

D.Minn.,2003.
Rexam, Inc. v. United Steelworkers of America, AFL-CIO-CLC
Not Reported in F.Supp.2d, 2003 WL 22477858 (D.Minn.), 31 Employee Benefits Cas. 2562

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Dippold-Harmon Enterprises, Inc. v. Lowe's
Companies, Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
DIPPOLD-HARMON ENTERPRISES, INC.,
Plaintiff,
v.
LOWE'S COMPANIES, INC., Defendant.
**No. 01-532-GMS.**

Nov. 13, 2001.

MEMORANDUM AND ORDER
SLEET, District J.

I. INTRODUCTION

**\*1** On May 23, 2001, Lowe's Home Centers, Inc.
("Home Centers"), filed a complaint against the
defendant Dippold-Harmon Enterprises, Inc.
("Dippld-Harmon") in the General Court of Justice,
Superior Court Division, located in North Carolina.
On July 27, 2001, Dippold-Harmon removed that
action to the United States District Court for the
Western District of North Carolina. On August 8,
2001, Dippold-Harmon filed the above-captioned
action against Lowe's Companies, Inc. ("Lowe's"),
the parent corporation of Home Centers, in Delaware.

Before the court is Lowe's' motion to dismiss, or
alternatively, to transfer this case to the Western
District of North Carolina or to stay this case
pending the outcome of that litigation. Lowe's argues
that the court should dismiss this action because the
court lacks personal jurisdiction over it. It further
argues that, should the court not dismiss this action,
the case should be transferred to North Carolina
pursuant to the "first-filed" rule and 28 U.S.C. §
1404(a). For the reasons that follow, the court will
deny Lowe's motion to dismiss for lack of personal
jurisdiction, but will grant Lowe's motion to transfer.

II. BACKGROUND

Dippold-Harmon is a Delaware corporation, with its
principle place of business in Delaware. Lowe's is a
North Carolina corporation with its principal place of

business in North Carolina. It is the world's second
largest home improvement retailer, serving more than
five million customers weekly. Lowe's maintains that
it is not, and has never been, registered or qualified to
do business in Delaware. It further asserts that it does
not have a registered agent for the service of process
in Delaware.

Home Centers is a wholly-owned subsidiary
corporation of Lowe's. It is a North Carolina
corporation registered to conduct business in
Delaware, although its principle place of business is
in North Carolina. Lowe's maintains significant
control over its subsidiary. Lowe's sends its corporate
representatives to its retail stores, including Home
Centers, and then directs the stores to take certain
actions in accordance with Lowe's policies. Other
Lowe's high-level executives admit that they
"supervise" and "oversee" the retail stores and travel
to these stores on almost a daily basis. Furthermore,
in Lowe's advertising materials, it proudly announces
that *it* has more than six-hundred and fifty store in
forty states, including four in Delaware. In actuality,
the four stores in Delaware are its subsidiary Home
Centers.

On April 3, 1998, Home Centers entered into a
written contract with Dippold-Harmon. The contract
specified that Dippold-Harmon would install granite
countertops for Home Centers' customers. In
approximately 1998, Lowe's also hired Dippold-
Harmon as a vendor for the sale and installation of
granite kitchen countertops. At that time, Dippold-
Harmon was one of several vendors that Lowe's
utilized for the installation of these countertops. As
Lowe's continued to open additional stores, it was
faced with the costly proposition of installing
countertop displays at each of these new stores. To
ensure that the countertop displays were properly
installed in a uniform manner, Lowe's representatives
sought to hire a single vendor to install these
displays. It also sought to hire a single vendor to
install countertops for its individual customers.

**\*2** Dippold-Harmon maintains that the parties
engaged in subsequent telephone negotiations aimed
at making Dippold-Harmon the exclusive vendor for
the installation of Lowe's countertop displays, as well
as for countertops it sold to individual customers.
Some of these discussions were initiated by Lowe's
and were directed to Dippold-Harmon in Delaware.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

At a December 20, 1999 meeting with Dippold-Harmon, Lowe's executives Michael Gettler and Tammy Edson purportedly offered to make Dippold-Harmon its exclusive national vendor for the installation of granite countertops. Dippold-Harmon contends that, during the meeting, it accepted Lowe's' offer and entered into an oral "Exclusivity Agreement." The two companies also exchanged numerous letters and e-mails during this time concerning their vendor agreement.

On May 23, 2001, Home Centers filed the North Carolina complaint against Dippold-Harmon. In its complaint, Home Centers alleges that Dippold-Harmon breached their April 3, 1998 written contract. Specifically, Home Centers contended that Dippold-Harmon failed to comply with their written contract's standards in the installation of countertops in the homes of individual customers.

Dippold-Harmon filed this action against Lowe's on August 8, 2001, alleging that Lowe's breached their Exclusivity Agreement and acted fraudulently and with bad faith.

Because the court concludes that exercising personal jurisdiction over Lowe's in this instance comports with traditional notions of fair play and substantial justice as required by the Due Process Clause, and that Lowe's falls within the reach of Delaware's long-arm statute, the court will deny Lowe's' motion to dismiss. See _International Shoe Co. v. Washington, 326 U.S. 310 (1945)_; DEL. CODE. ANN. tit. 10 § 3104(c) (2001). However, because the "balance of convenience" tips in favor of Lowe's, the court will grant its motion to transfer.

### III. DISCUSSION

### A. Jurisdiction

The essence of Lowe's' argument is that, since it has not purposefully directed its activities to Delaware, the assertion of personal jurisdiction by the courts of this forum would violate the Due Process Clause. Lowe's further contends that its activities do not bring it within the reach of Delaware's long-arm statute. While Lowe's correctly frames the inquiry the court must make, the court disagrees with its analysis and reaches a different conclusion.

### 1. Due Process

The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " _International Shoe_ 326 U.S. at 316 (quoting _Milliken v. Meyer_, 311 U.S. 457, 463 (1940)). In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. See _Burger King Corp. v. Rudzewicz_, 471 U.S. 462, 472 (1985). In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. See _World-Wide Volkswagen Corp. v. Woodson_, 444 U.S. 286, 297 (1980). Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." _Beverly Hills Fan Co. v. Royal Sovereign Corp._, 21 F.3d 1558, 1568 (Fed.Cir.1994).

*3 Lowe's argues that its only contacts with Delaware are through Dippold-Harmon, which is a Delaware corporation. Specifically, Lowes' contends that its Home Centers contract with a Delaware corporation is, by itself, an insufficient basis to establish personal jurisdiction. The court agrees. See _Blue Ball Properties, Inc. v. McClain_, 658 F.Supp. 1310, 1316-17 (D.Del.1987). However, the court finds that Lowe's has many more purposeful contacts with Delaware than it discloses in its brief.

First, with regard to the Exclusivity Agreement in issue, Lowe's communicated regularly with Dippold-Harmon by sending numerous letters and e-mails from North Carolina to Delaware. It also placed telephone calls to Dippold-Harmon in Delaware. These contacts alone would be sufficient to satisfy the minimum contacts analysis. See _Hide Power and Equip. Co. v. Strates Enters., Inc._, 1993 WL 258701, at *1 (Del.Super. June 15, 1993) (finding jurisdiction over a nonresident defendant based on a single visit to Delaware and two or three letters sent to Delaware.); see also _Mid-Atlantic Mach. & Fabric, Inc. v. Chesapeake Shipbuilding, Inc._, 492 A.2d 250, 255 (Del.Super.1985) (extending jurisdiction over a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

nonresident defendant where the negotiation and execution of the contract occurred entirely outside of Delaware, and the defendant's contacts with Delaware were limited to "an unspecified number of trips.")

However, in addition to these direct contacts with Dippold-Harmon in Delaware, Lowe's is the world's second largest home improvement retailer. This fact alone would provide a sufficient basis for the court to seriously question the legitimacy of Lowe's position. However, as previously noted, Lowe's has a wholly-owned subsidiary; that subsidiary, Home Centers, is registered to do business in Delaware, and operates four stores in this jurisdiction. Neither in its advertising material, nor in its internal communications, does Lowe's distinguish between its corporate stores and Home Centers stores. In fact, Lowe's announces the opening of new Home Centers stores as new *Lowe's* locations. Lowe's also maintains strict controlover its Home Centers operations. It sends its representatives to the Home Centers stores and then directs those stores not in compliance with Lowe's policies to take certain actions to come into compliance. Such representatives have visited the Delaware stores. Lowe's also publically admits to otherwise "supervising and overseeing" its stores, and sending Lowe's personnel to those stores, including Delaware locations.

These facts support the conclusion that Lowe's should reasonably have anticipated being brought into court here. However, due process requires that the court make one more inquiry.

Notwithstanding the existence of Lowe's purposeful minimum contacts with this forum, the court must consider whether the "minimum requirements inherent in the concept of 'fair play and substantial justice...' defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." *Asahi Metal Indust. Co. v. Superior Court,* 480 U.S. 102, 116 (1987). This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendant to litigation within the forum. *See Beverly Hills Fan,* 21 F.3d at 1568.

*4 Here, the answer is plainly, no. Delaware has an interest in this action. Dippold-Harmon is a Delaware corporation. Clearly this forum's interests extend to corporate citizens that have sought the protection of Delaware's laws. Moreover, Delaware has an interest

in addressing those purposeful activities conducted within its borders that result in allegations of injury. That interest extends to breaches of contract, such as that alleged here. Finally, Lowe's clearly has, through its Home Centers subsidiaries, significantly more than minimal contacts with this forum. Accordingly, the court concludes that the burden on Lowe's is not so onerous as to run afoul of traditional notions of fair play and substantial justice.

### 2. Delaware's Long-Arm Statute

The second step in the court's analysis into the propriety of subjecting Lowe's to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. *See* DEL. CODE. ANN. tit. 10 § 3104 (2001). While Lowe's contends that it does not fall within the grasp of Section 3104's provisions, Dippold-Harmon contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." DEL. CODE. ANN. tit. 10, § 3104(c) (2001).[FN1] The court will interpret this language broadly, as reaching the "maximum parameters of the due process clause." *See Jeffreys v. Exten,* 784 F.Supp. 146, 151 (D.Del.1992).

> FN1. This subsection provides general jurisdiction over the nonresident defendant. *See Mendelson v. Delaware River and Bay Auth.,* 56 F.Supp.2d 436, 439 (D.Del.1999). Accordingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

As discussed above, Lowe's directed telephone calls and numerous items of correspondence to Delaware in relation to the disputed Exclusivity Agreement. Through its wholly-owned subsidiary, Home Centers, Lowe's also operated, maintained, and directly supervised four stores in Delaware. Finally, Lowe's has not in any way publically differentiated itself from the Home Centers locations in Delaware. Consequently, it cannot now complain that it should

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

not be sued here.

Finding sufficient contacts to subject Lowe's to personal jurisdiction under both the State's long-arm statute and the Due Process Clause, the court will now move to a discussion of whether this action should be transferred to the Western District of North Carolina.[FN2]

> FN2. In its motion to dismiss, Lowe's also alleges that this action should be dismissed for lack of venue and insufficient service of process. However, both of these claims are based solely on its argument that the court lacked personal jurisdiction. As the court has found personal jurisdiction, these arguments too must fail.

### B. Venue

As previously noted, Lowe's seeks to transfer this action pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a).

### 1. The "First-Filed" Rule

The "first-filed" rule is a judicially-created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. See EEOC v. University of Pennsylvania, 850 F.2d 969, 971-72 (3d Cir.1988). As its name implies, the rule generally provides that a later-filed action should be stayed pending the resolution of an earlier filed action, or transferred to the court in which the earlier-filed action is pending. See Peregrine Corp. v. Peregrine Indus., Inc., 769 F.Supp. 169, 171 (E.D.Pa.1991).

*5 While Dippold-Harmon does not dispute that the North Carolina action was filed first, it argues that this rule should not apply to the present case because different parties and different issues are presented in the Delaware and North Carolina actions. The court finds this argument unpersuasive. First, Dippold-Harmon itself aggressively argued that Lowe's and Home Centers should be considered one and the same party for purposes of establishing personal jurisdiction. The court will not now find that Lowe's and Home Centers are different parties for the purposes of the "first-filed" rule. For the reasons stated in Section A. 1, supra, the court is satisfied that Lowe's and Home Centers are effectively the same party.

Second, with regard to Dippold-Harmon's argument that different issues are presented in the Delaware and North Carolina actions, the court again disagrees. The North Carolina action concerns the breach of a written agreement between Home Centers and Dippold-Harmon. The written agreement provided that Dippold-Harmon would install granite countertops for its customers in a certain fashion. The Delaware action concerns the breach of an alleged oral agreement between Lowe's and Dippold-Harmon. This alleged oral agreement provided that Dippold-Harmon would be the exclusive distributor of those granite countertops. Both actions thus concern different facets of the same business relationship between the parties. Specifically, both actions relate to Dippold-Harmon's status as a fabricator and installer of granite countertops for Lowe's and Home Centers' customers. A decision by the North Carolina court on the validity, or breach, of the written agreement will bear directly on the alleged oral agreement concerning the same type of services. To have two separate trials on these issues would defeat the purposes of the "first-filed" rule, namely sound judicial administration and comity among federal courts of equal rank. See EEOC, 850 F.2d at 971. Accordingly, the court finds that the application of this rule weighs heavily in favor of transferring this case to North Carolina.

### 2. Section 1404(a)

Transfer to North Carolina is also mandated under a section 1404(a) analysis. Section 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). The parties agree that this action could have been filed in the Western District of North Carolina as a diversity action. The court will, therefore, move on with the inquiry as directed by the Third Circuit. See Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995).

In Jumara, the Third Circuit provided a list of factors to assist the district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." Id. These factors include six private and five public interests which the court should consider. See id.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

### a. The Private Interests

**\*6** The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent these files cannot be produced in the alternate forum.[FN3] *See id.*

> FN3. For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc., 28 F.Supp.2d 192, 197-201 (D.Del.1998).* In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Western District of North Carolina is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See 28 U.S.C. § 1404(a).*

### 1. The Convenience of the Parties

Physically, North Carolina is moderately inconvenient for Dippold-Harmon, which is headquartered in Delaware. Thus, in order to litigate this matter in North Carolina, it must travel several hours. However, modern communication and transportation capabilities make this moderate journey far less burdensome than it would have been at one time. *See Beverly Hills Fan, 21 F.3d at 1569* (noting that it is not unduly burdensome for a defendant organized under the laws of the People's Republic of China to litigate in Virginia.). Because it is a national distributor of granite and stone kitchen fixtures, Dippold-Harmon is also financially capable of shouldering this burden. As such, it is doubtful that litigating in North Carolina would be an undue financial burden.

Furthermore, transfer to North Carolina would reduce the overall inconvenience to all parties involved. Dippold-Harmon must already travel to North Carolina to defend itself in the first-filed action pending in the Western District of North Carolina.

Bringing witnesses and relevant documents to only one location, here North Carolina, minimizes the level of disruption caused to both parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time.

### 2. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience" analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymeytrix, 28 F.Supp.2d at 203.* Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are "usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any. *See id.* (internal citations omitted). Fact witnesses who posses first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

Dippold-Harmon argues that Lowe's has failed to demonstrate that transfer to North Carolina would be more convenient for potential non-party fact witnesses. The court agrees, and notes that Lowe's' bare allegations of witness inconvenience, without more, are insufficient to tip the balance in its favor. However, all the material witnesses in this dispute, party or otherwise, will be in North Carolina already to litigate the first-filed action. Requiring that they then come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. Accordingly, the court finds that this factor also weighs in favor of transferring the action to North Carolina.

### 3. The Location of Records and Other Documents

**\*7** The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. Furthermore, the relevant documents will already be in North Carolina for the litigation of the first-filed action. The court thus sees no need to require that Lowe's, Home Centers, and Dippold-Harmon move

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the same documents from North Carolina to Delaware. Rather, it would be much more efficient to litigate these related actions in one location.

### b. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the three factors which the parties deem relevant to the pending case.

#### 1. Practical Considerations Making Trial Easy, Expeditious, or Inexpensive

This factor appears to substantially repeat the "first-filed" analysis advanced by Lowe's, and accepted by the court, in Section 2 .B, *supra*. As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

#### 2. Delaware's Interest in Deciding This Action

Dippold-Harmon claims that Delware has a far stronger interest in resolving this action since Dippold-Harmon is a Delaware corporation. While the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the alleged Exclusivity Agreement as a local controversy unique to Delaware. *See Affymetrix,* 28 F.Supp.2d at 207. Instead, this alleged agreement concerns Dippold-Harmon's status as Lowe's' exclusive, national distributor. By its very nature then, the agreement is not local and unique to only Delaware, but rather, affects every state included in the alleged Exclusivity Agreement. Furthermore, the court notes that Dippold-Harmon appears to concede that the alleged Exclusivity Agreement was not formed in Delware and would not be governed by Delaware law. Accordingly, this factor does not weigh in favor of denying Lowe's motion to transfer.

#### 3. Collective Travel Time and Cost

The final public interest factor identified by Lowe's concerns the time and cost allegedly associated with the potential witnesses' travel time to Delaware. This factor, however, duplicates other factors necessary to the court's transfer analysis, namely the private

factors considering the convenience and availability of witnesses and the location of documents. The court has already rejected these arguments in its earlier discussion of the "private" factors in the "balance of convenience" analysis.

### IV. CONCLUSION

For the foregoing reasons, the court concludes that Lowe's is subject to personal jurisdiction in Delaware, however, the "balance of convenience" tips strongly in favor of transferring this action to the Western District of North Carolina.

**\*8** For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:
1. Lowe's motion to dismiss for lack of personal jurisdiction (D .I. 8) is DENIED, and Lowe's alternative motion to transfer this action to the Western District of North Carolina (D.I.8) is GRANTED; and
2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Western District of North Carolina.

D.Del.,2001.
Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.