## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS, INTERNATIONAL UNION, AFL-CIO-CLC, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS LOCAL 4-786,<br><br>Plaintiffs,<br><br>v.<br><br>E. I . DU PONT DE NEMOURS AND COMPANY,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>C.A. No. 07-126 (JJF) |

## DEFENDANT'S REPLY IN SUPPORT OF ITS
## MOTION TO STAY ALL PROCEEDINGS

CROWELL & MORING LLP
Thomas P. Gies
Kris D. Meade
Jennifer G. Knight
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Telefax: (202) 628-5116

POTTER ANDERSON & CORROON LLP
Kathleen Furey McDonough (#2395)
Sarah E. DiLuzio (#4085)
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Telefax: (302) 658-1192
kmcdonough@potteranderson.com
sdiluzio@potteranderson.com

*Attorneys for Defendant E. I. du Pont de*
*Nemours and Company*

Dated: June 6, 2007

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................3

I.      THE ARWI LITIGATION IS INTEGRAL TO THE COURT'S
        CONSIDERATION OF THE MOTION TO STAY AND DUPONT HAS
        NOT ENGAGED IN FORUM SHOPPING ..................................................................3

II.     NONE OF PLAINTIFFS' THREE ARGUMENTS JUSTIFIES AN
        EXCEPTION FROM THE FIRST-FILED RULE .........................................................4

        A.      DuPont Is a "Natural Plaintiff" in the Virginia Action........................................4

        B.      The First-Filed Rule Applies Even Where Plaintiff in the First
                Filed Action Seeks a Declaratory Judgment.........................................................6

        C.      The Parties Need Not Be Identical to Apply the First-Filed Rule ........................8

III.    THE BALANCE OF CONVENIENCES FAVORS STAYING THIS
        MATTER WHILE THE VIRGINIA LITIGATION PROCEEDS...................................9

IV.     THE LOCAL WILL NOT BE PREJUDICED BY A BRIEF STAY OF
        THIS MATTER ..........................................................................................................10

CONCLUSION.....................................................................................................................11

## **TABLE OF AUTHORITIES**

**CASES**                                                                 Page

*AT&T Techs., Inc. v. Communications Workers of Am.,*
    475 U.S. 643 (1986)...................................................................................5

*Allstate Ins. Co. v. Clohessy,*
    9 F. Supp. 2d 1314 (M.D. Fla. 1998)..............................................7

*Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein,*
    107 F.3d 139 (2d Cir. 1997)...........................................................4

*Col. River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976)......................................................................7

*Crosley Corp. v. Hazeltine Corp.,*
    122 F.2d 925 (3d Cir. 1941)...........................................................8

*Crown Cork & Seal Co., Inc. v. USW,*
    No. 03-CV-1381, 2004 U.S. Dist. LEXIS 760 (W.D. Pa. 2004).....................6

*Devlin Graphic Indus. Inc. Pension Plan v. Lewis,*
    No. 00 Civ. 6665 LTSMHD, 2001 WL 310626
    (S.D.N.Y. March 30, 2001)............................................................4

*Dippold-Harmon Enters., Inc. v. Lowe's Cos.,*
    No. 01-532-GMS, 2001 WL 1414868 (D. Del. Nov. 13, 2001)......................8

*E.E.O.C. v. Univ. of Pa.,*
    850 F.2d 969 (3rd Cir. 1988) ........................................................7

*FMC Corp. v. AMVAC Chem. Corp.,*
    379 F. Supp. 2d 733 (E.D. Pa. 2005)..............................................2

*Fleet Capital Corp. v. Mullins,*
    No. 03 CIV 6660, 2004 WL 548240 (S.D.N.Y. March 18, 2004)...................2

*Int'l. Assoc. of Machinists & Aerospace Workers, Progressive Lodge*
    *No. 1000 v. Gen. Elec. Co.,*
    865 F.2d 902 (7th Cir. 1989) ........................................................5

*Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,*
    342 U.S. 180 (1952)......................................................................2

*Marshak v. Reed,*
  13 Fed. App. 19 (2d Cir. 2001) ........................................................................8

*PDG Chem., Inc, v. Oil, Chem. & Atomic Workers Int'l. Union,*
  164 F. Supp. 2d 856 (E.D. Tex. 2001) .............................................................5

*RJF Holdings III, Inc. v. Refractec, Inc.,*
  No. Civ.A. 03-1600, 2003 WL 22794987 (E.D. Pa. Nov. 24, 2003) .................8

*Regions Bank v. Wieder & Mastroianni,* P.C.,
  170 F. Supp. 2d 436 (S.D.N.Y. 2001) ....................................................8, 9, 10

*Schnabel v. Ramsey Qualitative Sys.,*
  322 F. Supp. 2d 505 (S.D.N.Y. 2004) ..............................................................6

*Serco Servs. Co., L.P. v. Kelley Co., Inc.,*
  51 F.3d 1037 (Fed. Cir. 1995) ..........................................................................6

*Spotless Enters. Inc. v. Accessory Corp.,*
  415 F. Supp. 2d 203 (E.D.N.Y. 2006) ..............................................................8

*UAW v. Dana Corp.,*
  No. 3:99CV7603, 2000 U.S. Dist. LEXIS 12041
  (N.D. Ohio March 22, 2000) .........................................................................5, 6

*U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.,*
  920 F.2d 487 (8th Cir. 1990) ...........................................................................6

*Winstead v. J.C. Penney Co., Inc.,*
  933 F.2d 576 (7th Cir. 1991) ...........................................................................4

## FEDERAL STATUTES

29 U.S.C. § 1132(a)(3)(B)(ii) ..............................................................................4

## INTRODUCTION

Plaintiffs United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "International") and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Local 4-786 (the "Local") (collectively, "Plaintiffs") attempt to frame this dispute narrowly, implying that its complaint in this matter has nothing to do with the litigation that is pending in Virginia. But Plaintiffs' Opposition to Defendant's Motion to Stay ("Opp.") fails to rebut key facts that belie this characterization and that demonstrate that a stay in this case, pending the resolution of the Virginia litigation, is appropriate. Specifically, Plaintiffs do not deny that:

- In August 2006, DuPont announced certain company-wide changes regarding eligibility for benefits under ERISA plans that it offers to all eligible employees nation-wide, including employees that the Local represents;

- Unions in various states have all filed similar grievances, each of which pertains to the same nation-wide ERISA benefit plans and arises from the same announcement that is at issue in this case;

- Ampthill Rayon Workers, Inc. ("ARWI"), which represents employees at DuPont's Spruance Fiber Plant located near Richmond, Virginia, filed one such grievance, and DuPont initiated litigation against the ARWI in the Eastern District of Virginia related to that grievance, nearly five weeks *before* the Local and the International filed this suit (the "ARWI action");

- Various other locals of the International have filed similar grievances, and DuPont initiated litigation related to those grievances against the International (the "Virginia USW action") *before* the Plaintiffs filed this suit; and

- All of the pending cases present identical questions of whether the grievances at issue are excluded from arbitration because they involve the administration of DuPont's ERISA plans and whether DuPont has acted within its rights under the relevant collective bargaining agreements.

While downplaying these facts, all of which support a stay, Plaintiffs argue that only they are the "natural plaintiff[s]" in this action and that DuPont has engaged in an

improper "tactical maneuver" in filing the Virginia USW action. Opp. at 9. Plaintiffs then urge the Court to inflexibly find that the "first-filed" rule never applies where: (1) the first-filed action is a declaratory judgment action; or (2) the parties are non-identical.

In reality, courts have long recognized the flexibility of the first-filed rule and routinely consider the particular circumstances of the pending cases when determining whether to apply the rule, which themselves Plaintiffs recognize in their brief. *See id.* ("The 'first-to-file rule is not a mandate directing wooden application of the rule without regard to rare or extraordinary circumstances. . . .'" (quoting *FMC Corp. v. AMVAC Chem. Corp.*, 379 F. Supp. 2d 733, 738 (E.D. Pa. 2005))); *see also Fleet Capital Corp. v. Mullins*, No. 03 CIV 6660, 2004 WL 548240, at *4 (S.D.N.Y. March 18, 2004) (Exhibit A hereto) ("[T]he first-filed rule is not to be applied in a mechanical way. . . . The Second Circuit has cautioned courts against acting as umpires on race to the courthouse disputes, and courts, in response, have paid careful attention to a variety of factors, taken as a whole, in adjudicating such disputes.") (internal quotations and citations omitted); *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952) ("Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems."). It is the unique circumstances of the cases at issue here that underscore the propriety of DuPont's first-filed action and justify application of the first-filed rule to stay this litigation.

## ARGUMENT

I.    **THE ARWI LITIGATION IS INTEGRAL TO THE COURT'S CONSIDERATION OF THE MOTION TO STAY AND DUPONT HAS NOT ENGAGED IN FORUM SHOPPING**

Plaintiffs focus on only a single chapter in this story – *their* collective bargaining agreement with DuPont, *the Local's* grievance challenging the benefit eligibility changes that were announced, and *their* second-filed lawsuit – and then claim that DuPont has engaged in forum shopping by initiating its first-filed action in federal district court in Richmond. Opp. at 15. The prior chapters of this story – ignored by Plaintiffs – wholly undermine any argument that DuPont has engaged in forum shopping.

The story actually begins with the August 2006 announcement, and the central characters include not only this Local and the International, but also the ARWI and various of the International's other local affiliates, *all of which* represent DuPont employees who participate in the nationwide benefit plans and *all of whom* are involved in this set of litigations.[1] The ARWI's grievance – not Plaintiffs' – was the first to reach the final step in the contractual grievance procedure. In response to the ARWI's request for arbitration, DuPont properly initiated a declaratory judgment action against the ARWI on January 24, 2007, in the Eastern District of Virginia – the judicial district within which the ARWI-represented DuPont employees work. DuPont Brief at 4-5. At that time, *none* of the grievances filed by the International and/or its local affiliates was at a

---

[1]    Plaintiffs incorrectly assert that DuPont has taken inconsistent positions as to whether the dispute is local or national in scope. Opp. at 4. DuPont has taken the position – and continues to take the position – that any *bargaining* over benefits issues is necessarily site-specific or local, just as every collective bargaining agreement is local. This is by no means inconsistent with its position that *litigation* over the benefit eligibility determinations should be handled in a single forum.

stage where litigation was imminent. It was only when the Steelworkers' grievance became ripe that DuPont initiated parallel litigation against the International. Given the nationwide nature of the underlying dispute and the similarity of all the grievances, DuPont determined – as a matter of practicality, not unfair strategic advantage – that the logical forum for the USW action was the court that was already considering the matter. *Id.* There was nothing improper about this decision.

## II.    NONE OF PLAINTIFFS' THREE ARGUMENTS JUSTIFIES AN EXCEPTION FROM THE FIRST-FILED RULE

### A.    DuPont Is a "Natural Plaintiff" in the Virginia Action

Plaintiffs posit a false dichotomy, in which the Local and the International are the "natural plaintiffs" and DuPont the natural defendant. Opp. at 14-15. From that false dichotomy, Plaintiffs argue that the first-filed rule should not apply, characterizing the Virginia USW action as nothing more than a defensive, preemptive strike by DuPont, aimed at foreclosing litigation in this Court and depriving the Local and the International of their forum of choice. *Id.*

To the contrary, DuPont has advanced two separate affirmative interests in the ARWI action and the Virginia USW action. First, as a fiduciary of the various benefit plans regulated by ERISA, DuPont is explicitly entitled to bring an action to enforce the terms of the plans and to seek a declaratory judgment as to the meaning of the terms of the plan and the fiduciary's rights and obligations under plan terms. *See* DuPont Brief at 10-11 (citing, *e.g.*, 29 U.S.C. § 1132(a)(3)(B)(ii); *Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139 (2d Cir. 1997); *Devlin Graphic Indus. Inc. Pension Plan v. Lewis*, No. 00 Civ. 6665LTSMHD, 2001 WL 310626 at *8 (S.D.N.Y. March 30, 2001) (Exhibit B hereto); *Winstead v. J.C. Penney Co., Inc.*, 933 F.2d 576 (7th

4

Cir. 1991)).  Second, DuPont has a legitimate interest in seeking a declaratory judgment

regarding the arbitrability of the grievance filed by ARWI arising out of the August 2006

announcement.  *See* DuPont Brief at 12-13 (citing, *e.g.*, *AT&T Techs., Inc. v.*

*Communications Workers of Am.*, 475 U.S. 643, 648-49 (1986); *Int'l Assoc. of*

*Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. Gen. Elec. Co.*, 865

F.2d 902, 904-06 (7th Cir. 1989); *PDG Chem., Inc, v. Oil, Chem. & Atomic Workers Int'l*

*Union*, 164 F. Supp. 2d 856, 864 (E.D. Tex. 2001)).  Because DuPont is acting to

vindicate these affirmative rights in each of the lawsuits in Virginia, it is a "natural

plaintiff."

The cases cited by the Plaintiffs, where courts have found that defensive

declaratory judgment suits, filed after a "natural defendant" receives a cease and desist or

demand letter from a natural plaintiff or otherwise learns of an potential suit, are

improper preemptive actions are inapposite.  Unlike those cases, no party in this litigation

is *only* a natural defendant, and this case is not an anticipatory declaratory judgment

action aimed at wresting the case from the only natural plaintiff's forum of choice.  *See*

Opp. at 10-12 (collecting cases).  For this same reason, this case is easily distinguished

from *UAW v. Dana Corp.*, No. 3:99CV7603, 2000 U.S. Dist. LEXIS 12041 (N.D. Ohio

March 22, 2000) (Exhibit C hereto), on which the Plaintiffs rely.  Opp. at 13.  In *Dana*

*Corp.*, the union had obtained a favorable decision from an arbitrator holding that the

company violated the terms of the parties' collective bargaining agreement.  The

employer then filed suit in another jurisdiction, in anticipation of the union's suit to

enforce the award.  The court concluded that the employer was not seeking vindication of

any affirmative rights and instead filed its declaratory judgment action solely to thwart

5

the union's impending effort to bring suit elsewhere. *Id.* at *3-4. Here, by contrast, in both cases proceeding in Virginia, DuPont seeks to vindicate important affirmative rights through injunctive and declaratory relief and is attempting to ensure that the entirety of the dispute relating to the August 2006 announcement is resolved in one forum, to conserve resources and avoid the risk of possible inconsistent outcomes.

Plaintiffs' reliance on *Crown Cork & Seal Co., Inc. v. USW*, No. 03-CV-1381, 2004 U.S. Dist. LEXIS 760 (W.D. Pa. 2004) (Exhibit D hereto)is likewise misplaced. Opp. at 13. In *Crown Cork & Seal*, both the union and the company sought to resolve the underlying employee benefits dispute in class action proceedings in a single forum – the two sides simply picked different jurisdictions. That case did not involve a multi-party, multi-jurisdictional dispute, like this one, where a natural plaintiff filed the first action in another forum seeking a resolution of the overall dispute.[2]

### B.     The First-Filed Rule Applies Even Where Plaintiff in the First Filed Action Seeks a Declaratory Judgment

Plaintiff's contention that the first-filed rule should not apply when the first-filed action seeks declaratory relief should be rejected. "The first-filed action is preferred, even if it is declaratory, 'unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise.'" *Serco Servs. Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995); *Schnabel v. Ramsey Qualitative Sys.*, 322 F. Supp. 2d 505, 513 (S.D.N.Y. 2004) ("the first filed rule has been applied

---

[2]     Even if Plaintiffs were only natural plaintiffs in this dispute, such a finding does not foreclose a stay under the first-filed rule. *See U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 489 (8th Cir. 1990). Rather, this Court must still consider the individual circumstances present in the litigation and determine whether a stay is appropriate under those facts. *Id.*

regardless of whether a declaratory judgment was sought in the initial action") (internal

quotation omitted); *Allstate Ins. Co. v. Clohessy*, 9 F. Supp. 2d 1314, 1316 (M.D. Fla.

1998) (party's filing of a declaratory judgment action in its home forum after receiving

notice of potential suit does "not automatically compel abandoning the first-filed rule.").

Exceptional circumstances that would justify a departure from the first-filed rule – e.g.,

when the action seeking declaratory relief reflects nothing more than a race to the

courthouse or a naked attempt to select a favorable forum – are not present here. *See,*

*e.g., E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 977-78 (3rd Cir. 1988) (district court did not

abuse discretion in refusing to dismiss second-filed action where university preemptively

sued E.E.O.C. in an attempt to avoid disfavorable law of one forum).

     This case is entirely distinct from *E.E.O.C.*, on which Plaintiffs heavily rely. In

that matter, the Third Circuit refused to apply the first-filed rule in large part because the

University filed first in the District of Columbia because it "perceive[d] the District of

Columbia Circuit as favoring its position" and was seeking to avoid a particular Third

Circuit decision that "presented a problem with respect to its" litigation position. *Id.* at

975, 978. There is nothing in this record to suggest that DuPont is seeking to avoid

unfavorable law in this circuit, to take advantage of favorable Fourth Circuit law, or to

"improperly subordinate" the Third Circuit. *Id.* at 978 (internal quotation omitted). In

this case, DuPont's Motion and the Virginia actions are properly predicated on concerns

over conservation of judicial resources and the avoidance of duplicative litigation. *See*

*Col. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (where

parallel cases are proceeding, "the general principle is to avoid duplicative litigation.");

*E.E.O.C*, 850 F.2d at 974 ("'It is of obvious importance to all the litigants to have a single

determination of their controversy, rather than several decisions which if they conflict may require separate appeals to different circuit courts of appeals.'" (quoting *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 930 (3d Cir. 1941)).

**C.    The Parties Need Not Be Identical To Apply The First-Filed Rule**

The Court should likewise reject Plaintiffs' intimation that the first-filed rule can never apply when the parties to the two litigations are non-identical. Various courts have held to the contrary, citing the very same considerations DuPont cites here. *Dippold-Harmon Enters., Inc. v. Lowe's Cos.*, No. 01-532-GMS, 2001 WL 1414868 (D. Del. Nov. 13, 2001) (Exhibit E hereto) (applying first-filed rule where two related parties were "effectively the same party"); *Regions Bank v. Wieder & Mastroianni, P.C.*, 170 F. Supp. 2d 436, 439 (S.D.N.Y. 2001) ("The purposes of this rule are to 'avoid duplication of judicial effort, avoid vexatious litigation over related issues, and eliminate the risk of inconsistent adjudication." (quoting *Marshak v. Reed*, 13 Fed. App. 19 (2d Cir. 2001))); *see also, e.g.*, *Spotless Enters. Inc. v. Accessory Corp.*, 415 F. Supp. 2d 203, 206 (E.D.N.Y. 2006) (first-filed rule applied in a patent infringement suit even though parties were not identical because "the rule does not require identical parties in both cases, but merely requires substantial overlap."); *RJF Holdings III, Inc. v. Refractec, Inc.*, No. Civ.A. 03-1600, 2003 WL 22794987 *2 (E.D. Pa. Nov. 24, 2003) (Exhibit F hereto) ("The first-filed rule turns on which court first obtains possession of the subject of the dispute, not the parties of the dispute.") (internal citation omitted). Indeed, in attempting to distinguish *Dippold-Harmon*, Plaintiffs fail to note that, rather than applying an inflexible rule, the court considered the circumstances of the case and determined, under the facts, to treat the parties and one and the same for purposes of the first-filed rule.

Plaintiffs' attempt to distinguish *Regions Bank v. Wieder & Mastroianni, P.C.*, 170 F. Supp. 2d 436 (S.D.N.Y. 2001) likewise falls flat. They maintains that *Regions Bank* is distinguishable because that case involved a company that was nothing more than a "middleman to the transaction in question." Opp. at 7. Notably, Plaintiffs do not deny that the court applied the first-filed rule even though the parties in that suit were not identical. Further, contrary to the Local's characterization, the parties in *Regions Bank* were each vested with independent rights that they sought to protect in the parallel litigation.[3]

## III. THE BALANCE OF CONVENIENCES FAVORS STAYING THIS MATTER WHILE THE VIRGINIA LITIGATION PROCEEDS

As detailed in DuPont's opening brief, this matter is duplicative of the litigation that is pending in the federal district court in Virginia, where there is a possibility for a comprehensive resolution of the entire dispute arising from the August 2006 announcement. *See* DuPont Brief at 8-10. Plaintiffs' Opposition fails to rebut the fundamental facts set forth by DuPont. Instead, the Local identifies three convenience-based factors that it believes warrant a departure from the first-filed rule – convenience of the witnesses and parties, location of the documents, and the location where the claim arose. Opp. at 18. However, DuPont anticipates that this matter (if it proceeds) will be resolved on cross-motions for summary judgment without the need for discovery, the

---

[3]     Notably, the *Regions Bank* court applied the first-filed rule even though a decision from the court in the first-filed litigation would "not estop Regions from litigating its claims against W&M before this court in the future." *Id. Cf.* Opp. at 9 (arguing against application of the first-filed rule because the Local cannot be bound by the judgment in the Virginia litigation). Similarly, application of the first-filed rule in this case is not foreclosed by the fact that a ruling in favor of DuPont in the Virginia USW action may not prevent the Local from maintaining this second suit in the future.

procedure on which the parties have agreed to resolve the ARWI action and various of the actions other locals have filed (if they too proceed). If this case proceeds in that matter, none of these factors will be relevant.

Further, as explained in DuPont's opening brief, the Company rightfully initiated litigation against the International in Virginia based on its status as a plan fiduciary and its need to determine the abitrability of the various grievances that were filed against it. *See* DuPont's Brief at 10-13. While the Plaintiffs may have an interest in resolving their suit in their chosen forum -- this Court -- DuPont has an equally weighty interest in resolving its suit in its chosen forum -- the Eastern District of Virginia. *Cf. id.* In these circumstances, the "balance of conveniences" favors staying this duplicative litigation pending resolution of the Virginia USW action. Opp. at 18.

## IV.    THE LOCAL WILL NOT BE PREJUDICED BY A BRIEF STAY OF THIS MATTER

The Local worries aloud that the "fate of its grievance [will be] determined in litigation in Virginia to which it is not even a party" if the Motion to Stay is granted. Opp. at 15. This concern is overstated and, even if credited, does not justify allowing duplicative litigation to proceed for two reasons. First, DuPont seeks only a brief stay of this matter, not a dismissal. Accordingly, the Local's right to challenge DuPont's actions or settle this case are preserved. The Local presents no serious argument that it or its members will be prejudiced by a brief delay. Further, "[a]ny prejudice resulting from such delay is greatly outweighed by considerations of judicial economy and avoiding unnecessary litigation expenses for the parties." *Regions Bank*, 170 F. Supp. 2d at 441.

Second, the Local's concerns may never even come to fruition, depending on how the Virginia USW action proceeds. The International's motion to dismiss the Virginia

USW action will be heard on June 7, 2007. If that motion is granted, this litigation would proceed without delay. If that motion is denied, DuPont anticipates that the Virginia USW action will be resolved by the end of the year on cross-motions for summary judgment. Accordingly, DuPont is requesting only that this Court "await a decision in the first-filed action that could render this action unnecessary."[4] *Id.*

### CONCLUSION

DuPont respectfully requests that its Motion to Stay be granted.

POTTER ANDERSON & CORROON LLP

By */s/ Kathleen Furey McDonough*
    Kathleen Furey McDonough (#2395)
    Sarah E. DiLuzio (#4085)
    Potter Anderson & Corroon LLP
    1313 North Market Street
    Hercules Plaza, 6th Floor
    Wilmington, DE 19801
    (302) 984-6000
    kmcdonough@potteranderson.com
    sdiluzio@potteranderson.com

CROWELL & MORING LLP
Thomas P. Gies
Kris D. Meade
Jennifer G. Knight
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500

Dated: June 6, 2007

799954

*Attorneys for Defendant E. I. du Pont de Nemours and Company*

---

[4]    The Local's claim that it will be irreparably prejudiced if the litigation against the International proceeds first should not be credited. The International is a co-plaintiff in this lawsuit. The International has taken the lead in challenging DuPont's actions here, *see* Complaint, Exhs. F & G, and the Local admits the International and its various locals are "coordinating certain aspects of their responses to" the August 2006 announcement. Briggs Decl. ¶ 8; *see also id.* at ¶ 7; Opp. at 8. Indeed, the International in the Virginia USW action and Plaintiffs here are represented by the same counsel.

# Exhibit A

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 1

Not Reported in F.Supp.2d, 2004 WL 548240 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Fleet Capital Corp. v. Mullins
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
FLEET CAPITAL CORP., Plaintiff,
v.
Billy J. MULLINS, Jr., et al., Defendants.
**No. 03 Civ.6660(RJH)(KNF.**

March 18, 2004.

*Memorandum Opinion and Order*
HOLWELL, J.
**\*1** Fleet Capital Corporation ("Fleet") filed this action seeking declaratory judgment and an injunction against Billy J. Mullins, Jr. and Faraway Enterprises, Inc. (collectively "Mullins"). Mullins has moved to dismiss, stay, or transfer this action. HIG Capital, LLC, HIG TestAmerica Cayman, Inc., and TestAmerica Environmental Services, LLC (collectively "HIG") have moved to intervene in the present case. Sagaponac Partners, L.P. and Marc Weisman (collectively "Sagaponac") have also moved to intervene and have submitted an opposition brief in response to Mullins's motion to dismiss, stay, or transfer this action. For the following reasons, Mullin's motion to stay the case is granted. HIG's and Sagaponac's motions are denied without prejudice.

## FACTS

The following facts are gleaned from Fleet's complaint, as well as HIG's and Sagaponac's motions, and are assumed true for the purposes of resolving the present motions. *See Astor Holdings, Inc. v. Roski,* No. 01 Civ.1905(GEL), 2002 WL 72936, at \*7 (S.D.N.Y. Jan. 17, 2002) ("For the purposes of deciding Defendants' motion to dismiss for improper venue or, in the alternative, to transfer the case to another judicial district, the Court must

accept all of the uncontroverted allegations in Plaintiffs' complaint as true and construe all reasonable inferences in plaintiffs' favor."); *Herman v. New York Metro Area Postal Union,* No. 97 Civ. 6839(KMW), 1998 WL 214787, at \*1 (S.D.N.Y. Apr. 30, 1998) ("The applicants' well pleaded allegations must be accepted as true for purposes of considering a motion to intervene, with no determination made as to the merits of the issues in dispute.").

In 1997, Sagaponac, an investment partnership, provided debt financing to a company called TestAmerica Inc.[FN1] *See* Mem. of Law in Supp. of Mot. to Intervene on Behalf of Sagaponac at 1 (hereinafter "Sagaponac Mot."). As part of the financing arrangement, Sagaponac received the right to block any sale by TestAmerica of a substantial portion of its assets. *See id.* at 2; Compl. ¶ 21.

> FN1. The name "TestAmerica" is presently found within the companies affiliated with HIG. However, that name was not associated with HIG in 1997 and, for ease of reference, the Court uses "TestAmerica" to refer to the entity, regardless of corporate form or affiliation, that owns the assets in which Sagaponac acquired an investment interest in 1997.

In 1998, Fleet entered into an agreement to provide TestAmerica with an additional $37 million in debt financing. *See* Compl. ¶ 7. TestAmerica used part of this additional financing to purchase from Mullins all the assets of Mullins Environmental Testing Company. *See id.* ¶ 10. In exchange for the assets, Mullins received, among other things, over $8 million in cash and an 8% Subordinated Convertible Note valued at approximately $2 million. *See id.* ¶ 11.

The purchase transaction was executed through a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 548240 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

set of agreements, one of which was a Subordination Agreement signed by Mullins, Fleet, and Sagaponac. *See* Sagaponac Mot. at 3; Compl. ¶ 12. The Subordination Agreement made Mullins TestAmerica's juniormost subordinated creditor, effectively placing Mullins's right to repayment of any debt owed by TestAmerica behind Fleet's and Sagaponac's rights to repayment by TestAmerica. *See* Sagaponac Mot. at 3; Compl. ¶ 13. The Subordination Agreement also stated:

**\*2** ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT MAY BE BROUGHT IN A COURT OF RECORD IN THE STATE OF NEW YORK, COUNTY OF NEW YORK, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, THE COMPANY, THE SUBORDINATED CREDITOR AND ALL OTHER PRESENT OR FUTURE HOLDERS OF SUBORDINATED DEBT HEREBY CONSENTING AND SUBMITTING TO THE JURISDICTION THEREOF ... AND MUTUALLY WAIVE TRIAL BY JURY AND ANY CLAIM THAT NEW YORK COUNTY OR THE SOUTHERN DISTRICT OF NEW YORK IS AN IMPROPER OR INCONVENIENT FORUM OR VENUE.[FN2] Compl. ¶ 15.

> FN2. Mullins alleges that the other contracts in the set of agreements expressly provide Texas courts with exclusive jurisdiction and venue. *See* Mem. of Law in Supp. of Defs.' Mot. to Dismiss at 1-3 (hereinafter "Mullins Mot."). Sagaponac responds that the Subordination Agreement is the only agreement in the set signed by Mullins, Fleet, and Sagaponac and, thus, that Fleet and Sagaponac have never agreed to adjudication in a Texas forum. *See* Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 2 (hereinafter " Sagaponac Opp'n").

On August 10, 2001, Fleet sent a notice of default to TestAmerica, a copy of which was also sent to Mullins. Compl. ¶ 17. TestAmerica's default to Fleet resulted in a cross-default under TestAmerica's agreement with Sagaponac. *See* Sagaponac Mot. at 3.

In Fall 2002, HIG, a private equity management company, began looking into purchasing the assets of TestAmerica. *See* Mem. of Law in Supp. of HIG's Mot. to Intervene at 1 (hereinafter "HIG Mot. "). HIG discovered that TestAmerica owed Fleet over $26 million. *See id.* at 2. HIG also discovered that TestAmerica could not sell its assets without Sagaponac's consent. *See id.* After extensive negotiations, HIG reached an agreement with TestAmerica, Fleet, and Sagaponac whereby, in exchange for acquiring TestAmerica's assets, HIG would pay Fleet approximately $23 million in full settlement of the debt owed by TestAmerica and Fleet, in turn, agreed that Sagaponac would be paid the remaining approximately $3 million for Sagaponac's consent to the sale of TestAmetica's assets. *See id.* at 2-3; Compl. ¶¶ 22-25.

On January 3, 2003, HIG consummated this agreement by wiring the agreed upon sums to Fleet and Sagaponac. *See* Sagaponac Mot. at 4. However, HIG's payment to Sagaponac did not reduce TestAmerica's debt to Sagaponac. *See id.* TestAmerica used the remaining proceeds from the sale of assets to pay off part of its debt to Sagaponac, but the debt was not fully paid off. *See id.* Mullins, as the most subordinated debt holder, did not receive any sums owed under the Subordinated Note. *See id.*

In Winter 2002, just before HIG consummated the agreement, Mullins filed suit against TestAmerica and Sagaponac in Texas state court. *See id.* The case was removed to the United States District Court for the Northern District of Texas. *See id.* The Texas district court promptly dismissed Sagaponac from the suit, upon Sagaponac's motion, for lack of personal jurisdiction. *See id .* Neither Fleet nor HIG were named as parties originally. *See id.* However, on July 17, 2003, Mullins sought leave from the Texas district court to amend his complaint to, among other things, add Fleet, Sagaponac, and HIG.[FN3]

> FN3. Mullins asserts that discovery since

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 3

Not Reported in F.Supp.2d, 2004 WL 548240 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

the Texas court's prior decision will show that the Texas court does indeed have personal jurisdiction over Sagaponac. *See* Defs.' Reply Br. in Further Supp. of Motion to Dismiss at 6-7, n. 6.

On September 3, 2003, Fleet filed the present action in the United States District Court for the Southern District of New York. The complaint seeks a declaratory judgment decreeing that the approximately $3 million payment to Sagaponac did not violate Mullins's rights and that the claims asserted against Fleet in Mullins's Texas action lack merit. Compl. ¶ 34. The complaint also seeks an injunction against Mullins from prosecuting any claim against Fleet related to this dispute in any action other than the present action. Compl. ¶ 35.

*3 On October 16, 2003, Mullins moved to dismiss, stay, or transfer the present action in light of the Texas action. That same day, Sagaponac moved to intervene in the present action. On October 28, 2003, HIG similarly moved to intervene in the present action.

On December 16, 2003, the Texas court granted Mullins leave to amend his complaint, and Mullins has since filed an amended complaint in that action naming Fleet, Sagaponac, and HIG as parties. On January 30, 2004, Sagaponac again moved in the Texas action to dismiss the complaint as against Sagaponac for lack of personal jurisdiction.

## DISCUSSION

### I. *Motion to Dismiss, Stay, or Transfer*

Mullins's arguments for dismissing, staying, or transferring this case revolve around the fact that a Texas action is already pending. Mullins expounds on judicial economy, deference to the Texas federal court, the avoidance of forum shopping, the propriety of the Texas venue, and the interests of justice. [FN4] *See* Mullins Mot. at 11-16.

FN4. Mullins also argues that defendants

were not properly served. *See* Mullins Mot. at 15. Because the Court grants Mullins's motion on other grounds, the Court does not address this claim.

Fleet counters that, pursuant to the forum selection clause in the Subordination Agreement, it is contractually entitled to bring this suit in the Southern District of New York. *See* Mem. in Opp'n to Def.'s Mot. at 9-10 (hereinafter "Fleet Opp'n"). Fleet argues that "the parties freely contracted to litigate in New York and Mullins should be prevented from evading his contractual obligation by adding Fleet to a two-year-old lawsuit in Texas concerning a host of issues unrelated to the precise issue" in this suit. *Id.* at 10. Fleet also argues that this suit has "first-filed" priority over the Texas suit. *See id.* at 10-13.

In reply, Mullins argues that "the special circumstances of this case merit a dismissal or stay in favor of the Texas action". Def.'s Reply Br. in Further Supp. of their Mot. at 1 (hereinafter " Mullins Reply"). These special circumstances, Mullins argues, show that the "forum selection clause only authorizes suit in New York courts rather than providing an exclusive forum." *Id.* Furthermore, Mullins alleges that he filed for leave to amend his Texas complaint after having numerous telephone conversations with Fleet regarding the basis for his amended complaint and after providing Fleet copies of the proposed amended complaint. *See id.* at 4-5. Mullins argues that Fleet should not profit from Mullins's forthrightness by having the first-filed rule mechanically applied to favor Fleet. *See id.* at 4-6.

In a sur-reply submission, Fleet argues that this Court should deny Mullins's motion because, according to the plain language of the Subordination Agreement's forum selection clause, Mullins has waived any claim that New York is an improper or inconvenient forum or venue. *See* Pl.'s Surreply in Opp. to Def.'s Mot. at 1.

The Court finds that, according to the language of the forum selection clause, Mullins indeed has agreed to waive any claim that New York is an improper or inconvenient forum or venue. However,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 548240 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the Court also finds that, as Mullins contends, that same forum selection clause *"empowers* the New York courts to adjudicate this matter, but does not indicate that New York is the *exclusive* or the only appropriate forum where the case may be heard." *Credit Alliance Corp. v. Crook,* 567 F.Supp. 1462, 1465 (S.D.N.Y.1983) (emphasis in original). Thus, the Court's inquiry does not end with the language of the forum selection clause, even striking Mullins's arguments regarding the propriety of the Texas forum. While Fleet may be contractually entitled to file suit in New York, the parties to the Subordination Agreement appear not to have contracted to litigate only in New York and Mullins cannot be said to "evade his contractual obligations" solely by attempting to add Fleet as a party to a lawsuit in a different forum.

**\*4** The Court begins it analysis, then, by examining the relationship between this matter and the Texas litigation. Ignoring for the moment the issue of which lawsuit was filed first, it is clear this litigation is intended to shield Fleet from liability in the Texas litigation. That intent is expressly stated in Fleet's claim for relief: "By virtue of the foregoing, Fleet is entitled to a declaratory judgment providing that ... all the claims asserted by [Mullins] in their proposed amended complaint in the Texas action lack merit." Compl. ¶ 34. Thus, although the two actions may not be identical in every aspect, a decision in one would likely have *res judicata* effect in the other and, in fact, a decision in the Texas action might extinguish completely this action.

This conclusion, which suggests that the two actions should not go forward simultaneously, brings the Court to the first-filed rule. Under this rule, well established in the Second Circuit, "where two actions involve substantially the same issues, the first suit should have priority absent the showing of a balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second." *Regions Bank v. Wieder & Mastroianni, PC,* 170 F.Supp.2d 436, 439 (S.D.N.Y.2001) (quotations omitted). The purposes behind this rule are to avoid duplication of judicial effort, to avoid vexatious litigation in multiple forums, to achieve comprehensive disposition of litigation among parties over related

issues,[FN5] and to eliminate the risk of inconsistent judgments. *See id.*

> FN5. The first-filed rule may apply even if the two actions in question involve different parties. *See Regions Bank,* 170 F.Supp.2d at 441.

However, the first-filed rule is not to be applied in a mechanical way, disregarding other considerations. *See Tucker Anthony, Inc. v. Bankers Trust Co.,* No. 93 Civ. 0257(SWK), 1994 WL 9683, at \*9 (S.D.N.Y. Jan. 10, 1994). The Second Circuit has cautioned courts against acting as "umpires on ' race to the courthouse' disputes," and courts, in response, have paid careful attention to a variety of factors, taken as a whole, in adjudicating such disputes. *See Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.,* 774 F.Supp. 858, 867 (S.D.N.Y.1991). Thus, in applying the rule, a court may use its discretion to dismiss, stay, or transfer a proceeding. *See Regions Bank,* 170 F.Supp.2d at 439 (" Ultimately, '[t]he decision whether or not to stay or dismiss a proceeding rests within the district judge's discretion.' "); *Tucker Anthony,* 1994 WL 9683, at \*9 ("[T]he decision to transfer is within the court's discretion.").

Fleet filed the present action after Mullins moved for leave to file an amended complaint adding Fleet as a party in the Texas action, but before the Texas court granted Mullins's motion. Thus, this action may be considered the first-filed with respect to Fleet. *Cf. Aerotel, Ltd. v. Sprint Corp.,* 100 F.Supp.2d 189, 195-96 (S .D.N.Y.2000) (explaining amended complaint does not relate back to filing date of original complaint in considering first-filed rule unless, *inter alia,* added party knew or should have known that, but for mistake, original complaint would have been brought against added party).

**\*5** However, the Court finds that there are special circumstances that justify giving priority to the Texas action despite it being the second-filed action. The Texas action has been proceeding for two years and contains issues broader than in this action. In contrast, this action has yet to even begin

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 5

Not Reported in F.Supp.2d, 2004 WL 548240 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the discovery stage. Given the history and scope of the Texas action, it cannot reasonably be stayed in favor of this action nor transferred to this Court. These special circumstances justify giving priority to the Texas action. Having determined that this action and the Texas action are sufficiently similar so as to pose a risk of conflicting judgments and duplication of judicial efforts should both proceedings go forward simultaneously, the Court finds that the most efficient and equitable way to resolve both litigations is to stay this action.

### II. *Motions to Intervene*

Mullins's opposition to the motions of HIG and Sagaponac to intervene in the present action is based on the same arguments that Mullins makes in support of the motion to dismiss, stay, or transfer this case. The crux of Mullins's arguments is that the motions should be denied so that the litigation in Texas could proceed properly and efficiently. *See* Mem. of Law in Opp'n to Mots. to Intervene at 10-15.

These arguments do not address the requirements for intervention set forth in Fed.R.Civ.P. 24(b)(2), a rule that is to be construed liberally. *See German v. Fed. Home Loan Mortgage Corp.,* 899 F.Supp. 1155, 1166 (S.D.N.Y.1995). Nor do these arguments address whether, as HIG and Sagaponac assert, the Court has supplemental subject matter jurisdiction over the claims of HIG and Sagaponac pursuant to 28 U.S.C. §§ 1332 and 1367.

Having decided to stay the present action, the Court declines to rule on the merits of HIG's and Sagaponac's respective motions to intervene. Thus, the Court denies HIG's and Sagaponac's motions without prejudice to the movants renewing their motions to intervene when the stay of the present action is lifted.

### CONCLUSION

For the foregoing reasons, defendant Mullins's motion to dismiss, stay, or transfer this action [5-1] is GRANTED. Sagaponac's and HIG's motions to

intervene [7-1 and 10-1, respectively] are DENIED without prejudice.

SO ORDERED.

S.D.N.Y.,2004.
Fleet Capital Corp. v. Mullins
Not Reported in F.Supp.2d, 2004 WL 548240 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Devlin Graphic Industries, Inc. v. Lewis
S.D.N.Y.,2001.

United States District Court, S.D. New York.
DEVLIN GRAPHIC INDUSTRIES, INC. Pension
Plan, et al., Plaintiffs,
v.
David LEWIS, Defendant.
**No. 00Civ.6665LTSMHD.**

March 30, 2001.

Scott M. Riemer, Attorney at Law, New York, NY,
for Plaintiffs.
Jerry Kugelmas, Attorney at Law, New York, NY,
for Defendant.

*OPINION AND PRELIMINARY INJUNCTION*
SWAIN, J.
**\*1** The issues in this case, which arises from a bitter
divorce and equitable distribution proceeding in
New York State court, focus on the interrelationship
between the federal Employee Retirement Income
Security Act of 1974, as amended ("ERISA") and
state domestic relations law. Plaintiffs are the
Devlin Graphic Industries, Inc. Pension Plan (the "
Plan") and Joan D. Lewis ("Mrs.Lewis") as a
trustee of the Plan. The defendant is David Lewis ("
Mr.Lewis"), the former spouse of plaintiff Lewis.
Mrs. Lewis, in her individual capacity, was the
plaintiff in the parties' state court proceeding.
Plaintiffs' complaint, filed in this Court on
September 6, 2000, seeks a declaration that an order
entered by the New York State Supreme Court,
Westchester County, on June 30, 1998 in the
parties' divorce and equitable distribution action
(the "State Court Order") fails to constitute a "
Qualified Domestic Relations Order" (a "QDRO")
within the meaning of relevant provisions of the
Employee Retirement Income Security Act of 1974,
as amended ("ERISA"), and is therefore preempted
by that statute. Plaintiffs also seek an injunction

prohibiting enforcement of the State Court Order.

The Court has jurisdiction of this action pursuant to
29 U.S.C.A. § 1132(e) (West 1999) and 28
U.S.C.A. §§ 1331 (West 1993), 2201 and 2283
(West 1994). Venue is proper in that the Plan is
administered in this District. *See* 28 U.S.C.A. §
1132(e)(2).

By Order to Show Cause entered by this Court on
November 24, 2000 (the "OSC"), plaintiffs initiated
an application for a preliminary injunction and
temporary restraining order preventing the
enforcement of the State Court Order. Plaintiffs'
application was prompted by a contempt proceeding
brought on in state court by Mr. Lewis. The Order
to Show Cause initiating the state court contempt
proceeding required Mrs. Lewis to show cause as to
why an order should not be entered directing her,
*inter alia*, "to comply with the [State Court Order]
and agreement with respect to the provisions therein
including (i) distribution from [Mrs. Lewis']
pension; (ii) transfers of certain stocks and
otherwise." Order to Show Cause, October 25, 200
(annexed to OSC as Exhibit C).

Following briefing and a hearing on November 30,
2000, this Court entered a Temporary Restraining
Order ("TRO"), setting forth the basis of its
decision at length on the record. The TRO was
subsequently continued through March 26, 2001.
The Court having had an opportunity to consider
the parties' further submissions and arguments,
plaintiffs' application for a preliminary injunction is
hereby granted, to the extent and for the reasons set
forth below. This opinion sets forth the Court's
findings of fact and conclusions of law in
accordance with Rule 52 of the Federal Rules of
Civil Procedure.

*Background*

The Court makes the following findings of fact. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
(Cite as: Not Reported in F.Supp.2d)

material facts are largely undisputed. The Plan, first
adopted in 1990 and subsequently amended, is
sponsored by Devlin Graphic Industries, Inc. ("
Devlin"), a closely-held corporation of which Mrs.
Lewis is a 51% shareholder and her daughter, Stacy
Semel, is the only other shareholder. Mrs. Lewis is
a trustee of the Plan. Devlin is the "Plan
Administrator" for ERISA purposes; Mrs. Lewis is
authorized to act on behalf of the company in that
connection. The Plan document in its current
version consists of the Datair Mass-Submitter
Prototype Defined Benefit Pension Plan and Trust ("
Plan Document" or "Plan Doc.") and an Adoption
Agreement in connection therewith. The Adoption
Agreement, dated December 10, 1993 ("Adoption
Agreement"), is signed by Mrs. Lewis as President
of Devlin and as a trustee of the Plan, and by Mr.
Lewis and Ms. Semel as Plan trustees. [FN1] The
Plan Document was submitted to the Court as an
exhibit to the March 15, 2001 Affirmation of Scott
Riemer. The Adoption Agreement was submitted to
the Court as Exhibit F to the OSC. There are
currently three Plan participants-Mrs. Lewis, Ms.
Semel and Dorothy Dabelstein.

> FN1. The Plan Document submitted to the
> Court by plaintiffs' counsel is dated March
> 1995, post-dating the Adoption
> Agreement. The Court notes that section
> 3.10.8 of the Plan Document authorizes the
> mass-submitter plan sponsor to amend the
> main plan document to comply with legal
> requirements. In that the material
> cross-references from the 1993 Adoption
> Agreement to the 1995 Plan Document
> appear consistent and the parties have not
> provided evidence of significant
> amendment of any of the relevant Plan
> provisions between 1993 and 1995, the
> Court has considered the version of the
> Plan Document provided to the Court as
> the operative one.

*2 The Plan is a tax qualified defined benefit plan
covered by ERISA. It provides for retirement
benefits in specified dollar amounts, calculated
pursuant to accrual formulae set forth in the
Adoption Agreement and underlying Plan

Document. The Plan does not provide for the
allocation of assets or benefits to the accounts of
specific participants. Rather, it provides for
payment of the formula benefit at or after "normal
retirement age," in annuity or lump sum form.
(Adoption Agreement at 11-21; Plan Doc. at
19-21.) Section 3.5.1 of the Plan Document
provides in pertinent part that:
All assets held by the Trustee, whether in the Trust
Fund or Segregated Funds, shall be owned
exclusively by the Trustee and no Participant or
Beneficiary shall have any individual ownership
thereof.

(Plan Doc. at 76.) Although the Adoption
Agreement includes language mandating the
allocation of "residual assets" among "Participants
in proportion to their Accrued Benefits" following "
satisfaction of all liabilities to Participants," that
language relates only to the operation of the Plan
provision governing termination of the Plan. Under
the termination provisions of the Plan,[FN2] any
distribution of residual assets would occur only
after formal termination of the Plan, liquidation of
its assets, and distribution of assets to participants
entitled to benefits in accordance with priority
categories set forth in the Plan Document.
(Adoption Agreement at 25; Plan Doc. at 49-50.)
The Plan has not been terminated.

> FN2. Plan Doc. § 2.5.15.

In or about September of 1996, Mrs. Lewis
commenced an action against Mr. Lewis in New
York State Supreme Court, Westchester County, for
divorce and equitable distribution of marital
property. At a hearing held in that action on April
23, 1998, Mr. Lewis' counsel recited into the record
a stipulation of settlement. The transcript of the
settlement stipulation reads in pertinent part as
follows:
MR. KUGELMAS: Mr. Lewis, it is agreed that he
is entitled to 50 percent of the wife's interest in her
pension and those stocks in the said pension
account will be divided by quadro [sic], by division,
in kind and I will prepare-
MRS. LEWIS: The Judge said to leave the in kind
off, right there in the office.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
(Cite as: Not Reported in F.Supp.2d)

MR. KUGELMAS: Mr. Lewis' percentage of the interest in the pension will be distributed to Mr. Lewis and I will prepare a quadro to be signed by the Court which I will submit together with the judgment and findings.

MRS. LEWIS: We want written notice of settlement.

(Transcript of April 23, 1998 hearing at 12-13.) Mrs. Lewis held herself out as appearing *pro se* at the hearing but was accompanied by a lawyer, one Joel Mayer, who participated to some degree in the settlement colloquy and who appeared as Mrs. Lewis' counsel in connection with later state court proceedings arising from the settlement stipulation. There is no indication in the caption of the state court action or in the transcript of the April 23, 1998 proceeding that Mrs. Lewis was appearing in any capacity other than as an individual.

**\*3** Mr. Kugelmas' reference in the colloquy to " quadro" was to a qualified domestic relations order ( "QDRO") within the meaning of section 414(p) of the Internal Revenue Code of 1986, as amended (the "Code") and section 206(d) of ERISA (29 U.S.C.A § 1056(d) (West 1999)). The relevant portions of section 206(d) of ERISA are set forth in the margin.[FN3]

> FN3. (1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated
>
> ....
>
> (3)(A) Paragraph (1) shall apply to the creation, assignment or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that ... [such provision] shall not apply if the order is determined to be a qualified domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.
>
> (B) For purposes of this paragraph-
> (i) the term "qualified domestic relations order" means a domestic relations order-
> (I) which creates or recognizes the

existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term "domestic relations order." means any judgment, decree, or order (including approval of a property settlement agreement) which-

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies-

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order-

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

(E)(i) A domestic relations order shall not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
(Cite as: Not Reported in F.Supp.2d)

be treated as failing to meet the requirements of clause (i) of subparagraph (D) solely because such order requires that payment of benefits be made to an alternate payee-

(I) in the case of any payment before a participant has separated from service, on or after the date on which the participant attains (or would have attained) the earliest retirement age,

(II) as if the participant had retired on the date on which such payment is to begin under such order (but taking into account only the present value of benefits actually accrued and not taking into account the present value of any employer subsidy for early retirement), and

(III) in any form in which such benefits may be paid under the plan to the participant (other than in the form of a joint and survivor annuity with respect to the alternate payee and his or her subsequent spouse).

For purposes of subclause (II), the interest rate assumption used in determining the present value shall be the interest rate specified in the plan or, if no rate is specified, 5 percent.

(ii) For purposes of this subparagraph, the term "earliest retirement age" means the earlier of-

(I) the date on which the participant is entitled to a distribution under the plan, or

(II) the later of the date of the participant [FN1 notes "So in original. Probably should be 'date the participant'."] attains age 50 or the earliest date on which the participant could begin receiving benefits under the plan if the participant separated from service.

...

(G)(i) In the case of any domestic relations order received by a plan-

(I) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and

(II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

(ii) Each plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Such procedures-

(I) shall be in writing,

(II) shall provide for the notification of each person specified in a domestic relations order as entitled to payment of benefits under the plan (at the address included in the domestic relations order) of such procedures promptly upon receipt by the plan of the domestic relations order, and

(III) shall permit an alternate payee to designate a representative for receipt of copies of notices that are sent to the alternate payee with respect to a domestic relations order.

(H)(i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the "segregated amounts") which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

(ii) If within the 18-month period described in clause (v) the order (or modification thereof) is determined to be a qualified domestic relations order, the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.

(iii) If within the 18-month period described in clause (v)-

(I) it is determined that the order is not a qualified domestic relations order, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

(II) the issue as to whether such order is a qualified domestic relations order is not resolved, then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.

(iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18-month period described in clause (v) shall be applied prospectively only.

(v) For purposes of this subparagraph, the 18-month period described in this clause is the 18-month period beginning with the date on which the first payment would be required to be made under the domestic relations order.

(I) If a plan fiduciary acts in accordance with part 4 of this subtitle in-

(i) treating a domestic relations order as being (or not being) a qualified domestic relations order, or (ii) taking action under subparagraph (H), then the plan's obligation to the participant and each alternate payee shall be discharged to the extent of any payment made pursuant to such Act.

(J) A person who is an alternate payee under a qualified domestic relations order shall be considered for purposes of any provision of this chapter a beneficiary under the plan....

(K) The term "alternate payee" means any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant.

29 U.S.C.A. § 1056(d) (West 1999).

Mr. Lewis' attorney thereafter settled on Mrs. Lewis a proposed order, labeled "Qualified Domestic Relations Order", which recited that it was intended to be a QDRO and directed the distribution to Mr. Lewis of 46.15% of the underlying assets of the Plan, including specific stockholdings or proceeds thereof and other specified Plan assets. The

percentage was calculated based on an actuarial calculation of the then-lump sum value of Mrs. Lewis' accrued Plan benefit and a review of the assets of the Plan. Mr. Lewis, through his counsel, had determined that the lump-sum value calculated by the actuary constituted 92.3% of the assets of the Plan and determined further that Mr. Lewis' 50% of Mrs. Lewis' "interest" in the Plan benefit thus constituted 46.15% of the Plan's assets. Mrs. Lewis was 59 years old at the time the State Court Order was entered. She was not yet eligible to receive any distribution under the Plan, which provides for distributions only after attainment of age 60 and the satisfaction of certain length of service requirements. (Adoption Agreement at §§ II.B.1, II.B.2, II.G.1, II.I. 4; Plan Doc. at § 2.5.1.) Mrs. Lewis did not object to the proposed order and it was entered, along with a divorce judgment, on June 30, 1998. The State Court Order is annexed to the OSC as Exhibit D.

Shortly after the State Court Order was entered, Mrs. Lewis appeared by counsel in the state court proceedings, asserting that the "QDRO" was not in fact a QDRO because it failed to comply with certain ERISA and Code provisions and that it should therefore be modified. Specifically, Mrs. Lewis argued that the order was inconsistent with ERISA and Code, with the terms of the Plan, and with the in-court stipulation insofar as it measured benefits payable to Mr. Lewis by the value of plan assets rather than the plan's benefit formula, directed distribution of specific Plan assets in kind, and directed an immediate distribution to Mr. Lewis. Mrs. Lewis also argued that the State Court Order was inconsistent with the parties' stipulation of settlement and that there had been an error regarding the distribution of certain of the couple's collectibles. The state court denied Mrs. Lewis' application for modification of the order, issuing an order reading in its entirety as follows:

Upon the foregoing papers it is ORDERED that this motion and cross-motion are denied. The Defined Benefit Plan in which the defendant is to receive 50% of the assets can be amended, if necessary, to provide for the distribution to defendant. Additionally, there is no showing of a mistake with respect to the figurines. Nevertheless, the motion was made in good faith and is not frivolous.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

Therefore, attorney fees are denied.

*4 (Order, Sept. 23, 1998, annexed to OSC as Ex. E.)

Mrs. Lewis, still appearing in her individual capacity in the divorce action, thereafter appealed the order to the Appellate Division, First Department, arguing again that the State Court Order failed to comply with the terms of the Plan and the requirements of ERISA and the Code. The Appellate Division, affirming, held in February 2000 that there was no reason to grant relief from the order below. It did not address specifically Mrs. Lewis' ERISA and Code-based arguments. (Decision & Order, Feb. 14, 2000, annexed to OSC as Ex. E.) The Appellate Division thereafter denied Mrs. Lewis' motion for reargument. (Decision & Order on Motion, May 2, 2000, annexed to OSC as Ex. E.) None of the arguments in the parties' state court briefs addressed the question of the state courts' jurisdiction to determine whether the State Court Order is a QDRO within the meaning of ERISA or the Code and, as explained *infra,* none of the state court decisions holds that the State Court Order is such a QDRO.

The State Court Order required service on the Plan Administrator of a certified copy of the order. Defendant takes the position that the original settlement of the order on Mrs. Lewis in connection with the divorce proceeding constituted such service. The State Court Order was apparently served formally on Devlin, as Plan Administrator, sometime after the final Appellate Division decision. It is undisputed that no steps have been taken to comply with the distribution requirements of the State Court Order. It is also undisputed that the Plan Administrator did not respond to the order by taking the steps outlined in section 206 of ERISA and related Code provisions, including informing Mr. Lewis of the Plan's procedures for determining the qualified status of domestic relations orders, making such determination and notifying Mr. Lewis within a reasonable time of such determination, and accounting separately for amounts that would have been payable to Mr. Lewis during the period of its deliberations if the order had been determined to be a QDRO. *See* 29

U.S.C.A. § 1056(d)(3)(G),(H) (West 1999). Instead, Mrs. Lewis (in her capacity as a trustee of the Plan) and the Plan commenced this litigation.

### *Erisa's Preemption and Civil Action Provisions*

ERISA's provisions generally "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" that is governed by ERISA. 29 U.S.C.A. § 1144(a) (West 1999). The Plan is such an employee benefit plan. Civil actions to enforce ERISA and/or the terms of employee benefit plans are authorized by section 502 of the statute, which also delineates the extent to which federal and state courts have jurisdiction of such actions. *See* 29 U.S.C.A. § 1132 (West 1999). Section 502 provides in pertinent part that a plan participant or beneficiary may bring an action " to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," 29 U.S.C.A. § 1132(a)(1)(B) ; and that a plan participant, beneficiary or fiduciary may bring such an action "(A) to enjoin any act or practice which violates any provision of [Title I of ERISA] [FN4] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan," 29 U.S.C. § 1132(a)(3). The statute grants federal and state courts concurrent jurisdiction of actions brought under subsection (a)(1)(B) and actions to enforce certain child support orders, but the federal district courts have exclusive jurisdiction of all other civil actions under ERISA. *See* 29 U.S.C.A. § 1132(e)(1).

> FN4. Title I of ERISA includes the anti-alienation, preemption, QDRO, and fiduciary responsibility provisions of ERISA. *See* 29 U .S.C. §§ 1101-1191c (West 1999 & Supp.2000).

### *Anti-alienation Provisions; Qdros*

*5 As noted above, ERISA and parallel provisions of the Code define a particular type of state court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 7

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

domestic relations order as a QDRO. QDROs, which are state judgments or orders relating, among other things, to marital property rights and meeting specific ERISA requirements, enjoy special status under these statutes. They are exempted from ERISA's general ban on the alienation of plan benefits, while state court domestic relations orders that are not QDROs do not enjoy such an exemption. [FN5] Employee benefit plans are required to provide for the payment of benefits in accordance with the applicable requirements of any QDRO. *See* 29 U.S.C.A. § 1056(d)(3)(A). ERISA also exempts QDROs (but not non-qualified state domestic relations orders) from its sweeping general preemption provision. *See* 29 U.S.C.A. § 1144(b)(7)

> FN5. ERISA section 206(d)(1) requires that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C.A. § 1056(d)(1) (West 1999). *See also* 26 U.S.C.A. § 401(a)(13) (West 1988 & Supp.2000). ERISA section 206(d)(3) provides that the bar on assignment and alienation of benefits "shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that [the bar] shall not apply if the order is determined to be a qualified domestic relations order." 29 U.S.C.A. § 1056(d)(3)(A).

Thus, if the State Court Order is indeed a QDRO, it can be enforced against the Plan. If it is not a QDRO, it cannot be so enforced and the Plan has no authority to make payments pursuant to it. The central ERISA issues for purposes of resolution of the instant application for injunction relief are: whether there has been a determination that the State Court Order is a QDRO; if so, whether that determination was made by an authority with jurisdiction of the issue; and, if no such valid determination has yet been made, whether the State Court Order is a QDRO. These issues go to the likelihood of ultimate success on the merits of this action. As with any application for injunctive relief,

the Court must also examine whether the other predicates for such relief-including irreparable harm-are present.

*Predicates for Injunctive Relief*

In this Circuit, a grant of preliminary injunctive relief is generally appropriate only upon the movant's showing: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See Brenntag Int'l Chemicals v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999); *Jackson Dairy v. H.P. Hood,* 596 F.2d 70, 72 (2d Cir.1979).

The Court will first examine the issue of irreparable harm for, if no such harm can be made out, injunctive relief will be inappropriate and there will be no need for the Court to engage at this stage of these proceedings in the delicate exercise of divining the impact of the State Court Order and determining whether that order is enforceable against the Plan.

The Court, having examined thoroughly the parties' factual proffers and considered carefully their arguments and the basic economic structure of defined benefit pension plans, finds that, if the State Court Order is not a QDRO, the Plan and its fiduciaries making distributions pursuant to the order would suffer irreparable harm in the absence of a preliminary injunction. If the order is not a QDRO, neither ERISA nor the Code provides authority for compliance with it. Compliance would thus violate the statutory prohibition on the alienation of pension plan benefits, and would violate the basic ERISA fiduciary rule that plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries.[FN6]

> FN6. *See* 29 U.S.C.A. § 1103 (West 1999 & Supp.2000).

*6 Defendant argues that "plaintiff is the monied

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 8

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
(Cite as: Not Reported in F.Supp.2d)

spouse in [the] divorce," asserting that Mrs. Lewis' personal net worth exceeds $2 million while his own is less than $250,000, suggesting that defendant's inability thus far to receive the substantial Plan distribution called for by the State Court Order has had an adverse impact on defendant's financial well-being. Defendant has also pointed out that he is some ten years older than Mrs. Lewis. (Def't's Memo of Law in Opp. to Pls' Motion and On Submission of Jurisdictional Issues at 4.) Plaintiffs here are, however, the Plan and Mrs. Lewis in her capacity as a Plan fiduciary only. Mrs. Lewis' personal financial status is irrelevant to the irreparable harm analysis, while Mr. Lewis's is, because it suggests that Plan assets improperly distributed to defendant-an individual admittedly in need of cash who intends to apply the money to his personal expenses-would be difficult, if not impossible, for the Plan to recover.

The Plan, as an entity that relies on employer contributions and investment return for augmentation of its assets, has no independent means of generating replacement assets in respect of any that may wrongly be disbursed.[FN7] While Mrs. Lewis, in her individual capacity, appears to be the principal beneficiary of the Plan in terms of the value of her accrued benefits thereunder, she is not the only person with an accrued benefit under the Plan. An improper depletion of the Plan's assets would undermine the benefits of all participants, who look to the common fund for payment of their benefits.[FN8] Fiduciaries effecting improper distributions face potential personal liability for breach of duty.[FN9] Furthermore, a violation of the Code's requirement that a tax-qualified pension plan preclude the alienation of benefits[FN10] could jeopardize the Plan's tax-qualified status, resulting in adverse financial ramifications for the company and all of the Plan's participants. Thus, a sufficient prospect of irreparable harm exists to warrant consideration of plaintiffs' likelihood of success on the merits. To the extent such prospect might not clearly rise to the level of irreparable harm, it surely suffices, when compared to the resources admittedly available to defendant, to weight the balance of hardships in plaintiffs' favor. As shown below in the Court's analysis of the likelihood of success on the merits, plaintiffs have also clearly raised issues

going to the merits that are sufficiently serious to make them a fair ground for litigation.

> FN7. *Cf. Brenntag Int'l,* 175 F.3d at 249-50 (noting that while monetary injury generally does not constitute irreparable harm because it can be estimated and compensated, where circumstances are such that "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied," irreparable harm exists).

> FN8. *See* Plan § 3.5.1 (Plan Doc. at 76).

> FN9. *See* ERISA sections 403, 404, 409, codified at 29 U.S.C.A. §§ 1103, 1104 and 1109 (West 1999 & Supp.2000).

> FN10. *See* 26 U.S.C.A. § 401(a)(13) (West 1988 & Supp.2000).

The first prong of the test for entitlement to injunctive relief having been met, the Court turns to the question of whether plaintiffs have shown a likelihood of success on the merits. The Court approaches with caution plaintiffs' efforts to thwart full enforcement of an order entered, after extensive litigation, in New York State court and affirmed on appeal after extensive motion practice and briefing. Section 1738 of title 28 of the United States Code requires federal courts to give "the same full faith and credit" to the judicial proceedings of states courts "as they have by law or usage in the courts of such State." The "Rooker-Feldman" doctrine, derived from *District of Columbia Court of Appeals v. Feldman*[FN11] and *Rooker v. Fidelity Trust Co.*[FN12] and their progeny, holds generally that the lower federal courts lack jurisdiction to entertain collateral attacks on state court judgments.

> FN11. 460 U.S. 462 (1983).

> FN12. 263 U.S. 413 (1923).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

*7 Before examining the validity of the State Court Order or its consistency with QDRO requirements, it is thus prudent to determine whether the state courts have already reached the issue that is at the heart of the instant litigation-is the State Court Order a QDRO with which ERISA and the Code require the Plan to comply? If the state court litigation has not addressed that issue, the litigation of the question in this Court does not constitute a collateral attack on that decision.

Careful review of the State Court Order and the state court litigation that followed its entry reveals that the issue of its QDRO status was never resolved by the state courts. The order, which was prepared by Mr. Lewis' counsel in the matrimonial action, is labeled a "Qualified Domestic Relations Order" and recites that "it is the intent of this Court that the provisions of this Domestic Relations Order operate as an effective assignment for the Alternate Payee's defendant's [sic] interest in the [Plan] for all purposes, and constitute a Qualified Domestic Relations Order in compliance with Section 414(p) of the [Code] and Section 206(d)(3) of [ERISA]." (State Court Order at 1-2.) Nowhere in the body of the order is there any analysis of the ERISA and Code criteria for QDRO status nor of whether the order meets those criteria. This Court cannot presume, on the basis of a caption and precatory language in an order prepared by counsel for an individual in an action to which the Plan was not a party, that the state court was purporting to adjudicate the Plan's obligations with respect to the distributions called for by the State Court Order.

Nor is the State Supreme Court's decision on Mrs. Lewis' subsequent motion to "resettle" the order any more suggestive of adjudication of the QDRO status issue. The state court's September 23, 1998 order reads in pertinent part: "it is ORDERED that this motion and cross-motion are denied. The Defined Benefit Plan in which defendant is to receive 50% of the assets can be amended, if necessary, to provide for the distribution to defendant." (OSC, Ex. E.) This language suggests that, far from having determined under federal law that the order meets QDRO requirements (which include a requirement that such an order "not require a plan to provide any type or form of benefit ... not otherwise provided

under the plan"),[FN13] the state court was of the view that further steps might be necessary to make the order enforceable against the Plan in its current form. The February 14, 2000 decision of the Appellate Division, Second Judicial Department, dismissing Mrs. Lewis' appeal and affirming the decision below, similarly alludes to inconsistency between the requirements of the order and the terms of the Plan. The appellate court observed that Mrs. Lewis' motion for "resettlement" was "seeking to have the terms of the stipulation amended to comply with the provisions of the Plan." Holding that the underlying stipulation of settlement in the divorce action was "neither unfair nor unreasonable" and that the State Court Order had been entered upon Mrs. Lewis' consent, the appellate court affirmed the lower court's denial of Mrs. Lewis' motion. (OSC, Ex. E .)

> FN13. 29 U.S.C. § 1056(d)(3)(D) (West 1999).

*8 Plaintiffs' efforts to litigate the question of the State Court Order's QDRO status here thus are not inconsistent with the scope of the proceedings in the state court or with the order itself. Accordingly, it is unnecessary for this Court to determine whether, for instance, the state court would have had jurisdiction under section 502(a)(1)(A) of ERISA [FN14] (granting concurrent state and federal court jurisdiction of actions "to recover benefits due ... under the terms of [a] plan") to make an advance determination, in an action to which the Plan was not a party, that an order constituted a QDRO with which Plan fiduciaries could be compelled to comply.

> FN14. 29 U.S.C. § 1132(a)(1)(B) (West 1999).

The Court now turns to the question of likelihood of success on the merits. Plaintiffs argue that the State Court Order is not a QDRO and that they are therefore entitled to preliminary injunctive relief precluding its enforcement pending this Court's ultimate determinations on their requests for declaratory and permanent injunctive relief.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

Defendant argues that this Court lacks jurisdiction to grant the declaratory relief sought by plaintiffs and that, to the extent this Court has jurisdiction of the issues raised it should defer to the state court because this is in essence a two-party domestic relations matter, relating to the Plan only incidentally, because Mrs. Lewis, as a shareholder of the sponsoring company, ultimately has the power to amend the Plan to comply with any agreements she may have made in her personal capacity. Defendant further asserts that the state court contempt proceedings should alternatively be considered as actions for benefits due under ERISA and therefore within the scope of concurrent state jurisdiction under ERISA section 502(a)(1)(B).

The Court clearly has jurisdiction to entertain this action. Section 502(a)(3) of ERISA grants the federal courts exclusive jurisdiction of civil actions brought on by fiduciaries for injunctions and equitable relief in respect of acts or practices that violate Title I of ERISA (the title that includes ERISA's anti-alienation provisions) or the terms of a covered plan. There is no dispute that Mrs. Lewis, in her trustee capacity, is a Plan fiduciary. To the extent defendant's state court activities constitute an effort to compel the Plan to make distributions inconsistent with its terms and/or the provisions of ERISA, this Court has exclusive jurisdiction under ERISA to entertain an action for appropriate injunctive or other equitable relief, including the grant of an appropriate declaratory judgment.[FN15] The Declaratory Judgment Act, 28 U.S.C. § 2201(a) , further empowers this Court, "[i]n a case of actual controversy within its jurisdiction, ... [to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201(a) (West 1994).

> FN15. *See, e.g, Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein,* 107 F.3d 139, 141-42 (2d Cir.1997); *Heimann v. Nat'l Elevator Industry Pension Fund,* 187 F.3d 493, 504 (5 th Cir.1999).

Having said that, the Court intends to focus

squarely, and exclusively, on the question of whether this particular State Court Order is a QDRO and therefore enforceable in its current form against the Plan. Defendant is correct in contending that the statutory scheme contemplates that determinations of the individual parties' rights with respect to marital assets, including the allocation of accrued employee plan benefits, is a state court matter. The federal issue is whether the state court's determination has been embodied in a domestic relations order that survives ERISA preemption and the ban on alienation of benefits by meeting the specific federal statutory requirements for "QDRO" status.[FN16]

> FN16. Defendant argues that the Plan Administrator's admitted failure to comply with ERISA's procedural requirements for the processing and review of domestic relations orders somehow forecloses plaintiffs' instant effort to bring the question of the QDRO status of the State Court Order before this Court. There *is* nothing in section 206 or section 502 of ERISA that suggests that an administrator's compliance with the letter of the procedure is a jurisdictional prerequisite to a civil action addressing the issue. It is, of course, clearly preferable for plan fiduciaries *to* take seriously their statutory duties, and the Court expresses no opinion as to other potential ramifications of the Plan Administrator's apparent failure thus far to comply with the procedural requirements in this matter.

**\*9** The question thus comes down to whether plaintiffs are likely to succeed on their claim that the State Court Order is not a QDRO. Arguing that the order is not a QDRO, plaintiffs have focused on its method of defining Mrs. Lewis' "interest" in the Plan, its mandate of an in-kind distribution of benefits, and its mandate that such distribution be immediate, at a time when Mrs. Lewis herself had not reached the minimum age requirement for Plan distributions. The elements of the requirements for QDRO status set forth in section 206(d)(3)(D) of ERISA are conjunctive.[FN17] Thus, plaintiffs will

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

have met their burden if they have shown that the State Court Order fails to meet any of the three criteria set forth in that subsection.

> FN17. "A domestic relations order meets the requirements of [a QDRO] only if such order-(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan, (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), *and* (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a domestic relations order." 29 U .S.C.A. § 1056(d)(3)(D) (West 1999) (emphasis supplied).

ERISA section 206(d)(3)(D) provides, among other things, that a domestic relations order is a QDRO only if it "does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." 29 U.S.C. § 1056(d)(3)(D). The State Court Order defines Mrs. Lewis' "interest" in the Plan as "Ninety-Two 3/10 (92.3%) percent of the total assets of said Plan." (OSC, Ex. D at 5.) It requires payment "directly to the Alternate Payee/defendant, DAVID LEWIS, [of] Fifty (50%) percent of plaintiff's interest in the .. . Plan (46.15% of the assets in the Plan) by transferring such assets to the Alternate Payee/Defendant's Charles Schwab retirement account in the name of David Lewis," and further specifies particular stockholdings to be transferred in the distribution. *Id.* The State Court Order requires the calculation of the amount to be transferred by applying the specified percentage "as of the date of such distribution/transfer." *Id.*

The Plan, by contrast, defines a participant's Normal Retirement Benefit as "30% of the Participant's Average Monthly Compensation reduced by 1/28 for each year of Credited Service less than 28 years ." (Adoption Agreement at 11.) Benefit accrual under the Plan is based on years of service. *Id.* at 15. No early retirement benefits are pr

ovided for; benefits payable after the normal retirement date (age 60 if certain service requirements are met) are based on the normal retirement and accrued benefit formulae. *See id.* at 18. Formulae for the date as of which a benefit is determined and the application of the accrual principles in connection therewith are provided in the Adoption Agreement and the Plan Document. *See* Adoption Agreement at 11-21; Plan Document at 19-32, 36-52. None of the benefit calculation formulae set forth in the Adoption Agreement or the Plan document provides for the calculation of a benefit by reference to a percentage of the value of Plan assets. A provision relating to the allocation to participants of residual assets applies only following termination of the Plan. *See supra* n. 2 and accompanying text.

The State Court Order is thus clearly inconsistent with the terms of the Plan in relying on a benefit calculation formula not provided for under the Plan. It fails to satisfy the ERISA section 206(d)(3)(D)(i) requirement that a QDRO "not require a plan to provide any type or form of benefit ... not otherwise provided under the Plan." 29 U.S.C.A. § 1056(d)(3)(D)(i). It thus appears likely that plaintiffs will succeed in establishing their entitlement to relief on Count II of their Amended Complaint.[FN18]

> FN18. Plaintiffs' Amended Complaint consistently cites section 206(d)(3)(D)(ii) as the legal basis for their claims regarding the order's QDRO status. It seems that plaintiffs mean, however, to rely on section 206(d)(3)(D)(i). Paragraph 22 of the Amended Complaint, which purports to quote subsection (ii), in fact quotes the latter provision.

**\*10** In Count I of their Amended Complaint, plaintiffs take issue with the immediate and in-kind distribution requirements of the order. There appears to be no dispute that, at the time the State Court Order was entered, Mrs. Lewis had not reached the age at which she would have been eligible for an immediate distribution of benefits. Although ERISA permits a QDRO to require

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 12

Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637
**(Cite as: Not Reported in F.Supp.2d)**

payments to an alternate payee to commence before a participant has separated from service, such payments can only be required to commence on or after "the date on which the participant attains ... the earliest retirement age." 29 U.S.C. § 1056(d)(3)(E)(i)(I). In that Mrs. Lewis had not yet reached the Plan's earliest retirement age at the time the State Court Order was entered, plaintiffs are likely to succeed on their claim that the order is also inconsistent with the Plan and QDRO requirements in this respect.

In Count III of their Amended Complaint, plaintiffs further argue that the State Court Order's requirement of the distribution of the benefit in the form of specific items of property is impermissible under the terms of the Plan and ERISA. Their likelihood of success on this element of the claim is less clear. The Plan provides that "distribution of a Participant's benefit shall consist of cash, property, an annuity policy or any combination thereof." Plan Document at 46. Plaintiffs have pointed to no statutory or Plan provision precluding distributions of stocks or other property in respect of defined benefit plan benefits. Plaintiffs' failure to make out a likelihood of success on this particular issue is not fatal to their effort to obtain injunctive relief because, as explained above, both the benefit calculation and distribution timing requirements of the State Court order appear likely to preclude a finding of QDRO status.

The Court having found that plaintiffs will likely suffer irreparable harm in the absence of a grant of preliminary injunctive relief and that plaintiffs have demonstrated a likelihood of success on the merits of two of their claims, the Court hereby grants a preliminary injunction as follows.

*Preliminary Injunction*

Defendant, his agents, servants, employees, attorneys, and those persons in active concert or participation with him who receive actual notice of this Preliminary Injunction by personal service or otherwise, are hereby enjoined, pending resolution of this action, from taking any action to enforce the " Qualified Domestic Relations Order" dated June 30,

1998 and entered by the Supreme Court of the State of New York, County of Westchester, in the action captioned *Joan D. Lewis v. David Lewis,* Index No. 14120/96 (the "State Court Order"), or to sanction noncompliance therewith, to the extent the State Court Order requires benefit calculations under or distributions from the plaintiff Plan. Plaintiffs are hereby enjoined preliminary from making any benefit calculations or distributions of Plan assets pursuant to the State Court 1998 Order. No bond is required to be posted.

**\*11** The parties shall appear before the Court for a pre-trial conference on April 26, 2001 at 10:00 a.m.

IT IS SO ORDERED.

S.D.N.Y.,2001.
Devlin Graphic Industries, Inc. v. Lewis
Not Reported in F.Supp.2d, 2001 WL 310626 (S.D.N.Y.), 25 Employee Benefits Cas. 2637

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

LEXSEE



Analysis
As of: Jun 06, 2007

**Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America-UAW, Plaintiff -v- Dana Corporation, Defendant**

**Case No. 3:99CV7603**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, WESTERN DIVISION**

**2000 U.S. Dist. LEXIS 12041**

**March 22, 2000, Decided**
**March 22, 2000, Opinion Filed**

**NOTICE:** [*1]   FOR ELECTRONIC PUBLISHING ONLY

**DISPOSITION:** Dana's motion for reconsideration denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer moved for reconsideration of the court's order directing defendant to show cause why it should not be enjoined from maintaining a declaratory judgment action which sought to declare an arbitrator's award void and unenforceable in the United States District Court for the Middle District of North Carolina.

**OVERVIEW:** Plaintiff labor union brought an action under the Labor Management Relations Act, 29 U.S.C.S. § 185, seeking to enforce compliance with an arbitrator's award. Defendant employer moved to dismiss, stay, or transfer the action. The court issued an order directing defendant to show cause why it should not be enjoined from maintaining its declaratory judgment action in the United States District Court for the Middle District of North Carolina. In response to the show cause order, defendant filed a motion for reconsideration. Defendant's motion for reconsideration was denied. The court found that both complaints asked the North Carolina court to enter judgment declaring that the arbitrator's decision was void and unenforceable. Accordingly, the court concluded that defendant sought from the outset to obtain a declaratory judgment in the action it brought in North Carolina. Since plaintiff union was entitled to choose its forum, and not to have that choice made for it by its adversary, the court enjoined defendant from further pursuing or maintaining its action in the Middle District of North Carolina.

**OUTCOME:** Defendant employer's motion for reconsideration was denied; since plaintiff union was entitled to choose its forum, and not to have that choice made for it by its adversary, the court enjoined defendant from further pursuing or maintaining its action in the Middle District of North Carolina.

**CORE TERMS:** arbitrator's, unenforceable, declaratory, declaring, enjoined, void, Declaratory Judgment Act, injunctive relief, et seq, arbitration, civil action, reconsideration, transferred, responding, pursuing, vacated, notify

**COUNSEL:** For counter-claimant: Stanley J. Brown, Hogan & Hartson, McLean, VA.

For defendant: Stanley J. Brown, Hogan & Hartson, McLean, VA.

For counter-claimant: Michael J. Lorenger, Hogan & Hartson, McLean, VA.

For defendant: Michael J. Lorenger, Hogan & Hartson, McLean, VA.

2000 U.S. Dist. LEXIS 12041, *

For counter-defendant: Michael B. Nicholson, International Union, UAW, Detroit, MI.

For plaintiff: Michael B. Nicholson, International Union, UAW, Detroit, MI.

For counter-defendant: Joan Torzewski, Lackey, Nusbaum, Harris, Reny & Torzewski, Toledo, OH.

For plaintiff: Joan Torzewski, Lackey, Nusbaum, Harris, Reny & Torzewski, Toledo, OH.

For counter-claimant: Richard S. Walinski, Cooper, Walinski & Cramer, Toledo, OH.

For defendant: Richard S. Walinski, Cooper, Walinski & Cramer, Toledo, OH.

**JUDGES:** James G. Carr, United States District Judge.

**OPINION BY:** James G. Carr

**OPINION:**

ORDER

This is an action by the International Union, United Automobile, Aerospace & Agricultural Workers of America-UAW (UAW) under the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, seeking to enforce compliance [*2] with an arbitrator's award. Pending is defendant Dana Corporation's motion to dismiss, stay, or transfer this action. (Doc. 4). On December 6, 1999, I issued an order directing Dana to show cause why it should not be enjoined from maintaining a declaratory judgment action now pending in the United States District Court for the Middle District of North Carolina. (Doc. 22).

That action was filed a few hours before this action. In response to the show cause order, Dana has filed its response and a motion for reconsideration. (Doc. 28). For the reasons that follow, Dana's motion for reconsideration shall be denied, and an order shall issue enjoining Dana from maintaining its suit in that district.

As Dana points out, the December 6th order was premised on the perception that the UAW, rather than Dana, is the "true plaintiff" in this dispute. That perception, in turn, is based on the nature of the rights at issue, which derive from those portions of an arbitrator's decision that favored the union and required Dana to take certain affirmative steps in response to the arbitrator's finding that Dana had violated a "neutrality agreement" between the parties.

In that dispute the union is [*3] the aggrieved party: it asserted and continues to assert that Dana violated the agreement. It sought and continues to seek remedies for that breach. Dana simply is responding to the union's complaint with a denial of any wrongdoing. The union, to the extent that it prevailed, seeks to enforce the arbitrator's decision. Dana, on the other hand, seeks to enforce no affirmative rights; it, rather, seeks to have the award vacated. If Dana prevails, the status quo ante is restored, and the parties will be left where they were when the dispute arose.

Dana has the right under § 185(a) to seek to have an arbitrator's award vacated, and employers, like Dana, against whom arbitrators have ruled may often exercise that right. But neither that opportunity nor that practice alters the basic relationship between the parties. In this case, the union, as the party seeking a remedy, stands in the posture of a plaintiff, while Dana, the putative wrongdoer, finds itself defending against that claim.

Dana also disputes my conclusion that its suit in the Middle District of North Carolina was filed in anticipation of an action by the union to enforce its rights under the award. After receiving notice [*4] of the arbitrator's award, the union asked Dana about its intentions; instead of responding to that inquiry, Dana filed its suit. I am satisfied that I can fairly infer that Dana 1) anticipated that the union, if Dana declined to comply with the award, would sue to enforce its rights under the award, and, 2) filed its suit to deprive the union of the opportunity to seek enforcement in the forum of its choosing.

Dana also argues that the cases involving declaratory judgments and the first to file rule are inapposite because its original complaint was not filed under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. To be sure, the original complaint did not recite that statute. Its description of the "nature of the action" stated, however, that "Plaintiff Dana Corporation . . . brings this action for declaratory and injunctive relief pursuant to 29 U.S.C. § 185, seeking an order vacating and declaring void and unenforceable the arbitration decision described below." (Doc. 28, Exh. B) (emphasis added).

There is, moreover, no meaningful difference between this language and the equivalent language in Dana's amended complaint [*5] (which Dana acknowledges seeks declaratory relief under § 2201 et seq.), which states that "Plaintiff Dana Corporation brings this action for declaratory and injunctive relief pursuant to 29 U.S.C. § 185, seeking an order . . . declaring void and unenforceable the arbitration decision described below." The amended complaint, like the first complaint, does not cite the Declaratory Judgment Act. In addition, both complaints ask the North Carolina court to "enter judg-

ment declaring" that the arbitrator's decision was void and unenforceable.

There is nothing in the form, style, or substance of the two complaints that supports Dana's contention that the relief it seeks differs in the two complaints. I conclude, accordingly, that Dana sought from the outset to obtain a declaratory judgment in the action it brought in North Carolina.

I conclude, in addition, that Dana has not shown cause why it should not be compelled to cease its litigation in North Carolina.

I remain firmly of the view that the union is the true plaintiff, and, as such, is entitled to choose its forum, and not to have that choice made for it by its adversary. Dana shall therefore be enjoined from [*6] further pursuing or maintaining its action in the Middle District of North Carolina, except as may be necessary to notify that court of this order, and to seek either to dismiss that action without prejudice, to have that action transferred to this court.

It is, therefore,

ORDERED THAT, except as may be necessary to notify the Middle District of North Carolina of this order, and to seek either to dismiss its action in that District without prejudice, to have that action transferred to this court, the defendant Dana Corporation and is officers, agents, employees, and attorneys be, and they hereby are enjoined from further pursuing and maintaining the civil action now pending in the United States District Court for the Middle District of North Carolina styled Dana Corporation v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America-UAW, and bearing docket number Civil Action No. 1:99CV000827.

So ordered.

3/22/00

/s/

James G. Carr

United States District Judge

# Exhibit D

LEXSEE



Cited
As of: Jun 06, 2007

CROWN CORK & SEAL COMPANY, INC., Plaintiff, v. UNITED STEEL
WORKERS OF AMERICA, AFL-CIO-CLC; MAX GLUGLA; RAYMOND
MICHALOWSKI; JAMES BERTUCCI; individually and on behalf of a defendant
class of retirees, Defendants.

03-CV-1381

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

2004 U.S. Dist. LEXIS 760; 32 Employee Benefits Cas. (BNA) 1950

January 9, 2004, Decided

**DISPOSITION:** [*1] Defendants' Motion to Dismiss granted and case dismissed. Judgment entered in favor of Defendants and against Plaintiffs.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employer sued defendants, retirees and a union, seeking a declaration that the employer lawfully reduced certain retirement benefits. Defendants moved to dismiss the complaint or to transfer the action for consolidation with a similar case in another district.

**OVERVIEW:** The employer contended that it was properly seeking a declaration of its rights with regard to reduction of retirement benefits, but defendants argued that the employer merely filed the action to preempt defendants' choice of forum, which was the proposed transferee district and potentially less favorable to the employer. The court held that, while the employer's requested declaratory relief was within the court's jurisdiction, defendants were the natural plaintiffs in the action who would normally sue to protect their retirement, and abstention was thus warranted. The court had discretion to decline declaratory jurisdiction, and overriding public and private interests indicated that the controversy should be resolved in defendants' choice of forum which had a nexus to the claims and where substantial progress was made in the similar litigation.

**OUTCOME:** Defendants' motion to dismiss was granted.

**CORE TERMS:** retiree, retirement benefits, declaratory judgment, motion to dismiss, first-filed, assigned, notice, Declaratory Judgment Act, extraordinary circumstances, declaratory judgment action, exercise jurisdiction, inequitable conduct, federal district, equitable relief, class action, unilaterally, anticipatory, abstention, entertain, imminent, briefing, weighing, shopping, invoked, declare, lawsuit, plants, supposedly, favorable, deprive

**LexisNexis(R) Headnotes**

*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview*
[HN1] The Declaratory Judgment Act provides that a district court which otherwise has jurisdiction may declare the rights and other legal relations of any interested party. 28 U.S.C.S. § 2201(a).

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Declaratory Judgment Actions > State Judgments > Discretion*
[HN2] District courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites.

2004 U.S. Dist. LEXIS 760, *; 32 Employee Benefits Cas. (BNA) 1950

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Federal & State Interrelationships > Abstention*
*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Discretion*
[HN3] The Brillhart abstention doctrine holds that, in determining whether or not to exercise jurisdiction, a district court should ascertain whether the questions or controversy between the parties to the federal suit can better be settled in a proceeding pending in a state court.

*Civil Procedure > Federal & State Interrelationships > Abstention*
*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Discretion*
[HN4] While Brillhart abstention is usually invoked where there is a pending or imminent related state proceeding, its guidelines for the exercise of a federal court's discretionary jurisdiction are equally applicable where the related case is in another federal district court.

*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN5] The first-filed rule is not a rigid or inflexible rule to be mechanically applied, and courts should refuse to permit first-filed action to proceed in various circumstances, such as when the first suit was motivated by forum-shopping, or when the second filed action had developed further than the initial suit, or when the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum.

COUNSEL: For CROWN CORK & SEAL COMPANY, INC., plaintiff: Amy E. Dias, Jones Day, Pittsburgh, PA.

For CROWN CORK & SEAL COMPANY, INC., plaintiff: Jerome A. Hoffman, Dechert, Price & Rhoads, Philadelphia, PA.

For CROWN CORK & SEAL COMPANY, INC., plaintiff: James A. Rydzel, Jones, Day, Reavis & Pogue, Cleveland, OH.

For CROWN CORK & SEAL COMPANY, INC., plaintiff: Lawrence Charles DiNardo, Jill Susan Vorobiev, Jones, Day, Reavis & Pogue, Chicago, IL.

For CROWN CORK & SEAL COMPANY, INC., plaintiff: Andrew M. Kramer, Jones, Day, Reavis & Pogue, Washington, DC.

For UNITED STEELWORKERS OF AMERICA INTERNATIONAL UNION, AFL-CIO- CLC, MAX GLUGA, RAYMOND MICHALOWSKI, JAMES BERTUCCI, defendants: William T. Payne, Schwartz, Steinsapir, Dohrmann & Sommers, John Stember, Pittsburgh, PA.

For UNITED STEELWORKERS OF AMERICA INTERNATIONAL UNION, AFL-CIO- CLC, defendant: David L. Gore, Gore & Gore, Chicago, IL.

JUDGES: Arthur J. Schwab, United States District Judge.

OPINION BY: Arthur J. Schwab

OPINION:

MEMORANDUM OPINION AND ORDER OF COURT

Pending before this [*2] Court is defendants' Motion to Dismiss (doc. no. 29) pursuant to FRCP Rule 12(b)(1)and (6), or in the alternative, to transfer to federal court in Cincinnati, where a similar class action case is pending. In this Pittsburgh case, Plaintiff Crown Cork & Seal Company, Inc. sued the individual blue-collar retirees defendants ("participants") - as representatives of a "defendant class," for a declaratory judgment that Crown's reduction of certain retirement benefits was proper. The other defendant is the labor union that negotiated on behalf of participants when they were actively employed, and that entered into the labor agreements containing the retirement benefits at issue. That union -- a plaintiff in the Cincinnati action -- is the United Steelworkers of America, AFL-CIO-CLC. This Court believes that defendant Union and defendant class members in the Pittsburgh action are the "natural" plaintiffs in the asserted claims -- the parties who normally would sue to protect rights to the retirement benefits; some of these retirees are plaintiffs in the Cincinnati action.

In the class action complaint in Cincinnati (entitled Lawhorn v. Crown Cork [*3] & Seal Company, Inc., Case No. 03-CV-461), plaintiff class representatives allege that participants earned these retirement benefits over decades of service at the can manufacturing plants owned by Crown, as well as other plants Crown acquired as a result of its purchase of the Metal Division of the Continental Can Company on July 15, 1990. The Lawhorn class representatives allege that successive labor agreements contained provisions that established Crown's obligation to provide retiree medical benefits

2004 U.S. Dist. LEXIS 760, *; 32 Employee Benefits Cas. (BNA) 1950

throughout retirement. The Cincinnati Complaint also alleges that Crown unilaterally reduced Participants' benefits and that Crown has taken the position that it is free at any time to further reduce or even eliminate said benefits. The Lawhorn class representatives also allege that Crown's conduct is actionable under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), and under Section 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B)and (a)(3), in that said conduct allegedly violates the rights of the participants under employee benefit plans. [*4]

On or about June 6, 2003, the same day Crown reduced the retirement benefits (without notice), effective August 1, 2003, Crown filed this action (again without notice) in federal court in Chicago. Defendants contend that said filing in Chicago was to deprive the "natural" plaintiffs from exercising their rights to sue in a forum of their own choice. Twenty (20) days thereafter, the Cincinnati federal court action was commenced. The Union contends that Crown filed in Chicago to avoid the United States Court of Appeals for the Sixth Circuit, supposedly because the United States Court of Appeals for the Seventh Circuit would be more favorable to employers in retiree medical benefit cases, and so Crown, defendants argue, sued without giving the "natural" plaintiffs the opportunity to sue first in its choice of forum (i.e., federal court in Cincinnati - - the Lawhorn action).

Defendant retirees and Union in the Chicago action moved to dismiss, contending that Crown's "preemptive" strategy was an improper use of the Declaratory Judgment Act (as they now so argue in the Pittsburgh action). Judge Shadur (the Chicago federal judge to whom the case was assigned) instead of setting a briefing [*5] schedule and receiving opposition and reply briefs on the motion to dismiss, promptly scheduled a status conference, and at the conference he ordered the Chicago action transferred to Pittsburgh. Supposedly neither side requested such a transfer. In transferring the case to Pittsburgh, Judge Shadur made no ruling on the motion to dismiss.

After the transfer to Pittsburgh, on or about September 17, 2003, the case was assigned to Judge Cercone, but he recused himself upon determining that his mother is among the retirees affected by Crown's action relating to retirement benefits (and is therefore a possible member of both the proposed Lawhorn class and the proposed class in the Pittsburgh action). The case was assigned to this Court on or about December 1, 2003.

By order of Judge Cercone of November 20, 2003, a briefing schedule was set on the renewed defendants' motion to dismiss. The renewed motion is based on the following grounds: First, this Court should dismiss (or

transfer the case to Cincinnati) because Crown has improperly invoked the Declaratory Judgment Act to bring a lawsuit that is, in all important respects, a "pre-emptive strike" that improperly deprives the retirees [*6] of their rights to frame their own claims and choose their own forum. Defendants argue that as the "natural" plaintiffs, they have chosen their forum (by the filing Lawhorn case), and the Judge in Lawhorn (Judge Beckwith) has been moving the case along, with the parties having already conducted their Rule 26(f) meeting, with the Rule 16 conference having taken place, and with the Lawhorn Plaintiffs having moved for class certification. Moreover, in August 2003, the Lawhorn parties briefed the propriety of proceeding in Cincinnati.

Defendants secondly argue that Crown fails to state a claim under ERISA because that statute does not authorize a cause of action where an employer sues its own retirees for declaratory judgment relief. Crown relies on 29 U.S.C. § 1132(a)(3), which allows "fiduciaries" to sue "to obtain ... appropriate equitable relief ... to enforce ... the terms of the plan". Defendants contest that Crown is not seeking "appropriate equitable relief."

[HN1] The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, provides that a district court which otherwise has jurisdiction *may* declare the rights and other [*7] legal relations of any interested party," 28 U.S.C. § 2201(a) (emphasis added). The United States Supreme Court has made clear that [HN2] "district courts possess discretion in determining whether and when to entertain an action under the DJA, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 282, 132 L. Ed. 2d 214, 115 S. Ct. 2137 (1995). See *United States v. Commonwealth of Pennsylvania,* 923 F.2d 1071 (3d Cir.1991) (setting forth factors to consider in deciding whether to exercise DJA discretion to entertain a declaratory judgment).

[HN3] *Brillhart* abstention doctrine holds that, in determining whether or not to exercise jurisdiction, a district court "should ascertain whether the questions in controversy between the parties to the federal suit ... can better be settled in [a] proceeding pending in the state court." *Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 495, 86 L. Ed. 1620, 62 S. Ct. 1173 (1942) (district courts have discretion to dismiss a declaratory judgment action when "it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory [*8] judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties."). [HN4] While *Brillhart* abstention is usually invoked where there is a pending or imminent related *state* proceeding, its guidelines for the exercise of a federal court's discretionary jurisdiction are equally applicable where the related case is in another

Case 1:07-cv-00126-JJF    Document 12-2    Filed 06/06/2007    Page 28 of 41

2004 U.S. Dist. LEXIS 760, *; 32 Employee Benefits Cas. (BNA) 1950

federal district court. *See Fischer & Porter Co. v. Moorco Intern. Inc.*, 869 F. Supp. 323, 327-28 (E.D.Pa. 1994) (Pennsylvania district court exercises discretion to accept jurisdiction over declaratory judgment despite existence of related case in another federal district court, and hears case under first-filed rule). *See also Hurley v. Columbia Cas. Co.*, 976 F. Supp. 268 (D.Del. 1997) (district court declines to exercise DJA jurisdiction where related claim would be addressed and resolved in Chapter 11 bankruptcy proceeding). In any case, a declaratory judgment action should not be used as a race for res judicata. *Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213, 1225 (3d Cir. 1989).

Applying these principles in the instant case, [*9] the Court finds overriding public and private interest in having this controversy resolved in Cincinnati, the forum chosen by the "natural plaintiffs," and therefore will decline to exercise jurisdiction under the DJA.

After reviewing the extensive motions and briefs and supporting documentation, this Court rules that the proper plaintiffs in an action to determine whether the retirees' retirement benefits can be unilaterally changed (and without notice) are the retirees and their Union. Further, that as the proper plaintiffs, the retirees and their Union should be permitted to select the forum of their choice so long as the selected forum has some nexus to the lawsuit.

Since the retirees and their Union have chosen as their forum the federal court in Cincinnati, since that case is substantially further along than this case, since that forum has nexus to the parties in the Lawthorn action, coupled with a very able and experienced jurist, and since the DJA grants discretion to the federal courts whether to declare the rights of the parties after considering the relevant conveniences and interests, this Court will grant the motion to dismiss. See Equal Employment Opportunity Commission v. The University of Pennsylvania, 850 F.2d 969, 972, 976-77 (3d Cir. 1988), [*10] aff'd on other grounds, 493 U.S. 182, 107 L. Ed. 2d 571, 110 S. Ct. 577 (1990) [HN5] (first-filed rule "is not a rigid or inflexible rule to be mechanically applied," and courts should refuse to permit first-filed action to proceed in various circumstances, such when the first suit

was motivated by "forum-shopping," or when "the second filed action had developed further than the initial suit," or "when the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum ...."); UAW v. Dana Corporation, 1999 U.S. Dist. LEXIS 22525, ** 5-6 (N.D. Ohio 1999), citing Alltrade Inc. v. Uniweld Products, Inc., 946 F.2d 622, 628 (9th Cir.1991); Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., 16 Fed. Appx. 433, 437, 2001 WL 897452 (6th Cir. 2000) (the Sixth Circuit listed factors weighing against application of the rule: "extraordinary circumstances, inequitable conduct, bad faith, anticipatory suits, and forum shopping.") See also d. Appx. 433, 437, 16 Fed. Appx. 433, 2001 WL 897452 (6th Cir. 2000) (the Sixth Circuit listed factors weighing against application of the rule. [*11] "extraordinary circumstances, inequitable conduct, bad faith, anticipatory suits, and forum shopping.") See also Mellon Bank, N.A. v. IBJ Schroder Bank & Trust, 1989 U.S. Dist. LEXIS 16517 (W.D.Pa. 1989) (Ziegler, J.) ("Even if we assume that Mellon filed this action first, the minimal difference in filing time would further support our decision to depart from the 'first-filed' rule. In particular, no discovery or pretrial procedures have occurred, to our knowledge, in this district. Thus, no judicial inefficiency or duplication of efforts will result from requiring the parties to litigate their dispute in New York.").

Accordingly,

AND NOW, this 9th day of January, 2004, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss (doc. no. 29) is GRANTED, and this case is dismissed. It is FURTHER ORDERED that Judgment is entered in favor of Defendants and against Plaintiffs.

The Court expresses no opinion on defendants' alternative argument that the case should be dismissed for failure to state an ERISA claim, and the decision is without prejudice to their raising this issue before the United States District Court for the Southern District of Ohio.

Arthur J. Schwab [*12]

United States District Judge

# Exhibit E

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

c
Dippold-Harmon Enterprises, Inc. v. Lowe's
Companies, Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
DIPPOLD-HARMON ENTERPRISES, INC.,
Plaintiff,
v.
LOWE'S COMPANIES, INC., Defendant.
**No. 01-532-GMS.**

Nov. 13, 2001.

MEMORANDUM AND ORDER
SLEET, District J.

I. INTRODUCTION

*1 On May 23, 2001, Lowe's Home Centers, Inc. ("
Home Centers"), filed a complaint against the
defendant Dippold-Harmon Enterprises, Inc. ("
Dippld-Harmon") in the General Court of Justice,
Superior Court Division, located in North Carolina.
On July 27, 2001, Dippold-Harmon removed that
action to the United States District Court for the
Western District of North Carolina. On August 8,
2001, Dippold-Harmon filed the above-captioned
action against Lowe's Companies, Inc. ("Lowe's"),
the parent corporation of Home Centers, in
Delaware.

Before the court is Lowe's' motion to dismiss, or
alternatively, to transfer this case to the Western
District of North Carolina, or to stay this case
pending the outcome of that litigation. Lowe's
argues that the court should dismiss this action
because the court lacks personal jurisdiction over it.
It further argues that, should the court not dismiss
this action, the case should be transferred to North
Carolina pursuant to the "first-filed" rule and 28
U.S.C. § 1404(a). For the reasons that follow, the
court will deny Lowe's motion to dismiss for lack of

personal jurisdiction, but will grant Lowe's motion
to transfer.

II. BACKGROUND

Dippold-Harmon is a Delaware corporation, with its
principle place of business in Delaware. Lowe's is a
North Carolina corporation with its principal place
of business in North Carolina. It is the world's
second largest home improvement retailer, serving
more than five million customers weekly. Lowe's
maintains that it is not, and has never been,
registered or qualified to do business in Delaware.
It further asserts that it does not have a registered
agent for the service of process in Delaware.

Home Centers is a wholly-owned subsidiary
corporation of Lowe's. It is a North Carolina
corporation registered to conduct business in
Delaware, although its principle place of business is
in North Carolina. Lowe's maintains significant
control over its subsidiary. Lowe's sends its
corporate representatives to its retail stores,
including Home Centers, and then directs the stores
to take certain actions in accordance with Lowe's
policies. Other Lowe's high-level executives admit
that they "supervise" and "oversee" the retail stores
and travel to these stores on almost a daily basis.
Furthermore, in Lowe's advertising materials, it
proudly announces that *it* has more than six-hundred
and fifty store in forty states, including four in
Delaware. In actuality, the four stores in Delaware
are its subsidiary Home Centers.

On April 3, 1998, Home Centers entered into a
written contract with Dippold-Harmon. The
contract specified that Dippold-Harmon would
install granite countertops for Home Centers'
customers. In approximately 1998, Lowe's also
hired Dippold-Harmon as a vendor for the sale and
installation of granite kitchen countertops. At that
time, Dippold-Harmon was one of several vendors
that Lowe's utilized for the installation of these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

countertops. As Lowe's continued to open additional stores, it was faced with the costly proposition of installing countertop displays at each of these new stores. To ensure that the countertop displays were properly installed in a uniform manner, Lowe's representatives sought to hire a single vendor to install these displays. It also sought to hire a single vendor to install countertops for its individual customers.

*2 Dippold-Harmon maintains that the parties engaged in subsequent telephone negotiations aimed at making Dippold-Harmon the exclusive vendor for the installation of Lowe's countertop displays, as well as for countertops it sold to individual customers. Some of these discussions were initiated by Lowe's and were directed to Dippold-Harmon in Delaware. At a December 20, 1999 meeting with Dippold-Harmon, Lowe's executives Michael Gettler and Tammy Edson purportedly offered to make Dippold-Harmon its exclusive national vendor for the installation of granite countertops. Dippold-Harmon contends that, during the meeting, it accepted Lowe's' offer and entered into an oral "Exclusivity Agreement." The two companies also exchanged numerous letters and e-mails during this time concerning their vendor agreement.

On May 23, 2001, Home Centers filed the North Carolina complaint against Dippold-Harmon. In its complaint, Home Centers alleges that Dippold-Harmon breached their April 3, 1998 written contract. Specifically, Home Centers contended that Dippold-Harmon failed to comply with their written contract's standards in the installation of countertops in the homes of individual customers.

Dippold-Harmon filed this action against Lowe's on August 8, 2001, alleging that Lowe's breached their Exclusivity Agreement and acted fraudulently and with bad faith.

Because the court concludes that exercising personal jurisdiction over Lowe's in this instance comports with traditional notions of fair play and substantial justice as required by the Due Process Clause, and that Lowe's falls within the reach of

Delaware's long-arm statute, the court will deny Lowe's' motion to dismiss. *See International Shoe Co. v. Washington,* 326 U.S. 310 (1945); DEL. CODE. ANN. tit. 10 § 3104(c) (2001). However, because the "balance of convenience" tips in favor of Lowe's, the court will grant its motion to transfer.

## III. DISCUSSION

### A. Jurisdiction

The essence of Lowe's' argument is that, since it has not purposefully directed its activities to Delaware, the assertion of personal jurisdiction by the courts of this forum would violate the Due Process Clause. Lowe's further contends that its activities do not bring it within the reach of Delaware's long-arm statute. While Lowe's correctly frames the inquiry the court must make, the court disagrees with its analysis and reaches a different conclusion.

### 1. Due Process

The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." *International Shoe* 326 U.S. at 316 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

under all the facts and circumstances, then due process requires that jurisdiction be denied." *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994).

**\*3** Lowe's argues that its only contacts with Delaware are through Dippold-Harmon, which is a Delaware corporation. Specifically, Lowes' contends that its Home Centers contract with a Delaware corporation is, by itself, an insufficient basis to establish personal jurisdiction. The court agrees. *See Blue Ball Properties, Inc. v. McClain,* 658 F.Supp. 1310, 1316-17 (D.Del.1987). However, the court finds that Lowe's has many more purposeful contacts with Delaware than it discloses in its brief.

First, with regard to the Exclusivity Agreement in issue, Lowe's communicated regularly with Dippold-Harmon by sending numerous letters and e-mails from North Carolina to Delaware. It also placed telephone calls to Dippold-Harmon in Delaware. These contacts alone would be sufficient to satisfy the minimum contacts analysis. *See Hide Power and Equip. Co. v. Strates Enters., Inc.,* 1993 WL 258701, at \*1 (Del.Super. June 15, 1993) (finding jurisdiction over a nonresident defendant based on a single visit to Delaware and two or three letters sent to Delaware.); *see also Mid-Atlantic Mach. & Fabric, Inc. v. Chesapeake Shipbuilding, Inc.,* 492 A.2d 250, 255 (Del.Super.1985) (extending jurisdiction over a nonresident defendant where the negotiation and execution of the contract occurred entirely outside of Delaware, and the defendant's contacts with Delaware were limited to " an unspecified number of trips.")

However, in addition to these direct contacts with Dippold-Harmon in Delaware, Lowe's is the world's second largest home improvement retailer. This fact alone would provide a sufficient basis for the court to seriously question the legitimacy of Lowe's' position. However, as previously noted, Lowe's has a wholly-owned subsidiary; that subsidiary, Home Centers, is registered to do business in Delaware, and operates four stores in this jurisdiction. Neither in its advertising material, nor in its internal communications, does Lowe's distinguish between its corporate stores and Home Centers stores. In

fact, Lowe's announces the opening of new Home Centers stores as new *Lowe's* locations. Lowe's also maintains strict controlover its Home Centers operations. It sends its representatives to the Home Centers stores and then directs those stores not in compliance with Lowe's policies to take certain actions to come into compliance. Such representatives have visited the Delaware stores. Lowe's also publically admits to otherwise " supervising and overseeing" its stores, and sending Lowe's personnel to those stores, including Delaware locations.

These facts support the conclusion that Lowe's should reasonably have anticipated being brought into court here. However, due process requires that the court make one more inquiry.

Notwithstanding the existence of Lowe's purposeful minimum contacts with this forum, the court must consider whether the "minimum requirements inherent in the concept of 'fair play and substantial justice...' defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." *Asahi Metal Indust. Co. v. Superior Court,* 480 U.S. 102, 116 (1987). This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendant to litigation within the forum. *See Beverly Hills Fan,* 21 F.3d at 1568.

**\*4** Here, the answer is plainly, no. Delaware has an interest in this action. Dippold-Harmon is a Delaware corporation. Clearly this forum's interests extend to corporate citizens that have sought the protection of Delaware's laws. Moreover, Delaware has an interest in addressing those purposeful activities conducted within its borders that result in allegations of injury. That interest extends to breaches of contract, such as that alleged here. Finally, Lowe's clearly has, through its Home Centers subsidiaries, significantly more than minimal contacts with this forum. Accordingly, the court concludes that the burden on Lowe's is not so onerous as to run afoul of traditional notions of fair play and substantial justice.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 4

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

### 2. Delaware's Long-Arm Statute

The second step in the court's analysis into the propriety of subjecting Lowe's to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. *See* DEL. CODE. ANN. tit. 10 § 3104 (2001). While Lowe's contends that it does not fall within the grasp of any of Section 3104's provisions, Dippold-Harmon contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual " regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." DEL. CODE. ANN. tit. 10, § 3104(c) (2001).[FN1] The court will interpret this language broadly, as reaching the " maximum parameters of the due process clause." *See Jeffreys v. Exten,* 784 F.Supp. 146, 151 (D.Del.1992).

> FN1. This subsection provides general jurisdiction over the nonresident defendant. *See Mendelson v. Delaware River and Bay Auth.,* 56 F.Supp.2d 436, 439 (D.Del.1999). Accordingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

As discussed above, Lowe's directed telephone calls and numerous items of correspondence to Delaware in relation to the disputed Exclusivity Agreement. Through its wholly-owned subsidiary, Home Centers, Lowe's also operated, maintained, and directly supervised four stores in Delaware. Finally, Lowe's has not in any way publically differentiated itself from the Home Centers locations in Delaware. Consequently, it cannot now complain that it should not be sued here.

Finding sufficient contacts to subject Lowe's to personal jurisdiction under both the State's long-arm

statute and the Due Process Clause, the court will now move to a discussion of whether this action should be transferred to the Western District of North Carolina.[FN2]

> FN2. In its motion to dismiss, Lowe's also alleges that this action should be dismissed for lack of venue and insufficient service of process. However, both of these claims are based solely on its argument that the court lacked personal jurisdiction. As the court has found personal jurisdiction, these arguments too must fail.

### B. Venue

As previously noted, Lowe's seeks to transfer this action pursuant to the "first-filed" rule and 28 U.S.C. § 1404(a).

### 1. The "First-Filed" Rule

The "first-filed" rule is a judicially-created doctrine that is designed to avoid concurrent litigation of the same issues, between the same parties, in more than one federal court. *See EEOC v. University of Pennsylvania,* 850 F.2d 969, 971-72 (3d Cir.1988). As its name implies, the rule generally provides that a later-filed action should be stayed pending the resolution of an earlier filed action, or transferred to the court in which the earlier-filed action is pending. *See Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D.Pa.1991).

*5 While Dippold-Harmon does not dispute that the North Carolina action was filed first, it argues that this rule should not apply to the present case because different parties and different issues are presented in the Delaware and North Carolina actions. The court finds this argument unpersuasive. First, Dippold-Harmon itself aggressively argued that Lowe's and Home Centers should be considered one and the same party for purposes of establishing personal jurisdiction. The court will not now find that Lowe's and Home Centers are different parties for the purposes of the "first-filed" rule. For the reasons stated in Section A. 1, *supra,* the court is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

satisfied that Lowe's and Home Centers are effectively the same party.

Second, with regard to Dippold-Harmon's argument that different issues are presented in the Delaware and North Carolina actions, the court again disagrees. The North Carolina action concerns the breach of a written agreement between Home Centers and Dippold-Harmon. The written agreement provided that Dippold-Harmon would install granite countertops for its customers in a certain fashion. The Delaware action concerns the breach of an alleged oral agreement between Lowe's and Dippold-Harmon. This alleged oral agreement provided that Dippold-Harmon would be the exclusive distributor of those granite countertops. Both actions thus concern different facets of the same business relationship between the parties. Specifically, both actions relate to Dippold-Harmon's status as a fabricator and installer of granite countertops for Lowe's and Home Centers' customers. A decision by the North Carolina court on the validity, or breach, of the written agreement will bear directly on the alleged oral agreement concerning the same type of services. To have two separate trials on these issues would defeat the purposes of the "first-filed" rule, namely sound judicial administration and comity among federal courts of equal rank. *See EEOC*, 850 F.2d at 971. Accordingly, the court finds that the application of this rule weighs heavily in favor of transferring this case to North Carolina.

### 2. Section 1404(a)

Transfer to North Carolina is also mandated under a section 1404(a) analysis. Section 1404(a) provides that "[f]or the convenience of [the] parties and [the] witnesses, in the interest of justice," the court may transfer this action to "any other district where it might have been brought." 28 U.S.C. § 1404(a). The parties agree that this action could have been filed in the Western District of North Carolina as a diversity action. The court will, therefore, move on with the inquiry as directed by the Third Circuit. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995).

In *Jumara*, the Third Circuit provided a list of factors to assist the district courts in determining " whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors include six private and five public interests which the court should consider. *See id.*

#### a. The Private Interests

*6 The private interests most relevant to this case include: (1) the convenience of the parties as indicated by their relative physical and financial position; (2) the convenience of the witnesses, but only to the extent that they may be unavailable for trial in one of the fora; and (3) the location of records and other documents, again, only to the extent these files cannot be produced in the alternate forum.[FN3] *See id.*

> FN3. For the reasons the court discussed in a previous opinion, it will not afford any weight to the first three *Jumara* factors, specifically, the plaintiff's initial choice of forum, the defendant's preferred venue, and whether the claim arose elsewhere. *See Affymetrix, Inc. v. Synteni, Inc.*, 28 F.Supp.2d 192, 197-201 (D.Del.1998). In not affording weight to these factors, the court avoids the risk of double-counting these interests and thereby throwing off the transfer analysis. *See id.* Instead, the court will consider whether the Western District of North Carolina is a more convenient forum for the parties and the witnesses, while also serving the interests of justice. *See* 28 U.S.C. § 1404(a).

#### 1. The Convenience of the Parties

Physically, North Carolina is moderately inconvenient for Dippold-Harmon, which is headquartered in Delaware. Thus, in order to litigate this matter in North Carolina, it must travel several hours. However, modern communication and transportation capabilities make this moderate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 6

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

journey far less burdensome than it would have been at one time. *See Beverly Hills Fan*, 21 F.3d at 1569 (noting that it is not unduly burdensome for a defendant organized under the laws of the People's Republic of China to litigate in Virginia.). Because it is a national distributor of granite and stone kitchen fixtures, Dippold-Harmon is also financially capable of shouldering this burden. As such, it is doubtful that litigating in North Carolina would be an undue financial burden.

Furthermore, transfer to North Carolina would reduce the overall inconvenience to all parties involved. Dippold-Harmon must already travel to North Carolina to defend itself in the first-filed action pending in the Western District of North Carolina. Bringing witnesses and relevant documents to only one location, here North Carolina, minimizes the level of disruption caused to both parties by the litigation. This is certainly a more economical and efficient result than having each party moving witnesses and documents between two states, depending on which of these related actions is being litigated at that time.

### 2. The Convenience of Witnesses

Party witnesses or witnesses who are employed by a party carry no weight in the "balance of convenience " analysis since each party is able, indeed obligated, to procure the attendance of its own employees for trial. *See Affymeytrix*, 28 F.Supp.2d at 203. Expert witnesses or witnesses who are retained by a party to testify carry little weight in determining where the "balance of convenience" lies because they are " usually selected [on the basis] of their reputation and special knowledge without regard to their residences and are presumably well compensated for their attendance, labor and inconvenience, if any. *See id.* (internal citations omitted). Fact witnesses who posses first-hand knowledge of the events giving rise to the lawsuit, however, have traditionally weighed quite heavily in the "balance of convenience" analysis. *See id.*

Dippold-Harmon argues that Lowe's has failed to demonstrate that transfer to North Carolina would be more convenient for potential non-party fact witnesses. The court agrees, and notes that Lowe's' bare allegations of witness inconvenience, without more, are insufficient to tip the balance in its favor. However, all the material witnesses in this dispute, party or otherwise, will be in North Carolina already to litigate the first-filed action. Requiring that they then come to Delaware to litigate this action separately cannot be considered convenient and in the interest of justice. Accordingly, the court finds that this factor also weighs in favor of transferring the action to North Carolina.

### 3. The Location of Records and Other Documents

*7 The technological advances of recent years have significantly reduced the weight of this factor in the "balance of convenience" analysis. *See id.* at 205. Furthermore, the relevant documents will already be in North Carolina for the litigation of the first-filed action. The court thus sees no need to require that Lowe's, Home Centers, and Dippold-Harmon move the same documents from North Carolina to Delaware. Rather, it would be much more efficient to litigate these related actions in one location.

### b. The Public Factors

As other courts have noted, depending on the circumstances of the case, some of the "public interest" factors listed in *Jumara* may play no role in the "balance of convenience." *See id.* at 205. The court thus elects to discuss only the three factors which the parties deem relevant to the pending case.

### 1. Practical Considerations Making Trial Easy, Expeditious, or Inexpensive

This factor appears to substantially repeat the " first-filed" analysis advanced by Lowe's, and accepted by the court, in Section 2 .B, *supra.* As such, the court declines to further address this issue here, since it has already taken this argument into consideration.

### 2. Delaware's Interest in Deciding This Action

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Dippold-Harmon claims that Delware has a far stronger interest in resolving this action since Dippold-Harmon is a Delaware corporation. While the court is mindful of Delaware's interest, that alone will not tip the "balance of convenience" in its favor. This is so because the court can hardly describe the alleged Exclusivity Agreement as a local controversy unique to Delaware. *See Affymetrix,* 28 F.Supp.2d at 207. Instead, this alleged agreement concerns Dippold-Harmon's status as Lowe's' exclusive, national distributor. By its very nature then, the agreement is not local and unique to only Delaware, but rather, affects every state included in the alleged Exclusivity Agreement. Furthermore, the court notes that Dippold-Harmon appears to concede that the alleged Exclusivity Agreement was not formed in Delware and would not be governed by Delaware law. Accordingly, this factor does not weigh in favor of denying Lowe's motion to transfer.

### 3. Collective Travel Time and Cost

The final public interest factor identified by Lowe's concerns the time and cost allegedly associated with the potential witnesses' travel time to Delaware. This factor, however, duplicates other factors necessary to the court's transfer analysis, namely the private factors considering the convenience and availability of witnesses and the location of documents. The court has already rejected these arguments in its earlier discussion of the "private" factors in the "balance of convenience" analysis.

### IV. CONCLUSION

For the foregoing reasons, the court concludes that Lowe's is subject to personal jurisdiction in Delaware, however, the "balance of convenience" tips strongly in favor of transferring this action to the Western District of North Carolina.

*8 For these reasons, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:
1. Lowe's motion to dismiss for lack of personal jurisdiction (D .I. 8) is DENIED, and Lowe's alternative motion to transfer this action to the

Western District of North Carolina (D.I.8) is GRANTED; and
2. The above-captioned matter is hereby TRANSFERRED to the United States District Court for the Western District of North Carolina.

D.Del.,2001.
Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.
Not Reported in F.Supp.2d, 2001 WL 1414868 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit F

Westlaw.

Not Reported in F.Supp.2d                                                                                                      Page 1

Not Reported in F.Supp.2d, 2003 WL 22794987 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
RJF Holdings III, Inc. v. Refractec, Inc.
E.D.Pa.,2003.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
RJF HOLDINGS III, INC.
v.
REFRACTEC, INC.
andKREMER LASER EYE CENTER, INC.
No. Civ.A. 03-1600.

Nov. 24, 2003.

*MEMORANDUM AND ORDER*
SURRICK, J.
*1 Presently before the Court are Defendants'
Motion to Dismiss Or, In the Alternative, To
Transfer or Stay (Doc. No. 4), and Plaintiff's
Motion to Strike Certain Portions of Defendants'
Reply Brief to Plaintiff's Opposition to Defendants'
Motion to Dismiss Or, In the Alternative, To
Transfer or Stay (Doc. No. 9). For the following
reasons, Defendants' Motion will be granted and
Plaintiff's Motion will be denied.

Background

This is a patent infringement action. Plaintiff alleges
that Defendant Refractec, Inc. ("Refractec") a
California company headquartered in California, is
the manufacturer of a device for performing ocular
surgery known as the ViewPoint CK. Refractec sold
ViewPoint CK devices to various doctors, hospitals,
and eye clinics across the country. Defendant
Kremer Laser Eye Surgery, Inc. ("Kremer"), a
company that operates eye surgery centers located
primarily in Pennsylvania, New Jersey, and
Delaware, purchased ViewPoint CK devices, which
it uses to perform eye operations. Plaintiff alleges
that Kremer's use of the ViewPoint CK devices
directly infringes two of its patents: U.S. Patent No.
5,413,574, entitled "Method of Radiosurgery of the

Eye" (the " '574 Patent"), and U.S. Patent No.
5,423,815, entitled "Method of Ocular Refractive
Surgery" (the " '815 Patent"). Plaintiff also alleges
that Refractec is inducing infringement of both
patents through its manufacture and distribution of
the ViewPoint CK devices.

Dr. Richard J. Fugo, a resident of Pennsylvania, is
the inventor of the '574 Patent and '815 Patent. Both
patents were granted to Fugo in 1995. On April 13,
1999, representatives of Fugo sent a letter to
Refractec stating Fugo's belief that Refractec was
infringing Fugo's patents. (Doc. No. 8, Def.'s Reply
to Mot. to Dis. Ex. B.) The letter requested that
Refractec cease and desist. Over the next few years,
Fugo and Refractec attempted to negotiate a
licensing agreement that would give Refractec the
right to use the '815 Patent in exchange for royalty
payments. When they were unable to come to an
agreement, Refractec filed an action in the District
Court for the Central District of California against
the then-owner of the '815 Patent, Fugo, seeking a
declaration that Refractec was not infringing the
'815 Patent (the "California Action").

The California Action was filed on March 6, 2003.
(Doc. No. 4, Def.'s Mot. to Dis. Ex. A.) On March
11, 2003, Fugo transferred ownership of the '574
Patent and '815 Patent to Plaintiff, a holding
company that he apparently created and owns.
(Doc. No. 13, Pl.'s Reply to Mot. to Strike Ex. A &
B.) On March 14, 2003, Plaintiff, a Delaware
company headquartered in Pennsylvania, filed this
action alleging infringement of the '574 Patent and
'815 Patent and seeking declaratory and injunctive
relief, and damages.

On April 3, 2003, after Plaintiff filed this action,
Refractec amended its complaint in the California
Action. In the amended complaint, Kremer joins
Refractec as a plaintiff. Each seeks a declaration
that they are not infringing the '574 Patent and '815
Patent. The amended complaint also names RJF
Holdings III, Inc. ("RJF"), the present owner of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22794987 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

patents, as a defendant.

### Discussion

### I. The First to File Rule

**\*2** Defendants request that we stay, dismiss or transfer this action pursuant to the well-recognized doctrine of federal comity known as the "first-to-file " rule. *See E.E.O.C. v. University of Pa.,* 850 F.2d 969, 971-72 (3d Cir.1988). The question of whether a patent infringement suit, like this one, should yield to a previously filed declaratory action asserting the same patent rights "raises the issue of national uniformity in patent cases," and therefore requires application of Federal Circuit caselaw. *See Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993), *abrogated on other grounds by Wilton v. Seven Falls Co.,* 515 U.S. 277 (1995). The Federal Circuit applies the "general rule whereby the forum of the first-filed case is favored, unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise." *Id.* Exceptions to the general rule are not rare. However, there "must be sound reason that would make it unjust or inefficient to continue the first-filed action. Such reason may be the convenience and availability of witnesses, or absence of jurisdiction over necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest." *Id.* (citing *Kahn v. General Motors Corp.,* 889 F.2d 1078, 1081-83 (Fed.Cir.1989)).

### II. Analysis

Even though the complaint in the California Action did not initially name two of the parties to the present action, the subsequent amendment of that complaint does not affect its status as the first-filed action. "The first-filed rule turns on which court first obtains possession of the subject of the dispute, not the parties of the dispute." *Advanta Corp. v. Visa U.S.A., Inc.,* No. 96-7940, 1997 WL 88906, at \*3 (E.D.Pa. Feb. 19, 1997). *See also Kahn,* 889

F.2d at 1082-83 (applying first-to-file rule even though different parties named in the competing actions); *Whelan v. United Pac. Indus., Inc.,* No. 02-2519, 2002 WL 31513432, at \*2 (E.D.Pa. Nov. 1, 2002) (holding that "[a]lthough plaintiffs argue that the California complaint failed to name the patent owners as parties to the declaratory judgment action, such an easily correctable oversight does not prevent this Court from deferring to the first-filed suit"); *National Foam, Inc. v. Williams Fire & Hazard Control, Inc.,* No. 97-3105, 1997 WL 700496, at \*1-2 (E.D.Pa. Oct. 29, 1997) (applying first-to-file rule even though defendant not named in initial complaint because the defendant "should have known that but for a mistake concerning the identity of the proper party, the initial complaint would have been brought against it") (quotations omitted). Plaintiff does not dispute that the subject of the California Action and this case are the same. [FN1] Accordingly, unless Plaintiff can show that an exception to the first-to-file rule applies, we will defer to the California Action.

> FN1. Indeed, all of Plaintiff's infringement claims are compulsory counterclaims to the claims in the California Action. *See Vivid Techs., Inc. v. American Sci. Eng'g, Inc.,* 200 F.3d 795, 802 (Fed.Cir.1999) (" [I]t is generally recognized that when the same patent is at issue in an action for declaration of non-infringement, a counterclaim for patent infringement is compulsory and if not made is deemed waived.").

**\*3** In arguing that an exception to the first-to-file rule applies, Plaintiff principally relies on *Serco Services Co. v. Kelley Co.,* 51 F.3d 1037 (Fed.Cir.1995). In *Serco,* Kelley Company, Inc. (" Kelley"), sent Serco Services Company, Inc. ("Serco "), a letter asserting that Serco was infringing Kelley's patent. The letter demanded a reply and threatened legal action. Serco failed to reply, but Kelley did not file a patent infringement action. Several months later, Kelley sent Serco a second letter, dated September 8, 1993, demanding that Serco respond by September 20 or face a patent infringement suit. On September 20, Serco

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22794987 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

responded by letter denying Kelley's infringement claims. Meanwhile, on September 17, Serco had filed an action in the District Court for the Northern District of Texas seeking a declaration that it was not infringing Kelley's patent. On September 20, Kelley filed a patent infringement suit against Serco in the District Court for the Eastern District of Wisconsin. Kelley later filed a motion in the federal court in Texas to dismiss the Texas declaratory action, arguing that the Texas action was filed in anticipation of Kelley's infringement action, and that convenience factors favored litigating the parties' dispute in Wisconsin. The court agreed and dismissed the Texas action.

On appeal, the Federal Circuit ruled that the district court had not abused its discretion in dismissing the Texas action. The court noted the general rule that the first-filed action is normally preferred. *Serco,* 51 F.3d at 1039. In *Serco,* however, two factors supported dismissing the first-filed suit. First, the district court's determination that the Texas action was anticipatory was a factor weighing in favor of its dismissal, even though the impact of forum shopping in patent cases has been tempered by the creation of the Court of Appeals for the Federal Circuit. *Id.* at 1040. Independently, however, the Federal Circuit found that the presence of convenience factors favoring the Wisconsin action was "sound reason" to dismiss the first-filed Texas action. The court noted that all of Kelley's witnesses were located in Wisconsin, while Serco's witnesses were scattered throughout the country. Also, while some of Serco's documents were located at its Canadian headquarters, all of Kelley's documents were located in Wisconsin. The presence of these convenience factors supported the court's decision to dismiss the first-filed Texas action. *Id.*

The circumstances in this case differ from those in *Serco* in several respects. First of all, the California Action is not anticipatory in the same sense that the Texas action was anticipatory in *Serco.* In that case, Serco filed the Texas action knowing that a patent infringement action against it by Kelley was imminent. Thus, Serco engaged in forum shopping, a fact that was properly considered by the district court as a factor weighing in favor of dismissing the Texas action.

*4 In this case, we cannot conclude that Refractec engaged in forum shopping. Plaintiff has presented no evidence to suggest that Refractec knew that a patent infringement action by Plaintiff was imminent at the time Refractec filed the California Action. To the contrary, Plaintiff argues in its opposition brief that "[a]t the time Refractec filed the California Action (i.e., March 6, 2003), it was not in reasonable apprehension of [a patent infringement] suit from Dr. Fugo or RJF." [FN2] (Doc. No. 7, Pl.'s Opp. to Mot. to Dis. at 17.) Thus, we cannot conclude that the California Action was anticipatory.

> FN2. Plaintiff makes this statement in support of its argument that the California Court lacks subject matter jurisdiction over the California Action, a topic on which we express no opinion.

This case is also different from *Serco* in that convenience factors do not favor litigating this dispute in Pennsylvania. If anything, convenience factors favor litigating this dispute in California. California is the location of the allegedly infringing manufacturer, Refractec, as well as the documents, manufacturing equipment, and witnesses responsible for the design, manufacture, and sale of the allegedly infringing product, the ViewPoint CK device. (Def.'s Mot. to Dis., Decl. of Peter T. Christensen ¶¶ 2, 4.) Plaintiff argues that convenience factors favor Pennsylvania because the doctors working for Kremer are located there and the doctors' testimony will be crucial in establishing direct infringement of Plaintiff's patents.[FN3] However, Defendants point out that the manner in which the ViewPoint CK devices are utilized for surgery is carefully prescribed in instructions and materials developed and distributed by Refractec, and that all of these materials emanate from Refractec's California headquarters. (Def.'s Reply to Mot. to Dis., Decl. of Mitch Campbell ¶ 5.) In sum, while Pennsylvania may be *a* convenient forum for this dispute, it is not clear to us that it is more convenient than California. We will not defer to a later-filed action when to do so "merely serves to shift inconveniences from one party to another." *Kahn,* 889 F.2d at 1083 (quoting *Weight Watchers*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 4

Not Reported in F.Supp.2d, 2003 WL 22794987 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Int'l v. The Stouffer Corp.,* No. 88-7062, 1989 WL
73292, at *4 (S.D.N.Y. June 28, 1989)).

> FN3. This is because Plaintiff claims the
> use of the ViewPoint CK devices directly
> infringes its patents, rather than the
> manufacture of the devices.

Finally, Plaintiff argues that Pennsylvania is a more
appropriate forum for this dispute because the
California court lacks both personal jurisdiction
over RJF, and subject matter jurisdiction over the
Defendants' declaratory judgment action. Our
review of the docket in the California Action
reveals that the defendants there have not answered
or otherwise responded to the complaint. Objections
to the jurisdiction of the California court should be
presented to and decided by that court. *See
Peregrine Corp. v. Peregrine Indus., Inc.,* 769
F.Supp. 169, 173 (E.D.Pa.1991); *Enzo Biochem,
Inc. v. Calgene, Inc.,* No. 93-110-JJF, 1993 WL
266515, at *2 (D.Del. May 18, 1993). If it turns out
that the California court lacks jurisdiction over a
necessary party or the subject matter of that action,
then we may reconsider our decision to stay this
action. Until that determination is made, we
conclude that this matter should be stayed.[FN4] An
appropriate order follows.

> FN4. Though Plaintiff moved to strike
> certain portions of Defendants' reply brief,
> the objected to portions were not necessary
> or considered for this decision.
> Accordingly, Plaintiff's motion to strike is
> denied as moot.

### ORDER

*5 AND NOW, this 24th day of November, 2003,
upon consideration of Defendants' Motion to
Dismiss Or, In the Alternative, To Transfer or Stay
(Doc. No. 4), and Plaintiff's Motion to Strike
Certain Portions of Defendants' Reply Brief to
Plaintiff's Opposition to Defendants' Motion to
Dismiss Or, In the Alternative, To Transfer or Stay
(Doc. No. 9), and all papers filed in support thereof
and in opposition thereto it is ORDERED as

follows:

1. Defendants' Motion to Stay is GRANTED. This
case shall be STAYED and placed on the Civil
Suspense Docket until further order of the Court.

2. Plaintiff's Motion to Strike is DENIED as MOOT.

IT IS SO ORDERED.

E.D.Pa.,2003.
RJF Holdings III, Inc. v. Refractec, Inc.
Not Reported in F.Supp.2d, 2003 WL 22794987
(E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.