# EXHIBIT 1

Westlaw. 

36 EBC 2648                                                                    Page 1

Not Reported in F.Supp.2d, 2006 WL 148898 (S.D.Tex.), 36 Employee Benefits Cas. 2648

**(Cite as: 36 Employee Benefits Cas. 2648)**


**H**

IN RE: RELIANT ENERGY ERISA LITIGATION. This Document Relates To All Actions.

v.

PENSION BENEFIT GUARANTY CORP., Appellee and Cross-Appellant.

**No. H-02-2051**

U.S. District Court, Southern District of Texas

January 18, 2006


BNA CASE HISTORY

On an employer and its defined contribution pension plan fiduciaries' motion for
summary judgment in a lawsuit by plan participants who allege the employer and the
fiduciaries breached their ERISA fiduciary duties by failing to remove the
employer's stock as an investment option and by making misrepresentations in Form
S-8 filed with the SEC. Motion granted.

BNA Labor Relations Reporter Headnote - EBC Cases

ERISA -- PROTECTION OF RIGHTS

1 Fiduciary Responsibility -- Fiduciary Duties -- In General
(C20.2070)
S.D.Tex., 2006

   Fiduciaries of employer's defined contribution pension plan did not breach their
ERISA fiduciary duties by failing to remove employer's stock as investment option,
since plan requires that employer stock be investment option given that plan
states that investment options could be added or deleted "with exception of"
employer's stock fund, and thus fiduciaries had no discretion whether to offer
employer stock as investment option and fiduciaries had duty to enforce plan in
accordance with its terms.

In re Reliant Energy ERISA Litigation
36 EBC 2648

BNA Labor Relations Reporter Headnote - EBC Cases

ERISA -- PROTECTION OF RIGHTS

2 Reporting and Disclosure -- Filing Requirements -- In General

BNA Labor Relations Reporter Headnote - EBC Cases

SECURITIES LAWS Enforcement -- Registration and Disclosure

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 148898 (S.D.Tex.), 36 Employee Benefits Cas. 2648

**(Cite as: 36 Employee Benefits Cas. 2648)**

(C254.02)
S.D.Tex., 2006

   Employer did not breach its ERISA fiduciary duties by allegedly making
misrepresentations in Form S-8 it filed with Securities and Exchange Commission,
where Form S-8 is registration statement that SEC requires to be filed by
employers that offer their company stock to employees under employee benefit plan,
since Form S-8 was filed by employer in its corporate capacity, not in its ERISA
fiduciary capacity.

In re Reliant Energy ERISA Litigation
36 EBC 2648

Amanda Frances Bell and Brant C. Martin, of Puls Taylor, of Fort Worth, Texas;
John G. Emerson and Scott E. Poynter, of Emerson Poynter, of Little Rock, Ark.;
Robert A. Izard and Eric L. Palmquest, of Schatz & Nobel, of Hartford, Conn.; and
Paul Paradis, of Abbey Gardy, of New York, N.Y., attorneys for the participants.

James Edward Maloney, of Baker Botts, of Houston, Texas, and Lawrence H. Hunt Jr.,
of Sidley Austin, of Chicago, Ill., attorneys for Reliant Energy Inc., et al.

                              Full Text of Opinion

ATLAS, District Judge.

   This Employee Retirement Income Security Act ("ERISA") case is before the Court
on the Motion for Summary Judgment Doc. # 153 filed by Defendants CenterPoint
Energy, Inc. (formerly known as Reliant Energy, Incorporated) ("REI"), and the
individual members of the REI Savings Plan Benefits Committee ("Benefits
Committee"). Also pending is Plaintiffs'Motion for Partial Summary Judgment Doc. #
149 . The Court has reviewed the thorough briefing by the parties, the full record
including the REI Savings Plan documents, and the relevant legal authorities.
Based on this review and its consideration of the arguments presented by counsel
at the hearing on December 1, 2005, the Court grantsDefendants' Motion and
deniesPlaintiffs' Motion.

                     I. FACTUAL AND PROCEDURAL BACKGROUND [FN1]

      FN[FN1]. Additional factual background is set forth in the Court's
      Memorandum and Order entered January 30, 2004 ("January 2004 Opinion") Doc.
      # 96 .

   Plaintiffs are current and former REI employees who are participants in the REI
Savings Plan. The REI Savings Plan offered participants the opportunity to
contribute up to 16% of their compensation in pre-tax 401(k) contributions and/or
after-tax contributions. The REI Plan offered a number of investment options in
which to invest their contributions. One investment option under the REI Plan was
the Reliant Energy Common Stock Fund (the "REI Stock Fund") which is comprised of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 148898 (S.D.Tex.), 36 Employee Benefits Cas. 2648

**(Cite as: 36 Employee Benefits Cas. 2648)**

REI common stock and a minimal amount of cash.

 The REI Plan also contained an Employee Stock Ownership Plan ("ESOP"). Under the ESOP, the company matched between a minimum of 75% and a maximum of 125% of the first 6% of a participant's contributions to the REI Plan. The matching contributions were paid in REI stock from the ESOP, and were allocated to the REI Stock Fund. The terms of the REI Savings Plan will be discussed in more detail later in this Memorandum and Order.

 In the January 2004 Memorandum and Order, the Court granted in part and denied in part Defendants' Motion to Dismiss. The moving Defendants are the only remaining Defendants in the case.

 In a Memorandum and Order entered August 18, 2005 Doc. # 182 , the Court certified a class of plaintiffs consisting of:

 All participants in the REI Savings Plan, as amended and restated April 1, 1999, for whose individual accounts the Plan purchased and/or held shares of Reliant Energy Common Stock Fund during the period from August 2, 1999 through May 16, 2002. Notice has been given to the potential class members.

 Plaintiffs allege that the REI common stock was an imprudent investment, based both on public information and non-public information, [FN2] and that Defendants violated their fiduciary *2650 duties under ERISA by continuing to offer REI stock (through the REI Stock Fund) as an investment option in their employees' defined contribution plans, despite REI stock being an imprudent investment.

>      FN[FN2]. The non-public information to which Plaintiff refers are the
>      widely-publicized "round-trip trades" executed by several energy traders
>      during the 1999-2001 time frame. These round-trip trades were simultaneous
>      purchases and sales of power or natural gas of the same volume with the same
>      counterparty at the same price at the same delivery point. Plaintiffs allege
>      that these transactions had the effect of artificially increasing revenues
>      and trading volumes.

 Following an adequate time for discovery, Defendants moved for summary judgment and Plaintiffs moved for partial summary judgment. The motions have been fully briefed and are now ripe for decision.

## II. ANALYSIS

### A. Summary Judgment Standard

 Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharmaceuticals Corp. , 283 F.3d 254, 263 (5th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 148898 (S.D.Tex.), 36 Employee Benefits Cas. 2648

**(Cite as: 36 Employee Benefits Cas. 2648)**

Cir.), cert. denied, 537 U.S. 824 (2002) (quoting Celotex Corp. v. Catrett , 477 U.S. 317, 322 (1986)). In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex, 477 U.S. at 322-23; Hart v. Hairston , 343 F.3d 762, 764 (5th Cir. 2003).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. Freeman v. Texas Dept. of Crim. Justice , 369 F.3d 854, 860 (5th Cir. 2004). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." Smith v. Brenoettsy , 158 F.3d 908, 911 (5th Cir. 1998) . If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. Littlefield v. Forney Indep. Sch. Dist. , 268 F.3d 275, 282 (5th Cir. 2001) (quoting Tubacex, Inc. v. M/V Risan , 45 F.3d 951, 954 (5th Cir. 1998)).

### B. Counts I and II

1 In Counts I and II, Plaintiffs allege that Defendants breached their fiduciary duty by offering the REI Stock Fund as an investment option when they knew or should have known that REI stock was an imprudent investment. Count I involves information that was publicly available, while Count II relates to non-public information. Defendants argue that they did not have a fiduciary duty to remove the REI Stock Fund as an investment option or, alternatively, that their failure to remove the REI Stock Fund as an option did not breach any fiduciary duty they may have owed to Plaintiffs.

Plaintiffs asserting a breach of fiduciary duty claim under ERISA must first show that Defendants had a fiduciary duty with respect to the challenged conduct. See Pegram v. Herdrich , 530 U.S. 211, 216 24 EBC 1641 (2000). A person is a fiduciary and has a fiduciary duty only with respect to those duties under the plan for which he has discretionary authority or control. See Bannistor v. Ullman , 287 F.3d 394, 401 27 EBC 2249 (5th Cir. 2002); 29 U.S.C. § 1002(21)(A).

The REI Savings Plan is a profit-sharing plan and an employee stock ownership plan. SeeREI Savings Plan, Exh. A to Defendants' Motion, ¶ 1.37. The stated express purpose of the REI Savings Plan is "to invest substantial sums in Company Stock for the benefit of the Participants in the Plan." Id., ¶ 5.6. Consistent with Fifth Circuit authority, the REI Savings Plan provides that REI and the Benefits Committee are fiduciaries of the Plan "only with respect to the specific responsibilities of each as described" in the Plan. Id., ¶ 1.26.

The REI Savings Plan requires that the REI Stock Fund be an investment option, stating specifically that investment funds could be added or deleted "with the exception of the REI Stock Fund ." SeeREI Savings Plan, Attachment A, p. 2.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 148898 (S.D.Tex.), 36 Employee Benefits Cas. 2648

**(Cite as: 36 Employee Benefits Cas. 2648)**


Amounts in a Participant's Employer Matching Account, ESOP Account, or Prior Plan
1999 Matching Account cannot be invested in any investment fund other than *2651
the REI Stock Fund. SeeREI Savings Plan, ¶ 8.1. The contributions to the REI Stock
Fund are required to be "primarily invested and reinvested" in REI stock. SeeREI
Savings Plan, Attachment A, p.1. The Plan's Statement of Investment Policy permits
a cash reserve in the REI Stock Fund not to exceed 1.25% of the total value of
that fund. SeeStatement of Investment Policy, Exh. K to Defendants' Motion, p. 2.
The target allocation of company stock in the REI Stock Fund, however, is 100%.
Id.at 3.

 In this case, the Benefits Committee members had no discretion whether to offer
the REI Stock Fund as an investment option. The Benefits Committee is required to
"enforce th e Plan in accordance with its terms" and may make rules and
regulations only to the extent they are "not inconsistent with the terms set
forth" in the Plan. SeeREI Savings Plan, ¶ 2.7. They warranted that any actions
they took would be "in accordance with the provisions of the Plan." Id., ¶ 2.13.
And, as set forth above, the Benefits Committee can delete any of the investment
options except forthe REI Stock Fund, and the Plan requires certain employer
matching and other funds to be invested in the REI Stock Fund. The Benefits
Committee had no discretion to do otherwise and, therefore, they did not have a
fiduciary duty to delete the REI Stock Fund as an investment option or to invest
employer matching funds anywhere other than the REI Stock Fund.

 The REI Savings Plan does permit REI to amend or terminate the Plan. [FN3]
Terminating the Plan or amending it to eliminate the REI Stock Fund, however,
would be entirely inconsistent with the Plan's stated purpose of investing
substantial sums in REI stock. REI's decisions made in connection with designing
the Plan itself, including decisions whether and how to amend or terminate the
Plan, do not implicate ERISA fiduciary duties. See Hughes Aircraft Co. v. Jacobson
, 525 U.S. 432, 443-44 22 EBC 2265 (1999). [FN4] Indeed, Plaintiffs do not argue
to the contrary.

> FN[FN3]. Plaintiffs are clear that it is not their position that Defendants
> should have amended or terminated the REI Savings Plan. Instead, Plaintiffs
> argue that Defendants had a duty to "override" the terms of the Plan. As
> discussed above, however, Defendants had no discretion to "override" the
> terms of the REI Savings Plan.

> FN[FN4]. In Hughes Aircraft, the employer amended its defined benefit plan
> to provide an early retirement option and to create a new, noncontributory
> benefit structure for new participants. Hughes Aircraft, 525 U.S. at 436.
> The District Court had dismissed Plaintiffs' complaint, which included a
> breach of fiduciary duty claim. The Ninth Circuit reversed, and the United
> States Supreme Court reversed the Court of Appeals, holding that the
> employer's decision to amend the plan did not implicate ERISA fiduciary
> duties. Id.at 443-44.

Because the REI Savings Plan was originally designed to require the REI Stock

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 148898 (S.D.Tex.), 36 Employee Benefits Cas. 2648

**(Cite as: 36 Employee Benefits Cas. 2648)**

Fund to be offered as an investment option and to require employer matching funds be invested in that fund, REI and its Benefits Committee had no discretion, and therefore no fiduciary duty, to act otherwise. Defendants are entitled to summary judgment on Counts I and II.

### C. Count III

2 In Count III, Plaintiffs allege that REI breached its fiduciary duty by negligently making misrepresentations in the REI filings with the Securities and Exchange Commission ("SEC"), which were incorporated by reference into the Form S-8 provided to Plan participants. Defendants argue that the SEC filings were made only in REI's corporate capacity, not in its fiduciary capacity.

Only those communications made in a fiduciary capacity are actionable under ERISA. See Varity Corp. v. Howe , 516 U.S. 489, 502 19 EBC 2761 (1996). A communication is fiduciary in nature only if it is made in connection with the "management" or "administration" of an ERISA plan. See id.; In re Tyco International, Ltd. , 2004 WL 2903889, * 6 34 EBC 1577 (D.N.H. Dec. 2, 2004).

The Form S-8 is a registration statement which the SEC requires be filed by employers that offer their company stock to employees under an employee benefit plan. See17 C.F.R. § 239.16(b)(a). The employer has no discretion whether to file the Form S-8 if it offers company stock under an ERISA plan. See15 U.S.C. § 77e(a)(1). Unless the SEC filings, including the Form S-8, are disseminated to the plan participants "in a way that was meaningfully related to the Plan itself, the mere fact that the employer filed such documents is not enough to establish ERISA liability." In re Calpine Corp. ERISA Litigation , 2005 WL 3288469, * 10 35 EBC 1181 (N.D. Cal. 2005).*2652

In this case, there is no evidence that REI took any action other than that required by the SEC for issuers of stock. REI did not incorporate the SEC filings in the Summary Plan Description ("SPD"). REI did not encourage plan participants to read the SEC filings or to rely on them in making any investment decisions. Cf. In re Dynegy, Inc. ERISA Litigation, 309 F.Supp.2d 861, 880 32 EBC 1999 (S.D. Tex. 2004) (holding that defendants' decision to encourage plan participants to review SEC filings represented a "voluntary exercise of their discretionary authority to communicate with plan participants"). There is no evidence that REI issued press releases regarding the SEC filings and the information therein. Cf. Gee v. UnumProvident Corp. , 2005 WL 534873, * 16 (E.D. Tenn. Jan. 13, 2005).

In this case, REI--as the issuer of stock to be provided to employees under an employee benefit plan--complied with the SEC requirement that it file a Form S-8. REI was not acting in connection with the management or administration of the REI Savings Plan and, therefore, was acting solely as the issuer of stock rather than in a fiduciary capacity. Although the Plan and its participants "plainly had the right to expect that REI would refrain from making material misstatements in its SEC filings," where, as here, the corporation does nothing more than comply with SEC filing requirements, "that expectation must be enforced under the securities

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 148898 (S.D.Tex.), 36 Employee Benefits Cas. 2648

**(Cite as: 36 Employee Benefits Cas. 2648)**

law rather than ERISA." See Tyco, 2004 WL 2903889, * 6. Defendants are entitled to summary judgment on Count III, without prejudice to the securities fraud litigation which is currently pending in this judicial district.

### III. CONCLUSION AND ORDER

For the reasons discussed above, Defendants are entitled to summary judgment on each count in Plaintiffs' complaint. Defendants do not have a fiduciary duty for areas in which they do not have any discretion. Plaintiffs' claim regarding the alleged misrepresentations in Reliant's SEC filings are not properly the subject of this ERISA case and, instead, are to be resolved in the securities fraud litigation currently pending before another judge in this district. [FN5] Accordingly, it is hereby

> FN[FN5]. The parties submitted thorough and extensive briefing of other issues, such as whether Plaintiffs have standing to assert the misrepresentation claim in Count III and whether there are any presumptions or varying standards for Plaintiffs' breach of fiduciary duty claims in Counts I and II. Based on the Court's ruling as set forth in this Memorandum and Order, those issues need not be addressed.

ORDEREDthat Defendants' Motion for Summary Judgment Doc. # 153 is GRANTEDand Plaintiffs' Motion for Partial Summary Judgment Doc. # 149 is DENIED. The Court will issue a separate Final Judgment.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw. 

38 EBC 1867                                                                      Page 1

Not Reported in F.Supp.2d, 2006 WL 1320031 (D.N.J.), 64 Fed.R.Serv.3d 570, 38
Employee Benefits Cas. 1867

(Cite as: 38 Employee Benefits Cas. 1867)

ZEV AND LINDA WACHTEL, et al.
v.
GUARDIAN LIFE INS. CO., et al. RENEE MCCOY, individually and on behalf of all
others similarly situated v. HEALTH NET, INC., HEALTH NET OF THE NORTHEAST,
INC., and HEALTH NET OF NEW JERSEY, INC.
Nos. 01-4183 and 03-1801
U.S. District Court, District of New Jersey
May 11, 2006

BNA CASE HISTORY
On a health plan administrator's objection to a special master's ruling that the
administrator's documents it prepared regarding allegedly outdated usual,
customary, and reasonable data were not subject to the attorney-client privilege,
and on the administrator's motion for summary judgment in plan participants'
action alleging the administrator breached its ERISA fiduciary duties by using
outdated UCR data. Motions denied. See also 34 EBC 1215, 223 FRD 196 (2004) and 38
EBC 1161 (2006).

BNA Labor Relations Reporter Headnote - EBC Cases

ERISA -- PROTECTION OF RIGHTS

1 Fiduciary Responsibility -- Fiduciary Duties -- In General
(C40.1050)
D.N.J., 2006

   Attorney-client privilege does not protect from discovery documents prepared by
health plan administrator regarding allegedly outdated usual, customary, and
reasonable data used when calculating health plan participants' copayments for
out-of-network services, where fiduciary exception excludes from protections of
attorney-client privilege communications between fiduciary and its attorneys
regarding fiduciary matters, and where administrator argues fiduciary exception
does not apply in context of ERISA, since, although U.S. Court of Appeals for
Third Circuit has not yet addressed whether fiduciary exception applies in context
of ERISA, other circuit courts have uniformly recognized existence of fiduciary
exception in variety of settings, including in ERISA cases, and since participants
need not show "good cause" before fiduciary exception can be invoked in that ERISA
fiduciaries directly and exclusively serve interests of participants, and because
fiduciaries are obligated to provide participants with information regarding plan
administration, there is no need to impose on ERISA participants additional "good
cause"requirement before allowing disclosure under fiduciary exception.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

38 EBC 1867                                                          Page 2

Not Reported in F.Supp.2d, 2006 WL 1320031 (D.N.J.), 64 Fed.R.Serv.3d 570, 38
Employee Benefits Cas. 1867

**(Cite as: 38 Employee Benefits Cas. 1867)**

Wachtel v. Guardian Life Insurance Co.
38 EBC 1867

BNA Labor Relations Reporter Headnote - EBC Cases

ERISA -- PROTECTION OF RIGHTS

2 Fiduciary Responsibility -- Fiduciary Duties -- In General
(C40.1050)
D.N.J., 2006

   Health plan administrator must disclose to plan participants documents it
prepared regarding allegedly outdated usual, customary, and reasonable data used
when calculating participants' copayments for out-of-network services, where
administrator argues that selection of outdated UCR data was not fiduciary
function and thus it is not subject to fiduciary exception to attorney-client
privilege and such documents are protected from discovery, since decision of how
to manipulate and apply UCR data in paying claims is not part of setting plan
terms but rather process of administering plan, and since administrator did not
engage in "plan design via amendment" when it selected UCR data to use for claims
determinations.

Wachtel v. Guardian Life Insurance Co.
38 EBC 1867

Barry M. Epstein and Barbara G. Quackenbos, of Sills Cummis Epstein & Gross, of
Newark, N.J., attorney for Wachtel, et al.

Heather V. Taylor, of McCarter & English, of Newark, N.J.; John J. Gibbons and
Kevin McNulty, of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, of Newark,
N.J.; and Robert Alan White, of Morgan, Lewis & Bockius, of Princeton, N.J.,
attorneys for Health Net Inc., et al.

                        Full Text of Opinion

HOCHBERG, District Judge. *1868

 Plaintiff-beneficiaries have sued their health care insurance providers under
ERISA 29 U.S.C. § 1001 et seq. for breach of fiduciary duty and other wrongs
connected to the way in which Health Net [FN1] reimburses out-of-network claims.

        FN[FN1]. As used in this Opinion, "Health Net" or "Defendants" refers
        collectively to Health Net, Inc., Health Net of the Northeast, Inc. (HNNE)
        and Health Net of New Jersey, Inc. (HNNJ).

 This opinion calls upon the Court to decide the Defendants' objections to the
Special Master's rulings on privilege, including the fiduciary exception thereto,

        © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

38 EBC 1867                                                                    Page 3

Not Reported in F.Supp.2d, 2006 WL 1320031 (D.N.J.), 64 Fed.R.Serv.3d 570, 38
Employee Benefits Cas. 1867

(Cite as: 38 Employee Benefits Cas. 1867)

and to decide the corollary issue in Defendant Health Net Inc.'s motion for
summary judgment claiming that it is not an ERISA fiduciary. In their appeal of
the Special Master, the Health Net Defendants challenge a series of findings
regarding documents they have claimed are protected from production by either
attorney-client or work product privilege. In particular, Defendants object to the
Special Master's conclusion that a fiduciary exception to the attorney-client
privilege applies to Defendants' claims of privilege. In its summary judgment
motion, Health Net, Inc. claims that it is not a fiduciary under ERISA for health
benefit plans administered by its subsidiaries.

I. Defendant's Objections to Special Master's Report and Recommendation

A. Factual and Procedural Background

The Special Master has reviewed 11 of the initial 13 logs produced by Defendants
in this litigation. [FN2] Defendants claim that over 4,000 of the documents listed
in their first 11 logs are protected from disclosure to Plaintiffs by the
attorney-client privilege and work product doctrines. On June 24, 2005, the Court
appointed a Special Master in this case for the purpose of "considering all claims
of privilege and work product protection that have been asserted over documents
listed on defendants' privilege log and for such other matters as the Court may
refer to the Special Master." The June 24, 2005 Order directed that the Special
Master "shall make findings of fact and conclusions of law with respect to the
matters presented by the parties and shall report same to the United States
District Judge."

> FN[FN2]. Defendants have also produced 6 additional logs, numbered 14- 19,
> since the conclusion of this Court's Rule 37/Integrity hearing on February
> 28, 2006.

The Special Master asked the parties to address the threshold issue of whether
Defendants' claims of privilege and work product protection could be pierced by
the fiduciary exception. After considering the parties' briefs on the applicable
legal standards, the Special Master issued an Interim Opinion and Order on August
1, 2005 (the "Interim Opinion") concluding that: (1) the fiduciary exception,
which excludes from the protection of the attorney-client privilege those
communications between a fiduciary and its attorneys relating to fiduciary
matters, is a recognized doctrine that applies in this case; (2) Plaintiffs bear
the burden to demonstrate the applicability of the fiduciary exception; (3)
Plaintiffs are not required to satisfy an additional "good cause" requirement; (4)
Plaintiffs have established the applicability of the fiduciary exception; (5)
Defendants' documents exclusively pertaining to the establishment, amendment,
modification or termination of their ERISA plans are immune from the fiduciary
exception (i.e. they fall within the "settlor function exception" to the fiduciary
exception); and (6) Defendants' documents that pertain solely to their civil or
criminal liability are likewise immune from the fiduciary exception (i.e. they
fall within the "liability exception" to the fiduciary exception).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1320031 (D.N.J.), 64 Fed.R.Serv.3d 570, 38
Employee Benefits Cas. 1867

(Cite as: 38 Employee Benefits Cas. 1867)


   The parties submitted additional briefing, following the Interim Opinion, in
order to further clarify their positions on how the privileges and exceptions
should be applied to the facts of this case and to the specific communications
presented to the Special Master for in camerareview. Plaintiffs argued that
communications between the Defendants and their attorneys about members' benefits
determinations were fiduciary in nature and thus subject to disclosure under the
fiduciary exception. Plaintiffs' major claim in this litigation is that
Defendants, in violation of N.J.S.A. § 11:21-17.13, [FN3] and as an undisclosed
misrepresentation to beneficiaries of large group plans, selected outdated data to
determine Usual and Customary ("UCR") charges, resulting in beneficiaries
absorbing a higher cost for medical *1869 treatment and/or services. [FN4]
Plaintiffs argued that Defendants function as fiduciaries when they decide which
UCR data to use, and "how and when to apply the databases, what versions, what
percentiles, what exceptions will apply and whether other reductions will be made
in combination or in lieu of the database," and thus such communications should
fall within the fiduciary exception and be produced.

        FN[FN3]. The State of New Jersey requires that "carriers . . . update their
        databases within 60 days after receipt of periodic UCR updates released by
        the Prevailing Healthcare Charges Systems." N.J.S.A. § 11:21- 17.13.

        FN[FN4]. Questions about Defendants' use of outdated data, including when it
        began, who within the company new about it and when they knew, have played a
        central role in this Court's Rule 37/Integrity hearing into alleged
        discovery abuses and misrepresentations to the Court. After an inquiry by
        the New Jersey Department of Banking and Insurance ("NJDOBI") in 2002,
        Defendants admitted that they used 1998 data to determine UCR charges
        between July 2001 and October 2002. On December 27, 2002, Defendants entered
        a consent agreement with NJDOBI to refund Health Net members for the
        overpayments that resulted from the "rollback" period. In November 2003,
        Defendants notified the Court that their use of outdated data extended back
        further than originally disclosed, to January 1999, and informed the Court
        that they would complete a "second restitution" to reimburse members for
        these additional overpayments. Over a year later, in January of 2005,
        Defendants admitted that the second restitution did not occur. Based on
        these and other facts, this Court has found a prima facie showing that
        review of Defendants' purportedly privileged documents may reveal that
        Health Net used its attorneys in furtherance of a crime or fraud. SeeMay 5,
        2006 Opinion and Order, 2006 U.S. Dist. LEXIS 27117.

   The Special Master considered the additional briefing and instituted the
following analytical framework for his review of the documents. First, he found
that Plaintiffs had waived the right to challenge the fiduciary exception as
applied to documents withheld pursuant to the work product doctrine; thus where
the work product doctrine was properly asserted, the Special Master recommended
that such communications not be produced. Next, if the attorney-client privilege
was asserted as to a particular communication (and the work product doctrine did

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1320031 (D.N.J.), 64 Fed.R.Serv.3d 570, 38
Employee Benefits Cas. 1867

**(Cite as: 38 Employee Benefits Cas. 1867)**

not apply) the Special Master reviewed the communication to determine whether the
claim of privilege was proper. If the communication did not meet the requirements
of the attorney-client privilege, the Special Master recommended it be produced.

If the attorney-client privilege did apply, the Special Master next reviewed the
communication to determine if the fiduciary exception would apply. If the
fiduciary exception did not apply, the communication was immune from production
because there was no reason to pierce the proper invocation of the attorney-client
privilege. Where the Special Master determined that the fiduciary exception did
apply to a communication, he continued his in camera inspection to determine if the
communication was protected from disclosure under either the settlor and/or the
liability exceptions. Documents relating to wholesale changes to plan design were
generally deemed to fall within the settlor exception and were protected from
disclosure. Likewise, communications exclusively pertaining to settlement and/or
consent orders entered into between Defendants and governmental and/or regulatory
agencies, as well as Defendants' responses to discovery requests in this
litigation, were deemed to fall within the liability exception and were
consequently exempt from disclosure. Documents that were generally not protected
from disclosure under either exception included those regarding UCR data used for
reimbursement and other management issues related to an inquiry or investigation
of the propriety of using old UCR data, documents referring to Defendants'
lobbying efforts or responding to compliance issues, and those that pertained to
inquiries or investigations by governmental or regulatory agencies.

Where the Special Master determined that neither the settlor nor liability
exception applied to a particular fiduciary communication, he recommended that it
be produced because there was no bar to the fiduciary exception piercing the
attorney-client privilege.

The Special Master reviewed 3,060 documents in 10 privilege logs. He reported his
findings to the Court in his October 18, 2005 Report and Recommendation ("R&R")
and attached several voluminous charts detailing his analysis of each document
reviewed in camera.

On November 3, 2005, several weeks after the Special Master filed his R&R,
Defendants produced an additional privilege log ("Log 11") containing 953
privilege entries. On November 7th, Magistrate Judge Shwartz ordered the Special
Master to conduct an expedited review of certain entries from the new log before
this Court resumed its Rule 37/Integrity hearing on November 15, and asked the
Special Master to complete his full review of Log 11 by December 20, 2005. The
Special Master completed his initial review on November *1870 14th and his entire
review on December 13, 2005, consistent with the framework and protocols outlined
above. Defendants filed timely objections to all three of the Special Master's
reports and this Court has consolidated the objections for review. [FN5]

> FN[FN5]. Defendants filed two additional privilege logs after the Special
> Master completed his supplemental review of Log 11. Privilege Log 13 was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw. 

36 EBC 2160                                                                    Page 1

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

**(Cite as: 36 Employee Benefits Cas. 2160)**

**H**

AQUANETTE HAMPTON
v.
HENRY FORD HEALTH SYS., et al.
**No. 04-CV-70221-DT**
U.S. District Court, Eastern District of Michigan
September 15, 2005

BNA CASE HISTORY

On cross-motions for summary judgment in a pension plan participant's action
alleging the plan administrator wrongfully denied her benefits and breach its
fiduciary duty by using the prior year's interest rate in calculating the balance
of her annuity account. Administrator's motion granted; participant's motion
denied.

BNA Labor Relations Reporter Headnote - EBC Cases

ERISA -- PROTECTION OF RIGHTS

1 Administration and Enforcement -- Action for Benefits -- Pension or Profit
Sharing Benefits
(C40.5003)
E.D.Mich., 2005

   Pension plan administrator did not act arbitrarily in calculating plan
participant's annuity by using prior year's interest rate pursuant to plan's
"lookback month" requirement, where plan was merged with another plan and
administrator for new plan calculated opening account balance using interest rate
on 30-year Treasury securities from previous August as opposed to current rate,
and where participant argued earlier rate undervalued her balance, since plan has
to be construed as whole and  establishes applicable interest rate on annuity to
be annual interest rate on 30-year Treasury securities for August prior to plan
year in which distribution was made, regardless of actual month or year in which
distribution was made.

Hampton v. Henry Ford Health System
36 EBC 2160

BNA Labor Relations Reporter Headnote - EBC Cases

ERISA -- PROTECTION OF RIGHTS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

**(Cite as: 36 Employee Benefits Cas. 2160)**


2 Fiduciary Responsibility -- Fiduciary Duties -- In General
(C40.5003)
E.D.Mich., 2005

   Pension plan participant's breach of fiduciary duty claim to enforce plan which
participant alleged used wrong interest rate that undervalued her account balance
is dismissed, since proper remedy for recover of benefits is claim brought under
ERISA Section 502(a)(1)(B) challenging wrongful denial of benefits, since it is
evident participant seeks money damages and not equitable relief, and since
participant is precluded from bringing ERISA Section 502(a)(3) claim because
relief may be available under Section 502(a)(1)(B) claim.

Hampton v. Henry Ford Health System
36 EBC 2160

Eva T. Cantarella, Robert P. Geller, Howard Hertz, and Bradley J. Schram, of
Hertz, Schram & Saretsky, of Bloomfield Hills, Mich., attorneys for Hampton.

Michael A. Alaimo, Richard W. Warren, and Charles S. Miskind, of Miller, Canfield,
Paddock and Stone, of Detroit, Mich., and Diane M. Soubly, of Vercruysse Murray &
Calzone, of Bingham Farms, Mich., attorneys for Henry Ford Health System, et al.

                           Full Text of Opinion

FRIEDMAN, District Judge.

   This matter is presently before the Court on cross Motions for Summary Judgment.
Magistrate Judge Virginia Morgan has submitted a Report and Recommendation ("R &
R"), in which she recommends that the Court grant Defendants' motion and deny
Plaintiff's motion. Both Aquanette Hampton ("Plaintiff") and Henry Ford Health
System and Henry Ford Health System Pension Plan ("Defendants") object to certain
findings by the Magistrate Judge's R & R. After having reviewed this matter de
novo, as required by Fed. R. Civ. P. 72(b), the Court shall grant Defendants'
Motion for Summary Judgment.

                           I. HISTORY OF THE CASE

                           A. FACTUAL BACKGROUND

   Plaintiff was a surgical nurse at Detroit Osteopathic Hospital Corporation
("DOHC") from August 21, 1978, until August 1, 2002. (Pl.'s Comp. ¶ 9.)Like other
non-union employees, she participated in the DOHC Retirement Income Plan
("DOHC/Horizon Plan"). (Id. at ¶ 10.) During her time as a member in the
DOHC/Horizon Plan, Plaintiff was credited with an "Accrued Benefit," which was to
be payable as a monthly annuity upon retirement. (J.S., Doc. #50, Ex. 9, pp.
1074-75, 1103-06.) [FN1] On July 31, 2002, the DOHC/Horizon Plan was merged into

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

(Cite as: 36 Employee Benefits Cas. 2160)

the Henry Ford Health System Pension Plan ("HFHS Plan"); therefore, on August 1,
2002, Plaintiff had an "Opening Account Balance" as a new participant in the HFHS
Plan. (Def.'s Br. Supp. Mot. Summ. J. under either standard, 1.)

> FN[FN1]. The referenced exhibits correspond to the exhibits included in the
> Joint Submission of documents exchanged between the parties and filed on
> 5-15-05 as Document #50 (on Docket Report).

The issue here is the amount of Plaintiff's "Opening Account Balance" for the
HFHS Plan. Plaintiff and Defendants disagree about the "applicable interest rate"
to be used in converting Plaintiff's "Accrued Benefit" under the DOHC/Horizon Plan
to the Plaintiff's "Opening Account Balance" for the HFHS Plan. While both parties
agree that Internal Revenue Code § 417(e) and ERISA § 205(g)(3) require the use of
an "applicable interest rate" that is the average monthly "rate of interest on
30-year Treasury securities," the parties disagree as to the particular month from
which to derive that rate. Defendants used the interest rate on 30-year Treasury
securities from August 2001 (5.48%) to convert Plaintiff's "Accrued Benefit" into
an "Opening Account Balance." (Def.'s Br. Supp. Mot. *2162 Summ. J. under
arbitrary and capricious standard, 3-5.) Plaintiff, however, asserts that
Defendants should have used the interest rate from August 2002 (5.08%) to make the
conversion. (Pl.'s Br. Supp. Mot. Summ. J., 3-4.) A lower interest rate generates
a larger present value and thus a larger opening account balance; on the other
hand, a higher interest rate generates a smaller present value and thus a smaller
opening account balance. (Id.) Thus, the Plaintiff wants the lower interest rate
(5.08%) to be used, while the Defendants want the higher interest rate (5.48%) to
be used.

Plaintiff claims that her "Opening Account Balance" for the HFHS Plan was
undervalued by approximately $9,000, because Defendants used the wrong month to
derive the "applicable interest rate." (Id.) Under Defendants' calculations,
Plaintiff was allotted an "Opening Account Balance" of $102, 961; whereas, under
Plaintiff's calculations, the value was found to be $112,130. (Id. at 4.)
Plaintiff wants her "Opening Account Balance" to be recalculated, using the
interest rate from August 2002. Defendants contend that no such recalculation need
be done, as they have substantially complied with the Plan's procedures and
applicable laws.

### B. PROCEDURAL HISTORY

On March 13, 2003, Plaintiff sent a letter to the HFHS Plan Administrator to
request that her "Opening Account Balance" be recalculated by using the interest
rate from August 2002 (5.08%), which she asserted was the correct rate to use
under Section 11.13 of the HFHS Plan. (J.S., Doc. #50, Ex. 1, p. 1001.) On April
4, 2003, Defendants sent a letter denying Plaintiff's request and explaining that
the calculation complied with Section 1.07(b)(ii)(B) of the HFHS Plan and with the
"actuarial equivalency" value stated in IRC § 417(e) and ERISA § 205(g)(3). (Id.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

**(Cite as: 36 Employee Benefits Cas. 2160)**

at 1003-06.) On April 30, 2003, Plaintiff appealed Defendants' decision. (Id. at
1007.)

 Defendants scheduled Plaintiff's appeal to be heard before the HFHS Appeals
Subcommittee in June 2003, but Plaintiff sent a letter stating that she could not
attend the meeting. (Id. at 1011.) Defendants claim that they discussed
rescheduling the Appeals Subcommittee meeting with Plaintiff, but that Plaintiff
declined the offer and stated that her reasons for the appeal were included in her
appeal letter. (Id. at 1012-13.) In mid-July, Defendants sent a letter to
Plaintiff that explained that the Appeals Subcommittee had reviewed and denied
Plaintiff's claim and consequently would not recalculate her "Opening Account
Balance." (Id. at 1014-19.) The letter also stated that the Appeals Subcommittee's
decision is considered to be Defendants' final and binding interpretation of the
HFHS Plan. (Id. at 1019.)

 Having apparently exhausted her administrative remedies, Plaintiff filed an
action in this Court, under ERISA § 502(a)(3), to enforce the terms of the HFHS
Plan. (Pl.'s Comp., 7-9.) Plaintiff brought the claim as a class action on behalf
of other non-union employees who wanted their "Opening Account Balances" to be
recalculated, by using the August 2002 interest rate instead of the rate from
August 2001. (Pl.'s Comp., 10-11.) Plaintiff and Defendants both moved for Summary
Judgment. The Magistrate Judge conducted a hearing on the cross-motions (as well
as on Plaintiff's Motion to Certify Class and Defendants' Motion to Compel
Discovery). The Magistrate Judge issued an R & R on the cross-motions for Summary
Judgment. Both parties then filed objections to the R & R. The Magistrate Judge
also issued Orders denying the two other motions.

II. MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

 The Magistrate Judge recommended that the Court grant the Defendant's Motion for
Summary Judgment based on the arbitrary and capricious standard of review. (Mag.
J. R&R, 27.) On the other hand, the Magistrate Judge recommended denial of
Defendant's Motion for Summary Judgment based on Defendants' claim that it acted
in a settlor function and was therefore immune from ERISA liability. (Id. at 5.)
Likewise, the Magistrate Judge recommended denial of Defendant's Motion for
Summary Judgment based on Plaintiff's not having stated a valid claim for redress
under ERISA § 502(a)(3). (Id. at 8.) Further, the Magistrate Judge recommended
denial of Defendant's Motion for Summary Judgment based on the claim as
time-barred by the statute of limitations. (Id. at 10.) As for the Plaintiff's
motions, the Magistrate Judge found that de novo review of the Appeals
Subcommittee's decision, as well as the use of the interest rate from August 2002,
would be inappropriate. (Id. at 17, 27.) *2163

 In addition to its R & R, the Magistrate Judge also issued Orders that denied
Plaintiff's Motion to Certify Class and denied Defendants' Motion to Compel
Discovery.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538, 2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P 23995X

(Cite as: 36 Employee Benefits Cas. 2160)

### III. ANALYSIS OF MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

#### A. ARBITRARY AND CAPRICIOUS STANDARD OF REVIEW

1 The Magistrate Judge recommended the granting of Defendant's Motion for Summary Judgment based on the arbitrary and capricious standard of review. (Mag. J. R&R, 27.) The Magistrate Judge first found that the Sixth Circuit follows a de novostandard of review when considering the denial of ERISA benefits, but that it follows an arbitrary and capricious standard if the plan administrator has discretion in the interpretation of the plan and benefits. (Id. at 11.) The Magistrate Judge then found that Section 7.03 of the HFHS Plan provided the plan administrator with discretionary authority and thus applied the arbitrary and capricious standard of review. (Id. at 12.) Plaintiff objects to the use of such a standard of review and asserts that the Court should use a de novostandard to review HFHS's denial decision.

The Court accepts and adopts the Magistrate Judge's recommendation of an arbitrary and capricious standard of review. In Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 110 10 EBC 1873 (1989), the Supreme Court explained that "ERISA explicitly authorizes suits against fiduciaries and plan administrators to remedy statutory violations, including breaches of fiduciary duty and lack of compliance with benefit plans." The Supreme Court explained that "a denial of benefits challenged under § 1132(a)(1)(B) ERISA § 502(a)(1)(B) [FN2] is to be reviewed under a de novostandard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 489 U.S. at 115.

> FN[FN2]. As codified at 29 U.S.C.A. § 1132, individuals can bring civil actions against retirement plan administrators for alleged violations of the Employee Retirement Income Security Program ("ERISA"). More specifically, an ERISA § 502(a)(1)(B) claim can be brought "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the plan." On the other hand, an ERISA § 502(a)(3) claim can be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan."

Although the FirestoneCourt specifically addressed an ERISA § 502(a)(1)(B) claim, the Sixth Circuit apparently does not interpret the finding so narrowly. In Wilkins v. Baptist Healthcare Sys., Inc. , 150 F.3d 609, 617 28 EBC 1218 (6th Cir. 1998), which involved an ERISA § 502(a)(3) claim, the Sixth Circuit explained that the "standards of review for determining ERISA denial-of-benefits claims are well-established." That standard of review seems to turn not on the particular

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

(Cite as: 36 Employee Benefits Cas. 2160)

subpart of ERISA § 502 under which the claim has been filed, but instead on
whether the plan administrator has discretionary authority. For instance, in
Wilkins, the Sixth Circuit explained that it "review s de novothe plan
administrator's denial of ERISA benefits, unless the benefit plan gives the plan
administrator discretionary authority to determine eligibility for benefits or to
construe the terms of the plan." 150 F.3d at 613 (citing Firestone, 489 U.S. at
115). Likewise, in McDonald v. Western-Southern Life Ins. Co. , 347 F.3d 161, 168
32 EBC 1310 (6th Cir. 2003), the Court of Appeals stated that it is a "general
principle of ERISA law" that a court will not review a plan administrator's denial
of benefits under a de novostand if the plan administrator has discretion to
interpret the plan. See also Yeager v. Reliance Standard Life Ins. Co. , 88 F.3d
376 380 28 EBC 1213 (6th Cir. 1996) (referencing "general trust law principles" to
conclude that if "the plan grants the administrator authority to determine
eligibility for benefits or to construe the terms of the plan," the court should
apply the "highly deferential arbitrary and capricious standard of review"). Thus,
if the plan administrator has discretionary authority, then that administrator's
decisions in distributing the plan's benefits are reviewed under a more
deferential standard than de novoreview.

The issue now becomes whether the HFHS Plan itself granted such discretionary
authority to the plan administrator. As stated in Yeager, the Sixth " C ircuit has
interpreted Bruch Firestone to require that the plan's grant of *2164
discretionary authority to the administrator be 'express."' Yeager, 88 F.3d at 380
(citing Perry v. Simplicity Eng'g , 900 F.2d 963, 965 12 EBC 1374 (6th Cir. 1990).
Therefore, it is necessary to "examine the Plan language to determine whether the
administrator is given such discretion." Id. If such discretion is given in the
Plan in this case, then the highly deferential standard is appropriate.

Here, the HFHS Plan itself grants discretionary authority to the plan
administrator. In particular, Section 7.03 expressly provides such power. Section
7.03 states:

HFHS shall have any and all power and authoritywhich shall be necessary, properly
advisable, desirable or convenient to enable it to carry out its duties under the
Plan . . . not inconsistent with the Plan, the Trust, the Code or ERISA, to
determine, consistently therewith, all questions that may arise as to the
eligibility, benefits, status and right of any person claiming benefits under the
Plan, including (without limitation) Members, former Members, . . . and subject to
and consistent with ERISA to construe and interpret the Planand trust agreement(s)
entered into in connection with the Plan and correct any defect, . . . such action
to be conclusive on all persons claiming benefits under the Plan. J.S., Doc. #50,
Ex. 3, p. 1405 (emphasis added).

The HFHS plan administrator calculated Plaintiff's "Opening Account Balance" in a
manner that was not only consistent with the HFHS Plan, but with IRC and ERISA as
well. Under the Plan, a participant's "Account Balance" is "the value of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

(Cite as: 36 Employee Benefits Cas. 2160)

Member's benefit payable under this Plan . . . expressed as a lump sum." (J.S.,
Doc. #50, Ex. 3, p. 1342) Section 11.13 of the HFHS Plan explains how the present
value of the lump sum earned under the DOHC/Horizon Plan is distributed to the
HFHS Plan. According to Section 11.13, "effective at the close of business on July
31, 2002, the accrued benefits (and related assets) of certain non-union employees
of Horizon were transferred from the Horizon Plan to this Plan." (Id. at 1450.) In
particular, Section 11.13(c) states: "The Horizon Accrued Benefit for a Non-Union
Employee . . . shall be converted into an Opening Account Balance under this Plan
on August 1, 2002 equal to actuarial equivalent present value of his Horizon
Accrued Benefit, such actuarial equivalency to be determined under Code Section
417(e) and ERISA Section 205(g)(3)." (Id. at 1451.)

The aforementioned sections of the Internal Revenue Code ("IRC") and ERISA each
contain identical language as the other. Both IRC § 417(e) and ERISA § 205(g)(3)
provide that the determination of the present value of a distribution of an
annuity should be calculated using an "applicable interest rate," which is defined
as "the annual rate of interest on 30-year Treasury securities for the month
before the date of distribution or such other time as the Secretary of the
Treasury may by regulations prescribe."(IRC § 417(e), as codified at 26 U.S.C.A. §
417(e), and ERISA § 205(g)(3), as codified at 29 U.S.C.A. § 1055(g)(3).) Treasury
Regulation § 1.417(e)-1(d)(4) allows a plan provider to set a "lookback month that
is used to determine the applicable interest rate." Treas. Reg. § 1.417(e)-1(d);
(J.S., Doc. #50, Ex. 1, pp. 1052-55.) That "lookback month" may be any one of the
first through fifth months "preceding the first day of the stability period . . .
. This stability period may be one calendar month, one plan quarter, one calendar
quarter, one plan year, or one calendar year" before the date of distribution. Id.
Treasury Regulation 1.417(e)-1(d)(4) also requires that the "plan must specify the
lookback month." Id.

To summarize, the plan administrator has the discretionary authority to convert
the lump sum distribution from the DOHC/Horizon Plan into the "Opening Account
Balance" of the HFHS plan, as long as that interpretation is in accordance with
IRC § 417(e) and ERISA § 205(g)(3). Those sections require the use of an interest
rate on 30-year Treasury securities during a month before the date of
distribution--either the month previous to the month of distribution or to a
specified lookback month.

It is important that the provisions of the Plan be "construed as a whole" and in
"relation to context," as required by the HFHS Plan itself. (J.S., Doc. #50, Ex.
3, p. 1417.) Thus, HFHS Plan § 1.07, entitled "Actuarial Equivalent," sheds
further light on the issue, by explaining what is required for the calculation
under HFHS Plan § 11.13, which itself calls for an actuarial equivalency value.
Section 1.07(b)(ii)(B) states that for "any distribution which is paid as lump sum
or commences as a single life annuity , . . . interest shall be based upon the
annual interest rate on *2165 30-year Treasury securities . . . for August prior
to the Plan Year during which the distribution is made, for distributions made on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

**(Cite as: 36 Employee Benefits Cas. 2160)**

and after January 1, 1998." (Id. at 1343-44.) Thus, regardless of what month in
the year 2002 that the lump sum distribution was made, the applicable interest
rate should be derived from the month of August from the previous year, 2001, as
expressly stated in the Plan. The plan administrator's determination to use the
interest rate from August 2001 is therefore consistent with the Plan, IRC, and
ERISA.

 In selecting the rate of interest from August 2001, the plan administrator
rationally interpreted the language included within the Plan, IRC, and ERISA. This
is all that is required to pass the arbitrary and capricious standard of review.
As the Sixth Circuit has explained, " in applying the arbitrary and capricious
standard, the Court must decide whether the plan administrator's decision was
'rational in light of the plan's provisions.' Stated differently, when it is
possible to offer a reasoned outcome, that outcome is not arbitrary or
capricious." Williams v. Int'l Paper Co., 227 F.3d 706, 712 25 EBC 2062 (6th Cir.
2000) (quoting Daniel v. Eaton Corp. , 839 F.2d 263, 267 10 EBC 1197 (6th Cir.
1988)). In this case, the Defendants' interpretation of the plan was rational, and
therefore adequate to pass the arbitrary and capricious standard of review.

 Although the HFHS plan administrator had discretionary authority and was thus
subject to a highly deferential standard of review, Plaintiff still contends that
a de novoreview should be conducted because Plaintiff asserts that she did not
receive adequate notice about the denial of her claim as it made its way through
the HFHS appeals process. (Pl.'s Br. Supp. Mot. Summ. J., 12.) The Magistrate
Judge correctly rejected this argument and found that proper notice had been given
to Plaintiff.

 Defendants' Initial Denial Letter provided Plaintiff with the basis for the
denial of Plaintiff's request for a recalculation of her "Opening Account
Balance." In particular, the Initial Denial Letter referenced Section 11.13 of the
HFHS Plan and the relevant IRC and ERISA sections to explain how the calculation
was made. (J.S., Doc. #50, Ex.1, pp. 1003-06.)

 In addition, the Initial Denial Letter presented the opportunity of an appeal to
Plaintiff. (Id. at 1004.) When Plaintiff stated that she could not attend the
appeals meeting, Defendant offered, on more than one occasion, to reschedule the
meeting, or to conduct the meeting by phone, or to allow Plaintiff to send a
representative to the meeting. (Id. 1012-13.) Defendant made such overtures even
though the Plaintiff had sent a letter stating that the "reasons for my claim are
stated in my claim letter" and that she would not attend the meeting to review her
appeal. (Id. at 1011.) Finally, as the Magistrate Judge correctly found, the
Defendants' Final Denial Letter "provide d a detailed justification for the basic
reasons provided for in the initial denial letter" and carefully walked Plaintiff
through both the calculation process and the Appeals Subcommittee's reasoning
behind its denial. (Mag. J. R&R, 13; J.S., Doc. #50, Ex. 1, pp. 1014-19) These
communications further show that Defendants, in denying Plaintiff's claim, did not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

(Cite as: 36 Employee Benefits Cas. 2160)


act in an arbitrary or capricious manner. Thus, the Magistrate Judge correctly
granted Defendants' Motion for Summary Judgment based on the arbitrary and
capricious standard of review.

### B. NO SETTLOR FUNCTION AND ERISA IMMUNITY

   The Magistrate Judge recommended the denial of Defendants' Motion for Summary
Judgment based on Defendants' claim that the plan administrator acted in a settlor
function when it decided the calculation of benefit payments and was therefore
immune from ERISA liability. (Mag. J. R&R, 5.) The Court accepts and adopts the
Magistrate Judge's recommendation.

   Plaintiff is not issuing a challenge to the design or amendment of the Plan.
(Pl.'s Br. in Opp'n to Def.'s Mot. Summ. J. under either standard, 12.) Instead,
Plaintiff is challenging whether the use of the interest rate from August 2001 is
correct under the terms of the HFHS Plan. (Id.) The interpretation of a plan's
terms and implementation of those terms, as conducted by a plan administrator, are
done in a fiduciary role. In Musto v. American General Corp. , 861 F.2d 897, 911
10 EBC 1441 (6th Cir. 1988), the Court stated that " t here is a world of
difference between administering a welfare plan in accordance with its terms and
deciding what those terms are to be. A company acts as a fiduciary in performing
the first task, but not the second." In the case at hand, Plaintiff is only
challenging whether Defendants followed the terms of its own Plan in *2166
calculating the benefits to be paid to Plaintiff. Thus, Defendants' conduct in the
administration of the terms of its Plan were done in a fiduciary capacity, and the
Magistrate Judge correctly denied the Defendants' Motion for Summary Judgment
based on settlor immunity from ERISA.

### C. NO STANDING UNDER ERISA § 502(a)(3)

   The Magistrate Judge recommended the denial of Defendant's Motion for Summary
Judgment based on Plaintiff's not having stated a valid claim for redress under
ERISA § 502(a)(3). (Mag. J. R&R, 8.) The Court rejects the Magistrate Judge's
recommendation and finds that Plaintiff's claim should be dismissed.

   2 An ERISA § 502(a)(1)(B) claim can be brought "by a participant or beneficiary .
. . to recover benefits due to him under the terms of his plan, to enforce his
rights under the terms of the plan, or to clarify his rights to future benefits
under the plan." On the other hand, an ERISA § 502(a)(3) claim can be brought "by
a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which
violates any provision of this subchapter or the terms of the plan, or (B) to
obtain other appropriate equitable relief (i) to redress such violations or (ii)
to enforce any provision of this subchapter or the terms of the plan." In Varity
Corporation v. Howe , 516 U.S. 489, 512 19 EBC 2761 (1996), the Supreme Court
found ERISA § 502(a)(3) to be a "catchall" provision that "act s as a safety net,
offering appropriate equitable relief for injuries caused by violations that § 502

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 EBC 2160                                                                 Page 10

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC  P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

(Cite as: 36 Employee Benefits Cas. 2160)


does not elsewhere adequately remedy."

   As Defendants assert, the Sixth Circuit follows the language in Varity to be a
bar against an ERISA § 502(a)(3) claim if the plaintiff in a case could have
brought the claim under ERISA § 502(a)(1)(B). See Wilkins, 150 F.3d at 615- 16
(finding that plaintiff has no cause of action under ERISA § 502(a)(3) because
plaintiff's proper remedy was under ERISA § 502(a)(1)(B)); Marks v. Newcourt
Credit Corp. , 342 F.3d 444, 454 31 EBC 1333 (finding that "a participant cannot
seek equitable relief for a breach of fiduciary duty under the catchall provision
of § 502(a)(3) if the alleged violations are adequately remedied under other
provisions of § 502").

   The proper remedy for recovery of denied benefits in a retirement plan is under
ERISA § 502(a)(1)(B), not ERISA § 502(a)(3). In Crosby v. Bowater Inc. Retirement
Plan , 382 F.3d 587, 589 33 EBC 1769 (6th Cir. 2004), the Court of Appeals stated
that "ERISA § 502(a)(3) . . . authorizes only suits for injunctive or other
equitable relief, but it does not, in most situations, authorize an action for
money claimed to be due and owing." The Court continued by further explaining that
"Section 502(a)(3) does not authorize a plan participant to sue for recovery of
benefits due to him under the terms of the plan" because " t hat is the office of §
 502 a (1)(B) . . . ." Crosby, 382 F.3d at 594. In fact, the Supreme Court has
explained that ERISA § 502(a)'s subsections "focus upon specific areas." Varity,
516 U.S. at 512. The Supreme Court identified ERISA § 502(a)(1) as the specific
section that focuses on "wrongful denial of benefits and information." Id. at 512.
Thus, it becomes evident that a plaintiff seeking legal relief (money damages)
properly brings a claim under ERISA § 502(a)(1)(B), whereas a plaintiff seeking
equitable relief (i.e. an injunction) need bring a claim under ERISA § 502(a)(3).
Here, the Plaintiff is seeking to be awarded legal relief (money damages) and
should have therefore brought her claim under ERISA § 502(a)(1)(B).

   However, even though the Plaintiff is seeking the payment of more than $9,000, in
allegedly unpaid benefits, the Magistrate Judge persists in finding that
Plaintiff's ERISA § 502(a)(3) claim sought equitable relief, not legal relief. The
Magistrate Judge reasoned that Plaintiff sought to enjoin Defendant from applying
the interest rate from August 2001. (Mag. J. R&R, 7-8.) However, this logic does
not hold water. The Plaintiff, in essence, is asking for allegedly unpaid
benefits, which are money damages. This denial-of-benefits claim is for legal
relief, not equitable relief. In fact, the Sixth Circuit has explicitly stated
that "the Supreme Court has specifically disallowed money damages as 'appropriate
equitable relief' under ERISA." Helfrich v. PNC Bank, Ky., Inc. , 267 F.3d 477,
483 26 EBC 2281 (6th Cir. 2001). Thus, as Defendants contend, the recalculation of
Plaintiff's allegedly denied benefits should have been brought as a claim under
ERISA § 502(a)(1)(B), the availability of which precludes any action by Plaintiff
under ERISA § 502(a)(3). Therefore, *2167 the Magistrate Judge should have ordered
the dismissal of Plaintiff's claim as brought under ERISA § 502(a)(3).


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2246928 (E.D.Mich.), 97 A.F.T.R.2d 2006-2538,
2006-1 USTC P 50,319, 36 Employee Benefits Cas. 2160, Pens. Plan Guide (CCH) P
23995X

**(Cite as: 36 Employee Benefits Cas. 2160)**

### D. CLAIM NOT BARRED BY STATUTE OF LIMITATIONS

 The Magistrate Judge recommended the denial of Defendants' Motion for Summary
Judgment based on the claim as time-barred by the statute of limitations. The
Court accepts and adopts the Magistrate Judge's recommendation.

 As presented by the Magistrate Judge, the issue here is "whether the present case
is more analogous to a breach of contract between plaintiff and defendants, or a
fringe benefit claim under the Michigan statute." (Mag. J. R&R, 9.) The Sixth
Circuit has answered the question. In Santino v. Provident Life & Accident Ins.
Co. , 276 F.3d 772, 776 27 EBC 1199 (6th Cir. 2001), the Court stated that " a
lthough ERISA does not provide a statute of limitations for benefit claims, this
Court has noted that such claims are governed by the most analogous state statute
of limitations, which is that for breach of contract." See also Laborers' Pen.
Trust Fund v. Sidney Weinberger Homes, Inc. , 872 F.2d 702, 706 (6th Cir. 1988)
(same). In the state of Michigan, the statute of limitations for breach of
contract is six years. (Mich. Comp. Laws § 600.5807(8) (2000).) Thus, a claim for
the denial of retirement benefits under a payment plan would be treated as an
alleged breach of contract, which means that a claimant has six years to come
forward with a claim for benefits.

 Here, Plaintiff requested that her "Opening Account Balance" be recalculated on
March 13, 2002. The merger of the DOHC/Horizon Plan into the HFHS Plan took place
several months later. Defendant first denied Plaintiff's claim for a recalculation
on April 4, 2003. Plaintiff then filed her complaint under ERISA on January 22,
2004. Thus, regardless of whether the statute of limitations is triggered by the
date of Plaintiff's request or Defendant's denial, there is no time-bar issue
here, as Plaintiff has filed her complaint well within the allowable six-year time
period.

### IV. CONCLUSIONS

 Based upon the record established and documentary evidence presented, the
Magistrate Judge was correct in granting Defendants' Motion for Summary Judgment
based upon the arbitrary and capricious standard of review. For the reasons stated
above, the Court accepts and adopts in part the Magistrate Judge's
recommendations. Accordingly,

 IT IS ORDERED that Magistrate Judge's Report and Recommendation of July 1, 2005,
is accepted insofar as it is consistent with the rulings indicated above.

 IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is granted.

 IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is denied.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.



40 EBC 2281                                                                                    Page 1

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

(Cite as: 40 Employee Benefits Cas. 2281)

**H**

BECK, LIQUIDATING TRUSTEE OF ESTATES OF CROWN VANTAGE, INC., et al.
v.
PACE INTERNATIONAL UNION et al.
No. 05-1448
U.S. Supreme Court
June 11, 2007

BNA CASE HISTORY

On writ of certiorari to the U.S. Court of Appeals for the Ninth Circuit which
ruled that a bankrupt employer breached its fiduciary duties by deciding to
annuitize its single employer pension plans as a method of terminating them
instead of considering a union's proposal that the employer merge its plans with a
multiemployer pension fund ( 35 EBC 2665, 427 F3d 668 (2005)). Reversed and
remanded. See also 29 EBC 2601 (2003).

BNA Labor Relations Reporter Headnote - EBC Cases

ERISA -- PROTECTION OF RIGHTS

1 Fiduciary Responsibility -- Fiduciary Duties -- In General

BNA Labor Relations Reporter Headnote - EBC Cases

TERMINATION INSURANCE Terminations -- In General

(C164.01)
U.S., 2007

    Bankrupt employer did not breach its ERISA fiduciary duties when it failed to
consider union's proposal that employer terminate its 18 single-employer pension
plans by merging them with union's multiemployer pension fund, where employer
instead decided to terminate its single-employer plans by purchasing annuity, and
where PBGC argues that merger is not permissible means of plan termination in that
merger is "alternative to" rather than example of plan termination, since merger
of plans is not permissible form of plan termination under ERISA Section 4041 as
that section speaks to terminating plans by purchasing annuities or by making
lump-sum distributions, since plan terminations and mergers are different in that
terminating plan through purchase of annuities formally severs ERISA's
applicability to plan assets and employer obligations, whereas merger of plans
would result in former plans' assets remaining within ERISA's purview, since,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

**(Cite as: 40 Employee Benefits Cas. 2281)**

although ERISA expressly allows employer to recoup surplus funds in standard
termination, as employer here sought to do, merger would preclude receipt of such
funds because ERISA prohibits employers from misappropriating plan assets for
their own benefit, and since merger is nowhere mentioned in Section 4041, but is
instead dealt with in entirely different set of statutory sections setting forth
entirely different rules and procedures.

Beck v. PACE International Union
40 EBC 2281

M. Miller Baker, David E. Rogers, and Jeffrey W. Mikoni, of McDermott Will &
Emery, of Washington, D.C., attorneys for Beck, et al.

Julia P. Clark, of Bredhoff & Kaiser, of Washington, D.C., attorney for PACE
International Union, et al.

Before ROBERTS, Chief Justice, and STEVENS, SCALIA, KENNEDY, SOUTER, THOMAS,
GINSBURG, BREYER, and ALITO, Justices.

                              Full Text of Opinion

SCALIA, Justice.

   We decide in this case whether an employer that sponsors and administers a
single-employer defined-benefit pension plan has a fiduciary obligation under the
Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended,
29 U.S.C. § 1001 et seq., to consider a merger with a multiemployer plan as a
method of terminating the plan.

                                       I

   Crown Paper and its parent entity, Crown Vantage (the two hereinafter referred to
in the singular as Crown), employed 2,600 persons in seven paper mills. PACE
International Union, a respondent here, represented employees covered by 17 of
Crown's defined-benefit pension plans. A defined-benefit plan, "as its name
implies, is one where the employee, upon retirement, is entitled to a fixed
periodic payment." Commissionerv. Keystone Consol. Industries, Inc., 508 U.S. 152,
154 16 EBC 2121 (1993). In such a plan, the employer generally shoulders the
investment risk. It is the employer who must make up for any deficits, but also
the employer who enjoys the fruits (whether in the form of lower plan
contributions or sometimes a reversion of assets) if plan investments perform
beyond expectations. See *2282Hughes Aircraft Co.v. Jacobson, 525 U.S. 432,
439-440 22 EBC 2265 (1999). In this case, Crown served as both plan sponsor and
plan administrator.

   In March 2000, Crown filed for bankruptcy and proceeded to liquidate its assets.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

**(Cite as: 40 Employee Benefits Cas. 2281)**

ERISA allows employers to terminate their pension plans voluntarily, see Pension
Benefit Guaranty Corporationv. LTV Corp., 496 U.S. 633, 638 12 EBC 1593 (1990),
and in the summer of 2001, Crown began to consider a "standard termination," a
condition of which is that the terminated plans have sufficient assets to cover
benefit liabilities. § 1341(b)(1)(D); id.,at 638-639. Crown focused in particular
on the possibility of a standard termination through purchase of annuities, one
statutorily specified method of plan termination. See § 1341(b)(3)(A)(i). PACE,
however, had ideas of its own. It interjected itself into Crown's termination
discussions and proposed that, rather than buy annuities, Crown instead merge the
plans covering PACE union members with the PACE Industrial Union Management
Pension Fund (PIUMPF), a multiemployer or "Taft-Hartley" plan. See § 1002(37).
Under the terms of the PACE-proposed agreement, Crown would be required to convey
all plan assets to PIUMPF; PIUMPF would assume all plan liabilities.

 Crown took PACE's merger offer under advisement. As it reviewed annuitization
bids, however, it discovered that it had overfunded certain of its pension plans,
so that purchasing annuities would allow it to retain a projected $5 million
reversion for its creditors after satisfying its obligations to plan participants
and beneficiaries. See § 1344(d)(1) (providing for reversion upon plan termination
where certain conditions are met). Under PACE's merger proposal, by contrast, the
$5 million would go to PIUMPF. What is more, the Pension Benefit Guaranty
Corporation (PBGC), which administers an insurance program to protect plan
benefits, agreed to withdraw the proofs of claim it had filed against Crown in the
bankruptcy proceedings if Crown went ahead with an annuity purchase. Crown had
evidently heard enough. It consolidated 12 of its pension plans [FN1] into a
single plan, and terminated that plan through the purchase of an $84 million
annuity. That annuity fully satisfied Crown's obligations to plan participants and
beneficiaries and allowed Crown to reap the $5 million reversion in surplus funds.

     FN[FN1]. Crown's various other pension plans are not at issue in this case.

 PACE and two plan participants, also respondents here (we will refer to all
respondents collectively as PACE), thereafter filed an adversary action against
Crown in the Bankruptcy Court, alleging that Crown's directors had breached their
fiduciary duties under ERISA by neglecting to give diligent consideration to
PACE's merger proposal. The Bankruptcy Court sided with PACE. It found that the
decision whether to purchase annuities or merge with PIUMPF was a fiduciary
decision, and that Crown had breached its fiduciary obligations by giving
insufficient study to the PIUMPF proposal. Rather than ordering Crown to cancel
its annuity (which would have resulted in a substantial penalty payable to Crown's
annuity provider), the Bankruptcy Court instead issued a preliminary injunction
preventing Crown from obtaining the $5 million reversion. It subsequently approved
a distribution of that reversion for the benefit of plan participants and
beneficiaries, which distribution was stayed pending appeal. [FN2]

     FN[FN2]. PACE now suggests that it would have been willing to agree to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

**(Cite as: 40 Employee Benefits Cas. 2281)**

> merger in which Crown kept its surplus funds. Brief for Respondents 17, n.
> 7. But this is belied not only by the terms of the proposed merger
> agreement, but by the fact that PACE actively sought and obtained a
> preliminary injunction freezing Crown's $5 million reversion. The Bankruptcy
> Court having rejected PACE's request to undo the annuity contract, PACE has
> provided no reason for pursuing this litigation other than to obtain the $5
> million that remained after Crown satisfied its benefit commitments.
> Moreover, as PACE concedes, whether the parties would have agreed to a
> merger arrangement that did not include the $5 million is "speculation." Tr.
> of Oral Arg. 42.

Petitioner, the trustee of the Crown bankruptcy estates, appealed the
Bankruptcy-Court decision to the District Court, which affirmed in relevant part,
as did the Court of Appeals for the Ninth Circuit. The Ninth Circuit acknowledged
that "the decision to terminate a pension plan is a business decision not subject
to ERISA's fiduciary obligations," but reasoned that "the implementationof a
decision to terminate" is fiduciary in nature. 427 F.3d 668, 673 35 EBC 2665 (2005)
. It then determined that merger was a permissible means of plan termination and
that Crown therefore had a fiduciary obligation to consider PACE's merger proposal
seriously, which it had failed *2283 to do. Petitioner thereafter sought rehearing
in the Court of Appeals, this time with the support of the PBGC and the Department
of Labor, who agreed with petitioner that the Ninth Circuit's judgment was in
error. The Ninth Circuit held to its original decision, and we granted certiorari.
549 U. S. ___ (2007).

                                    II

1 Crown's operation of its defined-benefit pension plans placed it in dual roles
as plan sponsor and plan administrator; an employer's fiduciary duties under ERISA
are implicated only when it acts in the latter capacity. Which hat the employer is
proverbially wearing depends upon the nature of the function performed, see Hughes
Aircraft Co., supra, at 444, and is an inquiry that is aided by the common law of
trusts which serves as ERISA's backdrop, see Pegramv. Herdrich, 530 U.S. 211, 224
24 EBC 1641 (2000); Lockheed Corp.v. Spink, 517 U.S. 882, 890 20 EBC 1257 (1996).

It is well established in this Court's cases that an employer's decision
whetherto terminate an ERISA plan is a settlor function immune from ERISA's
fiduciary obligations. See, e.g., ibid.; Curtiss-Wright Corp.v. Schoonejongen, 514
U.S. 73, 78 18 EBC 2841 (1995). And because "decision s regarding the form or
structure" of a plan are generally settlor functions, Hughes Aircraft Co., 525
U.S., at 444, PACE acknowledges that the decision to merge plans is "normally a
plan sponsor decisio n " as well. Brief for Respondents 13, n. 5, 20-21; see also
Malia v. General Electric Co., 23 F.3d 828, 833 18 EBC 1113 (CA3 1994) (holding
that employer's decision to merge plans "d id not invoke the fiduciary duty
provisions of ERISA"). But PACE says that its proposed merger was different,
because the PIUMPF merger represented a method of terminating the Crown plans. And

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

(Cite as: 40 Employee Benefits Cas. 2281)

just as ERISA imposed on Crown a fiduciary obligation in its selection of an
appropriate annuity provider when terminating through annuities, see 29 CFR §§
2509.95-1, 4041.28(c)(3) (2006), so too, PACE argues, did it require Crown to
consider merger.

The idea that the decision whether to merge could switch from a settlor to a
fiduciary function depending upon the context in which the merger proposal is
raised is an odd one. But once it is realized that a merger is simply a transfer
of assets and liabilities, PACE's argument becomes somewhat more plausible: The
purchase of an annuity is akin to a transfer of assets and liabilities (to an
insurance company), and if Crown was subject to fiduciary duties in selecting an
annuity provider, why could it automatically disregard PIUMPF simply because
PIUMPF happened to be a multiemployer plan rather than an insurer? There is,
however, an antecedent question. In order to affirm the judgment below, we would
have to conclude (as the Ninth Circuit did) that merger is, in the first place, a
permissible form of plan termination under ERISA. That requires us to delve into
the statute's provisions for plan termination.

ERISA sets forth the exclusive procedures for the standard termination of
single-employer pension plans. § 1341(a)(1); Hughes Aircraft Co., supra, at 446.
Those procedures are exhaustive, setting detailed rules for, inter alia, notice by
the plan to affected parties, § 1341(a)(2), review by the PBGC, § 1341(b)(2)(A),
(C), and final distribution of plan funds, § 1341(b)(2)(D), § 1344. See generally
E. Veal & E. Mackiewicz, Pension Plan Terminations 43-61 (2d ed. 1998)
(hereinafter Veal & Mackiewicz). At issue in this case is § 1341(b)(3)(A), the
provision of ERISA setting forth the permissible methods of terminating a
single-employer plan and distributing plan assets to participants and
beneficiaries. Section 1341(b)(3)(A) provides as follows:

"In connection with any final distribution of assets pursuant to the standard
termination of the plan under this subsection, the plan administrator shall
distribute the assets in accordance with section 1344 of this title. In
distributing such assets, the plan administrator shall--

"(i) purchase irrevocable commitments from an insurer to provide all benefit
liabilities under the plan, or

"(ii) in accordance with the provisions of the plan and any applicable
regulations, otherwise fully provide all benefit liabilities under the plan. . . .
" The PBGC's regulations impose in substance the same requirements. See 29 CFR §
4041.28(c)(1). Title 29 U.S.C. § 1344, which is referred to in § 1341(b)(3)(A),
sets forth a specific order of priority for asset distribution, including (under
certain circumstances) reversions of excess funds to the plan sponsor, see §
1344(d)(1). *2284

The parties to this case all agree that § 1341(b)(3)(A)(i) refers to the purchase

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

(Cite as: 40 Employee Benefits Cas. 2281)

of annuities, see 29 CFR § 4001.2 (defining "irrevocable commitment"), and that §
1341(b)(3)(A)(ii) allows for lump-sum distributions at present discounted value
(including rollovers into individual retirement accounts). As PACE concedes,
purchase of annuity contracts and lump-sum payments are "by far the most common
distribution methods." Brief for Respondents 45; see also Veal & Mackiewicz 72-73
("The basic alternatives are the purchase of annuity contracts or some form of
lump-sum cashout"). To affirm the Ninth Circuit, we would have to decide that
merger is a permissible method as well. [FN3] And we would have to do that over
the objection of the PBGC, which (joined by the Department of Labor) disagrees
with the Ninth Circuit, taking the position that § 1341(b)(3)(A) does notpermit
merger as a method of termination because (in its view) merger is an alternativeto
(rather than an example of) plan termination. See Brief for United States as
Amicus Curiae8, 17-30. We have traditionally deferred to the PBGC when
interpreting ERISA, for "to attempt to answer these questions without the views of
the agencies responsible for enforcing ERISA, would be to embar k upon a voyage
without a compass." Mead Corp.v. Tilley, 490 U. S. 714, 722, 725-726 (1989)
(internal quotation marks omitted); see also LTV Corp., 496 U. S., at 648, 651. In
reviewing the judgment below, we thus must examine "whether the PBGC's policy is
based upon a permissible construction of the statute." Id., at 648. [FN4]

>    FN[FN3]. We would not have to decide that question of statutory
>    interpretation if Crown's pension plans disallowed merger. Any method of
>    termination permitted by § 1341(b)(3)(A)(ii) must also be one that is "in
>    accordance with the provisions of the plan." Crown thus could have drafted
>    its plan documents to limit the available methods of termination, so that
>    merger was not permitted. Petitioner argued below that Crown had done just
>    that. Though the District Court concluded that the plan terms allowed for
>    merger, App. to Pet. for Cert. 47, the Ninth Circuit declined to consider
>    the plan language because it held that petitioner had failed to preserve the
>    argument in the Bankruptcy Court. Petitioner did not seek certiorari on the
>    factbound issues of waiver and plan interpretation, and we accordingly do
>    not address them here.

>    FN[FN4]. PACE argues that the PBGC took an inconsistent approach in several
>    opinion letters from the 1980's concerning the applicability of certain
>    joint guidelines for asset reversions during complex termination
>    transactions. See App. to Brief in Opposition 6a-9a (Opinion Letter 85-11
>    (May 14, 1985)); id.,at 10a-13a (Opinion Letter 85-21 (Aug. 26, 1985));
>    id.,at 14a-16a (Opinion Letter 85-25 (Oct. 11, 1985)). But insofar as the
>    PBGC's consistency is even relevant to whether we should accord deference to
>    its presently held views, none of those letters so much as hints that the
>    PBGC treated merger as a permissible form of plan termination. In fact, to
>    the extent they even speak to the question, they clearly show the opposite.
>    In Opinion Letter 85-25, for example, the PBGC explained that the joint
>    guidelines for asset reversions did not apply to "a transfer of assets and
>    liabilities from a single-employer plan to an ongoing multiemployer plan

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

40 EBC 2281                                                                    Page 7

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

(Cite as: 40 Employee Benefits Cas. 2281)

followed bythe termination of the single-employer plan." App. to Brief in
Opposition 15a (emphasis added). By characterizing the proposed transaction
as one that took place in two separate steps (merger and thentermination),
this letter fully contemplated that merger was notan example ofplan
termination.

We believe it is. PACE has "failed to persuade us that the PBGC's views are
unreasonable," Mead Corp., supra, at 725. At the outset, it must be acknowledged
that the statute, with its general residual clause in § 1341(b)(3)(A)(ii), is
potentially more embracing of alternative methods of plan termination (whatever
they may be) than longstanding ERISA practice, which appears to have employed
almost exclusively annuities and lump-sum payments. But we think that the
statutory text need not be read to include mergers, and indeed that the PBGC
offers the better reading in excluding them. Most obviously, Congress nowhere
expressly provided for merger as a permissible means of termination. Merger is not
mentioned in § 1341(b)(3)(A), much less in any of § 1341's many subsections.
Indeed, merger is expressly provided for in an entirely separate set of statutory
sections (of which more in a moment, see infra, at 11-13). PACE nevertheless
maintains that merger is clearly covered under § 1341(b)(3)(A)(ii)'s residual
clause, which refers to a distribution of assets that "otherwise fully provide s
all benefit liabilities under the plan." By PACE's reasoning, annuities are
covered under § 1341(b)(3)(A)(i); annuities are--by virtue of the word
"otherwise"--an exampleof a means by which a plan may "fully provide all benefit
liabilities under the plan," § 1341(b)(3)(A)(ii); and therefore, "at the least,"
any method of termination that is the "legal equivalent" of annuitization is
permitted, Brief for Respondents 23. Merger, PACE argues, is such a legal
equivalent. *2285

We do not find the statute so clear. Even assuming that PACE is right about
"otherwise"--that the word indicates that annuities are one exampleof satisfying
the residual clause in § 1341(b)(3)(A)(ii)--we still do not find mergers covered
with the clarity necessary to disregard the PBGC's considered views. Surely the
phrase "otherwise fully provide all benefit liabilities under the plan" is not
without some teeth. And we think it would be reasonable for the PBGC to determine
both that merger is not like the purchase of annuities in its ability to "fully
provide all benefit liabilities under the plan," and that the statute's distinct
treatment of merger and termination provides clear evidence that one is not an
example of the other. Three points strike us as especially persuasive in these
regards.

First, terminating a plan through purchase of annuities (like terminating through
distribution of lump-sum payments) formally severs the applicability of ERISA to
plan assets and employer obligations. Upon purchasing annuities, the employer is
no longer subject to ERISA's multitudinous requirements, such as (to name just
one) payment of insurance premiums to the PBGC, § 1307(a). And the PBGC is
likewise no longer liable for the deficiency in the event that the plan becomes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

**(Cite as: 40 Employee Benefits Cas. 2281)**


insolvent; there are no more benefits for it to guarantee. The assets of the plan
are wholly removed from the ERISA system, and plan participants and beneficiaries
must rely primarily (if not exclusively) on state-contract remedies if they do not
receive proper payments or are otherwise denied access to their funds. Further,
from the standpoint of the participants and beneficiaries, the risk associated
with an annuity relates solely to the solvency of an insurance company, and not
the performance of the merged plan's investments.

Merger is fundamentally different: it represents a continuation rather than a
cessation of the ERISA regime. If Crown were to have merged its pension plans into
PIUMPF, the plan assets would have been combined with the assets of the
multiemployer plan, where they could then be used to satisfy the benefit
liabilities of participants and beneficiaries other than those from the original
Crown plans. Those assets would remain within ERISA's purview, the PBGC would
maintain responsibility for them, and if Crown continued to employ the plan
participants it too would remain subject to ERISA. Finally, plan participants and
beneficiaries would have their recourse not through state-contract law, but
through the ERISA system, just as they had prior to merger.

Second, in a standard termination ERISA allows the employer to (under certain
circumstances) recoup surplus funds, § 1344(d)(1), (3), as Crown sought to do
here. But ERISA forbids employers to obtain a reversion in the absence of a
termination: "A valid plan termination is a prerequisite to a reversion of surplus
plan assets to an employer." App. to Brief in Opposition 15a (PBGC Opinion Letter
85-25 (Oct. 11, 1985); see also Veal & Mackiewicz 164-165. Crown could not simply
extract the $5 million surplus from its plans, nor could it have done so once
those assets had transferred to PIUMPF. This would have run up against ERISA's
anti-inurement provision, which prohibits employers from misappropriating plan
assets for their own benefit. See § 1103(c). Consequently, we think the PBGC was
entirely reasonable in declining to recognize as a form of termination a mechanism
that would preclude the receipt of surplus funds, which is specifically authorized
upon termination. [FN5]

> FN [FN5]. This inability to recover surplus funds through a merger could not
> be remedied, as PACE now suggests, by structuring the transaction so that
> Crown provided to PIUMPF only assets sufficient to cover plan liabilities
> (effectively creating a spinoff from Crown's plans and merging that spinoff
> plan with PIUMPF). Under that arrangement, Crown could indeed obtain the $5
> million reversion--not, however, by reason of the merger-called-termination,
> but only by subsequent termination of the residual plan. See, e.g., App. to
> Brief in Opposition 14a-16a (PBGC Opinion Letter 85-25 (Oct. 11, 1985))
> (describing such a sequence of transactions). This falls short of rendering
> the merger a termination permitting recovery of surplus funds. That a
> transfer of assets can occur in anticipation of a future termination does
> not render that transfer itself a termination.


© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

(Cite as: 40 Employee Benefits Cas. 2281)

   Third, the structure of ERISA amply (if not conclusively) supports the conclusion
that § 1341(b)(3)(A)(ii) does not cover merger. As noted above, merger is nowhere
mentioned in § 1341, and is instead dealt with in an entirely different set of
statutory sections setting forth entirely different rules and procedures. Compare §
 1058 (general merger provision), § 1411 (mergers between multiemployer plans),
and § 1412 (mergers between multiemployer and single-employer plans) with § 1341
(termination of single-employer plans), § 1341a (termination of multiemployer *2286
plans); see generally Veal & Mackiewicz 31-40 (describing merger as an
alternative to plan termination). Section 1058, the general merger provision, in
fact quite clearly contemplates that merger and termination are not one and the
same, forbidding merger "unless each participant in the plan would (if the plan
then terminated) receive a benefit immediately after the merger . . . which is
equal to or greater than the benefit he would have been entitled to receive
immediately before the merger . . . (if the plan had then terminated)." (Emphasis
added.)

   As for the different rules and procedures governing termination and merger: Most
critically, plans seeking to terminate must provide advance notice to the PBGC, as
well as extensive actuarial information. § 1341(b)(2)(A). The PBGC has the
authority to halt the termination if it determines that plan assets are
insufficient to cover plan liabilities. § 1341(b)(2)(C). Merger, by contrast,
involves considerably less PBGC oversight, and the PBGC has no similar ability to
cancel, see Brief for United States as Amicus Curiae24. And the rules governing
notice to the PBGC are either different or nonexistent. Section 1412, the
provision governing merger between a single and multiemployer plan (the form of
merger contemplated by PACE's proposal) makes no mention of early notice to the
PBGC. And while mergers between multiemployer plans do require 120-days advance
notice, § 1411(b)(1), this still differs from the general notice provision for
termination of single-employer plans, which requires notice to the PBGC " a s soon
as practicable" after notice is given to affected parties, § 1341(b)(2)(A).
Relatedly, § 1341(a)(2) also requires that, in a standard termination, written
notice to plan participants and beneficiaries include "any related additional
information required in regulations of the PBGC ." Those regulations require,
among other things, that the plan inform participants and beneficiaries that upon
distribution, "the PBGC no longer guarantees . . . plan benefits." 29 CFR §
4041.23(b)(9). (This requirement of course has no relevance to a merger, because
after a merger the PBGC continues to guarantee plan benefits.)

   PACE believes that these procedural differences can be ironed over rather easily.
It insists:

 "Many plan mergers take place without intent to terminate a plan; in those cases,
the requirements for plan merger can be followed without consulting the
requirements for plan termination. Conversely, many plan terminations take place
without an associated merger; in those cases there is no need to consult the
requirements for mergers. But if a plan sponsor intends to use merger as a method

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

127 S.Ct. 2310, 75 USLW 4399, 48 Bankr.Ct.Dec. 100, 40 Employee Benefits Cas. 2281,
07 Cal. Daily Op. Serv. 6659, 2007 Daily Journal D.A.R. 8497, Pens. Plan Guide
(CCH) P 24000B, 20 Fla. L. Weekly Fed. S 339

**(Cite as: 40 Employee Benefits Cas. 2281)**

of implementing a plan termination, it simply must follow the rules for both
merger and termination." Brief for Respondents 36.

PACE similarly explains that while the PBGC does not approve "ordinary merger s
," PBGC approval would be necessary when a merger is designed to terminate a plan.
Id., at 37. The confusion invited by PACE's proposed framework is alone enough to
condemn it. How could a plan be sure that it was in one box rather than the other?
To avoid the risk of liability, should it simply follow both sets of rules all of
the time? PACE's proposal is flawed for another reason as well: It has no apparent
basis in the statute. The separate provisions governing termination and merger
quite clearly treat the two as wholly different transactions, with no exception
for the case where merger is used for termination.

For all of the foregoing reasons, we believe that the PBGC's construction of the
statute is a permissible one, and indeed the more plausible. Crown did not breach
its fiduciary obligations in failing to consider PACE's merger proposal because
merger is not a permissible form of termination. Even from a policy standpoint,
the PBGC's choice is an eminently reasonable one, since termination by merger
could have detrimental consequences for plan beneficiaries and plan sponsors
alike. When a single-employer plan is merged into a multiemployer plan, the
original participants and beneficiaries become dependent upon the financial
well-being of the multiemployer plan and its contributing members. Assets of the
single-employer plan (which in this case were capable of fully funding plan
liabilities) may be used to satisfy commitments owed to other participants and
beneficiaries of the (possibly underfunded) multiemployer plan. The PBGC believes
that this arrangement creates added risk for participants and beneficiaries of the
original plan, particularly in view of the lesser guarantees that the PBGC
provides to multiemployer plans, compare § 1322 with *2287 § 1322a. See Brief for
United States as Amicus Curiae29, and n. 11. For employers, the ill effects are
demonstrated by the facts of this very case: by diligently funding its pension
plans, Crown became the bait for a union bent on obtaining a surplus that was
rightfully Crown's. All this after Crown purchased an annuity that none dispute
was sufficient to satisfy its commitments to plan participants and beneficiaries.

* * *

We hold that merger is not a permissible method of terminating a single-employer
defined-benefit pension plan. The judgment of the Court of Appeals is reversed,
and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

**Benefits Practice Center**          **ISSN 1544-0575**

**AGENCY DOCUMENTS**
DOL Information Letters

---

## DOL Information Letter, Richard M. Colasurd (03/07/1984)

3/7/1984

3(21)

Mar 7, 1984

Richard M. Colasurd, Esq.

1506 Edison Plaza

Toledo, Ohio 43604

Re: Identification Number: F-2842A

**Dear Mr. Colasurd:**

This is in response to your request of February 9, 1984, for an advisory opinion relating to whether an arbitrator is a fiduciary for the purposes of the Employee Retirement Income Security Act of 1974 (ERISA).

You tell us that an arbitrator has been appointed to decide a question involving a provision in a collective bargaining agreement governing the payment of pension benefits to certain individuals in the event of the permanent closing of a manufacturing plant. The arbitrator has informed the parties involved that he will only serve in a case involving ERISA where the parties fully indemnify him and hold him harmless from any claim, loss or damage arising out of the performance of his duties as an arbitrator.

Pursuant to section 5 of the ERISA advisory opinion procedure (ERISA Proc.76-1, 41 FR 36281, August 27, 1976), we are responding to your request in the form of an information letter. The effect of information letters is stated in section 11 of the procedure.

Section 3(21)(A) of ERISA provides, in relevant part, that a person is a fiduciary with respect to a plan to the extent (i) he or she exercises any discretionary authority or control respecting management of the plan or exercises any authority or control respecting management or disposition of its assets, (ii) he or she renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he or she has any discretionary authority or discretionary responsibility in the administration of

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

Benefits Practice Center          ISSN 1544-0575

the plan. The term "fiduciary" includes any person designated under section 405(c)(1)(B) of ERISA (relating to designation of certain fiduciary responsibilities to persons other than named fiduciaries).

Whether an arbitrator is a fiduciary in a particular case depends on the nature of the dispute and the circumstances under which the decision is rendered. The Department of Labor has taken the position in several cases that an arbitrator would be a plan fiduciary if he or she performs any of the functions described in section 3(21)(A) of ERISA.

In Advisory Opinion 78-14 (copy enclosed), the Department concluded that, under the facts presented, the arbitrator would not be a fiduciary of the plan by virtue of his deciding the rate at which employers would be required to contribute to the plan.

In Advisory Opinion 82-42 (copy enclosed), the Department concluded that an arbitrator would be a fiduciary by deciding whether a plan should seek reimbursement from a participating union (and what action the plan should take if the union declines to contribute) toward the amount paid by the plan in settlement of a sex discrimination suit filed against the plan and the union.

The Department wishes further to note for your general information that an arbitrator may enter into an agreement with a contributing employer or participating employee organization to indemnify the arbitrator, out of non-plan funds, against any fiduciary liability he or she might incur by reason of acting in an arbitration proceeding. See 29 CFR 2509.75-4 (copy enclosed).

We hope this information has been of assistance.

Sincerely,

Elliot I. Daniel

Acting Assistant Administrator for Fiduciary Standards

Office of Pension and Welfare Benefit Programs

BNA Identifier: DOL IL 84-D

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

# EXHIBIT 6

**Benefits Practice Center**            **ISSN 1544-0575**

**AGENCY DOCUMENTS**
DOL Information Letters

---

## DOL Information Letter, Richard P. Weitzman (04/22/1983)

4/22/1983

3(21)(A)

Apr 22, 1983

Mr. Richard P. Weitzman

Weitzman, Brady & Weitzman

50 Union Avenue

Irvington, New Jersey 07111

Re: Identification Number F-2600

**Dear Mr. Weitzman:**

This is in response to your letter of February 8, 1983 and subsequent telephone conversation of March 31, 1983 with a member of this office, in which you requested information regarding the Department of Labor's position with respect to the fiduciary status of arbitrators under section 3(21)(A) of the Employee Retirement Income Security Act of 1974 (ERISA).

The term "fiduciary" is defined in section 3(21)(A) of ERISA. Section 3(21)(A)provides, in pertinent part, that a person is a fiduciary with respect to a plan to the extent

**(i) he exercises any discretionary control respecting management or disposition of its assets,**

**(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or**

**(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.**

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

**Benefits Practice Center**               **ISSN 1544-0575**

In Advisory Opinion 78-14 (copy enclosed), the Department concluded that, under the facts presented, the arbitrator would not be a fiduciary of the plan by virtue of his deciding the rate at which employers would be required to contribute to the plan.

In Advisory Opinion 82-42 (copy enclosed), the Department concluded that an arbitrator would be a fiduciary by deciding whether a plan should seek reimbursement from a participating union (and what action the plan should take if the union declines to contribute) toward the amount paid by the plan in settlement of a sex discrimination suit filed against the plan and the union.

Whether an arbitrator is a fiduciary in a particular case depends on the nature of the dispute and the circumstances under which the decision is rendered.

The Department wishes to further note for your general information that an arbitrator may enter into an agreement with a contributing employer or participating employee organization to indemnify the arbitrator, out of non-plan funds, against any fiduciary liability he might incur by reason of acting in an arbitration proceeding in such a manner as would make him a fiduciary with respect to a plan. See Interpretive Bulletin 75-4 (29 CFR 2509.75-4).

We hope this information has been of assistance.

**Sincerely,**

Alan D. Lebowitz

Assistant Administrator for Fiduciary Standards

Pension and Welfare Benefit Programs

BNA Identifier: DOL IL 83-H

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V
2

# EXHIBIT 7

**Benefits Practice Center**          **ISSN 1544-0575**

**AGENCY DOCUMENTS**
DOL Opinion Letters

---

## DOL Opinion Letter 82-42A

8/16/1982

3(21)(A)(i); (iii)

**Aug 16, 1982**

James G. Johnson, Esq.

Fred T. Ashley, Esq.

Hill, Farrer and Burrill

Thirty-Fourth Floor - Union Bank Square

445 South Figueroa Street

Los Angeles, California 90071

James G. Varga, Esq.

Margolis, McTernan, Scope, Sacks & Epstein

3600 Wilshire Boulevard, Suite 2200

Los Angeles, California 90010

Re: Warehousemen's Health & Welfare Trust Fund

Identification Number: F-2231G

**Gentlemen:**

This is in response to your letter of December 18, 1981, and prior correspondence, in which you request an exemption for Mr. Melvin Lennard, an impartial arbitrator, "from the definition of 'fiduciary'" contained in section 3(21)(A) of the Employee Retirement Income Security Act of 1974 (ERISA). Mr. Lennard has been selected to settle a dispute between management and union trustees of the Warehousemen's Health & Welfare Trust Fund (the Plan).

The dispute pertains to a proposal that the Plan seek a contribution from the International Longshoremen's & Warehousemen's Union, Local 26 (Local 26) toward the

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

**Benefits Practice Center**          **ISSN 1544-0575**

amount paid by the Plan in settlement of a sex discrimination claim filed against the Plan and Local 26. The management trustees voted in favor of this proposal, and the union trustees voted against it. The management and the union trustees have agreed on the appointment of Arbitrator Lennard to render a final and binding determination on the issues in dispute pursuant to the Plan's declaration of trust and section 302(c) of the Labor Management Relations Act, 29 USC § 187(c). The issues to be arbitrated are: (1)whether the Plan should request pro rata contribution from Local 26 and (2) if local 26 should decline to contribute, what action the Plan should undertake.

Section 408(a) of ERISA grants the Department of Labor (the Department) the authority to grant administrative exemptions from the prohibited transactions provisions set forth in sections 406 and 407(a) of ERISA. Under Reorganization Plan No. 4 of 1978 (43 FR 47713, October 17, 1978), the Department's authority to issue exemptions from the prohibited transactions provisions was extended to section 4975(c)(1) of the Internal Revenue Code of 1954, which is parallel to section 406 of ERISA. However, the question of whether and to what extent an arbitrator is to be deemed a fiduciary of an employee benefit plan is not appropriately disposed of in an administrative proceeding for exemption from the prohibitions of sections 406 and 407(a) of ERISA.

Nevertheless, since we believe that the representations in your letter are sufficiently detailed to enable us to render an advisory opinion with respect to the circumstances you describe, we have undertaken to treat your letter as a request for an advisory opinion on the question of whether an arbitrator would be a fiduciary under the circumstances described in your letter.

Section 3(21)(A) of ERISA provides, in relevant part, that a person is a fiduciary with respect to a plan to the extent (i) he or she exercises any discretionary authority or control respecting management of the plan or exercises any authority or control respecting management or disposition of its assets, (ii) he or she renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he or she has any discretionary authority or discretionary responsibility in the administration of the plan. The term "fiduciary" includes any person designated under section 405(c)(1)(B) of ERISA (relating to designation of certain fiduciary responsibilities to persons other than named fiduciaries).

The Department has taken the position in several cases that an arbitrator would be a plan fiduciary if he or she performs any of the functions described in section 3(21)(A) of ERISA. In the instant case, Mr. Lennard must decide whether the Plan should seek reimbursement from Local 26 and what further action the Plan should undertake if Local 26 declines to contribute toward the settlement. It is the opinion of the Department that, by deciding the questions presented to him involving the Plan's claim for reimbursement, Mr. Lennard would be acting as a fiduciary under section 3(21)(A)(i) and (iii) of ERISA because he would be exercising discretionary authority or discretionary responsibility in the management and administration of the Plan.

Accordingly, based solely on your representations, we conclude that, in his role as

**Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V**

Benefits Practice Center          ISSN 1544-0575

arbitrator in deciding how the Plan is to proceed, Mr. Lennard is a fiduciary within the meaning of section 3(21)(A) of ERISA.

We note that the Department's advisory opinion does not deal with the propriety under sections 404 and 406 of ERISA of the trustees' earlier decision to settle the sex discrimination claim, or their actions on the issue of whether to seek contribution from the union.

This letter is an advisory opinion under ERISA Procedure 76-1. Accordingly, it is issued subject to the provisions of the procedure, including section 10 thereof, relating to the effect of advisory opinions.

Sincerely,

Alan D. Lebowitz

Assistant Administrator for Fiduciary Standards

Pension and Welfare Benefit Programs

BNA Identifier: DOL OL 82-42A

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

3

# EXHIBIT 8

**Benefits Practice Center**          **ISSN 1544-0575**

**AGENCY DOCUMENTS**
DOL Opinion Letters

---

## DOL Opinion Letter 81-50A

**6/4/1981**

**3(21)(A); 410(a)**

**Jun 4, 1981**

Curtis L. Roy, Esquire

Dorsey, Windhorst, Hannaford, Whitney and Halladay

2300 First National Bank Building

Minneapolis, Minnesota 55402

Re: George A. Hormel & Company

Local P-9, United Food and Commercial Workers, AFL-CIO

Identification Number: F-1591A

**Dear Mr. Roy:**

By letter dated June 27, 1980, you requested an opinion as to whether an arbitrator would, under circumstances described below, be a fiduciary within the meaning of section 3(21)(A) of the Employee Retirement Income Security Act of 1974 (ERISA) and, if so, whether an agreement by an employer and/or union to indemnify the arbitrator, out of non-plan funds, against any potential fiduciary liability would violate section 410 of ERISA. In a telephone conversation of September 25, 1980, this office asked for certain additional information, which you submitted by letter dated September 26, 1980. On September 30, 1980, you submitted an additional letter for the purpose of clarifying your letter of September 26, 1980. By letter dated February 10, 1981 this office requested further clarification, which you provided by letter dated February 24, 1981.

Your letters include the following facts and representations:

The collective bargaining agreement between George A. Hormel & Company(the Employer) and Local P-9, United Food and Commercial Workers, AFL-CIO (the Union) provides for the arbitration of grievances arising under the agreement. The George A. Hormel & Company Non-Exempt Employees' Pension Plan (the Pension Plan) was negotiated by the Employer and the Union, and is administered by the Employer. The

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

**Benefits Practice Center**             **ISSN 1544-0575**

Pension Plan document contains no independent arbitration provisions.

The Employer and the Union have selected Mr. Abner Brodie from among a panel of arbitrators to resolve a grievance concerning pension accrual. The issue before him may be summarized as follows.

On April 24, 1957, the Employer and the Union executed a letter agreement providing, in part, that

> **"female employees when recalled to work shall be considered as having been on the payroll continuously for purposes of. . . retirement benefits."**

Beginning with the Pension Plan Agreement dated July 23, 1957, each Pension Plan Agreement negotiated by the Employer and the Union, including the current one, has provided that

> **"For the purpose of computing periods of Company and Union seniority for pension benefits there shall be excluded any absence to the extent that it exceeds two continuous years . . ."**

Mr. Brodie must decide whether the provision contained in the letter agreement or the provision contained in the Pension Plan Agreement controls. His decision will determine the extent to which female employees will be entitled to pension credit for pregnancy leaves of absence occurring prior to the enactment of the Civil Rights Act of 1964. In its capacity as Plan Administrator, Hormel has interpreted the Plan as not providing pension credit for more than the first two years of an employee's absence from work.

You represent that the Employer and the Union have, in the instant case, asked Mr. Brodie to interpret only their contractual commitments. You state that this is not a case in which a Plan participant filed a claim for benefits, which claim was denied. The Plan's claims procedure is not involved here, and the document setting forth the terms of the Plan and pursuant to which the Plan is administered was not submitted for the arbitrator's consideration. Rather, you maintain that the issue relates solely to the extent of Hormel's collectively bargained promise to provide benefits (set forth in the letter and Pension Plan agreements), and does not involve administration of the current provisions of the Plan (set forth in the Plan document). You represent that Hormel would be bound by the arbitrator's award, but only in its capacity as a party to a collective bargaining agreement. You claim that Hormel would be free to comply with the award by, if necessary, amending the current Plan or by providing alternative benefits from some other source.

After the close of the hearing and the submission of posthearing briefs, Mr. Brodie informed the Employer and the Union that his concern over potential fiduciary liability could cause him to withdraw from the case without rendering a decision. To allay his concern, the Employer and the Union have proposed entering into an indemnification agreement under which the Employer or the Union or both would satisfy,

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

2

**Benefits Practice Center**          **ISSN 1544-0575**

from non-plan funds, any liability Mr. Brodie might incur by reason of his actions in the arbitration, should he be deemed to be a fiduciary.

The term "fiduciary" is defined in section 3(21)(A) of ERISA. Section 3(21)(A) provides, in pertinent part, that a person is a fiduciary with respect to a plan to the extent

**(i) he exercises any discretionary control respecting management or disposition of its assets,**

**(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or**

**(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.**

In Advisory Opinion No. 78-14 (July 27, 1978), the U.S. Department of Labor(the Department) stated that an arbitrator would be a fiduciary if he performed any of the functions described in section 3(21)(A) of ERISA, but concluded that under the facts presented, the arbitrator would not be a fiduciary of the plan involved by virtue of his deciding the rate at which employers would be required to contribute to the plan.

In Advisory Opinion No. 79-66A (September 14, 1979), the Department found that, by deciding a question of a participant's entitlement to benefits under a plan, an arbitrator would be a plan fiduciary, because he would be exercising discretionary authority respecting the management and administration of the plan.

Advisory Opinion No. 79-66A cited an example contained in Question and Answer No. D-3 of ERISA Interpretive Bulletin 75-8 (29 CFR sec. 2509.75-8). The example sets forth the Department's view that a plan employee who has final authority to grant or deny benefit payments in cases where a dispute exists as to the interpretation of plan provisions relating to eligibility for benefits would be a fiduciary within the meaning of section 3(21)(A) of ERISA.

Accordingly, if Mr. Brodie would be deciding a particular plan participant's entitlement to benefits under the Pension Plan pursuant to the Plan's lawful claims procedure* he would be acting as a fiduciary with respect to the Pension Plan. However, you indicate that the instant matter does not involve disposition of a claim by a Plan participant for benefits under the Plan, or of an appeal from a refusal to grant such a claim. It appears that the arbitrator has been called upon to construe two documents which comprise, at least in part, the collectively bargained agreements between the Union and the Employer, but that the outcome of the arbitration would have no immediate effect on administration of the plan or on the rights of Plan participants to benefits under the Plan as it is currently drafted. Although the outcome of the proceeding might increase the entitlement of some Plan participants to benefits, it appears that the arbitrator's decision would not affect the long-standing interpretation given to existing Plan provisions. If we understand you correctly, a participant's entitlement to benefits under the Plan would be

**Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V**

**Benefits Practice Center**                    **ISSN 1544-0575**

affected only if the Employer were to amend the Plan to achieve compliance with a ruling by the arbitrator.

Based on your representations, it is our understanding that the instant proceeding resembles an extension of the process of collective bargaining between the Union and the Employer. Accordingly, to the extent that the instant matter is solely a part of the process by which the parties design and create a plan (as opposed to a matter of Plan administration), then it is our view that Mr. Brodie would not be acting as a fiduciary in serving as arbitrator to decide the question presented to him.

It appears that the above discussion has mooted your question regarding possible indemnification by the Employer, the Union, or both, of an arbitrator who would be acting as a fiduciary under ERISA with respect to the Plan in the instant matter. We believe, however, that the following information might be useful in this regard.

Section 410(a) of ERISA, in pertinent part, voids, as against public policy, any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under Part 4 of Subtitle B of Title I of ERISA.

In ERISA Interpretive Bulletin 75-4 (29 CFR sec. 2509.75-4), the Department interpreted section 410(a) to permit indemnification agreements which do not relieve a fiduciary of responsibility or liability under Part 4 of Subtitle B of Title I. Interpretive Bulletin 75-4 states, in part, that indemnification provisions, which leave the fiduciary fully responsible and liable, but merely permit another party to satisfy any liability incurred by the fiduciary, are not void under section 410(a) of ERISA. Example of permissible indemnification provisions include indemnification of a plan fiduciary by an employer, any of whose employees are covered by the plan, or by an employee organization, any of whose members are covered by the Plan.

Accordingly, it is the view of the Department that an agreement by an employer and/or a union to indemnify an arbitrator, out of non-plan funds, against any fiduciary liability he might incur by reason of acting in an arbitration proceeding in such a manner as would make the arbitrator a fiduciary with respect to a plan would not violate section 410(a) of ERISA.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, it is issued subject to the provisions of that procedure, including section 10, relating to the effect of advisory opinions.

Sincerely,

Ian D. Lanoff

Administrator

Pension and Welfare Benefit Programs

**Footnotes**

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

4

**Benefits Practice Center**          **ISSN 1544-0575**

\* In this regard, section 503 of ERISA and 29 CFR §2560.503-1 set forth requirements regarding an employee benefit plan's procedure for handling claims for benefits. Section 12.3 of the document, furnished with your letter of September 26, 1980, which you refer to as an "Unofficial Working Copy of the Plan Document," appears to set forth the Plan's claims procedure. The procedure calls for submission of written claims to the "Pension Board," and provides for a "review hearing" before this same body of claims which have been denied. However, in your September 26, 1980, letter you state that claims for Plan benefits are initially made to the Employer's Manager of Employee Benefits, and that a participant whose claims has been denied would "have the option of filing a grievance under the grievance and arbitration procedures of the collective bargaining contract, rather than a claim arising under the terms of the plan. In your September 30, 1980, letter of clarification you indicate that the Employer, "in its capacity as Plan Administrator," decides benefit claims. Finally, in your February 24, 1981 letter, you again state that applications for benefits are made initially to the Manager of Employee Benefits, but then you state that this person also reviews claim denials. In these circumstances, we must remind you that section404(a)(1)(D) of ERISA requires plan fiduciaries to act in accordance with the documents and instruments governing the plan, insofar as these are consistent with the provisions of ERISA. Accordingly, it appears that an examination of the Plan's claims procedures would be called for. In this connection, we express no opinion as to whether any of the above-referenced procedures by which claims for benefits under the Plan might be decided would satisfy the requirements of section 503 and §2560.503-1.

BNA Identifier: DOL OL 81-50A

Copyright 2007, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS, INTERNATIONAL UNION, AFL-CIO-CLC, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS LOCAL 4-786, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 07-126 (JJF) |
| v. | ) ) ) | |
| E. I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT E. I. DU PONT DE NEMOURS AND COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Thomas P. Gies
Kris D. Meade
Jennifer G. Knight
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500

Kathleen Furey McDonough (#2395)
Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
(302) 984-6000
kmcdonough@potteranderson.com
sdiluzio@potteranderson.com

Dated: July 23, 2007

*Attorneys for Defendant E. I. du Pont de Nemours and Company*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

NATURE AND STAGE OF PROCEEDINGS .......................................................... 1

SUMMARY OF ARGUMENT ................................................................................ 2

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE......................................... 3

    I.     The Parties .......................................................................................... 3

    II.    The Parties' Collective Bargaining Agreement ....................................... 3

    III.   DuPont's Employee Benefit Plans........................................................ 5

    IV.   The Amendment of DuPont's Benefit Plans........................................... 7

         A.    Pension and Retirement Plan Amendment ................................. 8

         B.    Savings and Investment Plan Amendment ................................. 8

         C.    MEDCAP Amendment ............................................................ 9

         D.    Dental Plan Amendment.......................................................... 9

         E.    Life Insurance Plan Amendment ............................................. 10

         F.    Vacation Buying Plan Amendment .......................................... 10

    V.    Local 4-786's Grievance and Related Disputes.................................... 10

ARGUMENT...................................................................................................... 14

    I.     The Standard For Summary Judgment. ................................................ 14

    II.    DuPont Is Entitled To Summary Judgment on the Union's Complaint
         Because the Disputes Raised In The Grievance Are Excluded From
         Arbitration......................................................................................... 14

         A.    An Employer is Obligated to Arbitrate a Particular Dispute Only if
            the Court Determines that the Parties Agreed to Resolve the
            Dispute through Arbitration.................................................... 14

B.   The Disputes Raised in the Grievance Are Excluded from the
     Scope of the Arbitration Clause in the Edgemoor CBA ............................ 17

     1.   Disputes Regarding MEDCAP and the Dental Plan Are
          Outside the Arbitration Clause Because Neither Plan is
          Covered by the Edgemoor CBA ....................................................17

     2.   The Remainder of the Grievance Raises Issues That Are
          Excluded from the Parties' Arbitration Clause..............................18

          a.   Each Remaining Benefit Plan at issue is Referenced
               in the CBA, Specifies the Authority of the Plan
               Fiduciary, and Contains a Binding Dispute
               Resolution Mechanism...................................................... 20

          b.   DOL Regulations Implementing ERISA Confirm
               the Exclusion of This Dispute from Arbitration ............... 24

     3.   Permitting Arbitration of the Grievance Would Cause
          Untenable Results .......................................................................23

CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)..................................................................................................... 14

*AT&T Techs., Inc. v. Communications Workers of Am.,*
   475 U.S. 643 (1986)................................................................................................ *passim*

*Battaglia v. McKendry,*
   233 F.3d 720 (3rd Cir. 2000) ...................................................................................... 16

*Beck v. PACE Int'l Union,*
   __ U.S. __, 40 Emp. Ben Cases 2281 (June 11, 2007) ............................................. 23

*Berlin v. Mich. Bell Tel. Co.,*
   858 F.2d 1154 (6th Cir. 1988) .................................................................................... 21

*Brayman Const. Corp. v. Home Ins. Co.,*
   319 F.3d 622 (3rd Cir. 2003) ...................................................................................... 16

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)..................................................................................................... 14

*Chicago Dist. Council of Carpenters Pension Fund v. K & I Const., Inc.,*
   270 F.3d 1060 (7th Cir. 2001) .................................................................................... 14

*Curcio v. John Hancock Mut. Life Ins. Co.,*
   33 F.3d 226 (3d Cir. 1994) .......................................................................................... 21

*Devlin v. Empire Blue Cross & Blue Shield,*
   274 F. 3d 76 (2d Cir. 2001) ........................................................................................ 23

*E.I. du Pont de Nemours & Co., Inc., v. Martinsville Nylon Employees' Council Corp.,*
   78 F.3d 578 (Table) (4th Cir. 1996)...................................................................... 16, 18

*Estate of Becker v. Eastman Kodak Co.,*
   120 F.3d 5 (2d Cir. 1997) ........................................................................................... 21

*Firestone Tire & Rubber Co. v. Bruch,*
   489 U.S. 101 (1989)..................................................................................................... 28

*Flanigan v. Gen. Elec. Co.,*
   242 F.3d 78 (2d Cir. 2001) ......................................................................................... 23

*Gen. Drivers, Warehousemen & Helpers Local Union No. 509 v. Ethyl,*
　　68 F.3d 80 (4th Cir. 1995) ................................................................................................ 14

*Hampton v. Henry Ford Health Sys.,*
　　36 Emp. Ben. Cases [BNA] 2160 (E.D. Mich. 2005)........................................................ 23

*Hockett v. Sun Co. Inc.,*
　　109 F.3d 1515 (10th Cir. 1997) ........................................................................................ 23

*Hunt v. Hawthorne Assoc. Inc.,*
　　119 F.3d 888 (11th Cir. 1997) .......................................................................................... 28

*In re Reliant Energy ERISA Litig.,*
　　36 Emp. Ben. Cases [BNA] 2648 (S.D. Tex. 2006) ......................................................... 22

*Ingersoll-Rand Co. v. McClendon,*
　　498 U.S. 133 (1990)........................................................................................................... 24

*Int'l Ass'n of Machinists v. Waukeshau Engine Div., Dresser Indus. , Inc.,*
　　17 F.3d 196 (7th Cir. 1994) ........................................................................................ 16, 17

*Int'l Ass'n. of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. Gen.
Elec. Co.,*
　　865 F.2d 902 (7th Cir. 1989) ...................................................................................... 15, 16

*John Wiley & Sons, Inc. v. Livingston, 18*
　　376 U.S. 543 (1964)........................................................................................................... 14

*Local 4-449, Oil, Chemical and Atomic Workers v. Amoco Chem. Corp.,*
　　589 F.2d 162 (5th Cir. 1979) ........................................................................... 16, 17, 18, 24

*Local 827, Int'l B'hood of Elec. Workers, AFL-CIO v. Verizon New Jersey, Inc.,*
　　458 F.3d 305 (3d Cir. 2006) .............................................................................................. 15

*Martinez v. Schlumberger, Ltd,*
　　338 F.3d 407 (5th Cir. 2003) ............................................................................................ 22

*Mass. Mut. Life Ins. Co. v. Russell,*
　　473 U.S. 134 (1985)........................................................................................................... 24

*McGrath v. Auto-Body North Shore Inc.,*
　　7 F.3d 665 (7th Cir. 1993) ................................................................................................ 28

*Office of Comm'r of Baseball v. World Umpires Ass'n,*
　　242 F. Supp. 2d 380 (S.D.N.Y. 2003) .............................................................................. 14

*PDG Chem., Inc. v. Oil, Chem. & Atomic Workers Int'l Union,*
    164 F. Supp. 2d 856 (E.D. Tex. 2001) .......................................................................... 16, 17, 18

*Peralta v. Hispanic Bus. Inc.,*
    419 F.3d 1064 (9th Cir. 2005) ................................................................................................ 22

*Pilot Life Ins. Co. v. Dedeaux,*
    481 U.S. 41 (1986)................................................................................................................. 24

*Rexam v. United Steelworkers of Am.,*
    No. Civ. 03-2998, 2003 WL 22477858, at *3 (D. Minn. Oct. 30, 2003) ................................ 19

*Saldana v. Kmart Corp.,*
    260 F.3d 228 (3d Cir. 2001) .................................................................................................. 14

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,*
    363 U.S. 574 (1960)............................................................................................................... 14

*United Steelworkers of Am., AFL-CIO-CLC v. Lukens Steel Co., Div. of Lukens, Inc.,*
    969 F.2d 1468 (3d Cir. 1992) ................................................................................................ 15

*United Steelworkers v. Commonwealth Aluminum Corp.,*
    162 F.3d 447 (6th Cir. 1998) .................................................................................. 16, 17, 18, 22

*Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.,*
    984 F.2d 113 (4th Cir. 1993) ................................................................................................. 16

*Varity Corp. v. Howe,*
    516 U.S. 489 (1996)......................................................................................................... 21, 23

*Wachtel v. Guardian Life Ins. Co.,*
    38 Emp. Ben. Cases [BNA] 1867 (D.N.J. 2006) *vacated and remanded on other*
    *grounds sub. nom. by Wachtel v. Health Net, Inc.,*
    -- F.3d --, 2007 WL 958572 (3rd Cir. 2007)......................................................................... 22

*Weiss v. CIGNA Healthcare Inc.,*
    972 F. Supp. 748 (S.D.N.Y. 1997) ....................................................................................... 22

*Winstead v. J.C. Penney Co., Inc.,*
    933 F.2d 576 (7th Cir. 1991) ................................................................................................. 19

**Statutes**

29 U.S.C. § 1001............................................................................................................................ 6

29 U.S.C. § 1102.................................................................................................................... 26, 27

29 U.S.C. § 1132 ............................................................................................. 7, 11, 24, 29

29 U.S.C. § 1133 ............................................................................................. 25

29 U.S.C. § 151 ............................................................................................... 13

**Regulations**

29 C.F.R. § 2509 ............................................................................................. 26, 27

29 C.F.R. § 2520 ............................................................................................. 8

29 C.F.R. § 2560.503-1(b)(6) (2003) ............................................................ 25

**Rules**

Fed.R.Civ.P. 56(c) ......................................................................................... 14

**Other Sources**

Conf. Rpt. No. 93-1280, 93rd Cong., 2d Sess. (August 12, 1974) ........................................ 26, 27

DOL A.O. 81-50A (June 4, 1981) ................................................................. 27

DOL Advisory Opinion ("A.O.") 82-42A (August 16, 1982) ......................... 27

DOL Information Letter to Richard Colasurd (March 7, 1984) ..................... 27

DOL Information Letter to Richard Weitzman (April 22, 1983) ................... 27

## NATURE AND STAGE OF PROCEEDINGS

In August of last year, Defendant E.I. du Pont de Nemours & Company ("DuPont" or the "Company") announced prospective changes to certain of the employee benefit plans it sponsors and maintains for more than 150,000 plan participants across the country. These changes, which address both eligibility and benefit levels, were effected through amendments made to each of these plans in December. Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers Local 4-786 ("Local 4-786") filed a grievance alleging that DuPont's actions violate the collective bargaining agreement between DuPont and the Union. DuPont has refused to arbitrate this grievance because benefits disputes of this nature are excluded from arbitration.

Plaintiffs United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") and Local 4-786 (collectively, "Plaintiffs" or the "Union") filed the complaint in this matter on March 1, 2007, seeking to compel DuPont to arbitrate the grievance. The parties have agreed that this matter is amenable to resolution on cross-motions for summary judgment, and DuPont submits this memorandum in support of its motion for summary judgment.

## SUMMARY OF ARGUMENT

I.     DuPont is entitled to summary judgment on Plaintiffs' complaint seeking to compel arbitration of Local 4-786's grievance. As we explain, the issues raised by the grievance are excluded from the scope of the arbitration provision in the parties' collective bargaining agreement, either because the agreement does not encompass the benefit plans at issue or because the issues involve questions of benefit plan eligibility that, by virtue of the parties' agreement and the governing benefit plan documents, must be resolved exclusively under the dispute resolution provisions of the various benefit plans and are thereby excluded from arbitration. Moreover, DuPont acted within its rights under the collective bargaining agreements in making the benefit plan changes at issue here, because the relevant benefit plan documents give DuPont the absolute discretion to interpret the plans and make final benefit eligibility determinations.

2

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### I.    The Parties

DuPont employs more than 30,000 employees nation-wide.  Declaration of Mary Jo Anderson ¶ 2.[1]  In addition, DuPont has over 120,000 retirees and survivors who participate in its Pension and Retirement Plan and are thus eligible for post-retirement medical and other benefits.  Anderson Decl. ¶ 4.  DuPont operates more than two dozen manufacturing facilities across the country, including a plant located in Edge Moor, Delaware ("Edgemoor Plant").  The Union is the exclusive collective bargaining representative for certain employees at the Edgemoor Plant, as set forth in the collective bargaining agreement between the Union and DuPont ("Edgemoor CBA") (Anderson Decl. Exh. A).  *Id.* ¶ 5.  Approximately 125 Union-represented employees work at the Edgemoor Plant.  *Id.*

### II.    The Parties' Collective Bargaining Agreement

Historically, DuPont has been willing to permit its unionized employees to participate in the benefit plans it sponsors and administers for all its U.S. employees, subject to the terms of the plans themselves, on the condition that DuPont remain free to modify the plans at its discretion.  Anderson Decl. ¶ 30.  This understanding is memorialized in Article IX of the Edgemoor CBA, entitled "Industrial Relations Plans and Practices" ("IRP&P").[2]  The IRP&P provision covering Edgemoor employees states:

---

[1]    The Declaration of Mary Jo Anderson is being filed contemporaneously herewith and will be cited as "Anderson Decl. ¶ __."

[2]    Virtually identical language is contained in every other collective bargaining agreement to which DuPont is a party.  Anderson Decl. ¶ 30.

Section 1.  All existing privileges heretofore enjoyed by the employees in accordance with the following Industrial Relations Plans and Practices of the Company shall continue, **subject to the provisions of such Plans and to such rules, regulations and interpretations as existed prior to the signing of this Agreement , and to such modifications thereof as may be hereafter adopted generally by the Company to govern such privileges**; provided, however, that as long as any one of these Company Plans and Practices is in effect within the Company, it shall not be withdrawn from the employees covered by this Agreement; and provided, further, that any change in the Industrial Relations Plans and Practices which has the effect of reducing or terminating benefits will not be made effective until one (1) year after notice to the Union by the Plant of such change:

Edgemoor CBA, Art. IX (emphasis added). Of the six benefit plans at issue in this case, only the DuPont Pension and Retirement Plan ("Pension Plan") (Anderson Decl. Exh. E) and the Savings and Investment Plan ("SIP") (Anderson Decl. Exh. B) are specifically listed as plans subject to Section 1.

The IRP&P provision further provides:

Section 3 . In addition to receiving benefits pursuant to the Plans set forth in Section 1 above, employees shall also receive benefits as provided by the Company's Beneflex Benefits Plan, **subject to all terms and conditions of said Plan**.

*Id.*, Art. IX (emphasis added). Of the six benefit plans at issue in this case, only the BeneFlex Employee Life Insurance Plan ("Life Insurance Plan") (Anderson Decl. Exh. F) and BeneFlex Vacation Buying Plan ("Vacation Buying Plan") (Anderson Decl. Exh. H) are covered by this section. *Id.*; *see also* BeneFlex Flexible Benefits Plan (Anderson Decl. Exh. P). The remaining benefit plans at issue in this case, the Medical Care Assistance Program ("MEDCAP") (Anderson Decl. Exh. L) and the Dental Assistance Plan ("Dental Plan") (Anderson Decl. Exh. N), are neither identified in the IRP&P provision nor otherwise referenced in the Edgemoor CBA. *See* Edgemoor CBA.

The Edgemoor CBA contains an arbitration provision, which provides in pertinent part:

Section 1.  Any question as to the interpretation, or any alleged violation, of any provision of this Agreement, as defined in Section 3 of Article III, which is not otherwise settled to the mutual satisfaction of the parties hereto, at the request of either party, shall be submitted to arbitration in the manner provided in Section 2 of this Article.

Edgemoor CBA, Art. VII.

## III.    DuPont's Employee Benefit Plans

DuPont maintains more than a dozen nation-wide benefit plans for its U.S. employees, retirees and their eligible dependants.  Anderson Dec. ¶ 6.  Six of these plans are at issue in this case – SIP, the Pension Plan, the Life Insurance Plan, MEDCAP, the Dental Plan, and the Vacation Buying Plan.[3]  Each of these plans applies to all U.S. employees and/or pensioners and their dependents, both union and non-union alike, who meet the specific eligibility requirements of each of the plans.  *Id.* ¶¶ 7-10, 12-13.0[4]

---

[3]    DuPont also maintains a Vacation Plan that provides employees with annual vacation benefits. Anderson Decl. ¶ 11 & Exh. J.  DuPont amended the Vacation Plan at the same time as the six plans identified above.  The Vacation Plan is not at issue in this case.  Unlike the other plans at issue here, the Vacation Plan does not contain a dispute resolution mechanism that provides for a final and binding decision.  Accordingly, DuPont has agreed to arbitrate disputes involving benefits under the Vacation Plan.  Anderson Decl. Exh U.

[4]    Virtually all active DuPont employees receive medical benefits under DuPont's BeneFlex Medical Care Plan, which is separate and distinct from MEDCAP. Anderson Decl. ¶ 14-15. Similarly, virtually all active DuPont employees receive employee dental benefits under DuPont's BeneFlex Dental Care Plan, which is separate and distinct from the Dental Plan.  *Id.* There are no active employees at Edgemoor who currently participate in either MEDCAP or the Dental Plan.  *Id.* at ¶ 15.

5

DuPont serves as the Plan Administrator for each of these six plans, with the exception of the Pension Plan. Anderson Decl. ¶ 3; SIP, Art. XIX(1); Life Insurance Plan at 10; Vacation Buying Plan, Art. XI; MEDCAP, Art. XIX; Dental Plan, Art. XIII. The Pension Plan is administered by a Board of Benefits and Pensions, the members of which are appointed by DuPont. *Id.* ¶ 3; Pension Plan, Art. II. DuPont or its designees are responsible for making benefit eligibility decisions with respect to each of the plans. SIP, Art. XIX(1); Pension Plan, Art. II; Life Insurance Plan at 10; Vacation Buying Plan, Art. XI; MEDCAP, Art. XIX; Dental Plan, Art. XIII. The terms of each plan grant the Plan Administrator, acting as an Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") fiduciary, the sole right and discretion to interpret the terms of the plans and to make final benefit eligibility determinations under the plans, consistent with the terms of the plans, and any amendments thereto. For example, Article XIX.1 (d) of the SIP Plan Document specifically states:

> The Company retains the discretionary authority to determine eligibility for benefits hereunder and to construe the terms and conditions of the Plan. The decision of the Company shall be final with respect to any questions arising as to the interpretation of this Plan.

*See SIP* at 39-40. A similar provision is contained in the SIP Summary Plan Description ("SPD"), which provides in pertinent part: "E.I. du Pont de Nemours and Company, as Plan Administrator, has full discretion and authority to interpret Plan provisions, resolve any ambiguities and evaluate claims. The Company's decisions are final and binding." *See* SIP SPD at 26 (Anderson Decl. Exh. C). The Plan Documents and related SPDs for each of the other benefit plans at issue contain similar, if not identical, provisions. Anderson Decl. Exhs. B-O.

Consistent with ERISA requirements, the SPDs for each of the plans described above contain a dispute resolution procedure for participants and beneficiaries to appeal the Plan Administrator's decisions concerning interpretations and applications of the plan relating to

eligibility for benefits under the plan. Pension Plan SPD at 29; SIP SPD at 26; MEDCAP SPD at

41-42; Life Insurance Plan SPD at 7; Dental Plan SPD at 18-20; Vacation Buying Plan SPD at 5.

Each of the SPDs further specifies that those participants whose claims are denied in whole or in

part may file suit in a state or federal court to vindicate their rights pursuant to Section

502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B). Pension Plan SPD at 28; SIP SPD at 25;

MEDCAP SPD at 48; Life Insurance Plan SPD at 12; Dental Plan SPD at 24; Vacation Buying

Plan SPD at 6-7.

## IV.    The Amendment of DuPont's Benefit Plans

DuPont Senior Vice President Jim Borel issued an announcement, on August 28, 2006,

directed to all U.S. employees, stating that DuPont planned to make certain changes to its

employee benefit offerings. Anderson Decl. Exh. Q ("August 2006 announcement"). As set

forth below, DuPont effectuated these plan modifications by amending each of the plans on

December 20, 2006. Anderson Decl. ¶ 17 & Exhs. R(1), R(2). The plan amendments apply to

all U.S. DuPont employees and former employees and their eligible dependents, including

individuals represented by the Union. Anderson Decl. ¶ 17.

While no individual has filed a claim for benefits that has been denied under the terms of

the plans, in the time since the plans have been amended or adopted (in the case of the

Retirement Savings Plan ("RSP"), which is explained *infra*), DuPont has made a number of

decisions regarding plan eligibility and has communicated these decisions, as well as additional

information regarding plan coverage and participation, to both active and new employees.

Further, DuPont is currently actively administering the plans and paying claims, as appropriate,

under the plans' terms, as amended or adopted (in the case of the RSP). *Id.* ¶ 29. For example,

DuPont has paid out 401k distributions, as appropriate, under the amended SIP. *Id.* DuPont has

also taken a number of steps to implement the recent plan amendments after they were announced, such as issuing various communications to both active and new employees regarding the new eligibility rules for the various plans. DuPont also undertook a number of additional plan administration activities associated with implementing and maintaining the benefit changes, such as providing modeling tools to enable employees to project the effects of the changes on their personal retirement plans. *Id.* ¶ 28.

### A.    Pension and Retirement Plan Amendment

DuPont amended the Pension Plan to provide benefits only for employees who were hired on or before December 31, 2006. As a result, new hires are no longer eligible to participate in the Pension Plan.[5] Anderson Decl. Exh. R(1).

### B.    Savings and Investment Plan Amendment

DuPont adopted a new Retirement Savings Plan ("RSP") to provide enhanced benefits for new hires to compensate them for not being eligible to participate in the Pension Plan. Under the new RSP, employees hired on or after January 1, 2007 are eligible to receive a DuPont contribution to their RSP accounts equal to 3% of earnings. They are also eligible to contribute

---

[5]    The August 2006 announcement also provided that the rules for calculating service credits under the Pension Plan would be modified to provide that beginning on January 1, 2008, service credits for employees hired prior to January 1, 2007 will be calculated at one-third of the pre-existing rate. It also stated that the company-paid survivor benefit will not continue to grow with service or pay on or after January 1, 2008. Anderson Decl. Exh. Q. Both the service credit calculation and survivor benefit levels remain unchanged for all of calendar year 2007. The reduction in benefits does not affect the terms and conditions of employment for existing employees until January 1, 2008 -- more than a year after the August 2006 announcement. The Pension Plan has not yet been restated to incorporate the 2008 changes to the service credit calculation and survivor benefit, but DuPont has nonetheless informed employees of these future reductions, as mandated by ERISA section 104(b) the implementing regulations found at 29 CFR 2520.104b-3. Anderson Decl. ¶ 20.

up to 100% of their earnings to their RSP accounts, with DuPont making a matching contribution of 100% of that amount up to 6% of pay.  Anderson Decl. Exh. R(2).

DuPont also amended the SIP to exclude employees hired on or after January 1, 2007 from participation in the plan.  These modifications will have no impact during 2007 upon employees who were hired prior to January 1, 2007.  Those employees remain eligible for SIP benefits at the preexisting level for 2007 (i.e., they can contribute up to 100% of their earnings to the SIP, and the Company will match 50% of that contribution up to 3% of pay).  SIP, Art. V. Starting in 2008, however, employees hired before January 1, 2007 will become eligible for the enhanced benefits on the same terms as those offered to new hires during 2007.  Anderson Decl. Exh. R(2).

### C.     MEDCAP Amendment

DuPont amended MEDCAP to exclude employees hired on or after January 1, 2007 from participation in the plan.  Anderson Decl. Exh. R(1).  This modification does not affect medical benefits for active Union-represented employees, all of whom receive their medical benefits under the separate BeneFlex Medical Care Plan.  Anderson Decl. ¶ 23.  The change also has no effect on retiree medical benefits for employees hired prior to January 1, 2007. The change only affects retiree medical benefits for future-hires (i.e., those employed or reemployed on or after January 1, 2007).  *Id.*

### D.     Dental Plan Amendment

DuPont amended the Dental Plan to exclude employees hired on or after January 1, 2007 from participation in the plan.  Anderson Decl. Exh. R(1).  The effect of this modification mirrors that of the modification to MEDCAP.  It has no practical effect on dental benefits for active Union represented employees, either existing or new hires, because

those employees receive dental coverage under BeneFlex Dental Care Plan. The only effect of the change is on future retiree dental benefits for employees hired on or after January 1, 2007. *Id.* 24.

### E.    Life Insurance Plan Amendment

DuPont amended the Life Insurance Plan to provide that employees hired on or after January 1, 2007 are not eligible to receive a DuPont subsidy for retiree life insurance under the Company's group life insurance plan. Anderson Decl. Exh. R(1). As with MEDCAP and the Dental Plan, this change has no practical effect upon new hires until they reach retirement status. Anderson Decl. ¶ 25.

### F.    Vacation Buying Plan Amendment

DuPont amended the Vacation Buying Plan to permit employees hired on or after January 1, 2007 to participate in the Vacation Buying Plan only during their first 10 years of employment. Anderson Decl. Exh. R(1). This change had no impact on existing employees and, by definition, had no effect on the terms and conditions of employment of new hires for at least a decade. Anderson Decl. ¶ 26.

## V.    Local 4-786's Grievance and Related Disputes

On September 14, 2006, Local 4-786 filed a grievance claiming that the planned amendments to these employee benefits plans violated the Edgemoor CBA. Anderson Decl. ¶ 31; Anderson Decl. S. This grievance was subsequently amended, and the amended grievance specifically alleges, *inter alia*:

> With respect to actives, the application to such persons of the changes in the Pension and Retirement Plan and Savings and Investment Plan, effective January 1, 2008, violates Article VII, Section 1 of the Collective Bargaining Agreement because such changes are not permitted "modifications" within the meaning of that article and section. With respect to new hires hired on or after January 1,

10

2007, the withdrawal, effective January 1, 2007, of the Pension and Retirement Plan, the current terms of the Vacation Plan, and the retiree life insurance subsidy violate Article VII, Section 1 on two Independent and sufficient grounds. First, these announced changes violate Article VII, Section 1, because such changes are not permitted "modifications" within the meaning of that Article and Section. Second, these announced changes involved "Company Plans and Practices" within the meaning of Article VII, Section 1 and their withdrawal from employees covered by this agreement, on and after January 1, 2007, violates Article VII, Section 1 because such Plans and Practices remain "in effect within the Company." In addition, with respect to new hires hired on or after January 1, 2007, the withdrawal of the subsidies for retiree health care (medical and dental) violates Article XVI of the Collective Bargaining Agreement.

Anderson Decl. Exh. T.

Following review of the grievance, DuPont informed Local 4-786, on January 25, 2007, that it considered the grievance to raise a dispute regarding Union members' eligibility for benefits under the ERISA plans at issue. *See* Anderson Decl., Exh. U ("We consider the grievance to invoke a dispute, on behalf of members of your bargaining unit and/or other individuals who are or have been employed at the facility, as to whether those individuals are eligible for certain benefits under the terms of various employee benefit plans sponsored by DuPont."). Because all such disputes must be resolved exclusively through the claims procedures set forth in the plans or through a civil enforcement action under Section 502 of ERISA, DuPont informed the Union that it would not arbitrate the grievance. *See id.* DuPont further advised the Union that if any members desired to pursue a claim for benefits, "he/she should follow the claim procedures as detailed in the Summary Plan Description for each of the respective plans." *Id.* In addition, DuPont has refused to arbitrate those portions of the grievance relating to MEDCAP and the Dental Plan because those plans are not covered by the Edgemoor CBA in the first instance. Anderson Decl. Exh. V.

Local 4-786's grievance is not the only dispute arising from the August 2006 announcement. Unions representing employees at other facilities operated by DuPont and

DuPont Performance Elastomers, LLC ("DPE"),[6] a DuPont affiliate, have filed five grievances over precisely the same benefit plan eligibility issues presented here.[7] Declaration of Jennifer Knight, Exhs. A-G.[8] All of these grievances are virtually identical, involve the very same conduct, and claim a violation of collective bargaining agreements containing provisions that are strikingly similar to the provisions contained in the Edgemoor CBA. *Id.* DuPont has refused to arbitrate those grievances for the same reasons that it has refused to arbitrate the Edgemoor grievance. In response, the USW and/or its local affiliates have filed two similar actions in federal district courts in New Jersey and New York, including an action against DPE, seeking to compel arbitration. C.A. No. 1:07-cv-00965-RBK-JS (D.N.J.); C.A. No. 1:07-cv-01005-RBK-JS (D.N.J.); C. A. No. 07-CV-0122 S(F) (W.D.N.Y.). DuPont filed suit against ARWI in the United States District Court for the Eastern District of Virginia seeking, *inter alia*, a declaratory judgment that ARWI's grievance is not arbitrable. C.A. No. 3:07cv52 (E.D. Va.). ARWI filed a counterclaim seeking to compel DuPont to arbitrate its grievance.

In addition, on December 27, 2006, the Union filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") alleging that DuPont violated Sections 8(a)(1)

---

[6]    Employees of DPE are eligible to participate in the six benefit plans at issue in this case and are impacted in the same manner by the benefit plan changes as Union-represented employees at Chambers Works. Anderson Decl. ¶ 34.

[7]    The Ampthill Rayon Workers, Inc. ("ARWI") has filed a similar grievance at DuPont's Spruance facility, located in Richmond, Virginia. In addition, the USW and/or various of its local union affiliates other than Local 4-786 have filed grievances at DuPont's Chambers Works Plant in New Jersey, Niagara Falls plant in New York, and Louisville plant in Kentucky, as well against DPE at DPE's Chambers Works site. Similarly, the International Brotherhood of DuPont Workers ("IBDW") filed a grievance regarding the August 2006 announcement on behalf of employees working at DuPont's Marshall Labs facility.

[8]    The Declaration of Jennifer Knight is being filed contemporaneously herewith and will be cited as "Knight Decl. ¶ __."

and (5) of the Labor Management Relations Act, 29 U.S.C. 151 *et seq.* ("LMRA") by

announcing the plan amendments described above. Knight Decl. Exh. L.  Other unions

representing DuPont and DPE employees have filed eight additional unfair labor practice

charges, all of which are virtually identical to the Union's charge.[9]  Knight Decl. Exh. H-R.

---

[9]    These charges have been filed in four NLRB regional offices.  The charges are currently consolidated in NLRB Region 9 in Cincinnati, which is processing the charges.  Knight Decl. ¶ 20.

## ARGUMENT

### I.    The Standard For Summary Judgment.

To prevail on a summary judgment motion, the moving party must demonstrate that there

is no genuine issue as to any material fact and that it is entitled to judgment as matter of law.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed.R.Civ.P. 56(c)); *Saldana v. Kmart*

*Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).   Only factual disputes that materially affect the

outcome of the case preclude entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  The Supreme Court has explained that: "if the evidence is merely

colorable . . . or is not sufficiently probative . . . summary judgment may be granted . . . [T]he

mere existence of a scintilla of evidence in support of [a party's] position will be insufficient;

there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

Thus, parties against whom summary judgment is sought cannot create a genuine issue of fact

through mere speculation. *Saldana*, 260 F.3d at 234.

### II.    DuPont Is Entitled To Summary Judgment on the Union's Complaint Because the Disputes Raised In The Grievance Are Excluded From Arbitration

#### A.    An Employer is Obligated to Arbitrate a Particular Dispute Only if the Court Determines that the Parties Agreed to Resolve the Dispute through Arbitration

It is axiomatic that "arbitration is a matter of contract and a party cannot be required to

submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v.*

*Communications Workers of Am.*, 475 U.S. 643, 648-49 (1986).  Whether a particular dispute is

within the scope of a contractual arbitration clause "is undeniably an issue for judicial

determination*." Id.* at 649; *see also United Steelworkers of Am. v. Warrior & Gulf Navigation*

*Co.*, 363 U.S. 574, 582 (1960); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 546-47

(1964); *Gen. Drivers, Warehousemen & Helpers Local Union No. 509 v. Ethyl,* 68 F.3d 80, 83

14

(4th Cir. 1995). Where a collective bargaining agreement contains an arbitration clause, a presumption of arbitrability arises. *See AT&T*, 475 U.S. at 650. However, that presumption is applied only where the "the arbitration clause is clearly broad or ambiguous. . . . If the clause is not ambiguous and clearly delimits the issues subject to arbitration, the presumption of arbitrability does not apply." *Local 827, Int'l. B'hood of Elec. Workers, AFL-CIO v. Verizon New Jersey, Inc.*, 458 F.3d 305, 311 (3d Cir. 2006). "The party contesting the presumption of arbitrability bears the burden of producing 'strong and forceful' evidence of an intention to exclude the matter from arbitration." *United Steelworkers of Am., AFL-CIO-CLC v. Lukens Steel Co., Div. of Lukens, Inc.*, 969 F.2d 1468, 1475 (3d Cir. 1992).

Parties to a collective bargaining agreement can agree to exclude certain subjects from resolution through arbitration. "An employer . . . is not required to arbitrate a grievance that is not within the scope of the arbitration clause." *Int'l Ass'n. of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. Gen. Elec. Co.*, 865 F.2d 902, 904 (7th Cir. 1989) (employer had no duty to arbitrate a grievance over work assignments, one of several subjects excluded from arbitration).[10] The limitations the parties have imposed may be explicit – such as where the clause is limited to certain specific disputes arising under an agreement. *See, e.g., Verizon New Jersey*, 458 F.3d 305 (arbitration provision listed five specific subjects subject to arbitration). *Accord Gen. Elec.*, 865 F.2d at 904-06. The limitations may also be implicit – such as where the parties have agreed to other alternative dispute resolution procedures. *United Steelworkers v.*

---

[10]     *See also Chicago Dist. Council of Carpenters Pension Fund v. K & I Const., Inc.*, 270 F.3d 1060, 1070 (7th Cir. 2001) (employer had no duty to arbitrate disputes regarding trust fund contributions where contract did not cover those disputes); *Office of Comm'r of Baseball v. World Umpires Ass'n*, 242 F. Supp. 2d 380, 386-87 (S.D.N.Y. 2003) (dispute concerning disciplinary warning was not arbitrable under CBA where arbitration provision excluded disputes involving discipline).

*Commonwealth Aluminum Corp.*, 162 F.3d 447, 451 (6th Cir. 1998); *Int'l Ass'n of Machinists v. Waukeshau Engine Div., Dresser Indus. , Inc.*, 17 F.3d 196, 198 (7th Cir. 1994); *Local 4-449, Oil, Chemical and Atomic Workers v. Amoco Chem. Corp.*, 589 F.2d 162, 164 (5th Cir. 1979); *PDG Chem., Inc. v. Oil, Chem. & Atomic Workers Int'l Union*, 164 F. Supp. 2d 856, 864 (E.D. Tex. 2001); *see also AT&T*, 475 U.S. at 650 (where there is no express exclusion from arbitration, "forceful evidence" evincing an intent to exclude a claim from arbitration overcame the presumption of arbitrability).

The arbitration clause in the Edgemoor CBA mandates arbitration only of those disputes "relating to the interpretation or to any alleged violation of [the Edgemoor CBA]". Edgemoor CBA, Art. XI, Sec. 1. This provision plainly does not encompass all disputes between the Union and DuPont, irrespective of their provenance. *See E.I. du Pont de Nemours & Co., Inc., v. Martinsville Nylon Employees' Council Corp.*, 78 F.3d 578 (Table) (4th Cir. 1996) (where clause mandated arbitration of "[a]ny question as to the interpretation of this Agreement or as to any alleged violation of any provision of this Agreement," employer was not required to arbitrate dispute regarding reward program not governed by collective bargaining agreement); *Gen. Elec.*, 865 F.2d at 904-06 (employer not required to arbitrate work assignment dispute that was outside the scope of arbitration clause). *Cf., e.g., Brayman Const. Corp. v. Home Ins. Co.*, 319 F.3d 622 (3rd Cir. 2003) (broad provision required arbitration of "any dispute. . . between the Company and Insured with reference to the interpretation of [Agreement], or their rights with respect to any transaction involved."); *Battaglia v. McKendry*, 233 F.3d 720, 727 (3rd Cir. 2000) (broad clauses required arbitration of disputes "arising under" or "arising out of agreement"); *Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 115 (4th Cir. 1993) (clause mandated arbitration of "any dispute aris[ing] between the parties").

In any case, the Court must make an initial determination whether the specific disputes presented by the grievance are within the scope of this arbitration clause. *See, e.g., AT&T Techs.*, 475 U.S. at 649. As explained below, they are not, both because certain of the plans at issue are not even referenced in the Edgemoor CBA and because the remainder of the grievance implicates benefit plan disputes that the parties have agreed to resolve exclusively through the dispute resolution provisions of the underlying benefit plans, which give DuPont absolute discretion to interpret the plans and to make final benefit eligibility determinations, rather than through arbitration. *See Commonwealth Aluminum*, 162 F.3d at 451; *Waukeshau Engine Div.*, 17 F.3d at 198; *Amoco Chem.*, 589 F.2d at 164; *PDG Chem.*, 164 F. Supp. 2d at 864.

**B.    The Disputes Raised in the Grievance Are Excluded from the Scope of the Arbitration Clause in the Edgemoor CBA**

**1.    Disputes Regarding MEDCAP and the Dental Plan Are Outside the Arbitration Clause Because Neither Plan is Covered by the Edgemoor CBA**

The Edgemoor CBA contains no mention of MEDCAP or the Dental Plan. *See generally* Edgemoor CBA. By contrast, the IRP&P provision of the Edgemoor CBA specifically lists those benefit plans which are within the Agreement's scope. *See id.*, Art. IX. The parties knew how to include particular benefits plans within the scope of the agreement, but did not do so with respect to MEDCAP or the Dental Plan. The arbitration provision contained in the Edgemoor CBA extends only to those questions "relating to the interpretation or to any alleged violation of [the Edgemoor CBA]". *Id.*, Art. XI, Sec. 1. Disputes regarding plans that are not part of the collective bargaining agreement cannot raise questions regarding the interpretation of that agreement, nor can they be the basis for an allegation for breach of that agreement. Further, the absence of express language pertaining to specific plans in each of these agreements, when viewed against the delineation of other plans in the agreement, provides forceful evidence of an

intent to exclude from the scope of the agreement (including the arbitration clause) those plans

not specifically listed. *See, e.g., Martinsville*, 78 F.3d 578 (Table); *see also Gen Elec.*, 531 F.2d

at 1184 (dispute regarding transfer of work was not arbitrable where parties "'specifically

agreed' that transfer of work shall be excluded from arbitration."); *AT&T Techs., Inc.*, 475 U.S.

at 648-49.  Because DuPont has provided forceful evidence that these provisions are outside the

scope of the arbitration clause, even if this clause is viewed as broad, DuPont is entitled to

summary judgment finding that this aspect of the grievance is not arbitrable.[11]

### 2.    The Remainder of the Grievance Raises Issues That Are Excluded from the Parties' Arbitration Clause

An employer has no duty to arbitrate a grievance raising a dispute that falls within the

scope of a dispute resolution mechanism contained in an ERISA benefit plan that is merely

referenced in a collective bargaining agreement.[12] *PDG Chem.,* 164 F. Supp. 2d at 864

("inclusion of the language in the plan that the company will have exclusive control over the plan

and that interpretation of the terms and conditions of the plan will be in the sole discretion of the

[plan administrator], obviously excludes from arbitration disputes concerning the [ERISA benefit

plans]"); *Amoco Chem.*, 589 F.2d at 164 (dispute regarding payment of sick benefits under

---

[11]    This exclusion does not leave the Union without a remedy.  As noted above, the Union is already pursuing such remedies, having filed an unfair labor practice charge with the NLRB alleging that the plan amendments constitute unlawful unilateral changes under the LMRA.  The NLRB has the power to afford the Union the remedy that it seeks, if it were to determine that the charge is meritorious.  DuPont, of course, disagrees with that assertion, and is actively defending against those allegations.

[12]    An exception to this rule, not present here, applies where the plan documents provide for resolution of the dispute through the collective bargaining agreement arbitration provision.  The Department of Labor has issued regulations on this specific point.  *See infra* Section II.B.2.b.

ERISA plan was not arbitrable where CBA stated that benefits would be paid under the terms of the plan and plan document reserved to board of directors of company the right to interpret and apply plan and provided that decision of board would be final); *see also Waukesha Engine Div.*, 17 F.3d at 198-99 (dispute regarding claim for benefits under ERISA plan is not arbitrable).

This precise situation exists here. The IRP&P provision of the Edgemoor CBA explicitly makes the DuPont benefit plans available to Union-represented employees "subject to the provisions of" the Pension Plan and SIP and "subject to all terms and conditions of" the Life Insurance Plan and Vacation Buying Plan. Edgemoor CBA, Art. IX. The "provisions" and "terms and conditions" of the benefit plans at issue here include dispute resolution procedures that make the particular Plan Administrator's decisions on eligibility and benefit claims "final and binding." *See* Pension Plan SPD at 28-29; SIP SPD at 26; Life Insurance Plan SPD at 6-7; Vacation Buying Plan SPD at 4-5. The existence of such language compels the conclusion that benefits disputes like those presented here are excluded from arbitration and must be addressed in the plans' claims procedures because "the incorporation of the claims review procedure, which expressly provides that the decisions of the Plan Administrator will be final and binding on all interested parties, expresses an intention to exclude from arbitration all benefits disputes which are within the Administrator's authority." *Commonwealth Aluminum*, 162 F.3d at 451. As explained below, because these dispute resolution procedures are the exclusive means of resolving the eligibility dispute presented by the Edgemoor grievance, the evidence presented leads to one conclusion – that the disputes are outside the scope of the arbitration provision. The Company thus has no duty to arbitrate the grievance.

a.    **Each Remaining Benefit Plan at issue is
Referenced in the CBA, Specifies the
Authority of the Plan Fiduciary, and
Contains a Binding Dispute Resolution
Mechanism**

It is undisputed that the IRP&P provision of the Edgemoor CBA refers to the remaining

benefit plans at issue. *See* Section IV, *infra.* It is likewise undisputed that the benefits provided

pursuant to those plans are provided "subject to the provisions of such Plans and Practices," (in

the case of the Pension Plan and SIP) and "subject to all terms and conditions of said Plan" (in

the case of the Life Insurance Plan and the Vacation Plan), including the dispute resolution

mechanisms contained in each plan. Edgemoor CBA, Art. IX. An examination of the terms of

the plans, including the dispute resolution mechanism of each, and of the grievance reveals that

the grievance raises issues that are to be determined exclusively under the dispute resolution

provisions of these plans.

First, each of the plans identifies the responsible plan fiduciaries. Anderson Aff. ¶3;

Pension Plan, Art. II; SIP, Art. XIX(1); Life Insurance Plan at 10; Vacation Buying Plan, Art.

XI. Second, each of the plans vests the specified plan administrator with authority to determine

eligibility for plan benefits and to construe the terms of the plan. *See* Pension Plan, Art. II; SIP,

Art. XIX, Sec. 1(d); Life Insurance Plan at 10; Vacation Buying Plan, Art. XI. Each plan's SPD

likewise provides that the plan administrator has sole authority to construe the plan and

determine eligibility for benefits, and provides that the plan administrator's decisions regarding

plan interpretation are final. Pension Plan SPD at 29; SIP SPD at 26; Life Insurance Plan SPD at

7; Vacation Buying Plan SPD at 5. Each of the plan SPDs also describes the process by which

an individual can appeal any denial of a claim for benefits under the plan and provides that

decisions rendered under these procedures are final and binding. *See* Pension Plan SPD at 28-29;

SIP SPD at 26; Life Insurance Plan SPD at 6-7; Vacation Buying Plan SPD at 4-5. All of the

SPDs further advise individuals of their right to file suit in federal or state court if they disagree with these final decisions. *See* Pension Plan SPD at 28-29; SIP SPD at 25; Life Insurance Plan SPD at 11-12; Vacation Buying Plan SPD at 6-7.   None of the plans or the SPDs contain any mention of the arbitration provision in the Edgemoor CBA.

Since the August 2006 announcement, DuPont has taken various steps in its capacity as a fiduciary to implement the plan amendments summarized above.   DuPont has made a number of decisions regarding plan eligibility and has communicated these decisions, as well as additional information regarding plan coverage and participation, to both active and new employees. Anderson Decl. ¶ 29.  For example, DuPont has issued certain communications to employees regarding their eligibility to participate in the various plans.  *Id.* ¶ 28.  If these communications were misleading, they could be challenged as a breach of ERISA's fiduciary rules.  *See, e.g., Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226 (3d Cir. 1994); *Estate of Becker v. Eastman Kodak Co.,* 120 F.3d 5 (2d Cir. 1997); *Berlin v. Mich. Bell Tel. Co.,* 858 F.2d 1154 (6th Cir. 1988).  DuPont also undertook a number of additional plan administration activities associated with implementing and maintaining the plan amendments, such as providing modeling tools to enable employees to project the effects of the changes on their personal retirement plans. Anderson Decl. ¶ 28.  Further, DuPont is actively administering the plans and paying claims, as appropriate, under the plans' amended terms.  *Id.* ¶ 29.  For example, DuPont has paid out 401k distributions, as appropriate, under the amended SIP.  *Id.*

These plan administration activities, as well as similar decisions that will inevitably be made in the future (i.e., processing claims for benefits), involve the exercise of discretion in making eligibility decisions and administering the plan and thereby implicate ERISA's fiduciary duty rules.  *See, e.g., Varity Corp. v. Howe*, 516 U.S. 489 (1996) (company was acting in a

fiduciary capacity when it made certain representations regarding benefits under ERISA plan); *Peralta v. Hispanic Bus. Inc.*, 419 F.3d 1064, 1071-72 (9th Cir. 2005) (ERISA's fiduciary duty rules apply to the communication of operative plan terms to plan participants); *Martinez v. Schlumberger, Ltd*, 338 F.3d 407, 424-25 (5th Cir. 2003) (when an employer chooses to communicate with plan participants regarding future plan benefits, it does so as a fiduciary); *In re Reliant Energy ERISA Litig.*, 36 Emp. Ben. Cases [BNA] 2648, 2651 (S.D. Tex. 2006) (communications made in connection with plan administration and management are fiduciary in nature) (attached as Exh. 1); *Wachtel v. Guardian Life Ins. Co.*, 38 Emp. Ben. Cases [BNA] 1867, 1873 (D.N.J. 2006) *vacated and remanded on other grounds sub. nom. by Wachtel v. Health Net, Inc.*, -- F.3d --, 2007 WL 958572 (3rd Cir. 2007) (determination of cost basis for plan claims administration, and communication of that basis to plan participants, is subject to ERISA's fiduciary duty rules) (attached as Exh. 2); *Weiss v. CIGNA Healthcare Inc.*, 972 F. Supp. 748, 751-52 (S.D.N.Y. 1997) (control over communication of medical information in connection with participant claims is sufficient to result in fiduciary status).

Local 4-786's grievance specifically implicates the application of the plan changes to certain employees and thus raises matters exclusively within the province of the plan administrator. *See* Anderson Decl. Exh. T (grieving, *inter alia*, "the *application* to [active employees] of the changes in the Pension and Retirement Plan and Savings and Investment Plan"). Further, the grievance effectively requests an arbitrator to make determinations as to eligibility for particular plan benefits. *See id.* (grieving, *inter alia*, "the *withdrawal* [from new hires]. . . of the Pension and Retirement Plan, the current terms of the Vacation Plan, and the retiree life insurance"; and "the *withdrawal* of the subsidies for retiree health care") (emphasis added). Because these specific elements of the grievance also contain conclusions regarding the

eligibility of certain classes of employees for benefits under the plan provisions, the grievance

necessarily implicates questions of plan interpretation. *Id.* To the extent that the grievance also

raises issues regarding DuPont's authority to implement benefit plan changes, such issues are

inextricably intertwined with the benefit eligibility and plan interpretation questions, thereby

implicating DuPont's status and obligations under ERISA as a plan fiduciary.[13]

Moreover, the grievance raises disputes that are exclusively within the plan

administrator's "final and binding" authority. *See* Pension Plan SPD at 28-29; SIP SPD at 26;

Life Insurance Plan SPD at 6-7; Vacation Buying Plan SPD at 4-5. The grievance thus seeks to

circumvent the plan administrators' authority -- which the Union has agreed is "final and

binding" -- by improperly seeking to have these disputes resolved by an arbitrator. Accordingly,

the grievance is not arbitrable. *See PDG Chem.*, 164 F. Supp. 2d at 864; *Commonwealth*

*Aluminum*, 162 F.3d at 451 ("We find that the incorporation of the claims review procedure,

---

[13] Any suggestion by the Union that these activities involve the exercise of so-called "settlor functions" excluded from the scope of ERISA's fiduciary duty rules is without merit. *See, e.g., Varity*, 516 U.S. at 503 (even where reasonable employees might consider that an employer was acting as both settlor and fiduciary, communication regarding benefit issues was fiduciary action subject to ERISA); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F. 3d 76, 87-88 (2d Cir. 2001) (employer's communication of benefit changes to participants where validity of such changes was in doubt was a fiduciary activity); *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 84 (2d Cir. 2001) (any communications from employer to plan participants about future benefits is a fiduciary function); *Hockett v. Sun Co. Inc.*, 109 F.3d 1515, 1522 (10th Cir. 1997) (where plan amendment regarding benefit terms has been adopted or given serious consideration, communication of such change in benefits is a fiduciary function); *Wachtel*, 38 Emp. Ben. Cases [BNA] at 1873 (where communication to participants reflects plan administrative activities, it is a fiduciary function); *Hampton v. Henry Ford Health Sys.* 36 Emp. Ben. Cases [BNA] 2160, 2165-66 (E.D. Mich. 2005) (interpretation of plan terms is fiduciary activity subject to ERISA even where such interpretation was part of plan merger transaction that was not covered by ERISA) (attached as Exh. 3). *Cf. Beck v. PACE Int'l Union*, __ U.S. __, 40 Emp. Ben Cases 2281, 2283 (June 11, 2007) (indicating that even the settlor activity of terminating a plan may not be wholly immune from analysis under the fiduciary provisions of ERISA) (attached as Exh. 4).

which expressly provides that the decisions of the Plan Administrator will be final and binding on all interested parties, expresses an intention to exclude from arbitration all benefit disputes which are within the Administrator's authority"); *Amoco Chem*, 589 F.2d at 164 ("It is apparent from the face of the Agreement and the Plan that problems concerning sickness and disability benefits were intended to be allocated to the Board for final determination. This process, which is expressly constructed by the Agreement and the Plan, sufficiently excludes arbitration for grievances concerning sickness and disability benefits.").

The language in the Edgemoor CBA making benefit eligibility subject to the provisions of the various plans' dispute resolution procedures makes ERISA's civil enforcement provisions the comprehensive, and exclusive, means of resolving these disputes. *Cf. Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985) ("The six carefully integrated civil enforcement provisions found in section 502(a) of the statute as finally enacted . . . provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly."); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1986) (Congress intended ERISA's enforcement scheme to be exclusive as applied to employee benefit plans); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (ERISA establishes uniform standards governing fiduciary activity and establishes exclusive remedies for breaches of such duties). Such language is forceful evidence sufficient to overcome the presumption of arbitrability.

> **b.    DOL Regulations Implementing ERISA Confirm the Exclusion of This Dispute from Arbitration**

The absence of any reference in the plan documents for the ERISA plans at issue to the arbitration provision of the Edgemoor CBA further evinces the parties' intent to exclude this dispute from arbitration. Section 503 of ERISA directs the Department of Labor ("DOL") to develop claims procedures that afford participants with information regarding the manner in

which benefit plan claims denials will be processed, and which provide participants with a right to a full and fair review of their claim by the plan fiduciary. 29 U.S.C. § 1133. In accordance with this mandate, DOL has issued comprehensive regulations governing the processing of claims under ERISA plans, including specific regulations issued in 2003 that establish a mechanism by which the parties could have provided for an arbitration process to resolve the types of plan eligibility disputes presented by the Union grievance. *See* 29 C.F.R. § 2560.503-1(b)(6) (2003). These regulations delineate precise requirements that alternative clams processing procedures must meet in order to comply with ERISA and to supplant the conventional claims processing standards required of ERISA fiduciaries. In the case of a collectively bargained plan, DOL's regulations provide that grievance and arbitration procedures may be used only where the collective bargaining agreement pursuant to which the plan is established or maintained either (1) specifically sets forth such procedures to be used with respect to the plan, or (2) specifically incorporates the plan by reference, thereby subjecting the plan to the collective bargaining agreement's general grievance and arbitration procedures. *Id.*

Neither of these conditions is present in this case. None of the plans incorporates the arbitration provision of the collective bargaining agreement. *See generally*, Anderson Decl. Exhs. B-O. Nor does the Edgemoor CBA specifically incorporate the terms of any of the benefit plans by reference. Rather, the Edgemoor CBA simply requires DuPont to continue to provide benefits under the terms of the plans, subject to certain limitations. *See* Edgemoor CBA, Art. IX. And there is nothing to suggest that the parties ever considered changing their agreement to embrace the alternative suggested by the DOL regulations. In sum, the parties' failure to implement the alternative procedures as provided in DOL's regulations further provides forceful

evidence that the parties did not intend to have the disputes presented by the grievance resolved through the arbitration provision in the Edgemoor CBA.

### 2.    Permitting Arbitration of the Grievance Would Cause Untenable Results

Allowing an arbitration regarding the interpretation and application of benefit plans' eligibility provisions would be inconsistent with the express language in the various plans that the Plan Administrator's decisions on the disputes raised by the Union grievance are "final and binding." It would also impermissibly interject an arbitrator into the fiduciary benefit adjudication process, in contravention of the written terms of the plan and in violation of ERISA. The Union is thus effectively asking this Court to rewrite the Edgemoor CBA and the various benefit plans to give an arbitrator the authority to overrule the Plan Administrators' authority to make "final and binding" determinations of the issues presented by the Union grievance.[14]

Such outcomes would undermine the legislatively-mandated scheme for resolving plan eligibility and plan interpretation disputes such as are presented here. In enacting ERISA, one of Congress' primary concerns was that the plan document identify the fiduciary charged with plan administration "so the employees may know who is responsible for operating the plan." Conf. Rpt. No. 93-1280, 93rd Cong., 2d Sess. (August 12, 1974) at 297. Accordingly, ERISA requires that every plan name a fiduciary who has the final authority to control and manage the operation and administration of the plan. ERISA 402(a)(1), 29 USC § 1102(a)(1). This person is the plan administrator. 29 CFR § 2509.75-8, Q&A FR-12. There is no blanket exception in a collective bargaining situation to this requirement to identify a plan fiduciary. ERISA 402(a)(1), 29 USC

---

[14]    This potential mischief is not limited to the Union. The other labor unions that have filed grievances at other DuPont and/or DPE locations seek precisely the same result.

26

1102(a)(1). Further, the only circumstances under which a fiduciary's authority over plan administration may be effectively transferred or delegated to another person or entity is when the plan specifically so provides. ERISA § 402(b)(2), 29 USC § 1102(b)(2); 29 CFR 2509.75-8, Q&A FR-13.

Any arbitrator who decides the grievance would be assuming the role of a plan fiduciary, contrary to the express terms of the plans. DOL has long held that an arbitrator acts as a fiduciary whenever that arbitrator exercises discretionary authority over plan assets or plan administration. *See* DOL Information Letter to Richard Colasurd (March 7, 1984) (attached as Exh. 5); DOL Information Letter to Richard Weitzman (April 22, 1983) (attached as Exh. 6); *see also* DOL Advisory Opinion ("A.O.") 82-42A (August 16, 1982) (arbitrator who had discretionary authority over plan administration acted as fiduciary) (attached as Exh. 7); DOL A.O. 81-50A (June 4, 1981) (arbitrator will become an ERISA fiduciary where the arbitrator's decision would have an "immediate impact on administration of the plan.") (attached as Exh. 8); 29 C.F.R. § 2509.75-9 (individual who performs function described with Section 3(21)(A) of ERISA is a plan fiduciary). None of the ERISA plans at issue here permit fiduciary responsibility to be transferred to an arbitrator. *See, e.g.*, Anderson Decl. Exhs. B-O. Rather, the relevant plan documents identify DuPont or a committee appointed by DuPont as the sole plan fiduciaries. Anderson Aff. ¶3; Pension Plan, Art. II; SIP, Art. XIX(1); Life Insurance Plan at 10; Vacation Buying Plan, Art. XI. Accordingly, permitting an arbitrator to render such a decision would be facially inconsistent with these plan documents and thus contrary to the requirements of ERISA. *See* ERISA § 402(b)(2), 29 USC § 1102(b)(2); 29 CFR § 2509.75-8, Q&A FR-13. In addition, it would conflict with Congress's expressed desire for a single, clearly-identified plan fiduciary. *See* Conf. Rpt. No. 93-1280, 93rd Cong., 2d Sess. (August 12, 1974) at 297.

Inserting numerous arbitrators into fiduciary plan administration process could also result in inconsistent plan interpretations, which is likewise contrary to the requirements of ERISA. This concern is particularly apt in light of the various, virtually identical grievances that have already been filed regarding benefit eligibility and plan interpretation in response to the plan amendments. Each of these grievances presents the exact same question and could be decided by a separate arbitrator, which necessarily increases the chances of inconsistent outcomes with respect to plan interpretation and administration. This, in turn, increases the risk of allegations that the plan is being administered in an arbitrary and capricious manner, in direct violation of ERISA. *See, e.g.*, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

Further, there is the substantial risk that certain (or all) of the arbitrators who hear this dispute could issue decisions that are inconsistent with the terms of the benefits plans. DuPont's ERISA benefit plans are unitary and require that the Company treat all employees, represented or not, in a uniform fashion. ERISA clearly mandates that the plan fiduciaries follow these and all other terms of the plans, without exception. *See, e.g.*, *McGrath v. Auto-Body North Shore Inc.*, 7 F.3d 665, 670 (7th Cir. 1993); *Hunt v. Hawthorne Assoc. Inc.*, 119 F.3d 888, 892 (11th Cir. 1997). However, any or all of the individual arbitrators hearing the various grievances could issue decisions that require DuPont to treat union-represented employees in a special manner, which would be inconsistent with the unitary terms of the various plans. This, in turn, would present DuPont with an impossible dilemma. On the one hand, DuPont could comply with an arbitration decision requiring it to afford union-represented employees special treatment and, in its capacity as plan administrator, thereby be subject to suit for failure to follow the terms of the plans. *See, e.g.*, *McGrath*, 7 F.3d at 670; *Hunt*, 119 F.3d at 892. On the other hand, DuPont could refuse to comply with the arbitrator's decision, administer the plans in accordance with

their unitary terms, and be subject to suit for failure to comply with the arbitrator's award. Both alternatives are obviously unreasonable.

Finally, compelling arbitration of these grievances is unnecessary to resolve the current dispute between DuPont and the Union. Consistent with ERISA's full displacement of remedies in this field, Union-represented employees who disagree with any decisions regarding application of the plan amendments have an alternative for review of those decisions. Specifically, such employees can seek internal review of the decision through the plan's internal procedures pursuant to ERISA Section 503, can seek to clarify their rights under the plan in a suit brought pursuant to ERISA Section 502(a)(1)(B), and can seek injunctive relief to prevent violation of plan terms or ERISA pursuant to Section 502(a)(3). DuPont has already invited employees to pursue these remedies. *See* Anderson Decl. Exh. U. Moreover, to the extent that the Union contends that the amendments themselves violate the Edgemoor CBA, it retains the right to file a suit pursuant to Section 301 of the LRMA. All of these remedies are consistent with ERISA, while the Union's attempts to arbitrate this grievance are not.

## **CONCLUSION**

For the reasons stated above, DuPont respectfully requests that its motion for summary judgment be granted, and that this Court enter an order finding that the Edgemoor grievance is not arbitrable and that DuPont has not breached its contractual obligation to arbitrate the grievance.

POTTER ANDERSON & CORROON LLP

By _____
Kathleen Furey McDonough (#2395)
Sarah E. DiLuzio (#4085)
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
(302) 984-6000
kmcdonough@potteranderson.com
sdiluzio@potteranderson.com

Thomas P. Gies
Kris D. Meade
Jennifer G. Knight
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500

*Attorneys for Defendant E. I. du Pont de Nemours and Company*

Dated: July 23, 2007
808601

30

## CERTIFICATE OF SERVICE

I hereby certify this 23rd day of July, 2007, that the foregoing was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following counsel of record that the document is available for viewing and downloading from CM/ECF:

> Susan E. Kaufman
> HEIMAN, GOUGE & KAUFMAN, LLP
> 800 King Street
> Suite 303
> Wilmington, DE 19801

> /s/ Kathleen Furey McDonough
> Kathleen Furey McDonough (#2395)
> POTTER ANDERSON & CORROON LLP
> 1313 North Market Street
> Hercules Plaza, 6th Floor
> Wilmington, DE 19801
> (302) 984-6000
> kmcdonough@potteranderson.com